1  Michael E. Zeliger (SBN 271118)
   michael.zeliger@klgates.com
2  Ranjini Acharya (SBN 290877)
   ranjini.acharya@klgates.com
3  **K&L GATES LLP**
   620 Hansen Way
4  Palo Alto, California 94304
   Tel: (650) 798-6700
5  Fax: (650) 798-6701

6  Patrick J. McElhinny, *pro hac vice*
   patrick.mcelhinny@klgates.com
7  Mark G. Knedeisen, *pro hac vice*
   mark.knedeisen@klgates.com
8  Christopher M. Verdini, *pro hac vice*
   christopher.verdini@klgates.com
9  Anna Shabalov, *pro hac vice*
   anna.shabalov@klgates.com
10 **K&L Gates LLP**
   K&L Gates Center
11 210 Sixth Avenue
   Pittsburgh, Pennsylvania 15222
12 (412) 355-6500

13 Theodore J. Angelis, *pro hac vice forthcoming*
   theo.angelis@klgates.com
14 **K&L Gates LLP**
   925 Fourth Avenue, Suite 2900
15 Seattle, WA 98104
   (206) 623-7580

16
   *Counsel for Plaintiff*
17 *Carnegie Mellon University*

18              **IN THE UNITED STATES DISTRICT COURT**
             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
19                     **SAN FRANCISCO DIVISION**

20
   CARNEGIE MELLON UNIVERSITY,          )
21                                       )    Case No. 3:18-cv-04571-JD
                  Plaintiff,             )
22                                       )    **PLAINTIFF'S MEMORANDUM OF**
                  v.                     )    **LAW IN OPPOSITION TO**
23                                       )    **DEFENDANTS' MOTION TO DISMISS**
                                         )    **PURSUANT TO F.R.C.P. 12(B)(6)**
24 LSI CORPORATION and AVAGO            )
   TECHNOLOGIES U.S. INC.,              )     Date: November 8, 2018
25                                       )    Time: 10:00 am
                  Defendants.            )    Place: Courtroom 11 – 19th Floor
26                                       )    Hon. James Donato

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     THE ALLEGATIONS OF THE COMPLAINT ........................................... 4

    A.      The Patents ........................................................................................ 4

    B.      The Problem of Media Noise in Magnetic Data Storage ....................... 4

    C.      The Inventions Claimed in the Patents ................................................. 7

    D.      Defendants' Direct Infringement of the Asserted Claims...................... 9

III.    ARGUMENT ............................................................................................... 12

    A.      Legal Standards................................................................................. 12

    B.      CMU Has Adequately Pled that the Exemplary Accused Products Directly
            Infringe the Asserted Claims. ............................................................ 12

    C.      CMU Has Adequately Pled that Defendants' Simulators Directly Infringe
            the Asserted Claims. ......................................................................... 21

    D.      CMU Has Adequately Pled that Defendants Indirectly Infringe the Asserted
            Claims. ............................................................................................ 21

    E.      If the Court Finds that CMU Has Not Adequately Pled its Claims, CMU
            Must Be Given Leave to Amend. ........................................................ 22

IV.     CONCLUSION............................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB Turbo Sys. AG v. Turbousa, Inc.*,
    774 F.3d 979 (Fed. Cir. 2014)..................................................................................................19

*Adelos, Inc. v. Halliburton Co.*,
    CV-16-119-DLC, 2017 WL 3836145 (D. Mont. May 30, 2017) ...................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................................2, 12, 16

*Atlas IP LLC v. Pac. Gas & Elec. Co.*, *Atlas IP LLC v. Pac. Gas & Elec. Co.*,
    15-cv-05469-EDL, 2016 WL 1719545 (N.D. Cal. Mar. 9, 2016) ...................................14

*Avago Techs. Gen. IP (Singapore) PTE Ltd. v. Asustek Computer, Inc.*,
    15-CV-04525-EMC, 2016 WL 1623920 (N.D. Cal. Apr. 25, 2016)......................................14, 20

*Avocet Sports Tech., Inc. v. Garmin Int'l, Inc.*,
    NO. C 11-04049 JW, 2012 WL 2343163 (N.D. Cal. June 5, 2012)...........................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................................12, 20

*In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012)..................................................................................................3

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1283 (Fed. Cir. 2015)................................................................................... *passim*

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    986 F. Supp. 2d 574 (W.D. Pa. 2013), *aff'd in part, vacated in part, rev'd in part*,
    807 F.3d 1283 (Fed. Cir. 2015)..........................................................................................5, 19

*E.digital Corp. v. Toshiba Am. Info. Sys., Inc.*,
    13-CV-2909-H-BGS, 2014 WL 12516081 (S.D. Cal. July 10, 2014)..........................................17

*Disc Disease Solutions Inc. v. VGH Solutions, Inc.*,
    888 F.3d 1256 (Fed. Cir. 2018)..................................................................................................13

*Dynetix Design Sols. Inc. v. Synopsys Inc.*,
    CV 11-05973 PSG, 2013 WL 2239445 (N.D. Cal. May 21, 2013)..............................................17

*Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*,
    No. CV 14-1430-LPS-CJB, 2015 WL 5725768 (D. Del. Sept. 29, 2015), *report
    and recommendation adopted*, No. CV 14-1430-LPS-CJB, 2016 WL 1274812 (D.
    Del. Mar. 31, 2016)..................................................................................................................16

*Ironworks Patents LLC v. Samsung Elecs. Co., Ltd.*,
  17-CV-01958-HSG, 2018 WL 1400440 (N.D. Cal. Mar. 20, 2018) ............................................20

*J & K IP Assets, LLC v. Armaspec, Inc.*,
  3:17-CV-07308-WHO, 2018 WL 2047536 (N.D. Cal. May 2, 2018) ....................................13, 14

*Jenkins v. LogicMark, LLC*,
  3:16-CV-751-HEH, 2017 WL 376154 (E.D. Va. Jan. 25, 2017) ................................................15

*Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd.*,
  13-CV-02502-WHO, 2013 WL 5934698 (N.D. Cal. Nov. 4, 2013) ............................................3

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ............................................................................................12

*Potter Voice Techs., LLC v. Apple Inc.*,
  24 F. Supp. 3d 882 (N.D. Cal. 2014) ....................................................................................19

*Rearden LLC v. Crystal Dynamics, Inc.*,
  286 F. Supp. 3d 1076 (N.D. Cal. 2018) ................................................................................22

*Rearden LLC v. Walt Disney Co.*,
  293 F. Supp. 3d 963 (N.D. Cal. 2018) ..................................................................................3

*Regents of the Univ. of Minn. v. LSI Corp.*,
  16-cv-2891, Dkt. 56 (D. Minn. June 29, 2017) ............................................................3, 16, 20

*Scripps Research Inst. v. Illumina, Inc.*,
  16-CV-661 JLS, 2016 WL 6834024 (S.D. Cal. Nov. 21, 2016) ..............................................18

*Simplivity Corp. v. Springpath, Inc.*,
  No. CV 4:15-13345-TSH, 2016 WL 5388951 (D. Mass. July 15, 2016) ....................................16

*Swipe Innovations, LLC v. NCR Corp.*,
  No. 1:13-CV-2219-TWT, 2013 WL 6080439 (N.D. Ga. Nov. 18, 2013) ....................................20

*Uniloc USA, Inc. v. Apple Inc.*,
  C 18-00359 WHA, 2018 WL 2047553 (N.D. Cal. May 2, 2018) .........................................15, 21

*Uniloc USA, Inc. v. Apple Inc.*,
  18-cv-00362-PJH, 2018 WL 2392561 (N.D. Cal. May 25, 2018) ................................................18

*Vendavo, Inc. v. Price f(x), Inc.*,
  17-cv-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) ........................................2, 13, 15

*Vigil Sys. Pty. Ltd. v. Trackit, LLC*,
  16-CV-198 JLS, 2016 WL 4595538 (S.D. Cal. Aug. 22, 2016) ................................................20

*Watison v. Carter*,
  668 F.3d 1108 (9th Cir. 2012) ........................................................................................12, 17

**Statutes**

35 U.S.C. § 271(a) ................................................................................................................12

Plaintiff Carnegie Mellon University ("CMU") files this Opposition to Defendants LSI Corporation ("LSI") and Avago Technologies U.S. Inc.'s ("Avago U.S.") (collectively, "Defendants") Motion to Dismiss CMU's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Motion").

## I.    INTRODUCTION

CMU has sued Defendants for willful, direct and indirect infringement of U.S. Patent Nos. 6,201,839 ("'839 Patent") and 6,438,180 ("'180 Patent") (collectively, the "Patents"), which generally claim a data- (or signal-) dependent, noise-predictive method for improving the performance of read channel detectors like those developed and sold by Defendants.  In moving to dismiss the Complaint, Defendants ask this Court to hold that it is ***not plausible*** that Defendants infringe the Patents in face of CMU's detailed factual allegations, which this Court must take as true. These factual allegations include:

(i)    Defendants' accused products perform each step of methods claimed in the Patents, *see*, *e.g.*, Compl., Dkt. 1 at ¶¶ 114-30;

(ii)    an LSI Vice President, who worked on Defendants' read channel technology, admitted to Prof. Aleksander Kavcic, a co-inventor of the Patents, that LSI used Prof. Kavcic's "detector," and "cannot run [read] channels w/o Kavcic's DDNP algorithms," *id.* at ¶¶ 80-85;

(iii)    "DDNP" or "data-dependent noise prediction" is an industry term for the methods claimed in the Patents, which employ a set of signal-dependent branch metric functions, and Defendants have used the term "DDNP" (or variations thereof) in numerous patents and patent applications consistently with this industry understanding to refer to the invention claimed in the Patents, *id.* at ¶¶ 92-93;

(iv)  other LSI executives and engineers have made public statements admitting that Defendants have implemented and use DDNP in their chips, *id.* at ¶¶ 87-95;

(v)  Defendants compete in an industry where customers demand that chip manufacturers, like Defendants, offer technologies that their competitors have implemented and Defendants' principal competitor, Marvell Technologies, infringed the Patents by implementing the claimed methods in billions of chips, which the Court of Appeals for the Federal Circuit confirmed, *id.* at ¶¶ 71-78, 99-100;  and

(vi)  limited publicly available information about Defendants' chips and their publicly available patents confirms that Defendants use the methods claimed in the Patents, *id.* at ¶¶ 96, 101-07.

The applicable pleading standard does not require this Court to set aside its common sense.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense.").  When company executives admit to needing to use an inventor's patented methods to make their products work, when company engineers brag in their on-line resumes about their work implementing those methods, when companies spend time and money patenting inventions that include use of those methods and when a company's competitor in a highly competitive industry definitely uses those same methods, common sense demands the conclusion that it is at least plausible that the company infringes.  The Court should deny Defendants' Motion for at least the following five reasons.

   **First**, CMU has identified the accused products (*see* Compl., Dkt. 1 at ¶ 79) and alleged that each accused product performs each step of the asserted claims.  *Id.* at ¶¶ 114-30.  Those allegations alone provide adequate grounds to deny Defendants' Motion.  *See Vendavo, Inc. v. Price f(x), Inc.*, 17-cv-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018).  Moreover, just one of CMU's

many additional allegations regarding Defendants' admissions to Prof. Kavcic, industry adoption of the patented methods, or Defendants' other public statements and patents, standing alone, would state a plausible claim for direct infringement of the Patents.  *See Regents of the Univ. of Minn. v. LSI Corp.*, 16-cv-2891 (WMW/SER), Dkt. 56 at 5 (D. Minn. June 29, 2017).

**Second**, the viability of CMU's Complaint must be determined by the allegations "as a whole."  *See Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd.*, 13-CV-02502-WHO, 2013 WL 5934698, at *5 (N.D. Cal. Nov. 4, 2013) (citing *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1340 (Fed. Cir. 2012)).  To avoid the compelling combination of facts alleged by CMU, Defendants improperly attempt, albeit ineffectively, to assess the plausibility of each allegation in complete isolation.

**Third,** Defendants disregard the fact that this case is in the pleadings stage in two material respects. They (i) quibble with the accuracy of CMU's factual allegations, which is improper on a Motion to Dismiss, and they (ii) demand details from CMU that they know are not publicly available and will not be accessible to CMU until discovery.  Mot., Dkt. 35 at 9-12.  Defendants' Motion should be denied because CMU is not required to **prove** infringement in its complaint.  *See Rearden LLC v. Walt Disney Co.*, 293 F. Supp. 3d 963, 974 (N.D. Cal. 2018) (citing *In re Bill of Lading*, 681 F.3d at 1339).

**Fourth,** Defendants' Motion as it relates to CMU's claims that Defendants' Simulators infringe the asserted claims should be denied.  Defendants ignore the defined terms in CMU's Complaint when they assert that CMU made no technical allegations regarding the accused Simulators.  Mot., Dkt. 35 at 13.  CMU defined "Simulators" as detectors that simulate on a computer the methods performed by detectors in Defendants' hard disk drive chips and included them in the broader definition of "Exemplary Accused Products."  *See* Compl., Dkt. 1 at ¶ 79.  Accordingly, Simulators are covered by each allegation regarding the Exemplary Accused Products.

*Finally,* Defendants' only objection to CMU's claim of indirect infringement is that CMU failed to adequately allege the underlying direct infringement. Because Defendants' argument on direct infringement fails, the indirect infringement claims cannot be dismissed.

Accordingly, CMU has adequately pled its claims and Defendants' Motion should be denied.

## II.     THE ALLEGATIONS OF THE COMPLAINT

### A.     The Patents

The USPTO issued to CMU the '839 Patent and the '180 Patent on March 31, 2001, and August 20, 2002, respectively. *Id.* at ¶¶ 52-53, 70. The Patents generally claim a method used in a hard disk drive ("HDD") to improve the accuracy and performance of the HDD. *Id.* at ¶¶ 2, 52-66. After *ex parte* reexaminations, the USPTO confirmed the patentability of the claims of the Patents that CMU has accused Defendants of infringing. *Id.* at ¶¶ 67-69.

### B.     The Problem of Media Noise in Magnetic Data Storage

An HDD stores information, i.e., binary data, on a magnetic disk. *Id.* at ¶ 28. To write the data, the write head of a read/write device of the HDD records the data to the disk by magnetically polarizing bit regions on the disk according to the sequence of the binary data to be written. *Id.* at ¶¶ 31-32; *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1289 (Fed. Cir. 2015) ("*Marvell*"). Where adjacent polarized bit regions are magnetized in opposite directions, as shown in the diagram below, there is a polarity "transition" between the two bit regions; when adjacent bit regions are magnetized in the same direction, there is a "non-transition" between them. Compl., Dkt. 1 at ¶ 34; *Marvell*, 807 F.3d at 1289.



To read recorded data, the read head of the HDD's read/write device, hovering over the rotating disk, generates an analog "readback" signal corresponding to the magnetic fields sensed by the read head from the bit regions on the disk.  Compl., Dkt. 1 at ¶ 36.  The "read channel" of an HDD chip, located between the read head and an HDD's controller, provides the interface that enables data to be read from the disk, after the read head generates the readback signal.  *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 986 F. Supp. 2d 574, 591-92 (W.D. Pa. 2013), *aff'd in part, vacated in part, rev'd in part*, 807 F.3d 1283 (Fed. Cir. 2015).  The read channel consists of a series of circuit components, including a sequence detector, that converts the readback signal into binary data (e.g., a series of "0"s and "1"s) by determining from samples of the readback signal the likely sequence of transitions and non-transitions written to the disk.  Compl., Dkt. 1 at ¶ 37.

Noise distortion in the readback signal makes accurate detection of the data written to an HDD difficult.  *Id.* at ¶ 38.  Over the last decade, the overwhelming trend in the HDD industry has been to increase HDD data storage capacity, which causes the transitions to be packed more densely onto the disk.  *Id.* at ¶ 47; *Marvell*, 807 F.3d at 1289.  As a result, so-called "media noise" caused by those densely packed transitions has become the dominant source of the noise distortion in the HDD industry.  Compl., Dkt. 1 at ¶¶ 45-46.

In the 1990s, when media noise first started to become a significant problem, the HDD industry implemented Viterbi or Viterbi-like sequence detectors ("Viterbi detectors"), which use a Viterbi algorithm to translate noise-distorted samples of the readback signal into the likely data sequence that was written to the disk.  *Id.* at ¶ 42.  The Viterbi algorithm uses a trellis (*see* Fig. 4 of the Patents below) in which sequences of branches (i.e., the lines between the black circles) correspond to possible binary data sequences (e.g., 010).  *Id.* at ¶ 43.

FIG. 4

Linking several trellis sections together enables the representation of longer bit sequences. *Id.* at ¶ 44.  In such cases, a detector uses a branch metric function to compute a "branch metric value" for branches of each trellis section, and sums the branch metric values for the branches along multiple paths through the trellis to obtain "path metric values." *Id.*  The path with the lowest path metric value usually corresponds to the likely sequence of data written to the disk.  *Id.*; *see also Marvell*, 807 F.3d at 1290 (describing Viterbi algorithm).

Early Viterbi detectors used a single branch metric function to make all of these calculations. *Id.* at ¶ 51.  This approach failed to address two key problems of media noise.  *Id.* at ¶ 48.  First, the single branch metric function ignored the fact that the noise in the readback signal samples is "correlated," e.g., high media noise generated in a readback signal from a transition carries over into sample sequences in the neighborhood, so that all samples in that sequence tend to have high media noise.  *Id.*; *Marvell*, 807 F.3d at 1289.  Second, the single branch metric function did not account for the fact that correlated media noise is "signal dependent," also known in the industry as "pattern dependent" or "data dependent."  Compl., Dkt. 1 at ¶¶ 49, 90.  That is, the noise has structure that depends on the specific sequence of bits on the disk, such that, for example, noise from positive transitions is structured differently than noise from negative transitions.  *Id.* at ¶¶ 49-50; *Marvell*,

807 F.3d at 1289.  Ignoring the correlated, signal-dependent nature of the noise became untenable as data density and media noise continued to increase.  Compl., Dkt. 1 at ¶ 51.

### C.       The Inventions Claimed in the Patents

The inventions claimed in the Patents addressed the shortcomings of those prior Viterbi detectors by accounting for the signal-dependent, correlated nature of media noise, which allowed read channels to detect data more accurately.  *Id.* at ¶¶ 56, 61, 66; *Marvell*, 807 F.3d at 1289-91. This increase in accuracy substantially improves the performance of the read channel and allows for increased data density.  Compl., Dkt. 1 at ¶¶ 2, 51, 129-30.

The inventions enable this more accurate detection of written data by using a set of signal-dependent (also known as data-dependent) branch metric functions with multiple signal sample values as inputs, instead of a single branch metric function with one signal sample input.  *Id.* at ¶ 57. Specifically, the Patents disclose the general set of signal-dependent branch metric functions, where $M_i$ is the metric for one sequence of symbols, i.e., one trellis branch, and the multiple time variant signal samples are denoted by $N_i$ and $n_i$ (where $n_i$ is a subset of $N_i$):

$$M_i = \log \frac{\det C_i}{\det c_i} + \underline{N}_i^T C_i^{-1} \underline{N}_i - \underline{n}_i^T c_i^{-1} \underline{n}_i$$

*Id*.  The Patents teach tuning the parameters, i.e., $C_i$ and $c_i$ (where $c_i$ is a sub-portion of $C_i$), for different branches of the trellis to make up the set of signal-dependent branch metric functions.  *Id.* ***Because it accounts for the nonlinearity of media noise, that claimed set of functions is known in the industry as data dependent noise prediction or "DDNP."***  *Id.* at ¶ 92.

The Patents further disclose how to implement the set of signal-dependent branch metric functions in hardware through the use of finite impulse response ("FIR") filters.  *Id.* at ¶ 58.  Figure 3B from the Patents below shows an FIR filter for one signal dependent branch metric function.  *Id.*

In it, the multiple readback signal samples are shown as inputs $r_{i+L}$, $r_{i+L-1}$, ..., $r_{i+1}$, $r_i$. *Id.* These samples are from different time points of the readback signal and each sample is multiplied by a corresponding tap weight, represented as $w_i(L+1)$, $w_i(L)$, ..., $w_i(2)$, and 1 in Figure 3B. *Id.*



*FIG. 3B*

The FIR filter weights can, and typically do, differ between branches of the Viterbi trellis to allow a different signal dependent branch metric function to be implemented for different branches; this means that the FIR filter weights can be adjusted to account for the signal-dependent structure of the noise for different trellis branches. *Id.* at ¶ 59.  The HDD industry frequently refers to the FIR filters that implement this method, which the Patents claim, as "pattern-dependent" or "data-dependent" FIRs, since they depend on the specific data patterns for the trellis branches. *Id.* at ¶¶ 59-60, 90.

CMU asserts that Defendants infringe Claim 4 of the '839 Patent and Claim 2 of the '180 Patent.  Claim 4 of the '839 Patent claims:

> A method of determining branch metric values for branches of a trellis for a Viterbi-like detector, comprising: selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions; and applying each of said selected functions to a plurality of signal samples to determine the metric value corresponding to the branch for which the applied branch metric function was selected, wherein each sample corresponds to a different sampling time instant.

*Id.* at ¶ 62 (quoting '839 Patent at col. 14:10-19).  Claim 1 of the '180 Patent claims:

> A method of determining branch metric values in a detector, comprising: receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith; selecting a branch metric function at a certain time index; and applying the selected function to the signal samples to determine the metric values.

*Id.* at ¶ 63 (quoting '180 Patent at col. 15:39-48). Claim 2 of the '180 Patent claims the method as in claim 1 "wherein the branch metric function is selected from a set of signal-dependent branch metric functions." *Id.* at ¶ 64 (quoting '180 Patent at col. 15:49-51) (Claim 4 of the '839 Patent and Claim 2 of the '180 Patent are referred to collectively as the "Asserted Claims").

### D.    Defendants' Direct Infringement of the Asserted Claims

CMU expressly alleges in its Complaint that Defendants make, use and sell HDD read channel devices sold under the tradename TrueStore ("Accused Chips") that implement the inventions of the Asserted Claims. *Id.* at ¶ 79. The Accused Chips include (i) the RC5101 Spyder ELP PS Azure, the RC5110 Spyder ELP PS Boxster, and the RC5200 Spyder ELP PS Corvette read channels in the TrueStore line, (ii) systems-on-a-chip that include those read channels, and (iii) Defendants' other read channel chips, with names and model numbers that are not publicly available, that determine branch metric values in substantially the same manner as the specifically identified read channels. *Id.* CMU also alleges that Defendants' computer-implemented detectors that execute simulation code files to apply a set of branch metric functions to actual readback signal samples ("Simulators") (together with the Accused Chips, the "Exemplary Accused Products") infringe the Asserted Claims. *Id.*[1]

CMU alleges that the Exemplary Accused Products perform the methods of the Asserted Claims when their sequence detectors determine branch metric values by (i) receiving a plurality of

---

[1] Systems-on-a-Chip ("SOCs") combine the required electronic circuits of various computer components onto a single, integrated chip. *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 986 F. Supp. 2d at 592; https://www.broadcom.com/products/storage/hard-disk-drives/socs-read-channel. Defendants' accused SOCs include the read channel.

time variant samples, e.g., signal samples of the readback signal, that inherently have signal-dependent, correlated noise; (ii) selecting a branch metric function from a set of signal dependent branch metric functions corresponding to the branch of the trellis at a certain time index; and (iii) applying the selected signal dependent branch metric function to the plurality of signal samples to determine the branch metric value of the branch for which the applied branch metric value was selected. *Id.* at ¶¶ 114-16. CMU further alleges that the Accused Chips include sequence detectors that utilize FIR filters to perform the methods of the Asserted Claims. *Id.* at ¶ 128.

Defendants have, in effect, admitted to their infringement. In late 2009, at a meeting held at an LSI facility in California, Dr. Yuan Xing Lee, then an LSI Vice President,[2] told Prof. Kavcic, a co-inventor of the Patents, that LSI used Prof. Kavcic's "detector." *Id.* at ¶¶ 80-84. The following year, Dr. Lee also wrote in an email to Prof. Kavcic that "we [LSI] cannot run channels w/o Kavcic's DDNP algorithms." *Id.* at ¶ 85. At the time, Dr. Lee was a member of LSI's "Channel IP Development" team and copied on the email another member of that team, Dr. Haitao (Tony) Xia, a Principal Engineer of Read Channel Architecture from 2009 to 2011.[3] *Id.* at ¶¶ 85-86.

In multiple other instances, Defendants' senior executives and employees have made public declarations confirming the plausibility of CMU's claim that the Exemplary Accused Products infringe the Patents:

- Dr. Lee gave a presentation in 2012 at the Chinese American Information Storage Society Annual Conference in which he (i) declared that "pattern-dependent filter," an industry term for the FIR filters covered by the Patents, was a "major inflection point" in HDD technology for "noise processing" in the 2000-2010 period, and (ii) displayed a block diagram of a read

---

[2] Dr. Lee served as an LSI vice president from 2007 to 2014, subsequently served as a "Vice President of Engineering for the Data Controller Division at Broadcom," and is currently "Vice President & Head of Central Engineering in Broadcom Limited," Defendants' parent company. *Id.* at ¶ 81.

[3] Dr. Xia subsequently served as the Senior Manager, Read Channel Architecture at LSI and Senior Manager and then Director of Data Storage System Architecture at "Avago Technologies." *Id.* at ¶ 85-86.

channel that included a "DDNP," an industry term for a set of signal-dependent branch metric functions, which are claimed by the Patents, *id.* at ¶¶ 87-92 and Ex. 8 at 6-7;

- On his LinkedIn profile, Dr. Nenad Miladinovic states that he "[i]mprov[ed] DDNP BCJR implementation" while a "Senior ASIC Design Engineer" at LSI from 2008 to 2010, *id.* at ¶ 94, where "BCJR" refers to a specific type of soft-output Viterbi algorithm described in the '180 Patent, *id.* at ¶ 95;

- On his LinkedIn profile, Dongyan Jiang states that that he "Defined and Implemented DDNP (Data-Dependent Noise Prediction) FIR filter and Viterbi" while an engineer at LSI from 2000-2007, *id.* at ¶ 94; and

- On his LinkedIn profile, Weijun Tan states that that he "developed … data dependent noise prediction filter" while an engineer at LSI from 2004-2017, *id.*

Additionally, a publicly available presentation dated February 2004 from LSI's predecessor Agere Systems, Inc. specifies that Agere implemented "Data-dependent NPML," an industry term for a set of signal-dependent branch metric functions, which are claimed by the Patents, in its "Redtail" read channel product in around September 2003. *Id.* at ¶¶ 97-98.

Further, numerous patents and applications assigned to Defendants and the Broadcom Inc. family of companies, of which Defendants are a part, refer to "DDNP," "data dependent noise prediction," "signal-dependent" and "NPFIR" (i.e. noise predictive FIR filter)—all of which are industry terms for the invention claimed in the Patents—as an important part of a read channel. *Id.* at ¶¶ 93, 101-07, Exs. 9, 11-13. One of these patents, initially assigned to LSI and subsequently reassigned to a related IP holding company, even directly and expressly incorporates a paper co-authored by Prof. Kavcic describing the invention claimed in the Patents to provide information on how to implement noise predictive filtering. *Id.* at ¶ 105. The LSI patent does not describe any other way of implementing noise-predictive filtering. *Id.* at Ex. 13.

Finally, industry practice corroborates CMU's assertions that Defendants infringe. In the HDD industry, when one HDD chip supplier adopts a technology that useful to its customers (the handful of companies that make HDDs), those customers demand other HDD chip suppliers offer the same technology to compete for their business. *Id.* at ¶ 99. A jury has already found that

Defendants' principal competitor, Marvell Technologies, infringed the Asserted Claims beginning in 2001.  *Id.* at ¶ 72.  The Federal Circuit affirmed that finding.  *Id.* at ¶ 75.  As CMU has alleged, Marvell's use of the patented methods required Defendants to use those methods too.  *Id.* at ¶ 100.

## III.   ARGUMENT

### A.   Legal Standards

CMU need only "state a claim to relief that is plausible on its face" to survive a motion to dismiss.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "The plausibility requirement is not akin to a 'probability requirement.'"  *Iqbal*, 556 U.S. at 678.  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 663.  On such a motion, the court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the plaintiff."  *Watson v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012).

### B.   CMU Has Adequately Pled that the Exemplary Accused Products Directly Infringe the Asserted Claims.

CMU has presented a robust set of factual allegations that, taken both individually and collectively, support a plausible inference that Defendants directly infringe the Asserted Claims.

A defendant directly infringes when it "makes, uses, offers to sell or sells [a] patented invention, within the United States…during the term of the patent."  35 U.S.C. § 271(a).  "To infringe a method claim, a [defendant] must have practiced all steps of the claimed method."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).  Under this standard, CMU has adequately pled that Defendants' products infringe each step of the Asserted Claims in multiple respects.

***First***, addressing every limitation of the Asserted Claims, CMU has alleged that the Exemplary Accused Products contain sequence detectors that "determine branch metric values by [i] receiving a plurality of time variant samples, e.g., signal samples of the readback signal, that

inherently have signal-dependent, correlated noise; [ii] selecting a branch metric function from a set of signal dependent branch metric functions corresponding to the branch of the trellis at a certain time index; and [iii] applying the selected signal dependent branch metric function to the plurality of signal samples to determine the branch metric value of the branch for which the applied branch metric value was selected.  Compl., Dkt. 1 at ¶ 114.  CMU further alleges that, for the Accused Chips, the sequence detectors perform those steps using FIR filters in the read channel.  *Id.* at ¶ 128. Conspicuously, Defendants do not argue that CMU's Complaint somehow misses a claim element.

This Court has squarely held that such a recitation alone is enough to survive a motion to dismiss, even without allegations about admissions from the Defendants as to their use of the patented technology.  *See Vendavo*, 2018 WL 1456697, at *4-5 (holding that infringement allegations were "not subject to dismissal" where they "identifie[d] an accused Price f(x) product by name" and "marche[d] through the elements of claim 1 of the particular patent, alleging that the accused product meets each limitation"); *cf. Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (reversing district court's grant of a 12(b)(6) motion to dismiss and explaining that the complaint "provide[d] [defendant] fair notice of infringement of the asserted patents" where it "specifically identified three accused products [] by name … and alleged that the accused products meet 'each and every element of at least one claim of the [] Patent'").[4]  And indeed, some courts in this District do not even require plaintiffs to explicitly allege infringement of each claim element.  *See, e.g.*, *J & K IP Assets, LLC v. Armaspec, Inc.*, 3:17-CV-07308-WHO, 2018

---

[4] CMU's use of some of the claim language to describe how the Exemplary Accused Products infringe does not render the allegations insufficient:

> Although the allegations here arguably only 'parrot' the claim elements, they do represent factual assertions by Vendavo that the accused products read on each and every claim element.  Nor in this context does it appear that further explanation of 'how' the accused products infringe is critical.  Vendavo is asserting, in so many words, that the Price f(x) products function exactly in the manner described by the patent claims.

*Vendavo*, 2018 WL 1456697, at *5.

WL 2047536, at *2 (N.D. Cal. May 2, 2018) ("J & K need not allege how the Stealth Recoil Spring contains each and every limitation of the asserted claims (that specificity is reserved for initial disclosures), but it must allege some facts about the scope of the patent claims and how the Stealth Recoil Spring infringes.").

Contrary to the position espoused here, Defendants' sister company, which holds their intellectual property, has argued successfully to this Court that allegations simply reciting claim elements support denial of a 12(b)(6) motion to dismiss. *See Avago Techs. Gen. IP (Singapore) PTE Ltd. v. Asustek Computer, Inc.*, 15-CV-04525-EMC, 2016 WL 1623920, at *4 (N.D. Cal. Apr. 25, 2016) (holding that Avago Technologies General IP (Singapore) PTE Ltd., an IP holding company related to Defendants, stated a claim for direct infringement under *Twombly/Iqbal* where its complaint "largely track[ed] the language of the claims").  Incredibly, Defendants attempt to distinguish that case by claiming that Avago Technologies General IP (Singapore) PTE Ltd. "pled its allegations 'upon information and belief,' whereas CMU makes unqualified factual allegations." Mot., Dkt. 35 at 13 n.1.  In other words, Defendants suggest that this Court should give more credit to allegations made "upon information and belief," than to CMU's specific factual allegations based in large part on Defendants' own public statements, and that the latter should be subject to a stricter pleading standard.  Defendants cite no authority for such a remarkable position.

Instead, Defendants cite only three cases in support of their argument that CMU has not adequately pled infringement of the Asserted Claims. Mot., Dkt. 35 at 8, 13.  These cases are either inapposite or contradict Defendants' position.  For instance, in *Atlas IP LLC v. Pac. Gas & Elec. Co.*, the Court dismissed the complaint because "reciting *some elements* of a representative claim and then describing generally how an accused product operates, *without* specifically tying the operation to any asserted claim or *addressing all of the claim requirements*, is insufficient."  15-cv-05469-EDL, 2016 WL 1719545, at *2 (N.D. Cal. Mar. 9, 2016) (emphasis added).  Defendants also

cite *Jenkins v. LogicMark, LLC*, but that case dealt with an even more deficient pleading, as the plaintiff alleged that the defendant infringed "one or more claims of the [asserted patents]," without identifying each asserted claim or making any allegations tying the defendant's products to individual claim elements.  3:16-CV-751-HEH, 2017 WL 376154, at *3 (E.D. Va. Jan. 25, 2017). By contrast, Defendants themselves recognize that, at a minimum, CMU specified the claims that it is asserting, recited ***all*** elements of those claims, and alleged that the Accused Products practice ***each of the claim limitations***.  *See* Mot., Dkt. 35 at 4-5; Compl., Dkt. 1 at ¶ 114; *cf. Vendavo*, 2018 WL 1456697, at *5 (distinguishing an earlier Northern District of California case that dismissed infringement allegations on the basis that there "the complaint apparently failed to address numerous claim elements entirely").  Defendants' third case, *Uniloc USA, Inc. v. Apple Inc.*, contradicts Defendants' assertion that CMU has failed to state a claim for direct infringement.  There, the Court ***declined to dismiss*** a claim of direct infringement where the plaintiff "assert[ed] that Apple products meet [a claim] limitation by parroting the claim language word-for-word" and provided only a single high-level example.  C 18-00359 WHA, 2018 WL 2047553, at *2-3 (N.D. Cal. May 2, 2018).

***Second***, in addition to identifying the specific product lines and products that practice the Patents, and alleging that those products perform each step of the Asserted Claims, CMU also recited specific admissions by Defendants that individually establish the plausibility of CMU's allegations of infringement.  Those admissions include an email from an LSI Vice President that LSI "***cannot run channels w/o Kavcic's DDNP algorithms***," which are claimed by the Asserted Claims. *See* Compl., Dkt. 1 at ¶¶ 80-98 (emphasis added).  CMU's allegations did not stop there.  CMU also alleged that HDD industry practice mandated Defendants' adoption of CMU's patented technology in light of the adoption of that technology by Defendants' director competitor Marvell.  *Id.* at ¶¶ 99-100.  Another district court has held that similar allegations against ***these same defendants*** for direct infringement of another university patent owner's patented inventions by the ***same accused products***

satisfy the *Twombly/Iqbal* pleading standard.  *See Regents of the Univ. of Minn.*, Dkt. 56 at 5 ("The University's allegations that Defendants' employees have stated that they use MTR-code technology in their work, coupled with the allegations throughout the complaint that MTR coding is industry-standard technology that has been in use for several years, make it plausible that Defendants' products perform the patented method.").

**Third**, Defendants take the indefensible approach of attempting to individually discredit each allegation relevant to direct infringement.  The Court must evaluate the plausibility of CMU's allegations *as a whole*.  *See Simplivity Corp. v. Springpath, Inc.*, No. CV 4:15-13345-TSH, 2016 WL 5388951, at *10 (D. Mass. July 15, 2016) (explaining that although "[p]erhaps in isolation, none of these allegations is enough to raise SimpliVity's entitlement to relief from speculative to plausible[, c]ollectively however, they suffice"); *Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*, No. CV 14-1430-LPS-CJB, 2015 WL 5725768, at *3 (D. Del. Sept. 29, 2015), *report and recommendation adopted*, No. CV 14-1430-LPS-CJB, 2016 WL 1274812 (D. Del. Mar. 31, 2016) ("In and of themselves, the allegations … may not have been sufficient here.  And even taken together, they may not make pre-suit knowledge probable.  But considered as a whole, they render it at least plausible.").  When CMU's detailed allegations of direct infringement are evaluated as a whole, they undoubtedly cross the threshold from "possibility" to "plausibility."  *See Iqbal*, 556 U.S. at 678.  To find otherwise would require the Court to conclude, among other things, that (1) Dr. Lee was referring to algorithms that Prof. Kavcic developed but did not cover in his Patents; (2) Defendants' employees developed and "implemented" technology that their employers never actually deployed in their products; (3) Defendants paid to patent technology that they never deployed in their products; (4) Defendants' presentation referred to technology that they never implemented, even though it constituted a "major inflection point" for noise processing; **and** (5) Defendants declined to implement technology that benefitted their principal competitor and that their

customers required.  As a matter of law, Defendants are not entitled to any of those inferences on a motion to dismiss, especially because such inferences would defy common sense.

**Fourth**, Defendants ignore the requirement that this Court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the plaintiff." *Watison*, 668 F.3d at 1112.  Betraying the fatally flawed nature of their argument, Defendants ask this Court to ignore as "neither reasonable nor plausible," "not plausible," "without any basis," "baseless," and "conclusory" CMU's well-pled **factual** allegations, including, *e.g.*:

- That "[b]anks of data-dependent filters noise predictive filters" such as those described in patents issued to LSI are used "in the Viterbi branch metric calculations designed by Defendants and used in their TrueStore line of Exemplary Accused Products," *compare* Compl., Dkt. 1 at ¶ 106 *with* Mot., Dkt. 35 at 9, 10;

- That "[p]attern-dependent filter" is an industry term that refers to "a set of FIR filters that is used to implement a set of signal-dependent (or 'pattern-dependent') branch metric functions," *compare* Compl., Dkt. 1 at ¶ 90 *with* Mot., Dkt. 35 at 10, 11;

- That "DDNP" is an industry term that refers to "data dependent noise prediction," *compare* Compl., Dkt. 1 at ¶ 92 *with* Mot., Dkt. 35 at 10, 11; and

- That Defendants' executives and engineers made statements that indicate use by Defendants of technology claimed by the Patents, *compare* Compl., Dkt. 1 at ¶¶ 83, 85, 91, 94 *with* Mot., Dkt. 35 at 11-12.

"The Supreme Court has explained that the trial court is limited to determining whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, the court is not permitted to assess whether supporting evidence is 'speculative.'" *Dynetix Design Sols. Inc. v. Synopsys Inc.*, CV 11-05973 PSG, 2013 WL 2239445, at *3 (N.D. Cal. May 21, 2013) (internal quotations and citation omitted); *see also E.digital Corp. v. Toshiba Am. Info. Sys., Inc.*, 13-CV-2909-H-BGS, 2014 WL 12516081, at *3 (S.D. Cal. July 10, 2014) (declining, on a motion to dismiss, "to rule on factual matters that fall outside of the pleadings" where defendants took issue with websites identified in the complaint as evidencing direct infringement on the ground that "they describe the use of a certain kind of generic use of the technology at issue, as opposed to the particular kind taught by Claim 1").  It is hard to imagine what

a reasonable, not conclusory factual allegation would look like if admissions by Defendants, industry term definitions, and concrete statements regarding Defendants' use of specific technology do not. *See Avocet Sports Tech., Inc. v. Garmin Int'l, Inc.*, NO. C 11-04049 JW, 2012 WL 2343163, at *3 (N.D. Cal. June 5, 2012) (rejecting as "misguided" defendant's assertion that "[t]he allegation that Defendant … attended trade shows at which it discussed Plaintiff's patented devices with Plaintiff is … a legal conclusion").

Adjudication of Defendants' repeated contention that CMU's factual allegations are wrong is for summary judgment, not for a motion to dismiss.  "The court is not now adjudicating the factual accuracy of [CMU's] allegations; rather, the court assesses whether [CMU's] pleading and supporting, non-conclusory factual allegations allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  *Uniloc USA, Inc. v. Apple Inc.*, 18-cv-00362-PJH, 2018 WL 2392561, at *6 (N.D. Cal. May 25, 2018); *see also id.* at *4 ("Apple argued … that its products do not in fact work the way Uniloc alleges. … [That] argument[] may ultimately prove persuasive following … discovery.  But [that] argument[] do[es] not support a motion to dismiss on the pleadings."); *Avocet Sports Tech.*, 2012 WL 2343163, at *3 (explaining that if "Defendant … believes that this factual allegation is inaccurate, it may file the appropriate motion for summary judgment"); *Scripps Research Inst. v. Illumina, Inc.*, 16-CV-661 JLS (BGS), 2016 WL 6834024, at *6 (S.D. Cal. Nov. 21, 2016) ("[I]t is irrelevant at this stage whether Plaintiff's allegations are accurate, as the Court accepts all of Plaintiff's allegations as true.... The Court only requires that Plaintiff plausibly alleges that a product or products of Defendant infringes on at least one claim of the [asserted] patent.") (quoting *TeleSign Corp. v. Twilio, Inc.*, No. CV 16-2106 PSG (SSX), 2016 WL 4703873, at *4 (C.D. Cal. Aug. 3, 2016)); *Adelos, Inc. v. Halliburton Co.*, CV-16-119-DLC, 2017 WL 3836145, at *6 (D. Mont. May 30, 2017) ("HESI claims that Adelos cannot base its allegations of infringement on HESI's patent application because Adelos has not demonstrated that

the allegedly infringing products are the same as the product described in the application.  This argument conflates the standard applied at this stage of litigation with that applied at the summary judgment stage … [T]he application makes Adelos's allegations more plausible, even if it does not provide direct evidence of infringement.").

*Finally*, Defendants demand a level of detail in CMU's pleadings that CMU could provide only after Defendants respond to discovery requests.  For instance, Defendants contend that CMU's allegations are not plausible because CMU did not make the following additional allegations:

- The proprietary details of how Defendants code the methods performed by the read channels in their chips;

- Which of Defendants' products practice which of Defendants' patents and claims; and

- What roles named inventors on Defendants' patents had in the development of specific products of Defendants.

Mot., Dkt. 35 at 9-11.[5]  As CMU's Complaint demonstrates, CMU undertook an extensive investigation of publicly-available sources prior to filing.  The information Defendants demand, however, is not publicly available and, in many instances, is a closely-guarded corporate secret.  If such details were required to even plausibly allege infringement, Defendants would, in effect, be immunized from suit, ***even where their own executives effectively admitted infringement***.  That is not what federal notice pleading standards require.  *See ABB Turbo Sys. AG v. Turbousa, Inc*., 774 F.3d 979, 988 (Fed. Cir. 2014) (noting "the particular need to apply the plausibility standard with a recognition that direct evidence of some facts…may be distinctively in the defendant's possession, requiring that the threshold standard of plausibility be applied to more circumstantial evidence.");

---

[5] Moreover, some of the detail Defendants demand from CMU is extraneous to a determination of direct infringement.  For instance, Defendants discount CMU's allegations that Dr. Lee admitted LSI used the invention claimed in the Patents by arguing that CMU did not allege that "Dr. Lee had any awareness of the Asserted Patents or their claims."  Mot. at 11.  Leaving aside that CMU did make such allegations, *see, e.g.*, Compl. at ¶¶ 78, 157- 61, direct infringement is a "strict liability offense."  *Potter Voice Techs., LLC v. Apple Inc.*, 24 F. Supp. 3d 882, 885 (N.D. Cal. 2014).  Accordingly, whether or not LSI or Dr. Lee knew of the Patents, Dr. Lee's admission that LSI uses a specific technology certainly makes it plausible that LSI is infringing Patents that claim that technology.

*Vigil Sys. Pty. Ltd. v. Trackit, LLC*, 16-CV-198 JLS (JMA), 2016 WL 4595538, at *3 (S.D. Cal. Aug. 22, 2016) ("'[I]t is difficult to imagine what else [Plaintiff] could have done to obtain facts relating to [Defendant]'s alleged infringement.' … '[A] defendant cannot shield itself from a complaint for direct infringement by operating in such secrecy that the filing of a complaint itself is impossible.'") (quoting *Hoffman-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1364 (Fed. Cir. 2000); *K–Tech Telecomm., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1286 (Fed.Cir.2013)); *Regents of the Univ. of Minn.*, Dkt. 56 at 5 ("At this stage, the University may rely on a 'reasonable expectation that discovery will reveal evidence' of the alleged infringement.") (quoting *Twombly*, 550 U.S. at 556).

Indeed, assuming that Defendants comply with their discovery obligations to promptly produce their non-public technical information, Defendants' erroneous interpretation of the pleading standards would render redundant the early disclosure requirements set forth in the Patent Local Rules. *See* Patent L.R. 3-1 (requiring after the Initial Case Management Conference service of a "Disclosure of Asserted Claims and Infringement Contentions" that includes "[a] chart identifying specifically where and how each limitation of each asserted claim is found within each Accused Instrumentality"); *Avago Techs. Gen. IP (Singapore) PTE Ltd.*, 2016 WL 1623920, at *4 ("[T]his District generally has not required detailed infringement theories until the time that infringement contentions are served, which is typically several months after a complaint has been filed."); *see also Ironworks Patents LLC v. Samsung Elecs. Co., Ltd.*, 17-CV-01958-HSG, 2018 WL 1400440, at *2 (N.D. Cal. Mar. 20, 2018) ("Heightened discovery obligations make patent cases unique with respect to pleading, in that arguments for more specificity in a complaint are not always warranted." (internal quotations omitted)); *Swipe Innovations, LLC v. NCR Corp.*, No. 1:13-CV-2219-TWT, 2013 WL 6080439, at *3 (N.D. Ga. Nov. 18, 2013) (reasoning that where the local patent rules required a certain disclosure "within thirty (30) days after filing of the Joint Preliminary Report and

Discovery Plan," "[i]t would be redundant, and thus inconsistent with the local rules, to construe the pleading requirements as requiring this level of detail any earlier").

### C. CMU Has Adequately Pled that Defendants' Simulators Directly Infringe the Asserted Claims.

Defendants' objection to CMU's claim of direct infringement by Defendants' Simulators rests on the faulty premise that "CMU's substantive technical allegations … all relate solely to the Accused Chips, i.e., the actual physical products."  Mot., Dkt. 35 at 13.  In its Complaint, CMU defined Simulators as "computer-implemented detectors that execute simulation code files to apply a set of branch metric functions to actual readback signal samples" and included Simulators in the defined "Exemplary Accused Products."  Compl., Dkt. 1 at ¶ 79.  Indeed, the very nature of *simulators* is that they *simulate* the function of "actual physical products."  Given what simulators do, the substantive technical allegations CMU makes regarding use of CMU's patented *methods* in the Exemplary Accused Products apply equally to the Accused Chips and Simulators, which apply the same methods on different devices.  *Cf. Marvell*, 807 F.3d at 1296 (upholding jury finding "that Marvell infringed when it used what Marvell called a 'simulator,' notably, when it used a computer to practice the same methods it eventually implemented in its MNP/EMNP and NLD chips").

### D. CMU Has Adequately Pled that Defendants Indirectly Infringe the Asserted Claims.

Defendants' *sole* argument for dismissal of CMU's indirect infringement allegations is that CMU failed to properly plead the underlying direct infringement.  *See* Mot., Dkt. 35 at 14.  This argument fails because, as set forth above, CMU has adequately pled that Defendants' Exemplary Accused Products directly infringe the Asserted Claims.  *See Uniloc*, 2018 WL 2047553, at *4 ("Uniloc's direct infringement claim survives dismissal, which in turn neutralizes Apple's [] argument" that Uniloc's complaint "fails to state a claim for indirect infringement because it [] fails to plead a direct infringement claim").

**E.      If the Court Finds that CMU Has Not Adequately Pled its Claims, CMU Must Be Given Leave to Amend.**

If the Court determines there are any deficiencies in CMU's pleading, Ninth Circuit law mandates that it be given an opportunity to amend its complaint to cure the defect. *See Rearden LLC v. Crystal Dynamics, Inc.*, 286 F. Supp. 3d 1076, 1079 (N.D. Cal. 2018) ("If the motion to dismiss is granted, the court should grant leave to amend 'even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'") (quoting *Doe v. U.S.*, 58 F.3d 494, 497 (9th Cir. 1995)).

## IV.    CONCLUSION

For the foregoing reasons, CMU respectfully requests that the Court deny Defendants' Motion.

Dated:  October 18, 2018                                    *Respectfully submitted,*

                                                            /s/ *Ranjini Acharya*
                                                            Michael E. Zeliger (SBN 271118)
                                                            michael.zeliger@klgates.com
                                                            Ranjini Acharya (SBN 290877)
                                                            ranjini.acharya@klgates.com
                                                            **K&L Gates LLP**
                                                            620 Hansen Way
                                                            Palo Alto, CA 94304
                                                            Telephone: (650) 798-6700
                                                            Facsimile: (650) 798-6701

                                                            AND

                                                            Patrick J. McElhinny (PA #53510)
                                                            patrick.mcelhinny@klgates.com
                                                            Mark G. Knedeisen (PA #82489)
                                                            mark.knedeisen@klgates.com
                                                            Christopher M. Verdini (PA #93245)
                                                            christopher.verdini@klgates.com
                                                            Anna Shabalov (PA #315949)
                                                            anna.shabalov@klgates.com
                                                            (*pro hac vice*)
                                                            **K&L Gates LLP**
                                                            K&L Gates Center
                                                            210 Sixth Avenue
                                                            Pittsburgh, Pennsylvania 15222

Telephone: (412) 355-6500
Facsimile: (412) 355-6501

AND

Theodore J. Angelis (WA #30300)
theo.angelis@klgates.com
(*pro hac vice forthcoming*)
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
Facsimile: (206) 623-7022

*Attorneys for Plaintiff Carnegie Mellon University*