Harold H. Davis, Jr. (SBN 235552)
harold.davis@klgates.com
**K&L Gates LLP**
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel: (415) 882-8200
Fax: (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Carnegie Mellon University*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CARNEGIE MELLON UNIVERSITY,

Plaintiff,

v.

LSI CORPORATION and AVAGO
TECHNOLOGIES U.S. INC.,

Defendants.

Case No.: 3:18-cv-04571-JD

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR
JUDGMENT ON THE PLEADINGS
UNDER 35 U.S.C. § 101**

Date: August 1, 2019
Time: 10:00 a.m.
Courtroom: 11 - 19th Floor
Hon. James Donato

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................................1

II.   Factual Background ......................................................................................................2

      A.    The Problem of Media Noise in Magnetic Data Storage ...............................2

      B.    The Claims ...................................................................................................3

      C.    Acclaim for the Invention .............................................................................4

      D.    Prior Proceedings Involving the Claims ........................................................4

III.  Legal Standards ...........................................................................................................5

      A.    Motions for Judgment on the Pleadings .......................................................5

      B.    Patentable Subject Matter .............................................................................5

      C.    Rule 12 Motions Raising a Section 101 Defense ..........................................5

IV.   Argument .....................................................................................................................6

      A.    The Claims Are Not Directed to an Abstract Idea. .......................................6

      B.    The Claims Contain an Inventive Concept. .................................................13

      C.    The Claims Do Not Pre-Empt All Read Channel Detection Methods.........15

V.    Conclusion ................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)..............................................................................6, 8, 14

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
  573 U.S. 208 (2014)................................................................................................ *passim*

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016).........................................................................................13

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)........................................................................................5, 6

*Cal. Inst. of Tech. v. Hughes Comm's Inc.*,
  59 F. Supp. 3d 974 (C.D. Cal. 2014) ...........................................................................10, 11

*Carnegie Mellon Univ. v. Marvell Tech. Grp.*,
  807 F.3d 1283 (Fed. Cir. 2015)................................................................................ *passim*

*Carnegie Mellon Univ. v. Marvell Tech. Grp.*,
  Appeal No. 14-1492, Dkt. (Fed. Cir. Aug. 4, 2014) ........................................................4

*Carnegie Mellon Univ. v. Marvell Tech. Grp.*,
  986 F. Supp. 2d 574 (W.D. Pa. 2013)................................................................................2

*Carnegie Mellon Univ. v. Marvell Tech. Grp.*,
  2010 WL 3937157 (W.D. Pa. Oct. 1, 2010) ......................................................................2

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,
  15-CV-02177-SI, 2016 WL 283478 (N.D. Cal. Jan. 25, 2016).........................................6

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019).....................................................................................10, 12

*Deere & Co. v. Bush Hog, LLC*,
  703 F.3d 1349 (Fed. Cir. 2012).........................................................................................9

*Diamond v. Diehr*,
  450 U.S. 175 (1981)..........................................................................................................10

*Digitech Image Tech., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014)........................................................................................13

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016)................................................................................ *passim*

*Evolved Wireless, LLC v. Apple Inc.*,
    221 F. Supp. 3d 485 (D. Del. 2016)..........................................................................................14

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016).................................................................................................12

*Finjan, Inc. v. Symantec Corp.*,
    14-CV-02998-HSG, 2017 WL 550453 (N.D. Cal. Feb. 10, 2017)..............................................8

*Fleming v. Pickard*,
    581 F.3d 922 (9th Cir. 2009) .....................................................................................................5

*France Telecom S.A. v. Marvell Semiconductor Inc.*,
    39 F. Supp. 3d 1080 (N.D. Cal. 2014) ...............................................................................11, 13

*Gen. Elec. Co. v. Nintendo Co., Ltd.*,
    179 F.3d 1350 (Fed. Cir. 1999)..................................................................................................9

*Gottschalk v. Benson*,
    409 U.S. 63 (1972).....................................................................................................................12

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*,
    3:16-CV-02787-WHO, 2016 WL 6834614 (N.D. Cal. Nov. 21, 2016) .....................................12

*Intel Corp. v. Wi-LAN, Inc.*,
    C 08–04555 JW, 2011 WL 62494 (N.D. Cal. Jan. 7, 2011) ......................................................8

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015)..................................................................................................6

*Intri-Plex Techs., Inc. v. NHK Int'l Corp.*,
    17-CV-01097-EMC, 2018 WL 659017 (N.D. Cal. Feb. 1, 2018) .........................................8, 9

*Johnstech Int'l Corp. v. JF Microtechnology Sdn Bhd*,
    14-CV-02864-JD, 2016 WL 631936 (N.D. Cal. Feb. 17, 2016) (Donato, J.) ...............................9

*MAZ Encryption Techs. LLC v. Blackberry Corp.*,
    CV 13-304-LPS, 2016 WL 5661981 (D. Del. Sept. 29, 2016).....................................................13

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)......................................................................................7, 12, 13

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006)..................................................................................................9

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015)..................................................................................................9

*Parker v. Flook*,
    437 U.S. 584 (1978)...................................................................................................................12

iii

*PersonalWeb Techs. LLC v. IBM Corp.*,
   16-CV-01266-EJD, 2017 WL 2180980 (N.D. Cal. May 18, 2017)..............................................9, 11

*Proveris Sci. Corp. v. Innovasys., Inc.*,
   739 F.3d 1367 (Fed. Cir. 2014)....................................................................................................9

*Pure Data Sys., LLC v. Ubisoft, Inc.*,
   329 F. Supp. 3d 1054 (N.D. Cal. 2018) .....................................................................................14

*Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*,
   16-CV-05251-EJD, 2017 WL 4410174 (N.D. Cal. Oct. 4, 2017) .................................................9

*Regents of the Univ. of Minn. v. LSI Corp.*,
   5:18-cv-00821-EJD, Dkt. 210 (N.D. Cal. Apr. 27, 2018).............................................................1

*SAP Am., Inc. v. Investpic, LLC*,
   898 F. 3d 1161 (Fed. Cir. 2018)................................................................................................12

*Sycamore IP Holdings LLC v. AT&T Corp.*,
   294 F.Supp.3d 620 (E.D.Tex. 2018)....................................................................................11, 12

*Symantec Corp. v. Zscaler, Inc.*,
   17-CV-04426-JST, 2018 WL 3539269 (N.D. Cal. July 23, 2018)..............................................14

*Tatcha, LLC v. Landmark Tech. LLC*,
   16-CV-04831-WHO, 2017 WL 951019 (N.D. Cal. Mar. 10, 2017).............................................6

*Ultramercial, Inc. v. Hulu, LLC*,
   722 F.3d 1335 (Fed. Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2870 (2014).....................5

*Uniloc USA, Inc. v. ADP, LLC*,
   2018-1132, 2019 WL 2245938 (Fed. Cir. May 24, 2019)..........................................................11

*Visual Memory, LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017).................................................................................................5

**Statutes**

35 U.S.C. § 101 ............................................................................................................. *passim*

**Other Authorities**

Rule 12(b)(6)..............................................................................................................................14

Rule 12(c)....................................................................................................................5, 14, 15

## TABLE OF ASSERTED CLAIMS

### '839 Patent (Claim 4)

4.    A method of determining branch metric values for branches of a trellis for a Viterbi-like detector, comprising:

selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions; and

applying each of said selected functions to a plurality of signal samples to determine the metric value corresponding to the branch for which the applied branch metric function was selected, wherein each sample corresponds to a different sampling time instant.

Dkt. 1-3 at col. 14:10-19.

### '180 Patent (Claims 1 and 2)

1.    A method of determining branch metric values in a detector, comprising:

receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith;

selecting a branch metric function at a certain time index; and

applying the selected function to the signal samples to determine the metric values.

Dkt. 1-4 at col. 15:39-48.

2.    The method of claim 1, wherein the branch metric function is selected from a set of signal dependent branch metric functions."

*Id.* at col. 15:49-51.


CMU refers herein to Claim 4 of the '839 Patent and Claim 2 of the '180 Patent as the "Claims."

OPPOSITION TO MOTION FOR JUDGMENT                    CASE NO. 3:18-cv-04571-JD
ON THE PLEADINGS

Carnegie Mellon University ("CMU") files this Opposition to Defendants' Motion for Judgment on the Pleadings ("Motion").  Dkt. 105.

## I.    **INTRODUCTION**

The Claims (set out in their entirety in the Table of Asserted Claims at p. v) increase the accuracy with which data written to a magnetic storage medium are read by improving the method by which a detector processes noisy signal samples to determine the likely sequence of data written to the medium.  The Federal Circuit, citing *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208 (2014), described the claimed invention as "an unconventional method … for improving a physical process by overcoming limitations in physical devices—discerning more accurately what is on a physical recording medium from what a read head has sensed."  *Carnegie Mellon Univ. v. Marvell Tech. Grp.*, 807 F.3d 1283, 1297 n.3 (Fed. Cir. 2015).  Defendants ask this Court not only to disregard the Federal Circuit's description, but also to ignore the actual claim language and CMU's factual allegations, which demonstrate patent eligibility on both *Alice* prongs.

Under the first prong of the *Alice* analysis, the Claims are directed to patent-eligible subject matter because they are firmly tied to a physical and concrete sequence detection process.  Claim language that Defendants studiously ignore limits the claims to that physical process.  Moreover, even though employing mathematical concepts, the Claims are patent-eligible because they improve the physical sequence detection process.  Defendants themselves recognized the eligibility of the Claims when they argued in another case in this Court that (i) the Claims "expressly recite 'a Viterbi-like detector,'" (ii) "[t]he 'improvement' [in the Claims] related to the Viterbi detector recited in claim 4," and (iii) "the 'improvement' was tied to 'what a read head has sensed.'"  *Regents of the Univ. of Minn. v. LSI Corp.*, 5:18-cv-00821-EJD, Dkt. 210 at 17-18 (N.D. Cal. Apr. 27, 2018).

Under the second *Alice* prong, the Claims include an "inventive concept," as CMU has alleged.  For example, the Claims consist of unconventional and non-routine steps, constitute a substantial improvement over the prior art, and were widely praised and implemented in the industry.  *See, e.g.*, Dkt. 1 at ¶¶ 61, 85, 100-01; Dkt. 100 at ¶ 19.  Defendants denied those allegations but those denials create material disputes of fact that are fatal to the Motion.  Defendants' sole counterargument, that the Claims can be performed on a "general computer," misstates the law

1

and ignores the specification, which explains that the "computer" is programmed to function as a detector to process real signal samples obtained from a physical sampling process in a read channel.

## II.    FACTUAL BACKGROUND[1]

### A.    The Problem of Media Noise in Magnetic Data Storage

Aleksandar Kavcic and José Moura co-invented a method for use in a hard disk drive ("HDD") to improve its accuracy and performance. Dkt. 1 at ¶¶ 52-66. An HDD stores binary data on a disk of magnetic media. *Id.* at ¶ 28. To record data, the HDD's write head magnetically polarizes bit regions on the disk according to the sequence of the binary data to be written. *Id.* at ¶¶ 31-32. Where adjacent polarized bit regions are magnetized in opposite directions, there is a polarity "transition" between them; conversely, there is a "non-transition" between two adjacent bit regions magnetized in the same direction. *Id.* at ¶ 34. Sequences of transitions and non-transitions correspond to binary data (*e.g.*, a sequence of 0s and 1s). *Id.* at ¶¶ 34-37.

To read the recorded data, a read head generates an analog "readback" signal corresponding to the magnetic fields sensed by the read head. *Id.* at ¶ 36. The "read channel" of an HDD acts as an interface to read the data from the disk using the readback signal. *See Marvell*, 986 F. Supp. 2d at 591-92. Modern read channels contain a series of circuit components, including a sequence detector, that convert the readback signal into binary data by determining from samples of the readback signal the likely sequence of transitions and non-transitions on the disk. Dkt. 1 at ¶ 37.

Noise distorts the readback signal and complicates accurate detection of the written data. *Id.* at ¶ 38. As HDD capacity increased, bit regions became denser, transitions in the magnetic media increased and the dominant noise source became "media noise," which results from those transitions. *Id.* at ¶¶ 45-47. In the 1990s, when media noise became an increasingly significant problem, the HDD industry implemented Viterbi or Viterbi-like sequence detectors ("Viterbi detectors"), which use a Viterbi algorithm to translate noise-distorted samples of the readback signal into the likely data sequence written to the disk. *Id.* at ¶ 42. The read channel uses a Viterbi algorithm to detect the

---

[1] Mindful that the Court has not had the benefit of the technology tutorial, CMU sets forth below a general overview of the Claims and the problem to which they are directed. More detailed information is available in several opinions from the *Marvell* litigation, including (i) 807 F.3d 1283 (Fed. Cir. 2015), (ii) 986 F. Supp. 2d 574 (W.D. Pa. 2013) (JMOL/new trial/remitter), and (iii) 2010 WL 3937157 (W.D. Pa. Oct. 1, 2010) (claim construction).

likely data sequence using a trellis with branches that correspond to possible binary data sequences (*e.g.*, 010).  *Id.* at ¶ 43; Dkts. 1-3, 1-4 at Figs. 4 & 5.  The detector uses a branch metric function to compute a "branch metric value" for branches of the trellis, and sums the branch metric values along multiple paths through the trellis to obtain "path metric values."  Dkt. 1 at ¶ 43.  The path with the lowest path metric value usually corresponds to the likely sequence of data written to the disk.  *Id.*

Early Viterbi detectors used a single branch metric function to make all of these calculations.  *Id.* at ¶ 51.  This approach failed to address two key problems caused by the ever-increasing media noise.  *Id.* at ¶ 48.  First, it ignored that noise in readback signal samples is "correlated," *e.g.*, high media noise generated in the readback signal from a transition carries over into sample sequences in the neighborhood of the transition, so that all samples in the neighborhood tend to have high media noise.  *Id.*  Second, a single branch metric function does not account for the fact that correlated media noise is "signal dependent."  *Id.* at ¶¶ 49, 90.  That is, the noise has structure that depends on the specific data sequence written to the disk.  *Id.* at ¶¶ 49-50.  Ignoring the correlated, signal-dependent nature of the media noise became untenable as data density continued to increase.  *Id.* at ¶ 51.  Those skilled in the art recognized that accurate detection in the presence of media noise was a "very difficult" problem and, unable to solve it, resorted to inferior methods.  Dkt. 100 at ¶ 19, Ex. 2.

## B.    The Claims

CMU asserts that Defendants infringe claim 4 of the '839 Patent ("claim 4") and claim 2 of the '180 Patent ("claim 2").  As noted above, for the Court's convenience, CMU has set forth the Claims in a table at p. v.  Notably, Defendants recite only claim 4 in full in their Motion, but barely even address the specifics of claim 2, instead discussing ***unasserted*** claims extensively.  Claim 2 depends from claim 1 of the '180 Patent, which states:

> A method of determining branch metric values in a detector, comprising: receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith; selecting a branch metric function at a certain time index; and applying the selected function to the signal samples to determine the metric values.

Dkt. 1-4 at col. 15:39-48.  Claim 2 adds that the "branch metric function is selected from a set of signal-dependent branch metric functions."  *Id.* at col. 15:49-51.

The Claims addressed a long-felt need to improve the "physical realm" of HDDs by

accounting for the signal-dependent, correlated nature of media noise that degraded their performance. *See, e.g.,* Dkt. 100 at ¶ 19; Dkt. 1 at ¶¶ 2, 19, 51, 56, 61. The Claims enable more accurate data detection (and by extension, increased data density) because they use multiple signal-dependent branch metric functions ("a set"). Moreover, the functions are applied to multiple time-variant signal samples (*i.e.*, samples of the readback signal from different sampling time instances, *see* Fig. 3 of the Patents) to account for correlation of the signal-dependent noise.

### C.    Acclaim for the Invention

The inventiveness and resulting technical advance of the Claims was widely recognized in the field. Dkt. 100 at ¶ 19. Prof. Jaekyun Moon, a Senior IEEE Member and then professor at the University of Minnesota, wrote that the CMU invention "is viewed as a true breakthrough by myself and numerous others in the field" because before the invention "no one simply knew how to do optimal detection in the presence of jitter." *Id.* at ¶ 19, Ex. 4. The invention also became industry-standard. Dkt. 1 at ¶¶ 99-100. Marvell Technology Group, Ltd. ("Marvell"), a leading supplier of HDD read channel chips and Defendants' chief competitor, benchmarked all of its chips using the Claims in its "Kavcic Viterbi" detector, which its engineers referred to as the "gold standard." Dkt. 100 at ¶ 19. Marvell also incorporated the Claims in over two billion read channel chips, including in a version it called "KavcicPP." *Id.* Defendants themselves recognized the inventiveness of the Claims when an LSI Vice President told Prof. Kavcic in 2010 that LSI "cannot run channels w/o Kavcic's DDNP algorithms." Dkt. 1 at ¶¶ 85, 92 ("DDNP" an industry term for claimed invention).

### D.    Prior Proceedings Involving the Claims

In March 2009, CMU sued Marvell for infringement of the Claims. The seven-year, vigorously contested litigation included, *inter alia*, a four-week jury trial resulting in a $1.169 billion verdict (increased to $1.54 billion) and an appeal to the Federal Circuit, which upheld the validity of the Patents. In the appeal, Marvell invited the Federal Circuit to invalidate the Claims as covering an abstract idea. Appeal No. 14-1492, Dkt. 42 at 56 (Fed. Cir Aug. 4, 2014). The Federal Circuit declined Marvell's invitation, citing *Alice* and explaining that Marvell failed to identify any authority to support that an "unconventional method, like CMU's, for improving a physical process by overcoming limitations in physical devices" is patent ineligible. 807 F.3d at 1297 n.3. After the

4

*Marvell* verdict, in *ex parte* reexaminations of the Claims, the USPTO confirmed the patentability of both Claims without amendment.  Dkt. 1 at ¶¶ 67-69, Exs. 5-6.  Defendants disparage these prior proceedings as pre-*Alice* and argue that *Alice* undercuts these results, but simultaneously ignore the Federal Circuit's citation to *Alice* while inconsistently embracing decades-old case law that substantially predates the *Marvell* verdict.  Dkt. 105 at 11 (citing 1978 and 1981 cases).

## III.    LEGAL STANDARDS

### A.    Motions for Judgment on the Pleadings

On a Rule 12(c) motion, the court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  Judgment on the pleadings is appropriate only "when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Id.*

### B.    Patentable Subject Matter

35 U.S.C. § 101 provides broadly for patent eligibility of "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." There are three exceptions to that rule: "[l]aws of nature, natural phenomena, and abstract ideas." *Alice*, 573 U.S. at 216.  Courts must "tread carefully in construing this exclusionary principle, lest it swallow all of patent law."  *Id.* at 217.

To analyze patent-eligibility, courts use a two-step framework.  *Id.*  First, they determine if the claims are directed to a patent-ineligible concept ("Step One").  *Id.*  If so, courts then look for an "inventive concept"—"an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself" ("Step Two").  *Id.* (internal quotations omitted).  The two steps "involve overlapping scrutiny." *Visual Memory, LLC v. NVIDIA Corp.,* 867 F.3d 1253, 1258 (Fed. Cir. 2017).  In conducting the analysis, courts should not "oversimplif[y]" key inventive concepts or "downplay" an invention's benefits.  *Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1337-38 (Fed. Cir. 2016).

### C.    Rule 12 Motions Raising a Section 101 Defense

Patent eligibility, "while ultimately a legal determination, is rife with underlying factual issues."  *Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335, 1339 (Fed. Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2870 (2014); *Berkheimer v. HP Inc.,* 881 F.3d 1360, 1368 (Fed. Cir. 2018).  A

5

defendant asserting a Section 101 defense "bears the burden of proving invalidity by clear and convincing evidence." *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.,* 15-CV-02177-SI, 2016 WL 283478, *2 (N.D. Cal. Jan. 25, 2016); *Berkheimer,* 881 F.3d at 1368.

Where factual disputes exist as to patent eligibility, the court must deny a Rule 12 motion. *Aatrix Software, Inc. v. Green Shades Software, Inc.,* 882 F.3d 1121, 1128 (Fed. Cir. 2018) (grant allowed "***only*** when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law"). Dismissal before claim construction and discovery is often improper. *See, e.g.*, *Tatcha, LLC v. Landmark Tech. LLC*, 16-CV-04831-WHO, 2017 WL 951019, at *6 (N.D. Cal. Mar. 10, 2017) (denying 12(c) motion because "a more developed record and claim construction will be helpful in resolving the … dispute[s]"); *Cave*, 2016 WL 283478 at *3 (same).

## IV.    ARGUMENT

### A.    The Claims Are Not Directed to an Abstract Idea.

Defendants improperly divorce the invention from its context, including the language of the Claims and their specifications, when they argue that the Claims are directed to "the wholly abstract endeavor" of "calculating branch metric values." Dkt. 105 at 6. Under Step One, claims must be "considered in their entirety to ascertain whether their character ***as a whole*** is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.,* 790 F.3d 1343, 1346 (Fed. Cir. 2015) (emphasis added). Here, the Claims plainly are directed to improving a specific physical process to solve a concrete technical problem, especially when considered as a whole.

#### 1.    The Claims Are Tied to a Specific Physical Process.

Ignoring some key claim terms and substituting abstract terms for others, Defendants incorrectly assert that the claimed inventions are "disembodied from the physical realm." Dkt. 105 at 9. The claim language, however, is directed to a specific physical process performed by a ***detector*** to more accurately ***detect*** data written on a ***physical*** storage medium.

Indeed, Defendants repeatedly mischaracterize the Claims as simply applying a mathematical formula to generic "information." *See, e.g.*, *id.* at 13-14. The Claims never use the term "information"; they are explicitly limited to the detection of written data from "signal samples," a far more precise term. The Patents explain that the "signal" that is "sampled" is the "readback signal,"

6

which reflects "the variations in the magnetic flux" from the written bit regions on the magnetic medium.  Dkt. 1-3 at col. 3:14-15.  "Sampling" is the process of taking the instantaneous value of the analog readback signal at discrete, periodic instants in time.  *See id*. at Fig. 3.  A "signal sample" is, therefore, the value of the signal at a particular sampling time.  Thus, a "signal sample" results from an analog signal reflective of physical phenomena (*i.e.*, the magnetic fields from the disk) being put through a sampling circuit.   Using "information" to obscure the physicality of signal samples, Defendants improperly "describ[e] the claims at such a high level of abstraction and untethered from the language of the claims" that it "all but ensures that the exceptions to § 101 swallow the rule." *Enfish,* 822 F.3d at 1337; *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the[ir] specific requirements…") (internal quotations omitted).

The parties' claim constructions further demonstrate that the Claims are directed to a concrete physical process.  Several of the parties' ***agreed-upon*** constructions directly reference the process by which a read channel reads data in a "noisy" environment.  The parties agree that "branch" means "a potential transition between two states (nodes) immediately adjacent in time in a 'trellis.'"  Dkt. 78 (Joint Claim Construction Statement) at 2.  "Trellis" in turn means, as agreed, "a graphical representation of the progression of states ***of a communications channel*** in time."  *Id.* (emphasis added).  Likewise, a "signal sample" is not simply an arbitrary numerical value, but specifically means "a value of a ***signal*** at a ***certain point in time***."  *Id.* (emphasis added).  Claim 2, in particular, requires the detector to "***receiv[e]*** a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith."  Because a "signal sample" can be generated and received only as part of a physical process, the requirement of "receiving" such a sample further grounds the Claim in that physical process.  The parties further tie the Claims to a physical signal by agreeing that "noise" is "an unwanted ***disturbance*** in a ***signal***."  Signals and noise exist where data has been written to a storage medium and specific hardware undertakes a physical process to read that data.

CMU's proposed constructions, which LSI disputes, further underscore this point.[2]  CMU

[2] Defendants' requests to delay claim construction proceedings leave unresolved several claim

OPPOSITION TO MOTION FOR JUDGMENT                            CASE NO. 3:18-cv-04571-JD
ON THE PLEADINGS

construes (i) "signal-dependent branch metric function" as "a 'branch metric function' that accounts for the **signal-dependent structure of the media noise**," (ii) "signal-dependent noise" as "**media noise** in the **readback signal** who noise structure is attributable to a specific sequence of symbols…," and (iii) "correlated noise" as "**noise** with 'correlation' among '**signal samples**'…." Dkt. 78-3 at 6, 19, 22 (emphasis added). "Media noise" requires the presence of physical "media" (*i.e.*, the magnetic disk in a hard drive) and CMU's constructions further tie signal-dependent branch metric functions directly to physical media noise. Tellingly, Defendants **never** address "signal-dependent branch metric functions" in their Motion, focusing instead exclusively on the conspicuously truncated phrase "branch metric functions." *See, e.g.*, Dkt. 105 at 6.

Moreover, if the Court adopts CMU's claim constructions for purposes of this Motion, it must treat the preambles of the Claims as limiting, thereby requiring that the Claims be performed in or for detectors. Defendants, unsurprisingly, dispute CMU's construction, arguing that the preambles cannot be limiting because they "simply recite the *purpose or intended use* for the calculated values." *Id.* at 18. This is untenable under the law and should be rejected to the extent the Court engages in claim construction to resolve the Motion. The preambles are limiting here because they "recite[] essential structure or steps, or … [are] necessary to give life, meaning, and vitality to the claim." *Intri-Plex Techs., Inc. v. NHK Int'l Corp.*, 17-CV-01097-EMC, 2018 WL 659017, at *3 (N.D. Cal. Feb. 1, 2018) (internal quotations omitted); *see also Intel Corp. v. Wi-LAN, Inc.*, C 08–04555 JW, 2011 WL 62494, at *5 (N.D. Cal. Jan. 7, 2011) ("[P]reamble language will limit … if it recites … the essence of the invention without which performance of the recited steps is nothing but an academic exercise. This principle … frequently holds true for method claims.").

**First**, the Claims are plainly directed to methods for use in or for detectors as confirmed by

---

construction disputes, as to which this Court "must proceed by adopting the non-moving party's constructions, or … resolv[ing] the disputes to whatever extent is needed to conduct the § 101 analysis." *Aatrix*, 882 F.3d at 1125. If the Court does the latter, it should give "reasonable deference" to CMU's constructions, which generally track those adopted in the *Marvell* litigation, in a carefully reasoned order issued following extensive proceedings, including a technology tutorial, hearing, and input from a court-appointed technical advisor. *See Finjan, Inc. v. Symantec Corp.*, 14-CV-02998-HSG, 2017 WL 550453, at *3 (N.D. Cal. Feb. 10, 2017) ("[D]istrict courts have granted 'reasoned deference' to claim construction orders outside their jurisdiction that address the same term in the same patent, given the importance of uniformity in claim construction.").

the title of the invention, summary of the invention and the drawings.  Courts routinely find

preambles limiting in such cases.  *See, e.g.*, *Intri-Plex*, 2018 WL 659017, at *6; *Quanergy Sys., Inc.*

*v. Velodyne Lidar, Inc.*, 16-CV-05251-EJD, 2017 WL 4410174, at *6 (N.D. Cal. Oct. 4, 2017)

(preamble limiting where patent had "a consistent and exclusive focus" on 3-D systems indicating

"the inventors intended to limit the claims" to those systems and the preamble was "the only portion

of the claims in which these words appear").[3]  Consistent with CMU's position, the USPTO during

prosecution treated "Viterbi-like detector" in the claim 4 preamble as limiting.  *See* Verdini Decl. at

¶ 3, Ex. 1.

     *Second*, the preambles are limiting because the "limitations in the body of the claim[s] rely

upon and derive antecedent basis from the preamble[s]."  *Proveris*, 739 F. 3d at 1372.  The body of

Claim 4 recites "branches," referring back to the preamble's "branches of a trellis for a Viterbi-like

detector."  Likewise, the "detector" in the preamble of Claim 2 is needed to perform the "receiving"

step in the claim body.  Again, courts routinely find such preambles limiting.  *See, e.g.*, *id.* at 1373.[4]

     Finally, Defendants' own proposed claim constructions confirm that the Claims are tethered

to a specific physical process.   Defendants construe "signal-dependent noise" as "***noise in a***

***received signal*** attributed to the specific sequence of symbols" and "correlated noise" as "***noise***

among ***signal samples*** that tends to vary together."  Dkt. 78-3 at 19, 22 (emphasis added).  Without a

---

[3] *See also, e.g.*, *Proveris Sci. Corp. v. Innovasys., Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) (preamble limiting where the specification described an inventive concept and the preamble "is the only reference in any independent claim to th[at] inventive concept"); *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (preamble reference to rotary cutter limiting where "[t]he title of the patent, the summary of the invention, and every drawing describe the invention as a deck for a rotary cutter"); *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343-44 (Fed. Cir. 2006) (preamble of "method of high speed manufacture of a single copy of a book" was "necessarily" limiting because it "states the framework of the invention"); *Gen. Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999) (preamble limiting where specification clearly addressed display devices and "to read the claim indiscriminately to cover all types of display systems would be divorced from reality"); *PersonalWeb Techs. LLC v. IBM Corp.*, 16-CV-01266-EJD, 2017 WL 2180980 (N.D. Cal. May 18, 2017) (preamble reference to "hardware, including at least a processor, and software, in combination with said hardware" limiting where the specification indicated the invention related to data processing systems, identified problems in computer systems to which the invention was addressed, and described multiple exemplary hardware arrangements).

[4] *See also, e.g., Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015); *Johnstech Int'l Corp. v. JF Microtech. Sdn Bhd*, 14-CV-02864-JD, 2016 WL 631936, at *4 (N.D. Cal. Feb. 17, 2016) (Donato, J.); *PersonalWeb*, 2017 WL 2180980, at *13.

OPPOSITION TO MOTION FOR JUDGMENT
ON THE PLEADINGS

CASE NO. 3:18-cv-04571-JD

physical process in a read channel, there are no "received" signals and there is no noise.

Given the physical limitations in the language of the Claims, Defendants ultimately ask this Court to hold that the Claims are nonetheless invalid simply because they incorporate an algorithm. The law, however, is clear that an invention is not rendered patent-ineligible "simply because it uses a mathematical formulation." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981); *Cal. Inst. of Tech. v. Hughes Comm's Inc.*, 59 F. Supp. 3d 974, 994 (C.D. Cal. 2014) (claims directed to encoding and decoding data for error correction patentable even though "limitations are mathematical algorithms" because the "algorithms are narrowly defined" and "tied to a specific error correction process").

### 2.   <u>The Specifications Confirm that the Claims are Not Abstract.</u>

Defendants, in a further attempt to strip all specificity from the Claims, ask this Court to ignore the specifications of the Patents as purportedly inconsistent with the claim language.  Dkt. 105 at 3.  The specifications, however, further highlight what the claim language taken as a whole already demonstrates—that the Claims cannot be abstracted from the physical process by which a read channel detects data written to a storage medium and are directed to solving the physical problem of media noise.  *Compare with ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019) (finding claim directed to abstract idea of networking where the invention was not directed to any physical problem with the charging station to which networking was added).

The '839 Patent specification, for instance, opens with "[t]he present invention is directed generally to high density magnetic recording sequence detectors, and, more particularly, to correlation-sensitive sequence detectors."  Dkt. 1-3 at col. 1:21-23.  It then describes the concrete problem of media noise in "high density magnetic recording," to which the invention is directed.  *Id.* at col. 1:38-41, 58-63, 2:3-8.  It further explains that "[t]he present invention represents a substantial advance over prior sequence detectors" that "takes into account the correlation between noise samples in the readback signal," indicating that the invention is a form of sequence detection that addresses the physical problem of media noise in magnetic recording systems.  *Id.* at col. 2:24-25.  Defendants denigrate the relevance of the specification's description by focusing illogically on the claim limitations of ***unasserted*** claims.  That other claims in the Patents may have ***more*** physical restrictions, however, does not erase the physicality of the Claims.

10

When the Claims are read "against th[e] context" of the specifications, "it is clear that [they are] not intended to be a … disembodied set of steps, but a solution that is implemented on a [detector] and deployed in the real world." *PersonalWeb*, 2017 WL 2180980, at *13; *Uniloc USA, Inc. v. ADP, LLC*, 2018-1132, 2019 WL 2245938, at *5 (Fed. Cir. May 24, 2019) (claims not abstract where specification demonstrates "clear focus" of the claim is "a particular improvement in *how* [the functioning of distribution networks] is done"). In fact, the Patents are "so clearly directed to a method" for sequence detection in a read channel "that it is difficult to interpret [the Claims] as serving any [other] function." *Sycamore IP Holdings LLC v. AT&T Corp.*, 294 F.Supp.3d 620, 651 (E.D.Tex. 2018) ("That is so even though compression is not expressly required by claim 1 and even though dependent claim 4 adds the requirement of compression."). Because the Claims "perform the specific function" of sequence detection, they "are not simply claims to an abstract idea with the instruction to 'apply it'" and are patent-eligible under Step One. *France Telecom S.A. v. Marvell Semiconductor Inc.*, 39 F. Supp. 3d 1080, 1093 (N.D. Cal. 2014) ("specific function" of "error correction in … decoding").

### 3.    The Claims Present a Specific Solution to a Technical Problem.

Finally, under Step One, "[a]pplication[s] of [patent-ineligible] concepts to a new and useful end … remain eligible for patent protection." *Alice*, 573 U.S. at 217. The Federal Circuit itself recognized that the Claims met this standard, when, quoting that very language from *Alice,* it described the Claims as "an unconventional method … for improving a physical process by overcoming limitations in physical devices—discerning more accurately what is on a physical recording medium from what a read head has sensed." *Marvell*, 807 F.3d at 1297 n.3.[5]

CMU pled that the Claims improve a physical process. Dkt. 1 at ¶¶ 65-66. These factual allegations, which must be taken as true here, demonstrate that the "[C]laims provide a specific … solution for a [specific] problem, … even if their novel elements are mathematical algorithms," and as such are patent-eligible. *Hughes*, 59 F. Supp. 3d at 993 (claims patent-eligible because they "improve[d] efficiency" of data transmission system); *Enfish,* 822 F.3d at 1336 (claims improving

---

[5] Defendants downplay this language by asserting it "does not address a § 101 challenge," and is directed only to an argument about simulators. No spin can detract from the Federal Circuit's direct citation to *Alice*'s § 101 standard and plain characterization of the Claims in view of that standard.

OPPOSITION TO MOTION FOR JUDGMENT                     CASE NO. 3:18-cv-04571-JD
ON THE PLEADINGS

"existing technological process[es]" are patent eligible even if they rely on a mathematical algorithm); *McRO,* 837 F.3d at 1316 (claim patentable where it "uses the limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice"); *Sycamore,* 294 F.Supp.3d at 651 ("[T]he point of the invention is not simply the transmission of data in coded form, but the conversion of the data into a form that makes [its] communication … more efficient. … As such, the recited protocol, even though expressed … as an algorithm, is a concrete technical contribution and not simply the embodiment of an abstract idea."); *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 3:16-CV-02787-WHO, 2016 WL 6834614, at *7 (N.D. Cal. Nov. 21, 2016) (method that uses a predefined set of numbers derived from an equation to enable a mobile device to more efficiently synchronize with a base station patentable because it "entails more than an abstract idea or 'just math'").

### 4.   <u>Defendants' Case Law is Inapposite.</u>

The physical limitations inherent in the claim language, the particular method claimed setting forth how to improve physical limitations (*e.g.*, the ***set*** of ***signal-dependent branch metric functions*** applied to a ***plurality*** of signal samples), and the improvement generated by the Claims render Defendants' case law inapposite. *See Parker v. Flook*, 437 U.S. 584 (1978) (formula with no explanation of how variable inputs were to be determined and same end result as pre-existing calculation methods); *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972) (claim for binary-coded decimal numeral conversion "not limited to any particular art or technology, to any particular apparatus or machinery, or to any particular end use" and purporting "to cover any use of the … method in a general-purpose digital computer"); *ChargePoint*, 920 F.3d at 768 (invention "'directed to' the abstract idea of communication over a network to interact with network-attached devices" ***in absence of*** any suggestion that "charging station itself is improved from a technical perspective" or "invention involved overcoming some sort of technical difficulty in adding networking capability to the charging stations"); *SAP Am., Inc. v. Investpic, LLC*, 898 F. 3d 1161, 1167 (Fed. Cir. 2018) (claim directed to analyzing financial "information" with no corresponding "physical-realm improvement"); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (claim directed to analyzing pre-existing "information," *i.e.*, "records of human activity" like access

12

logs, using pre-existing fraud-related rules such that it "merely implement[s] an old practice in a new environment"); *Digitech Image Tech., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1349, 1351 (Fed. Cir. 2014) (no claim language tied the method to an image processor so claim "directed to information in its non-tangible form" and not to "any tangible embodiment of this information (i.e., in physical memory or other medium)").

**B.    The Claims Contain an Inventive Concept.**

Because the Claims are not directed to an abstract idea, this Court need not proceed to Step Two. *Enfish*, 822 F.3d at 1339. Even if this Court concludes that the Claims fail Step One, they are still patent-eligible under Step Two as containing "inventive concept[s]" beyond "simply recit[ing] well-understood, routine, conventional activit[ies]." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (internal quotations omitted).[6]

CMU's pleadings and the Patents demonstrate the inventiveness of the Claims. CMU has pled that the Claims (i) are a concrete solution to the physical problem of media noise, (ii) make read channels more accurate, improving HDD performance, (iii) are a substantial improvement over the prior art (and were confirmed in reexaminations), (iv) utilized non-routine and unconventional steps for determining branch metric values for branches of a trellis of a detector, and (v) represented a breakthrough widely recognized, praised, and adopted in the field. *See infra* at Sections II.A-D. The Patents further support these allegations by identifying (i) the problem to which the invention is directed— media noise that "deteriorates significantly the performance of detectors at high densities," (ii) the inadequacies of the prior art—it "did not take into consideration the correlation between noise samples in the readback signal," and (iii) the tangible benefits of the invention—a "substantial advance over prior sequence detectors" that "takes into account th[at] correlation" and thereby enables detection "with a higher degree of accuracy."[7] *See, e.g.*, Dkt. 1-3 at col.1:38-2:28. This inventiveness renders the Claims patent-eligible. *See, e.g., France Telecom*, 39 F. Supp. 3d at

---

[6] Conversely, if the Court finds that the Claims satisfy Step Two, or the matter is disputed, it can deny the Motion on that basis, without making a Step One determination. *Id.* at 1348.

[7] "[T]he court must take the specification's statements about the purported invention to be true." *MAZ Encryption Techs. LLC v. Blackberry Corp.*, CV 13-304-LPS, 2016 WL 5661981, at *5 (D. Del. Sept. 29, 2016); *see also McRO*, 837 F.3d at 1313 (specification's explanation of benefits of the claimed rules establish inventive concept).

13

1093 (claims "that exceed the prior art, namely, coding in parallel and a novel method of iterative coding" patent eligible); *Evolved Wireless, LLC v. Apple Inc.,* 221 F. Supp. 3d 485, 493-94 (D. Del. 2016) (claims that solve specific problems in a communications system by overcoming limitations in prior art are patent eligible).

Defendants denied CMU's allegations as to inventiveness, *see generally* Dkt. 97, and the resulting dispute of material fact also necessitates the denial of their Motion. *See Aatrix*, 882 F.3d at 1126-28 (disputes of material fact exist where complaint "describe[d] the development of the patented invention, including the problems present in prior art" and alleged "improvements and problems solved by the ... patented inventions," thereby contradicting that "the claimed combination was conventional or routine"); *Pure Data Sys., LLC v. Ubisoft, Inc.*, 329 F. Supp. 3d 1054, 1069 (N.D. Cal. 2018) (denying Rule 12(b)(6) motion where plaintiff "alleges that its purported invention improves data storage system efficiencies in a non-conventional manner and Ubisoft has not presented cognizable sources showing that allegation to be false"); *Symantec Corp. v. Zscaler, Inc.*, 17-CV-04426-JST, 2018 WL 3539269, at *3 (N.D. Cal. July 23, 2018) (denying Rule 12(c) motion based on the patent's discussion of the invention's novelty).

In a bid to avoid this fatal factual dispute, Defendants inaccurately claim the invention can be performed on an "already-available computer[]" that by definition cannot be "inventive." Dkt. 105 at 16. Tellingly, Defendants do not make the classic *Alice* argument that the Claims recite long-standing practices simply improved by implementation on a computer. Rather, Defendants resort to an incomplete quotation from the '839 Patent that the method "can be performed on a computer." *Id.* The full quote belies Defendants' argument.

> It can be understood by those skilled in the art that the method of FIG. 6 can be performed on a computer. The steps may be coded on the computer as a series of instructions, which, when executed, cause the computer to detect a sequence of adjacent signal samples stored on a high density magnetic recording device. The computer may be, for example, a personal computer, a WorkStation, or a main frame computer. The computer may also have a storage device, such as a disk array, for storage of the series of instructions.

Dkt.1-3 at col. 11:20-35. Fig. 6 depicts that the method that "can be performed on a computer" is for "detecting a sequence of adjacent signal samples stored on a high density magnetic recording device." *Id.* at col. 11:11-13. It includes the step of performing sequence detection with the signal

14

samples from the magnetic recording device.  *Id.* at fig. 6, step 38.  Thus, a computer used to implement the Claims, just like a specialized read channel chip, is specially programmed to read actual data written to a disk using readback signal samples.  *Id.* at step 40.  Because computer implementations of the Claims remain firmly tied to a physical process in a read channel, the Claims do not "simply instruct the practitioner to implement [an] abstract idea … on a generic computer." *Alice*, 573 U.S. at 225; *see also Enfish*, 822 F.3d at 1338 (contrasting patent-eligible claims with those "recit[ing] a purely conventional computer implementation of a mathematical formula").[8]

### C.    The Claims Do Not Pre-Empt All Read Channel Detection Methods.

Defendants end by arguing that CMU's Complaint "highlight[s]" that the Claims purportedly "preempt[] all use of [the claimed abstract] idea."  Dkt. 105 at 20.  This, too, is wrong.  Defendants characterize the "abstract idea" underlying the Claims as "applying mathematical functions to values (signal samples) to obtain other values (branch metric values)."  *Id.* at 6.  It is undisputed that there are methods other than CMU's to do this; Defendants even identify the Viterbi algorithm as one.  *Id.* Moreover, the claims do not preempt, for instance, applying a selected signal dependent branch metric function to a single signal sample.  *See, e.g.*, Dkt. 1-3 at col.1:26-56; *see also Hughes*, 59 F. Supp. 3d at 996 (claimed method did not "capture many forms" of implementing error correction, and thus, the claims did "not preempt the field").  The parties' dispute as to preemption further emphasizes that Defendants' Section 101 defense is inappropriate for a Rule 12(c) resolution.  *See Mirror Worlds Techs., LLC v. Apple Inc.,* 6:13-CV-419, 2015 WL 6750306, * 10 (E.D. Tex. July 7, 2015) ("[T]he court cannot conclude at the pleading stage that [the] claim uses … generic computer functions to disproportionately preempt the abstract idea").

### V.    <u>CONCLUSION</u>

For the foregoing reasons, CMU respectfully asks that this Court deny Defendants' Motion.

---

[8] The Patents describe (but do not claim) computer simulations that were performed with non-real (*i.e.*, synthetic) signal samples to validate through simulations the improved performance of the invention.  Dkt. 1-3 at col. 11:30-65.  But such use to validate performance does not support Defendants' attempt to treat the Claims as a mathematical equation applied to "values" or "information" when the Claims are directed to a physical process with real signal samples that have real signal-dependent media noise from real magnetic recording media.

OPPOSITION TO MOTION FOR JUDGMENT
ON THE PLEADINGS

CASE NO. 3:18-cv-04571-JD

Respectfully submitted,

Dated:  June 26, 2019

*/s/ Christopher M. Verdini*
Harold H. Davis, Jr. (SBN 235552)
harold.davis@klgates.com
**K&L Gates LLP**
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
(415) 882-8200

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Carnegie Mellon University*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 26th day of June, 2019, the foregoing document was served on all counsel of record who have consented to electronic service via the Court's ECF system.  Any other counsel of record who have not registered as an ECF user will be served by electronic transmission, facsimile transmission, or first class mail.

*/s/ Christopher M. Verdini*
Christopher M. Verdini

OPPOSITION TO MOTION FOR JUDGMENT
ON THE PLEADINGS

CASE NO. 3:18-cv-04571-JD