# EXHIBIT F

KENNETH L. STEINTHAL (SBN 268655)
ksteinthal@kslaw.com
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone:    (415) 318-1211
Facsimile:    (415) 318-1300

STEVEN JAY RIZZI (admitted *pro hac vice*)
srizzi@kslaw.com
RAMY HANNA (admitted *pro hac vice*)
rhanna@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendants LSI CORPORATION
and AVAGO TECHNOLOGIES U.S. INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY, <br><br> Plaintiff, <br><br> vs. <br><br> LSI CORPORATION and AVAGO TECHNOLOGIES U.S. INC., <br><br> Defendants. | Case No.: 3:18-cv-04571-JD <br><br><br> **REBUTTAL CLAIM CONSTRUCTION DECLARATION OF EMINA SOLJANIN, PH.D.** |

I, Emina Soljanin, submit this declaration at the request of Defendants LSI Corporation and Avago Technologies U.S. Inc. ("Defendants") to provide my opinions concerning the proposed claim constructions in this action, in rebuttal to the opinions on claim construction set forth in the Declaration of Professor Steven W. McLaughlin, dated April 8, 2019.

**I.    Introduction**

1.    I am a Professor of Electrical and Computer Engineering at Rutgers University in Piscataway, New Jersey.

2.    I have been asked to offer opinions as an expert regarding the scope of certain terms of claim 4 of U.S. Patent No. 6,201,839 ("the '839 patent"), which I understand has been asserted against Defendants by plaintiff Carnegie Mellon University ("CMU"). I have also been asked to offer opinions as an expert regarding the scope of certain terms of claims 1 and 2 of U.S. Patent No. 6,438,180 ("the '180 patent"), which I understand is also being asserted in this case.  The '839 and '180 patents pertain to the fields of telecommunications, signal processing, and detection & estimation for storage and transmission systems.

3.    In addition, I have been asked to provide expert opinions related to the level of ordinary skill of a hypothetical person working in the fields of telecommunications, signal processing, and detection & estimation for storage and transmission systems.

4.    I have also provided opinions on the meanings of the claim terms "Viterbi-like," "each sample corresponds to a different sampling time instant," "signal-dependent noise," "correlated noise," "branch metric function," and "a set of signal-dependent branch-metric functions."

5.    For purposes of my analysis I have applied a timeframe between 1997-1999.  My opinions would remain the same for any specific date in that timeframe.

6.    The bases for my opinions include the following: (i) my education; (ii) my 25 years of experience in the fields of telecommunications, signal processing, and detection & estimation for storage and transmission systems; and (iii) my review of certain documents pertaining to this proceeding.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

7.     In forming the opinions discussed in this declaration, I have reviewed at least:

- The '839 patent and its file history;
- The '180 patent and its file history;
- Dr. McLaughlin's declaration on claim construction; and
- All other documents cited in this declaration.

## II.     Expert Qualifications

8.     I am currently a professor of Electrical and Computer Engineering at Rutgers University, a position I have held since 2016. My research interests are broad, but mainly concern theoretical understanding and practical solutions that enable efficient, reliable, and secure operation of communications and storage systems. I also have expertise and interest in power systems and quantum computing. My research has been funded by the National Science Foundation, DARPA, and other funding agencies.

9.     All of my degrees are in Electrical Engineering. I earned a European Diploma degree from the University of Sarajevo, Bosnia, in 1986, and MS and PhD degrees from Texas A & M University in 1989 and 1994, respectively.

10.     Between my studies at the University of Sarajevo and my graduate studies, from 1986 to 1989, I worked in industry developing optimization algorithms and software for power system control.

11.     Upon earning my PhD, I joined Bell Laboratories in Murray Hill, NJ, where I was a Member of the Technical Staff in the Mathematics of Networks and Communications research department. Over a dozen alumni of Bell Labs have won the Nobel prize in physics, with several more having been awarded the Turing Award, the highest distinction in computer science. In 2004 I was elevated to Distinguished Member of the Technical Staff.

12.     During my time at Bell Labs I was also an adjunct professor, guest lecturer, or visiting professor at various academic institutions around the world including, Columbia University, École Polytechnique Fédérale de Lausanne (EPFL) in Switzerland, École Nationale Supérieure de l'Électronique et de ses Applications (ENSEA) in Cergy-Pontoise, France, the

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

University College Dublin, and others. I also mentored many students, interns, and postdoctoral researchers during that time.

13.    In the course of my twenty-one-year employment with Bell Labs, I participated in a very wide range of research and business projects. These projects include designing the first distance enhancing codes to be implemented in commercial magnetic storage devices.

14.    Other projects that I worked on at Bell Labs included the first forward error correction for Lucent's optical transmission devices, color space quantization and color image processing, quantum computation, link error prediction methods for the third generation wireless network standards, and anomaly and intrusion detection. Some of my most recent activities are in the area of network and application layer coding.

15.    I am the inventor of 14 issued U.S. patents. I am also the named inventor on a variety of additional patent applications that are pending at this time.

16.    I have authored numerous peer-reviewed journal and conference publications, as well as books and book chapters. Many of these publications relate to signal processing and data detection and estimation for storage and transmission systems, including magnetic recording channels, and several were published in leading journals including the IEEE Transactions on Magnetics and the IEEE Transactions on Information Theory.

17.    In the mid-1990s I published several research articles relating to signal processing and data detection and estimation for storage and transmission systems. For example, in 1994 I presented a paper[1] at the IEEE International Symposium on Information Theory (known as ISIT) titled "Two-track codes for magnetic recording channels" investigating the performance of a digital recording system using two track detectors to detect two adjacent tracks simultaneously to combat inter-symbol interference and inter-track interference that result from densification. In 1995 I extended this result in a paper[2] titled "Coding for two-head recording systems" in the

---

[1] E. Soljanin & C. N. Georghiades, *Two-track codes for magnetic recording channels*, PROC. 1994 IEEE INT. SYMP. INFORM. THEORY 150, (1994) (attached as Exhibit 1).
[2] E. Soljanin & C. N. Georghiades, *Coding for two-head recording systems*, 41 IEEE TRANS. INFORM. THEORY 744, (1995) (attached as Exhibit 2).

IEEE Transactions on Information Theory. Additional publications in the fields are listed in my curriculum vitae.

18.    At Rutgers, I have also taught undergraduate and graduate courses relevant to the subject matter of the '839 and '180 patents. For example, I have taught Probability and Random Processes, Error Control Coding, Signal Processing I & II, and Communication Theory I & II.

19.    Among other professional recognitions, I was elected an IEEE Fellow for my "contributions to coding theory and coding schemes for transmission and storage systems." I am currently President of the IEEE Information Theory Society.

20.    My curriculum vitae, attached as Exhibit 3, includes additional details about my experience and professional background.

21.    I am being compensated at my standard hourly rate of $450 for my work in this case. My compensation is not contingent on the outcome of this litigation.

## III.    Applicable legal standards

22.    I am not an attorney. In preparing and expressing my opinions and considering the subject matter of the '180 and '839 patents, I am relying on certain legal principles that counsel has explained to me, as described below.

### A.    Level of ordinary skill in the art

23.    I understand that various factors should be considered in determining the level of skill of the hypothetical person of ordinary skill in the art.  These factors include: (a) the educational background of those actively working in the field at the time the invention was made; (b) the type of problems encountered in the art; (c) the various ways that others sought to solve the existing problems; (d) the rapidity with which innovations were being made in the art at the time of the invention was made; (e) the level of technological sophistication at the time the invention was made; (f) the educational level of the inventor; and (g) the teachings and disclosures of any references that indicate what the level of ordinary skill in the field may have been at the time the invention was made.

4

24.     A person of ordinary skill in the art ("POSITA") would possess at least a Master's degree in electrical engineering and at least two years of experience in industry or academia. The person could also have a Ph.D. in electrical engineering in lieu of industry experience. The person would have experience in the implementation, design, and analysis of data detection algorithms including equalization, decoding, and filtering. This knowledge would include the Viterbi algorithm, the BCJR algorithm, and partial response filtering.  A person of ordinary skill may be working alone or in a team of individuals to possess these skills.  I was a person of at least ordinary skill in the relevant art under this definition prior to the 1997-1999 time frame.

25.     In forming my opinions for this declaration, I have used the perspective of one of ordinary skill in the art as explained above. My opinions would not change, however, if a person of ordinary skill in the art were defined as someone who has a few more or less years of experience than defined above.

26.     Dr. McLaughlin defines a POSITA as someone with a Master's degree in electrical engineering with "several years" of work experience. McLaughlin Decl., ¶ 58. I was a person of at least ordinary skill in the relevant art under this definition prior to the 1997-1999 time frame. My opinions would not change if a POSITA were defined under Dr. McLaughlin's definition.

**B.     Claim construction**

27.     I understand that the purpose of claim construction is to ascertain the proper meaning and scope of a claim term, as understood by a person of ordinary skill in the art.  I understand that patent claims are construed in light of: (a) the claims themselves; (b) the specification including the drawings of the patent; and (c) the prosecution history of the patent and related patents in the family, including the cited references.  I understand that this material is referred to as the "intrinsic" evidence.  I understand that the Court may consider additional evidence ("extrinsic" evidence) which is outside the patent and prosecution history.  I understand that extrinsic evidence can include expert testimony, dictionaries, treatises, and prior art.

28.     A primary source for construing a claim term is the plain and ordinary meaning of the claim term itself. Other claims in the patent can also be informative, even if those claims are not asserted, since claim terms are normally used consistently throughout the patent. Claims in related patents may also be informative, since it is presumed that the same claim term in the same patent or related patents has the same meaning. It is also my understanding that language in a claim should not be construed so as to render that language superfluous.

29.     Claims are read in light of the specification as understood by a person of ordinary skill in the art.  I understand that the specification and other intrinsic evidence may be used to assist with understanding the claims, but that limitations from the specification should not be read into the claims.

30.     I understand that the prosecution history of a patent provides the record of the examination of a patent application before the U.S. Patent and Trademark Office (PTO) with reference to the prior art cited during the examination, and includes any reexamination proceedings before the PTO. The prosecution history provides evidence of how the patent examiner and the inventor understood the patent application and the claims, and can therefore be instructive on how to interpret the claims. For instance, the prosecution history may show that the patentee surrendered a particular claim interpretation in an argument or in a claim amendment to overcome prior art or for other reasons. It is my understanding that arguments or amendments made in one patent of a patent family can be instructive as to the meaning of like terms in another patent of the family.

31.     Extrinsic evidence may also be used in understanding the meaning of a claim term. Extrinsic evidence includes dictionaries, treatises, expert testimony, and prior art. But it is my understanding that one should first look to the intrinsic evidence in construing claims.

32.     I have been informed that patent claims must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them, which is referred to as the "definiteness" requirement.  I further understand that although the Court has indicated that claim indefiniteness is not going to be decided as part of the claim construction

process, a patent claim is invalid for indefiniteness if the specification of the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

33.    I further understand that analysis of indefiniteness of any claim terms is similar to that of claim construction in that it must be conducted from the viewpoint of a person skilled in the art at the time of the filing of the patent.

## IV.    Background of the technology

### A.    Signal Processing and Sequence Estimation

34.    The '839 patent relates to the fields of telecommunications, signal processing, and detection & estimation for storage and transmission systems. In general terms, problems in detection and estimation typically surround the issue of estimating data symbols by performing calculations on a noisy version of the symbols. Approaches to these problems typically vary depending on underlying assumptions about the noise. One very common example is the assumption that noise is additive (it is represented as an addition of a noise term on top of the data) and Gaussian (the probability of the noise value being a given value is represented by a bell curve).

35.    Another common assumption is that the noise term for any given symbol has the same statistical properties (they are said to have an "identical distribution"), and that noise terms for adjacent symbols are independent (*i.e.*, knowledge of the noise term for one symbol provides no information about the noise term for any other symbol). When noise terms are independent for each symbol, they are also statistically uncorrelated.

36.    It is common practice in the field for practitioners to approach the data detection problem by: 1) assuming a given model for the noise; 2) choosing a performance metric to optimize; and 3) deriving algorithms to achieve an optimal or sub-optimal performance based on the chosen performance metric.

37.    There are many ways to evaluate the performance of an algorithm, and one common performance metric is known as the "likelihood." Likelihood has a precise statistical

7

definition, but it also matches with our intuition: given a sequence of numbers, what is the "likelihood" that the underlying data was a certain sequence instead of a different sequence? One can calculate a specific number to answer this question, and that calculation depends on the assumptions about the noise terms. In fact, for certain assumptions—such as the additive white Gaussian noise—one can use the Viterbi algorithm to implement a Maximum Likelihood Sequence Estimation (MLSE).

**B.    The Viterbi Algorithm**

38.      The Viterbi algorithm is named after Andrew Viterbi, the co-founder of Qualcomm who described the algorithm in a 1967 paper.[3] In 1973, David Forney famously applied the Viterbi algorithm to a number of applications, including digital magnetic recording, as well as text recognition "to show that the [Viterbi algorithm] is not limited to digital communications."[4] Noting the "generality of the model to which it applies," Forney foresaw that "it will find increasing application in the years ahead."[5] In 2005, Forney wrote that the Viterbi algorithm "has proved to be an extremely important algorithm in a surprising variety of fields."[6] He further noted that it "has become a general-purpose algorithm for decoding hidden Markov models in a huge variety of applications, from speech recognition to computational biology."[7]

39.      I agree with Dr. Forney that the Viterbi algorithm is a general-purpose algorithm for decoding systems with memory in a huge variety of applications. This is true because the algorithm itself is an abstract mathematical concept. The algorithm is often described using a graphical representation, called a "trellis diagram," depicting the states of a system.  A trellis diagram is used to depict the "nodes" and "branches" that represent possible transitions between states.  Trellises and branches  are abstract mathematical concepts that can be used to represent many different types of information. The Viterbi algorithm is general and extremely well-known

---

[3] Andrew J. Viterbi, *Error Bounds for Convolutional Codes and an Asymptotically Optimum Decoding Algorithm*, 13 IEEE Trans. Information Theory 260 (1967) (attached as Exhibit 4).
[4] G. David Forney, Jr., *The Viterbi Algorithm*, 61 Proc. IEEE 268, 270 (1973) (attached as Exhibit 5).
[5] *Id.* at 276.
[6] G. David Forney, Jr., *The Viterbi Algorithm: A Personal History*, Abstract, pre-print available at https://arxiv.org/pdf/cs/0504020.pdf (2005) (attached as Exhibit 6).
[7] *Id.* at 6.

1  in signal processing to determine the most likely sequence of useful data represented by noisy

2  signal samples.

3      40.     In other words, the trellis is a graphical way for people to understand the

4  algorithm and the system to which it is applied. But implementations of the algorithm do not use

5  actual graphical trellises or branches. Rather, the algorithm is implemented by calculating

6  numbers, comparing numbers, storing numbers, and retrieving stored numbers. The circuitry that

7  performs these operations does not use graphical representations such as a "trellis" or "branch."

8      **C.      Probability Density Functions**

9      41.     Dr. McLaughlin provides several pages of background on the specifics of digital

10 magnetic recording. In my opinion, this background is extraneous to the claim construction

11 disputes before the Court because the asserted claims (claim 4 of the '839 patent and claims 1

12 and 2 of the '180 patent) are not specific to digital magnetic recording.

13     42.     I disagree with Dr. McLaughlin to the extent that his opinions are based,

14 implicitly or explicitly, on the premise that the subject matter of the asserted claims is limited to

15 digital magnetic recording.  This misunderstanding contributes to his erroneous opinions on the

16 disputed claim terms.

17     43.     In fact, it is my opinion that the asserted claims are abstract and relate to a

18 statistical algorithm that can be applied in various environments—one of which is digital

19 magnetic recordings.

20     44.     Specifically, the asserted claims "select[]" a function, described as a "branch

21 metric function," and then "apply[]" that function to compute a value. From a high level, this is

22 all the claims do, although they do limit the type of mathematical function, what it is applied to,

23 and what type of value it produces.

24     45.     A branch metric function is derived from a probability density function, which is

25 a basic statistical concept that delineates "the relative frequency distribution of a random

26 variable, given the probability of occurrence of observations of various possible values of the

27

28

9

random variable." Pocket Dictionary of Statistics[8] (2002) at p. 211.  A conditional probability density function is a "probability distribution of a random variable (or joint distribution of several random variables) when the values of one or several other random variables are held constant."  Pocket Dictionary of Statistics (2002) at p. 55.

### D.  Branch Metric Functions

#### 1.  Relevance to Claims

46.  Claim 2 of the '180 patent requires the "select[ion]" of a "branch metric function" "at a certain time index" "from a set of signal dependent branch metric functions" that is in turn "applied" to calculate "branch metric values."

47.  Claim 4 of the '839 patent requires "selecting a branch metric function for each of the branches" "at a certain time index" "from a set of signal dependent branch metric functions."

48.   The signal-dependent nature of the branch metric functions means that for "each of the branches" analyzed, there needs to be a branch metric function that accounts for the noise attributable to the specific symbol sequence associated with that branch. In other words, when computing the branch metric value of a first branch, the branch metric function is specific to that branch's signal-dependent noise, which differs from the signal-dependent noise (and therefore signal dependent function) for any other branch.

49.   The "selected" function in each of the asserted claims is a "branch metric function."  This function, which is a statistical concept untied to any technology, is derived by maximizing a conditional probability density function. '839 patent, 4:4–39. It is used in statistical analyses to understand the likelihood of an individual event assuming that some other event has occurred. For example, a conditional probability density function could provide the likelihood that it will rain conditioned on the event that the sky was cloudy in the morning.

50.   In the context of a communication channel, a conditional probability density function could provide the likelihood of observing a particular sequence of noisy samples

---

[8] Pocket Dictionary of Statistics (2002) (attached as Exhibit 17).

1  conditioned on an assumption that a given data sequence was transmitted.  This notion can be

2  easily understood in relation to the spoken word. Assuming a person is speaking to a listener in a

3  noisy environment, a conditional probability density function could provide the likelihood that

4  the listener heard one word assuming we know the word that the speaker actually said. One can

5  intuitively see that the likelihood that the listener heard "hat" would be higher when we assume

6  that the speaker said "cat" than if we assume the speaker said "dog." As this example shows,

7  these functions are not tied to magnetic recording or any other technology. I discuss conditional

8  probability density functions further below in connection with my disagreement with Dr.

9  McLaughlin's opinions relating to "branch metric function."

10  **2.    The Branch Metric Functions of the Specification**

11  51.    The patents' specifications do not use the term "branch metric function" outside

12  of the Abstract and claims. The specifications disclose three "branch metrics" in Equations 8, 10,

13  and 13, respectively. For convenience I will focus on the specification of the '839 patent,

14  although the discussion below applies equally to the '180 patent.

15  **a)    Equation 8**

16  52.    First, the '839 patent describes a "Euclidean branch metric" that assumes "the

17  noise samples are realizations of independent identically distributed Gaussian random variables

18  with zero mean and variance $\sigma^2$." '839 patent, 5:59–62. The '839 patent describes this as a

19  "white Gaussian noise assumption." *Id.* at 5:62. In other words, the noise is assumed to be

20  uncorrelated. *Id.* at 62–64. Applying the Gaussian probability density function and simplifying to

21  maximize the logarithm of the likelihood function, the Euclidean branch metric is provided as

22  Equation 8, reproduced below:

$$M_i = N_i^2 = (r_i - m_i)^2$$

24  where $r_i$ is a "signal sample" and $m_i$ is a "mean signal" or "mean signal value." '839 patent, 6:6–

25  14; 4:19–20. This is the branch metric used in the Viterbi algorithm, and was known for decades

26  before the '839 patent. This is derived from a simple form of a conditional probability density

27  function where the observed "signal sample" variable is compared to the "mean signal" under the

28

11

1   assumption that a certain symbol was transmitted/written. The "mean signal" is a signal/noise

2   statistic and a parameter of the conditional probability density function because a variation in the

3   "mean signal" results in a changed conditional probability density function, as I will discuss

4   below.

5                    **b)      Equation 10**

6        53.      Next, the '839 patent describes a "Variance dependent branch metric" where the

7   noise samples are independent and Gaussian, but are not identically distributed. Specifically, the

8   variance $\sigma_i^2$ of the noise "depends on the written sequence of symbols." '839 patent, 6:15–18.

9   The Variance dependent branch metric is provided as Equation 10, reproduced below:

10              $$M_i = \log \sigma_i^2 + N_i^2/\sigma_i^2 = \log \sigma_i^2 + (r_i - m_i)^2/\sigma_i^2.$$

11   This result was previously disclosed by Zeng and Lee in 1992, and implemented by Zayad in

12   1997, as the inventors admit in the Background section of the '839 patent at 1:38–56 and in their

13   1998 paper.[9] This metric is still derived from a conditional probability density function, and the

14   signal sample is compared to the "mean signal" adjusted by the variance.  The "mean signal" and

15   the variance are both signal/noise statistics and parameters of the conditional probability density

16   function. The branch metric of Equation 10 is signal-dependent because it accounts for the

17   signal-dependent nature of the noise variance.

18                    **c)      Equation 13**

19        54.      Finally, the '839 patent discloses what it terms a "correlation-sensitive branch

20   metric" that assumes that noise samples are correlated over a "correlation length [] $L > 0$." '839

21   patent, 6:36–37. In this case, the noise is still assumed to be Gaussian, but no longer assumed to

22   be independent or identically distributed. In the case of correlation, the likelihood function

23   considers not only the signal sample $r_i$ but also prior signal samples. '839 patent, 6:53–65. The

24   variance $\sigma_i^2$ is replaced by a matrix called the covariance matrix $C_i$ where each value in the

25

26   _____

     [9] Aleksander Kavcic & José M. F. Moura, *Correlation-Sensitive Adaptive Sequence Detection*, 34 IEEE Trans.
27   Magnetics 763, 765 (1998) (deriving equation 10 and stating it "is the metric presented" by Zeng and Lee in
     references [16] and [17] therein).

28

matrix specifies either the variance of the noise at a given sample (e.g., $r_i$) or the correlation

between two noise samples (e.g., between $r_i$ and $r_{i+1}$). What the patent describes as the "general

correlation-sensitive metric is" provided in Equation 13:

$$M_i = \log|C_i/|c_i|| + \underline{N}_i^{\mathrm{T}} C_i^{-1} \underline{N}_i - \underline{n}_i^{\mathrm{T}} c_i^{-1} \underline{n}_i$$

where

$$\underline{N}_i = \left[(r_i - m_i), \underline{n}_i{}^T\right]^T \text{ and } \underline{n}_i = \left[(r_{i+1} - m_{i+1}), \ldots, (r_{i+L} - m_{i+L})\right]^T$$

Much like the prior branch metrics, Equation 13 is derived from a conditional probability density

function, and the "signal samples" are compared to the "mean signals" adjusted by the

"covariance matrix." The "mean signal" and the "covariance matrix" are signal/noise statistics

and parameters of the conditional probability density function.

55.     I disagree with Dr. McLaughlin's statements describing the branch metric

functions disclosed in the patents. For example, I disagree with his statement that "branch metric

functions (BMFs), like those disclosed in the CMU Patents, are two-input functions …."

McLaughlin Decl., ¶ 32. The conditional probability density functions relating to the "signal

samples" disclosed by the asserted patents are single-input functions. I explain my reasoning in

further detail below in connection with my opinions relating to "branch metric function."

56.     I also disagree with Dr. McLaughlin to the extent he implies that the asserted

claims describe actual electronic circuits. McLaughlin Decl., ¶¶ 55–56. The asserted claims are

wholly abstract, and describe only the mathematical and statistical computation of branch metric

values, and not the reading of data from a magnetic disk. Notably, the claimed methods do not

include the process of sequence detection. The result of the claims is merely a branch metric

value at a single stage of an abstract trellis, which is used in processes for sequence detection,

but is not enough to detect a signal on its own.

57.     To detect a signal, a POSITA would be faced with a number of design choices for

processing the signal both before and after the steps recited in the claims of the CMU Patents.

For example, in the case of a magnetic recording system, aside from the physical reading of the

channel with a read head, the POSITA would need to design an equalizer to mitigate some of the

inter-symbol interference in the signal. Based on the remaining inter-symbol interference, the POSITA would need to decide how many states to use in the algorithm (e.g., as graphically represented by a trellis). The POSITA would also need to derive forms for the branch metric functions in the claims, which do not place any restriction on the branch metric functions other than the signal-dependent requirement and the requirement that they are applied to a plurality of signal samples. The POSITA would need to design the system to accumulate branch metric values and select surviving branches for all states and all stages of processing. The POSITA would also need to design the system to select the most likely sequence based on these accumulated metric values. In most systems, the POSITA would then provide some error correction decoding to reduce errors in the signal, and often will iterate between detection and error correction to further improve performance.

58.     None of these steps are recited in the claims. Instead, the claims cover only the computation of branch metric values, an interim step among many others that must be performed both before and after in order for signal detection to occur.

### E.     Signal Samples

59.     The asserted claims apply a selected branch metric function to "signal samples," with no limitation on the source of the samples or the information conveyed by the samples. The signal samples could be generated from a wireless communication receiver, a magnetic recording device, a digital camera, a vending machine, a satellite communicating with deep space, or any other source. The samples could represent randomly generated numbers from a computer program or just abstract symbols such as the samples $\{r_i\}$ in the patents.

60.     A sample typically represents data (e.g., a bit) that has been distorted or corrupted in some way such that the sample is not exactly equal to the data. To analogize this concept to vocal communication, when a speaker says a sentence, a listener's ear will not hear exactly what the speaker says—the ear might also hear another person speaking simultaneously, echoes of the speech from nearby walls, or noise from a loud fan. These distortions can be represented mathematically by their statistical properties, including their mean and covariance matrices. In

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

this way, "noise" is not limited to any physical phenomenon. For example, the term "noise" is often used to describe a random number that is added to some "data" to form a sample using only mathematics and/or simulations.

61.     The Viterbi algorithm, which I described in Section III.B, evaluates each sample by calculating how likely that sample was to occur for each branch/transition given the statistical properties of the noise. This results in a metric value for each branch. After making this calculation, the Viterbi algorithm performs several other steps to output the most likely sequence of data corresponding to the samples and the given signal/noise statistics. These additional steps are not part of the claimed methods.

62.     The claimed methods thus do not perform detection. In other words, they do not detect any data from the samples. Rather, they only apply a derivation of a conditional probability density function to samples to compute a metric value for a branch. This operation is abstract, and not tied to any signal processing technology or  source of signal samples.

## V.     Claim Construction

### A.     "Viterbi-like"

63.     Claim 4 of the '839 patent recites "[a] method of determining branch metric values for branches of a trellis for a Viterbi-like detector."

64.     Dr. McLaughlin argues that the term "Viterbi-like detector" should be construed according to CMU's proposal, as follows:

> *A detector that uses a "Viterbi-like algorithm." A "Viterbi-like algorithm["] is an algorithm that is or is similar to the Viterbi algorithm, which is an iterative algorithm that uses a trellis to determine the best sequence of hidden states (in this case, written symbols) based on observed events (in this case, observed readings that represent the written symbols), where the determined sequence is indicated by the best path through the trellis and is determined used [sic] branch metric values calculated for branches of the trellis.*

McLaughlin Decl., ¶ 60.

65.     CMU's proposed construction, and Dr. McLaughlin's justification thereof, devote significant space to defining the term "Viterbi algorithm" (McLaughlin Decl., ¶¶ 60–64), but do not provide any clarity to the meaning of this term.   For example, defining "Viterbi algorithm" does nothing to address the uncertainty of the word "like" in the phrase "Viterbi-like detector." CMU's 85-word construction of the phrase "Viterbi-like detector" devotes 5 words to construing "like" to mean "is or is similar to." Being "similar to" Viterbi brings no more certainty than the phrase "Viterbi-like."

66.     CMU's proposed construction thus serves no purpose other than to substitute a lengthy, unhelpful explanation for the term at issue.  Dr. McLaughlin's discussion of the four "Viterbi-type algorithm[s]" listed in the '839 patent (7:5–9) does not provide any clarity to the terms "like" or "similar." McLaughlin Decl., ¶¶ 65–70. Each of these algorithms falls into CMU's definition of a "Viterbi algorithm," and therefore "is… the Viterbi algorithm" under its proposed construction. Specifically, Dr. McLaughlin states that PRML "us[es] a maximum likelihood (ML) sequence detector, e.g., a Viterbi detector." McLaughlin Decl., ¶ 65. Under CMU's construction and Dr. McLaughlin's characterization, PRML is a detector that uses an algorithm that "*is*… the Viterbi algorithm" rather than one that "is *similar to* the Viterbi algorithm." PRML therefore does not teach a POSITA anything about what "similar" or "like" mean.

67.     Dr. McLaughlin also states that "FDTS/DF similarly uses a trellis with branches and paths and branch metrics to determine the likely sequence of written symbols." McLaughlin Decl., ¶ 66. Under his own analysis, the only noted distinction between Viterbi and FDTS/DF is no distinction at all. He states that "FDTS/DF uses a tree representation" but states that "[t]he tree is akin to a trellis" and summarizes by stating that "FDTS/DF similarly uses a trellis." McLaughlin Decl., ¶ 67. This summary renders FDTS/DF indistinguishable from CMU's definition of "Viterbi algorithm": "an iterative algorithm that uses a trellis to determine the best sequence of hidden states (in this case, written symbols) based on observed events (in this case, observed readings that represent the written symbols), where the determined sequence is

indicated by the best path through the trellis and is determined used [*sic*] branch metric values calculated for branches of the trellis." Under CMU's construction and Dr. McLaughlin's characterization, FDTS/DF is a detector that uses an algorithm that "***is***… the Viterbi algorithm" rather than one that "is ***similar to*** the Viterbi algorithm." Dr. McLaughlin therefore provides no insight into how the patents' discussion of FDTS/DF teaches a POSITA anything about what "similar" or "like" mean.

68.     The same is true for RAM-RSE ("RAM-RSE detectors similarly use branch metric computations for branches of paths through the (reduced-state) trellis to detect the likely symbol sequence." McLaughlin Decl., ¶ 68.). Although Dr. McLaughlin notes that RAM-RSE uses a "reduced-state" trellis, CMU's definition of "Viterbi algorithm" does not preclude use of reduced-state trellises. Under CMU's construction and Dr. McLaughlin's characterization, RAM-RSE is a detector that uses an algorithm that "***is***… the Viterbi algorithm" rather than one that "is ***similar to*** the Viterbi algorithm." Dr. McLaughlin therefore provides no insight into how the patents' discussion of RAM-RSE teaches a POSITA anything about what "similar" or "like" mean.

69.     Dr. McLaughlin characterizes MDFE as a "detector [that] uses a trellis, branches, branch metric functions, path metrics, etc., but its path memory is shorter than with a full (non-truncated) Viterbi detector." McLaughlin Decl., ¶ 69. CMU's definition of "Viterbi algorithm," however, does not mention path memory, nor does it preclude truncation. Under CMU's construction and Dr. McLaughlin's characterization, MDFE is a detector that uses an algorithm that "***is***… the Viterbi algorithm" rather than one that "is ***similar to*** the Viterbi algorithm." Dr. McLaughlin therefore provides no insight into how the patents' discussion of MDFE teaches a POSITA anything about what "similar" or "like" mean.

70.     The above analysis shows that CMU's construction attempts to avoid the uncertainty around "like" by 1) defining "Viterbi-like" to include "Viterbi," and 2) defining "Viterbi" broadly.  The '180 patent adds to the uncertainty concerning the intended meaning of "Viterbi-like" by stating that "The teachings of the present invention can be extended beyond

1  Viterbi-like detectors to apply to turbo decoders, soft-decision detectors, and detectors utilizing

2  the Viterbi algorithm, the BCJR algorithm, the Soft-Output Viterbi Algorithm (SOVA), and

3  other similar algorithms," which suggests that "Viterbi-like detectors" exclude "detectors

4  utilizing the Viterbi algorithm." 14:9–13. But even if that were not true, CMU's construction,

5  and Dr. McLaughlin's analysis, brings no certainty to what is "similar to" a Viterbi algorithm.  In

6  my opinion, the specification of the patents do not provide any objective guidance or

7  understanding as to a reasonable scope of "like" in "Viterbi-like."

8        71.     Dr. McLaughlin lists 12 documents that use the term "Viterbi-like detector" to

9  support his position that a POSITA would have understood the scope of that term as used in

10  claim 4 of the '839 patent. McLaughlin Decl., ¶ 74. A few authors had used the term "Viterbi-

11  like detector" to describe the specific detectors disclosed in their own respective works before

12  the CMU Patents were filed. This use of the term is fundamentally different than the use of the

13  term in the '839 patent because it does not require the reader to know the scope of the term—it

14  only matters, in those papers, that the term applies to the specific disclosed detector. One

15  example of this use is the Dahlman article cited by Dr. McLaughlin. This article states "[i]n this

16  letter we will describe a low-complexity 'Viterbi-like' detector."[10] It discloses "[a] new type" of

17  detector.[11] Unlike the CMU Patents, the Dahlman article does not assume the reader knows the

18  scope of what falls into "Viterbi-like" and what does not.

19        72.     The majority of the documents cited by Dr. McLaughlin post-date the provisional

20  filing date of the CMU Patents by 5 or more years and I understand are therefore not reliable

21  indicators of the knowledge of a POSITA in 1997–1998. Nevertheless, looking at the specific

22  disclosures of these documents reveals that they do not support Dr. McLaughlin's assertion that a

23  POSITA would have had reasonable certainty about the scope of "Viterbi-like." For example,

24  U.S. Patents 9,336,885 and 10,185,623 to SK Hynix Memory Solutions, both having a 2012

25  priority date, define "a Viterbi-like detector" as "a Viterbi detector which has been modified."

26  _____

27  [10] Exhibit 10 at 350.
    [11] Id. at Abstract.

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Exhibit 11, 10:10–12, Exhibit 12, 10:26–28. But this is not the definition that CMU proposes. To the extent the SK Hynix patents support Dr. McLaughlin's assertions, they support a different definition of "Viterbi-like detector" than he favors.

73.     Beside the Dahlman article, the earliest document cited by Dr. McLaughlin using "Viterbi-like detector" appears to be a Marvell patent, U.S. Patent 7,773,329 to Burd et al. This patent is related to U.S. Patent 6,961,197, filed April 29, 2002. The Marvell inventors therefore not only had the time to review the '839 patent, but they actually had read their work before this date because they cited the 2000 IEEE Transactions on Information Theory article by Kavcic and Moura in an earlier provisional application.[12] The Marvell patents therefore are not reliable indicators as to how a POSITA would have understood "Viterbi-like detector" as of 1997–1998.

74.     The term "Viterbi-like" is not one with a well understood meaning in the art. While the term is sometimes used in the technical literature, different papers use the term to describe very different modifications to the Viterbi algorithm. For example, Zeng and Moon[13] describe a "Viterbi-like detector" that differs from the Viterbi algorithm only in its branch metric functions, whereas Laferté[14] gives a detailed description of a "Viterbi-like algorithm" that operates on a data structure called a "quadtree" instead of on a trellis. In both cases, the authors describe their own solutions as "Viterbi-like," and provide detail on how they are different from conventional Viterbi. The '839 patent, in contrast, relies on the reader to apply his or her own subjective judgment as to what is or is not "Viterbi-like" in the context of algorithms to which the claimed subject matter can supposedly be applied.[15]

75.     The use of "like" as part of the term highlights the subjective nature of what the inventors convey in claim 4. Put another way, a "Viterbi-like detector" is both "like" a Viterbi detector, in some undefined way(s), and "unlike" a Viterbi detector in other undefined way(s).

---

[12] Exhibit 13 at 4.
[13] Weining Zeng & Jaekyun Moon, *Modified Viterbi Algorithm for a Jitter-Dominant 1–D² Channel*, 28 IEEE Trans. Magnetics 2895, 2896 (1992) (attached as Exhibit 7).
[14] J.-M. Laferté et al., *Hierarchical Statistical Models for the Fusion of Multiresolution Image Data*, Proc. IEEE Int'l Conf. on Computer Vision 908, 911 (1995) (attached as Exhibit 8).
[15] In conducting my analysis, I have been asked by the attorneys to assume that the preamble of claim 4 is limiting.

76. Unlike the papers discussed above, the CMU patents and prosecution histories fail to provide any guidance to a POSITA as to the manner in which the claimed "Viterbi-like detector" differs from a conventional Viterbi algorithm.

77. The patents and prosecution histories do not define any objective boundaries for what constitutes something that is "like" a "Viterbi detector." Consequently, a POSITA would have been uncertain as to what makes a detector sufficiently "like" Viterbi to be encompassed within the scope of the claim, both in terms of which properties need to be present to be included, and to what degree those properties must be similar to the conventional Viterbi algorithm.

78. One passage in the '839 patent appears to delineate some items that are included in "Viterbi-like," stating that "[t]raditional peak detectors… have been replaced by Viterbi-like detectors in the form of partial response maximum likelihood (PRML) schemes or hybrids between tree/trellis detectors and decision feedback equalizers (DFE), such as FDTS/DF, MDFE and RAM-RSE." '839 patent, 1:29–33.[16] But PRML schemes are detectors that use the Viterbi algorithm,[17] and therefore they are in the same category of detectors that the inventors ***excluded*** from the definition of "Viterbi-like" in the '180 specification. The inventors provide no guidance to a POSITA to determine why this type of detector that uses the Viterbi algorithm would be "Viterbi-like," whereas others are not. Further, to the extent the patents include FDTS/DF, MDFE, and RAM-RSE as "Viterbi-like" detectors, they do not inform a POSITA as to *why* they are Viterbi-like.

---

[16] The '839 patent also describes these exact approaches as "Viterbi-type algorithms," departing from the claim language of "Viterbi-like detectors." '839 patent, 7:8–9. In addition, in providing this quote, I am not agreeing with any assessment that the list of supposed detectors and equalizers are "Viterbi-like." It is unclear whether the phrase "or hybrids" distinguishes the hybrids from Viterbi-like detectors (i.e., reading the passage as "replaced by [either] Viterbi like detectors… or hybrids"), or from PRML schemes (i.e., reading the passage as "Viterbi-like detectors in the form of [either PRML] or hybrids").

[17] *See* Ke Han & Richard Spencer, *Comparison of Different Detection Techniques for Digital Magnetic Recording Channels*, 31 IEEE Trans. Magnetics 1128 (1995) ("Research has mostly focused on partial response maximum likelihood (PRML) detection using the Viterbi algorithm (VA)… and variations of these techniques.") (attached as Exhibit 9).

79.     Considering the totality of the specifications and prosecution histories of the '839 and '180 patents, a POSITA is left with no way to determine whether a given algorithm is "Viterbi-like" or not, and therefore the patents fail to convey to a POSITA the scope of this term with reasonable certainty.  The same is true for CMU's proposed construction.

**B.     "each sample corresponds to a different sampling time instant"**

80.     Claim 4 recites

4. A method of determining branch metric values for

branches of a trellis for a Viterbi-like detector, comprising:

selecting a branch metric function for each of the branches *at a certain time*

*index* from a set of signal-dependent branch metric functions; and

applying each of said selected functions to a plurality of signal samples to

determine the metric value corresponding to the branch for which the applied

branch metric function was selected, wherein *each sample corresponds to a*

*different sampling time instant*.

81.     While an instant of time is an understood temporal concept standing alone, use of this this term is problematic and creates uncertainty in the context of the claim language as a whole.  First, the term "sampling time instant" has no context within the claim—there is no "sampling time" mentioned anywhere else in the claim. The only other "time" recited in claim 4 is a "time index" used in the step of "selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions."

82.     Because the claim uses "time instant" and "time index" in the same claim, a person of ordinary skill would not understand these two terms to describe the same concept. However, the claim language does not convey to a POSITA how these terms differ, or how they temporally relate to each other.

83.     Adding to the uncertainty, the '839 patent specification does not use the word "time," let alone "time index" or "sampling time instant," in relation to either the branches, the process of selecting a branch metric function, or the samples. Aside from the Abstract, which

only reproduces claim language without adding context, the specification uses "time" only in connection with the unrelated discussion of the "forgetting factor" in its recursive least-squares algorithm. *See* '839 patent, 9:57–10:5. There is no discussion of "time" in the context of samples. The '839 patent's specification also does not even use the word "sampling," let alone "sampling time" or "sampling time instant."

84.     The mathematical notation used in the patent does not impart reasonable certainty. In the specification, the "sequence of samples" is denoted as $r_i, i = 1, \cdots, N$. '839 patent, 4:7. The sequence of samples $r_i$ is generated from a "readback waveform" that was "passed through a pulse-shaping equalizer and sampled one sample per symbol." '839 patent, 4:4–6. The subscript $i$ is described as an "index." '839 patent, 6:20–21. There is no mention of $i$ being a "sampling time instant."

85.     The branch metrics are also indexed by $i$. *See* '839 patent, Equations (8), (10), (13). Thus, if the inventors meant to recite in claim 4 the notion in, for example, Equation (13) that the branch metric $M_i$ considers not only $r_i$ but also $r_{i+1}$, a POSITA would expect them to have used the same term for the branches: "time index," rather than a completely new term: "sampling time instant."

86.     The '839 patent specification thus does not add any clarity to the uncertainty created by the claim language itself, and therefore the '839 patent fails to convey to a POSITA the scope of claim 4 with reasonable certainty.

87.     In summary, the specification of the '839 patent refers to $i$ as an "index" and never uses the term "sampling time instant." The term $i$ is an index of the branch metric function, for example in equation (13). But although claim 4 uses the term "time index" to refer to the branch metric function, it uses a different term—"sampling time instant"—to refer to the samples. *Id.*

88.     CMU's proposed construction ("each 'signal sample' is from a different point in time") and Dr. McLaughlin's declaration do not address these ambiguities. Dr. McLaughlin relies on the index $i$ of the samples $r_i$ as the sampling time instant recited in the claims with no

1   consideration of the actual language used in the claims. Like claim 4, Dr. McLaughlin does not

2   address the difference in words used in the claim, and he compounds the confusion by using

3   different words such as "periods," "indices," and "instances" interchangeably without

4   justification or explanation. McLaughlin Decl., ¶¶ 120 ("the signal samples are from different

5   sampling time **periods**"), 121 ("signal samples with different **indices**" and "signal samples from

6   different sampling time **instances**").

7       C.      "signal-dependent noise"

8       89.     I disagree with Dr. McLaughlin's opinions in his declaration concerning "signal-

9   dependent noise."  Specifically, Dr. McLaughlin opines that "signal-dependent noise" should be

10  construed to mean "media noise in the readback signal whose noise structure is attributable to a

11  specific sequence of symbols (e.g., written symbols)." McLaughlin Decl., ¶ 84. I do not agree

12  that a POSITA would understand "signal-dependent noise" to have such meaning.

13      90.     First, signal-dependent noise is not limited to media noise, let alone media noise

14  in a "readback signal." Second, Dr. McLaughlin's inclusion and emphasis on "noise structure" in

15  his proposed construction adds ambiguity, is not based on the specification, and is inconsistent

16  with a POSITA's understanding of the term.

17      91.     Dr. McLaughlin's logic is flawed. He reads "media noise" into the term "signal-

18  dependent noise" by arguing that the '839 patent describes media noise as having "signal-

19  dependent structure." McLaughlin Decl., ¶ 78. But Dr. McLaughlin concedes earlier in the

20  declaration that media noise and signal-dependent noise are not the same when he opines that

21  "Media noise includes signal-dependent noise in the readback signal …" McLaughlin Decl.,

22  ¶ 36.  Setting aside that "media noise" is not limited to noise caused by magnetic media, and the

23  claimed "signal samples" are not limited to "readback signals," this statement shows that

24  substituting "media noise" for "signal dependent noise" is not accurate.

25      92.     A POSITA would not understand "signal dependent noise" to be limited to, or

26  synonymous with, media noise. Signal-dependent noise arises in various applications such as, for

27  example, with wireless communication systems where the transmitted signal can be distorted by

28

23

nonlinearities in the transmission equipment that depend on the signal strength and bandwidth. Unaccounted-for interference is also signal-dependent noise, and can occur in wireless, optical, and other communication systems.[18]

93.     In addition, I disagree with Dr. McLaughlin's attempt to limit "media noise" to noise attributable to magnetic media.  The patent explicitly states that the purported invention has general application in a "communication channel."  '839 patent, 13:50–59.  A POSITA would understand that communication channels include a wide variety of signal transmission techniques.  For example, an optical signal transmitted through fiber can have "signal-dependent noise" because of its interaction with the optical medium.

94.     Dr. McLaughlin disagrees with LSI's proposed construction because it "encompasses effects other than media noise" (McLaughlin Decl., ¶ 85), but again he does not provide any explanation as to why "signal-dependent noise" would be understood by a POSITA to exclude other types of noise that are signal-dependent.

95.     For the same reasons, I disagree with Dr. McLaughlin's inclusion of a "readback signal" in his proposed construction. McLaughlin Decl., ¶ 77 ("'[M]edia noise' refers noise [*sic*] in the readback signal of a magnetic recording system."). First, it is based on his flawed opinion that "signal-dependent noise" is limited to media noise. Second, even if "signal-dependent noise" is equated with media noise (which I disagree with as discussed above), a POSITA would not understand that the claims are limited to magnetic recording, and "readback signal" is specific to a magnetic recording system.

96.     Dr. McLaughlin's inclusion and emphasis on "noise *structure*" in his proposed construction adds limitations and ambiguity to the term that and are also inconsistent with the plain language of the term, the specification, and the understanding of a POSITA.

97.     Dr. McLaughlin seems to agree that "signal-dependent" means "attributable to a specific sequence of symbols." *See* McLaughlin Decl., ¶ 76; *see also* ¶ 78 ("signal-dependent

---

[18] *See, e.g.*, U.S. Patent No. 6,151,370 to Wei, 1:5-7 (attached as Exhibit 15).

structure" means "structure that depends on the sequence of symbols").  My disagreement with Dr. McLaughlin relates to *what* must be signal-dependent. He states that the "structure" of the noise must be signal-dependent, where "structure" supposedly refers to "characteristics of the noise that can be parameterized, such as through the covariance matrices or FIR filter tap weights."  McLaughlin Decl., ¶ 78.  I disagree. The plain language of the claim term requires only that the *noise* be signal-dependent: it is "signal-dependent noise." The claim does not mention "noise structure."  In addition, "noise structure" is not a term that is typically used in the field, and does not have a well understood meaning to a POSITA.  Nor does Dr. McLaughlin provide any support or explanation for his definition of "noise structure" as "characteristics of the noise that can be parameterized. . .," which is not found in the patent or prosecution history, and not an accepted definition to a POSITA.

98.      Dr. McLaughlin attempts to support his opinion by citing to portions of the specification discussing "media noise" (McLaughlin Decl., ¶ 78), which is not used in the claim, and not synonymous with the term "signal-dependent noise" as I discussed above.  I disagree that the portions cited by Dr. McLaughlin would cause a POSITA to replace the claim term "noise" with "noise structure" as he suggests.  Again, the claim language requires only that the *noise* be signal-dependent, not the "noise structure." I note that one way for noise to be signal-dependent is for its parameters (e.g., mean and variance) to depend on a specific sequence of symbols, but noise can depend on the specific sequence of symbols in other ways.

99.      I also disagree with Dr. McLaughlin's criticisms of LSI's proposed construction ("noise in a received signal attributed to a specific sequence of symbols") in paragraph 85 of his declaration.  First, LSI's proposed construction properly excludes reference to "media noise," because as discussed above signal-dependent noise is not limited to media noise.  Second, there is no lack of clarity due to the reference to the "received signal," which clearly refers to the source of the "signal samples" that are referenced in the asserted claims. Claim 2 of the '180 in particular includes a step of "receiving a plurality of time variant signal samples."  Third, there is nothing vague or confusing in LSI's proposed construction, which clearly indicates that the noise

is "attributed to a specific sequence of symbols." And finally, it is the signal-dependent *noise* that is attributed to the specific sequence of symbols, not its "structure."  As discussed above, injecting the vague, undefined concept of "noise structure" into the claim would result in an ambiguous and confusing construction.  Finally, that symbols in the abstract are noise-free misses the point.  "*Signal*-dependent noise" is noise in the *signal* that conveys the symbols. Thus, Dr. McLaughlin's criticisms of LSI's proposed constructions do not justify his attempt to add "noise structure," "media noise," or "readback signal" to the claim language.

### D.      "correlated noise"

100.    Dr. McLaughlin's interpretation of "correlated noise" appears to be similar to LSI's construction, except that it lists four example causes of correlated noise.  However, these examples are improper because a POSITA would not typically associate correlated noise with any of them.  In addition, they convey the false impression that correlated noise is unique to magnetic recording, which is inconsistent with the understanding of a POSITA.  Correlated noise can arise in any number of applications where noise is present. Additional applications familiar to electrical engineers include image processing, speech processing, video processing, artificial intelligence/machine learning, or wired and wireless communication. It is also applied in mathematics, physics, and other areas of engineering.

### E.      "branch metric function"

101.    I disagree with Dr. McLaughlin's declaration as it relates to his understanding of "branch metric function."  Specifically, Dr. McLaughlin opines that "branch metric function" should be construed to mean "a function for determining a branch metric value for a branch where the first set of the function comprises one or more signal samples and one or more target values and the second set comprises branch metric values." I do not agree that a POSITA would understand "branch metric function" to have such meaning.

102.    A POSITA would understand "branch metric function" to mean "a mathematical relation that uniquely associates signal samples with branch metric values."

103.    I agree with Dr. McLaughlin that generally a function associates a set of "inputs" known as the "range" of the function with a set of outputs, known as the "domain" of the function.  Dr. McLaughlin and I also agree that in this case the output of a "branch metric function" is a branch metric value.

104.    I also agree with Dr. McLaughlin concerning the general attributes of a function. Specifically, a function is dependent on parameters.  Parameters are numerical characteristics of a function where a change in a parameter changes the function. McLaughlin Decl., ¶ 35.  As Dr. McLaughlin stated, a function $f(x) = 2x$ is different from a function $f(x) = 3x$ because the parameters of the function are different (2 versus 3). Another way of representing this truism is by representing the function $f(x)$ as a function with a parameter $m$ that can also be called the "slope." Therefore, $f(x) = mx$. Changes in $m$ result in different functions of $x$, as can be visualized by the following graph, which shows the functions $f(x) = 10x$ (i.e., $m = 10$) and $f(x) = 2x$ (i.e., $m = 2$).



105.    However, I disagree with Dr. McLaughlin as to the parameters for a "branch metric function" in the Asserted Patents.  Dr. McLaughlin asserts that what he characterizes as the "target" is an input to the branch metric function. McLaughlin Decl., ¶¶ 90, 91. To support his opinion, Dr. McLaughlin relies on what he calls a "Euclidean distance function" in Equation 8 of the Asserted Patents. McLaughlin Decl., ¶ 92.  Dr. McLaughlin also generally cites to his March 2011 and November 2011 declarations from the Marvell litigation.

106. It is my opinion that branch metric functions are one-input functions and that the "mean signal" value (what Dr. McLaughlin refers to as the "target" value) is a parameter of that function. It is also my opinion that the claimed branch metric functions are not Euclidean distance functions.

107. The asserted claims confirm my opinion. The claims select a signal-dependent branch metric function and "apply[]" it to the samples—the input to the function. The claims do not recite "applying" the branch metric function to the mean/target values because they are not inputs, but part of the functions themselves, *i.e.*, parameters of the functions, as are the variance and the covariance matrix $C_i$.

108. As a preliminary matter, Dr. McLaughlin's use of the word "target" in his declaration is confusing, ambiguous and inconsistent with how "target" is used in the asserted patents. Dr. McLaughlin introduces what he labels as the "target" to be the same as "expected" values, that "might be" *both* what the patent refers to as the "target" (meaning the ideal, noise free signal value) and what the patent refers to as the "mean signal." McLaughlin Decl., ¶¶ 29, 95. In addition to creating this ambiguity, introducing the term "target" to the claim construction is unnecessary and inconsistent with how a POSITA would understand the term.

109. While Dr. McLaughlin appears to draw some significance in the patent specification's use of the words "target" (which is an example of the "target" he introduces in paragraph 29) and "mean signal" to describe $m_i$ (McLaughlin Decl., ¶ 95; *see* '839 patent, 6:6 ("mean signal $m_i$"); 8:6–8 ("$m_i$… are the target response values, or mean signal values of [equation] (12).")), he concedes that what the patent refers to as the "target" can be the "mean signal $m_i$." McLaughlin Decl., ¶ 95.

110. In my opinion, the "$m_i$" disclosed in the Asserted Patents, represents the "mean signal value." There are numerous instances in the specification that refer to "$m$" or "$m_i$" as the "mean" or "mean signal value." For example:

a)  In describing Equation 7, a precursor of Equation 8, the Asserted Patents describe "$m_i$" as the "mean signal value." '839 patent, 6:5.

b)  In describing Equation 12, the Asserted Patents describe "$m_i$" as "the target response values or mean signal values."  '839 patent, 8:6–8.

c)  In describing the branch metrics of Equation 13 the Asserted Patents disclose that Equation "(13) requires knowledge of signal statistics.  These statistics are the mean signal values $m_i$ in (12) as well as the covariance matrices $C_i$ in (13)." '839 patent, 8:24–26.

d)  The Asserted Patents further disclose that in connection with Equation 13 "tracking the mean signal values is generally done so that these values fall on prespecified targets." '839 patent, 8:42–43.

111.    Perhaps most telling is the patent's statement that "for simplicity, it is assumed that the front-end equalizer is placing the signal samples right on the desired target values and that there is no need for further mean correction."  '839 patent, 9:18–21. This establishes that the patent is only *assuming* that the mean is the same as the "target" for simplicity.

112.    In other words, the patent teaches a POSITA that the described method attempts to make the "mean signal value" *fall* on a "target," but the "$m_i$" of Equation 13 is a "mean signal value," not a "target."  In any event, labeling the $m_i$ values as "targets" does not somehow change them from parameters to inputs to the branch metric function.

113.     As I discussed above in Section III.C, the branch metric functions disclosed in the patent are single input functions.  That input is the signal sample.[19]  The "mean signal," "variance," "covariance matrix" are all signal/noise statistics that are parameters of the branch metric functions because they are parameters of the conditional probability density functions from which the branch metric functions are derived.

114.     The specifications of the asserted patents confirm that the signal/noise statistics of the branch metric functions relate to the underlying conditional probability density functions that they parameterize.  For example, in addressing the derivation of the "correlation-sensitive branch metric" (Equation 13) the patents state that "Joint Gaussian pdf [(probability density functions)] are assumed" to account for the presence of noise that is both "signal-dependent" and "correlated." '839 patent, 6:39–40.  It was well-known that the joint Gaussian pdf is parameterized by two parameters: the mean signal vector and the covariance matrix.  For example, Helstrom's 1984 book on Probability and Stochastic Processes for Engineers[20] states that "[n]umbers such as the ***mean and the variance*** that characterize a probability density function ***are called parameters***." Helstrom at 217 (emphasis added). This fact is so widely known that Wikipedia explicitly states that the mean ($\mu$) and variance ($\sigma^2$) are "parameters" of a Gaussian (also known as a "Normal") pdf:

---

[19] In Equation 13, the signal sample can be a vector of samples. The question of whether a vector represents a single input or multiple inputs is irrelevant to this discussion. My disagreement with Dr. McLaughlin rests on the question of whether a "mean value" constitutes an input or a parameter to the branch metric functions.

[20] Carl W. Helstrom, *Probability and Stochastic Processes for Engineers* (1984) (attached as Exhibit 16).

30

**Normal Distribution**

| Notation | $\mathcal{N}(\mu, \sigma^2)$ | |
|---|---|---|
| **Parameters** | $\mu \in \mathbb{R}$ = mean (location) | |
| | $\sigma^2 > 0$ = variance (squared scale) | |

115.    More generally, in deriving the 3 types of branch metrics (Equations 8, 10, and 13), the patent discloses that the "likelihood function $f(r_1, \ldots, r_N | a_1, \ldots, a_N)$ is the joint probability density **function (pdf) of the signal samples $r_1, \ldots, r_N$**, conditioned on the written symbols $a, \ldots, a_N$." '839 patent, 4:18–21 (emphasis added). Here the patent is explicitly (and properly) defining the conditional probability density function as a function of only the signal samples. It is not defined as a function of the written symbols $a_1, \ldots, a_N$. The fact that the function is "conditioned on the written symbols" means that for each function a value for the written symbols is assumed. By assuming a different value for the written symbols, the conditional probability density *function* of the input $r_1, \ldots, r_N$ changes because the mean and variance/covariance matrix change. Stated another way, the functions are parameterized based

31

on the assumed written symbols.  In the case of signal dependent noise (e.g., Equation 10), the assumed written symbols dictate the mean and variance of the function, and therefore they change the function by influencing the parameters of the conditional pdf. The written symbols are therefore not an input to the conditional probability density function of the signal samples, though they influence the parameters of the conditional pdf.

116.    The specification of the asserted patents further emphasizes that branch metric functions as single-input functions.  In particular, in connection with Equation 6, which I understand Dr. Kavcic characterized as "the invention," the patent states that "the **[branch] metric is a function of the observed samples $r_i, r_{i+1}, ..., r_{i+L}$**." '839 patent, 5:49–50 (emphasis added).  This is consistent with the claim language discussed above, which "appl[ies]" the branch metric functions only to the signal samples.  Thus, the patent is unambiguously stating that the branch metric function is a function only of the observed samples (the signal samples).  The metric function therefore has only one input.

117.    The specification then goes on to state that "[i]t is also dependent on the postulated sequence of written symbols $a_{i-K_l}, ..., a_{i+L+K_t}$ which ensures the signal-dependence of the detector.  As a consequence, the branch metrics for every branch in the tree/trellis is based on its corresponding signal/noise statistics." '839 patent, 5:47–55.

118.    The patent never states that the metric is a function of the mean signal value or the written symbols $a_{i-K_l}, ..., a_{i+L+K_t}$, but rather that the metric "depends" on the written symbols.  As quoted in the previous paragraph, it also states that what insures the "signal dependence of the detector," meaning the use of different, signal-dependent branch metric functions for each branch, is the "postulated sequence of written symbols" that are represented in the equation for the branch metric function by the "signal/noise statistics" (i.e., the mean, variance and covariance matrix).  The function is thus described as "dependent" on the written symbols because it changes when the written symbols, and therefore the signal/noise statistics, change.  One way that Equation 8 changes when the written symbols change is because "the mean signal $m_i$ is dependent on the written sequence of symbols." '839 patent, 6:6–7. As Dr. McLaughlin and

1  I agree, a change in the parameters changes the underlying function. *See* McLaughlin Decl., ¶ 35.

2  Thus, the signal/noise statistics, including the mean, variance, and covariance matrix, are

3  parameters. The dependence of the mean signal $m_i$ on the written symbols therefore does not

4  transform the mean signal $m_i$ from a parameter to an input.

5       119.    In other words, the written symbols $a_{i-K_l}, \ldots, a_{i+L+K_t}$ influence the mean, m_i, of

6  the conditional probability density function of the signal samples, and the branch metric

7  functions are derived from the conditional probability density functions. But under the signal-

8  dependent assumption of Equations 10 and 13, the variance $\sigma^2$ and covariance matrix $C$, which

9  are undisputedly parameters, also depend on the written symbols $a_{i-K_l}, \ldots, a_{i+L+K_t}$.

10 *See* '839 patent, 6:20–21 ("The variance is $\sigma^{2i}$ [*sic*—$\sigma_i^2$] where the index $i$ denotes the

11 dependence on the written symbol sequence."); 6:53–55 ("[M]atrix Ci is the covariance matrix of

12 the data samples… when a sequence of symbols $a_{i-K_l}, \ldots, a_{i+L+K_t}$ is written.").

13      120.    A review of Equation 13 of the patents, which is described as the "correlation-

14 sensitive branch metric" and repeated below, further supports my opinion.

15 $$M_i = \log|C_i/|c_i|| + \underline{N}_i^{\mathrm{T}} C_i^{-1} \underline{N}_i - \underline{n}_i^{\mathrm{T}} c_i^{-1} \underline{n}_i$$

16 where $\underline{N}_i = \left[(r_i - m_i), \underline{n}_i{}^T\right]^T$ and $\underline{n}_i = [(r_{i+1} - m_{i+1}), \ldots, (r_{i+L} - m_{i+L})]^T$.

17 The only inputs to this function are the signal samples $r_i$. The other letters in the equation

18 designate parameters, and specifically signal/noise statistics.  These include the covariance

19 matrices $C_i$ and $c_i$, and the mean signal values $m_i$.  The $\underline{N}_i$ and $\underline{n}_i$ identify mathematical matrix

20 operations performed on the signal samples $r_i$ and mean signal values $m_i$.  The equation thus

21 does not include any other values that can be characterized as "inputs."

22      121.    A similar review of Equation 10 of the patents, which is described as the

23 "variance dependent branch metric" and repeated below, further supports my opinion

24 $$M_i = \log \sigma_i^2 + N_i^2/\sigma_i^2 = \log \sigma_i^2 + (r_i - m_i)^2/\sigma_i^2$$

25 The only inputs to this function are the signal samples $r_i$. The other letters in the equation

26 designate parameters, and specifically signal/noise statistics.  These include the variance $\sigma_i^2$, and

27

28

1  the mean signal values $m_i$.  This equation thus also does not include any other values that can be

2  characterized as "inputs."

3      122.  In addition, the patents' specifications unequivocally refer to the "mean signal

4  $m_i$," the covariance matrix, and the variance as signal/noise statistics. '839 patent, 5:53–55,

5  8:24–27.  Dr. McLaughlin agrees that the covariance matrix is a parameter of the branch metric

6  function. McLaughlin Decl., ¶¶ 51, 54. But the '839 patent treats the $m_i$ in the same way it treats

7  the covariance $C_i$. For example, it describes both $m_i$ and $C_i$ as "signal statistics." '839 patent,

8  8:24–27. It contemplates tracking and adapting to both $m_i$ and $C_i$. '839 patent, 8:42–9:17

9  (tracking $m_i$) and 9:24–10:25 (tracking $C_i$).  A POSITA would classify all of these statistics as

10  parameters of the branch metric functions disclosed in the asserted patents, and understand that

11  there is no basis to draw an arbitrary distinction classifying the mean as an input.

12      123.  To further explain, the mean and covariance/variance of a Gaussian pdf

13  parameterize the pdf because varying them results in different pdfs, similar to the variation of the

14  slope $m$ resulted in different functions in the linear plot I discussed above. Specifically, changing

15  the mean shifts the Gaussian pdf to the left or right, and changing the variance/covariance

16  changes the shape of the bell curve (i.e., makes it narrower or wider). These changes are shown

17  in the following plot, which shows three different Gaussian probability density functions that

18  occur when varying the mean $\mu$ and the variance $\sigma^2$.



24      124.  This figure plainly shows that changing the mean $\mu$ from 0 to 1 shifts the bell

25  curve to the right such that the curve is centered on the mean $\mu$.

26      125.  Reference materials further support my opinion that signal/noise statistics are

27  parameters of the conditional probability density function.  "Numbers such as the **mean and the**

28

1 **variance** that characterize a probability density function are called **parameters**." Helstrom at

2 217.

3 126.    The pocket dictionary of statistics defines parameter as "the numerical

4 characteristic or descriptive measure of a population resulting from the combination of

5 populations measurements according to certain mathematical operations.  Some examples of a

6 parameter are the **population mean**, …and the **population standard deviation**." Pocket

7 Dictionary of Statistics (2002) at p. 190. The standard deviation is simply the square root of the

8 variance.

9 127.    I have also reviewed CMU's original infringement contentions dated December

10 21, 2018, and CMU itself agreed with my position that the mean signal value is a parameter.

11 Since only a change in parameter and not a change in input changes a function, CMU endorsed

12 that the mean signal value is a parameter in stating that ██████   ████████████████████

13 ████████████████████████████████████████████████████"[21] This

14 shows that CMU clearly relied on the different "branch means" as different parameters to

15 support its position that the functions are unique.

16 128.    A POSITA would therefore understand that the mean signal, variance and

17 covariance matrix of the branch metric functions described in the asserted patents are parameters.

18 129.    While Dr. McLaughlin agrees that the covariance matrices $C_i$ and $c_i$ and the

19 variance $\sigma_i^2$ are *parameters* of the branch metric functions, he inexplicably and inconsistently

20 contends that the mean is an input.  As discussed above, I disagree because the mean signal, $m_{i,}$

21 is also a parameter.  I highlight certain of the errors of Dr. McLaughlin's reasoning below.

22 130.    Dr. McLaughlin bases his erroneous conclusion in part by analogizing the branch

23 metric functions to a Euclidean distance function that computes a distance between two values.

24 But Dr. McLaughlin does not (and cannot) assert that the claimed branch metric functions

25 actually **are** distance functions. Rather, Dr. McLaughlin asserts that the branch metric functions,

26 ─────────────────────

27 [21] CMU's December 21, 2018 Claim Charts Supporting Infringement Contentions (attached as Exhibit 19) at 26, 70 (emphasis added).

28

35

such as Equation 13—the crux of CMU's invention (McLaughlin Decl., ¶¶ 50–54)—are at best "like" a distance function. McLaughlin Decl., ¶ 93. However, even analogizing to a regular distance function is inappropriate.

131.    Dr. McLaughlin selectively focuses on Equation 8 because it does not contain the $C_i$ and $c_i$ and the variance $\sigma_i^2$ even though he does not appear to believe that it is a "signal-dependent branch metric function" as set forth in the asserted claims.  Instead, it only includes the signal, r, and the mean signal, m.  In focusing on Equation 8, Dr. McLaughlin does not address with any detail functions that have other signal/noise statistics (undisputed parameters) which would highlight the flaw of his argument.

132.    I disagree with Dr. McLaughlin's opinions that Equation 8 is a Euclidean distance function or that it is a two input function.  I also disagree with his attempt to extend his conclusions about Equation 8 to Equations 10 and 13.  Dr. McLaughlin's opinions are inconsistent with the specification of the patents, as well as a POSITA's understanding of conditional pdfs from which the branch metric functions are derived.

133.    While Equation 8 has a similar form to the Euclidean distance function, this similarity results from a series of assumptions and simplifications that model the noise as a Gaussian "bell" curve of a fixed shape (variance) centered on the assumed written/transmitted symbol. The task is to decide which symbol was written/transmitted. Under those assumptions and simplifications, which do not apply to the branch metrics of Equations 10 and 13, it's clear that the best choice of written/transmitted symbols is the one having a bell curve whose peak (i.e., mean value) is closest to the observed value. In other words, the branch metric functions associated with Equation 8 compares the observed value (input) to the mean value (parameter) that parameterizes the conditional pdf corresponding to that branch. That is the result of Equation 8, which was widely known decades before the patents in this case.  Because Equation 8 compares the observed signal (undisputedly an input) to the mean or expected value (a parameter), it is a single-input function.

1      134.    Similarly, the fact that Equation 8 has a similar form to the Euclidean distance

2 function does not mean that all branch metric functions, including the supposed signal-dependent

3 branch metric functions described in Equations 10 and 13, resemble distance functions. This is

4 clear from Equations 10 and 13 of the asserted patents.  These other functions were derived from

5 the probability density function with different assumptions and simplifications and therefore do

6 not result in the intuition that the bell curve with the closest peak is the best choice. Equations 10

7 and 13 allow the variance to vary, meaning that the bell curves could have different shapes at

8 different times and for different written samples.  Under the branch metric of Equations 10 and

9 13, the best estimate given an observation might not be the one that has the closest mean to the

10 estimate, unlike the branch metric of Equation 8. The figure below illustrates a scenario where

11 this is the case. In this figure, a value of $r = 1$ (shown as a vertical red line) is observed.

12 However, in this case, the best estimate for the written symbol is not $a = 1$, which is the estimate

13 whose mean value is closest to the observation. Rather, the best estimate is that the written

14 symbol is $a = 0$. This is true because the variance is signal-dependent, and is much higher when

15 $a = 1$ than when $a = 0$.[22] Using a metric similar to the Euclidean distance would actually

16 produce the opposite result because $r = 1$ is closer to the peak of the curve when $a = 1$ (in fact,

17 it's located exactly at the peak of the curve). Equations 10 and 13 are simply not distance

18 functions and can produce entirely different results than metrics that resemble distance functions.

19

20

21

22

23

24

---

25 [22] Plugging the observed value $r = 1$ and means and variances in the figure into Equation 10 confirms the result,
which is intuitive from the plot because the blue curve is higher (more likely) than the gold curve at $r = 1$.

26 Specifically, for the blue curve with $\mu = 0$ and $\sigma = 1$, the branch metric value is 1.0; for the gold curve with $\mu = 1$
and $\sigma = 2.23607$, the branch metric value is approximately 1.609. With log-likelihood-based branch metrics such

27 as the ones derived in the CMU patents, the lowest value is chosen at each step and therefore the blue curve is best.

28



135.    Another reason Equations 10 and 13 are not like distance functions is that they do not satisfy the well-known requirement for a distance function known as the "triangle inequality." In Euclidean geometry, the triangle inequality requires that a "distance" between two points A and B must be less than or equal to the distance between a third point C and point A plus the distance between point C and point B. Stated another way, the length of any side of a triangle must be less than or equal to the sum of the lengths of the other two sides of the same triangle. Equations 10 and 13 do not satisfy this inequality at least because they can be negative. They are therefore are not distance functions.[23]

136.    Thus, Equations 10 and 13, like all of the branch metric functions disclosed in the '839 patent, is premised on an analysis of "conditional pdfs" or conditional probability density functions ('839 patent, Equations 6, 9, 11) based on the single input of the signal samples "r" and dependent on noise/signal parameters including the mean and variance/covariance matrix.

137.    Similarly, in Dr. McLaughlin's March 2011 declaration, he conflated a function of two inputs with a probability density function of a single input conditioned on some event.[24] I disagree with Dr. McLaughlin's unexplained conflation of these two concepts. They are not the same.  The notation "$M(r, v)$" denotes a theoretical function with two inputs, as indicated by the

---

[23] *See* McLaughlin March 22, 2011 Declaration at 16 (CMU_LSI_00201056) (attached as Exhibit 18) (Dr. McLaughlin conceding that the triangle inequality and other formal metric properties, positivity and symmetry, are not required for branch metrics).

[24] Exhibit 18 at 17 (CMU_LSI_00201057) (equating an undefined theoretical function $M(r, v)$ with a log-likelihood function of $r$ conditioned on $v$ from a textbook, denoted as $M(r|v)$).

comma separating the "r" and the "v." Such a function could be plotted as a three dimensional curve—one dimension for each input, and one dimension for the value of the function when the inputs take on certain values.

138.    The notation "$M(r|v)$" denotes a conditional pdf with a single input "r" that is dependent on a known condition or parameter "v" specific to the function, as indicated by the vertical line between the "r" and the "v." The conditional pdf can be plotted as a two-dimensional curve—one dimension for the input, and one dimension for the value of the function when the input takes on certain values. The conditional pdf can be viewed as a cross-section of the three-dimensional joint function $M(r, v)$ for a given value of $v$. But that does not make it a two-input function.

139.    Dr. McLaughlin's conflating of $M(r, v)$ and $M(r|v)$ implies another false equivalence.  Specifically, it appears that Dr. McLaughlin may attempt to equate the written symbols $a_1,\ldots,a_n$ in the conditional probability functions of Equation 2, for example, with the mean signal value $m_i$ in the branch metrics of Equations 8, 10, and 13. To be clear, the parameter $m_i$ depends on $a_1,\ldots,a_n$. That does not change its status as a parameter. For example, the variance $\sigma^2$ in Equation 10 also depends on $a_1,\ldots,a_n$, but Dr. McLaughlin concedes that variance is a parameter. *See* McLaughlin Decl., ¶¶ 51, 54. The same is true for the covariance matrix $C$ in Equation 13. *Id.*

140.    In other words, the question of whether "v" is an input or a parameter to a conditional function $M(r|v)$ does not change the fact that $m_i$ is a parameter to the branch metrics of Equations 8, 10, and 13.

**F.    "a set of signal-dependent branch metric functions"**

141.    Claim 4 of the '839 patent recites "selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions." Claim 2 of the '180 patent recites "wherein the branch metric function is selected from a set of signal-dependent branch metric functions."

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

142.    I have reviewed Dr. McLaughlin's opinions with respect to this limitation and disagree with him.  A POSITA reviewing the intrinsic record would conclude that the proper construction for this term is one where "set" means "finite or infinite number of objects of any kind, of entities, or of concepts that have a given property or properties in common," and where "signal dependent branch metric function" means "a branch metric function that accounts for the noise attributable to the specific symbol sequence associated with one branch, i.e., when computing the branch metric value of a first branch the method selects the branch metric function that is specific to the signal dependent noise associated with that branch, which differs from the function for any other branch."

143.    Dr. McLaughlin states that the dispute concerns "how many signal dependent branch metric functions can be in the set." McLaughlin Decl., ¶ 108. In my opinion Dr. McLaughlin did not fully characterize the nature of the parties' disagreement, which is three-fold. First, should "set" be construed in isolation, divorced from "signal dependent branch metric functions"? Second, should "set" include a lower limit on the number of its members? Third, does "selecting" modify the meaning of "set of signal dependent branch metric functions" to require at least two such functions?

144.    As to the first two questions, "set" should be construed together with "signal dependent branch metric functions," and should be afforded its common meaning in both statistics and to a lay person. A "set" is simply a grouping of any number of elements that share a given property. For example, one can refer to the "set of even numbers."  There is no numeric limitation on the members of that set.

145.    Here, "set" should be construed with reference to the claim language that defines the property or characteristic shared by the members of the set.  For example, in the asserted claims, the members of the "set" have the characteristic of being "signal-dependent branch metric functions."  That is to say that each function that is part of the set needs to account for the noise attributable to the specific sequence associated with one branch.

146.   Therefore, it is my opinion that "set of signal dependent branch metric functions" are the branch metric functions that share the property of being "signal-dependent."

147.   The asserted patents and their prosecution histories support my view.  In the office action response of the reexamination proceeding of the '839 patent, the patentee stated that "Equation 13 of the CMU patents discloses a 'set of signal dependent branch metric functions' as required in claim 4 because each member of the set is a function with parameters that are different for each specific neighborhood of symbols, e.g., different for each trellis branch."[25] In doing so, the patentee described the claimed "set" in terms of the property or characteristic that defines its members—"a function with parameters that are different for each specific neighborhood of symbols"—and not in terms of any numeric limitation on the number of members, divorced from the property or characteristic itself, as Dr. McLaughlin now opines.

148.   As to the third question of whether "selecting" somehow modifies the meaning of "set of signal dependent branch metric function" to require the presence of "two or more" functions, it is my opinion that the answer is "no."

149.   Dr. McLaughlin points to the "selecting" language of the claim to fault LSI's construction as allowing for a set of "zero" and "one" members. McLaughlin Decl., ¶ 14. However, Dr. McLaughlin misunderstands the meaning of "selecting," which is not a term that is disputed by the parties. "Selecting" does not change the meaning of the "set of signal dependent branch metric functions," as I explain below.

150.   Claim 1 of the '180 patent requires "selecting a branch metric function," whereas claim 2 of the '180 patent adds the requirement that such selected function be from the "set of signal dependent branch metric functions."  Neither claim requires that two different selections be made. Therefore, making one selection from the "branch metric functions" that share the property of being "signal dependent" satisfies the limitation of asserted claim 2.

[25] Exhibit 14, Sep. 3, 2014 Response to Office Action in 90/013,125, at 27.

41

151.     Similarly, because a "selection" is required as part of the claimed method of the '180 patent, the instance of "zero" selections is inherently excluded by the claimed method. There is no need or basis to accord "set" itself a construction that contradicts its ordinary meaning and is not supported by any language in the patent or prosecution history that specially defines the term as Dr. McLaughlin proposes.

152.     The '839 patent is similar in this respect to the '180 patent.  Claim 1 of the '839 patent requires "selecting a branch metric function," while claim 4 requires " selecting a branch metric function . . . from a set of signal-dependent branch metric functions."

153.     Nothing in the '839 patent requires that there be multiple (more than "one") different selections. Similar to the '180 patent, because a "selection" is required as part of the claimed method of the '839 patent, the instance of "zero" selections is excluded.

154.     The dictionaries that Dr. McLaughlin relies on support my understanding. Neither of the dictionaries imply that "selecting" requires more than one selection. Nor do the dictionaries indicate that "selecting can include *not* making a choice or selection.

155.     The definitions to "pick out" and "chosen from a number or group by fitness or preference" highlight my point.  The method claims merely require "picking out" or "choosing" from a "group" of signal dependent branch metric functions. Nothing in these definitions requires that more than "one" selection be made.

156.     Dr. McLaughlin's "cookie" analogy in paragraph 109 of his declaration is therefore flawed, particularly in light of CMU's infringement contentions.  Each branch in a trellis has available to it any possible "branch metric function" that has the property of being "signal dependent" under the form of Equation 13.  What determines, as Dr. McLaughlin's dictionaries put it, "the fitness or preference" for a particular branch is the noise associated with the specific written symbols for that branch.

157.    Equation 13, under CMU's understanding, covers "a general set of branch metric functions."[26]  In fact, if Equation 13 is read to cover more than one function, it would mathematically cover all "signal-dependent branch metric functions" that take the form of Equation 13—i.e., every slight variation in the parameters of Equation 13 results in a different function that is covered by Equation 13.  Each of those infinite number of "branch metric functions" is available for "selection" for each of the branches; alternatively the available number of functions can be narrowed based on any predefined criteria.  The appropriate "branch metric function" is then selected for a branch based on the noise associated with the specific written symbols for that branch.

158.    Even if Dr. McLaughlin was right that "selecting" somehow restricted the common meaning of "set of signal dependent branch metric functions," there is nothing in the Asserted Patents that excludes a set of one member. Nor would that prevent the "selecting" step from being performed.  In fact, claim 1 of the '180 patent and claim 1 of the '839 patent explicitly recite "selecting" without the presence of any "set."  Therefore, it is illogical to say that selecting would only make sense in the presence of a set with more than one member.

### 1.    Different functions for different branches

159.    Dr. McLaughlin states that LSI's construction is incorrect because "it mandates that each branch of the trellis have a different function." McLaughlin Decl., ¶ 105. I address this issue separately below.

160.    Dr. McLaughlin states that the asserted claims do not require a method having a different signal-dependent branch metric function for each branch. *Id.*, ¶ 105.  However, he does not provide any explanation or support for his opinion (*see id.*, ¶¶ 105–07), and his opinion contradicts the intrinsic record of the patents.

161.    As I previously discussed, Dr. McLaughlin asserts that changing the "parameters" of a function results in a different function. *See* McLaughlin Decl., ¶¶ 50, 54. He also asserts that

---

[26] Exhibit 14, Sep. 3, 2014 Response to Office Action, 90/013,125, at 27.

1  the covariance matrix of Equation 13 is a parameter. *Id.*, ¶ 51. Thus, in Dr. McLaughlin's view,

2  changing the covariance matrix also changes the function.

3       162.    The patents explicitly state that each branch has a different covariance matrix:

4                 "***It is important to point out*** *that, due to the signal-dependent character of the*

5                 *media noise,* ***there will be a different covariance matrix to track for each***

6                 ***branch*** *in the tree-trellis of the Viterbi-like detector."*

7  '839 patent, 10:18–21. With a different covariance matrix for each branch, and under Dr.

8  McLaughlin's theory that changing the covariance matrix changes the function, this passage of

9  the patents requires that there be a different signal-dependent branch metric function for each

10  branch.

11       163.    The text of the '839 patent gives no room for doubt. It does not state that there

12  "can" be or "might" be different covariance matrices. It says "there will be" different covariance

13  matrices, and therefore "there will be" different branch metric functions due to signal-dependent

14  noise. '839 patent, 10:18–21. The inventors even emphasized that "[i]t was important to point

15  [this] out."

16       164.    Dr. McLaughlin did not address this passage in his declaration. Instead, he

17  presents a general discussion of branches and branch metric functions that contradicts the

18  specification. Specifically, Dr. McLaughlin asserts that the number of branch metric functions is

19  $2^L$, where L is the "length… of the sequence of written symbols used to define the signal-

20  dependence." McLaughlin Decl., ¶ 106.

21       165.    The specification's discussion of Figures 4 and 5 directly contradicts Dr.

22  McLaughlin on this point. Discussing Figure 4, the '839 patent provides an example where the

23  "noise correlation length" L=1. '839 patent 10:35–36. The specification states that "[t]he number

24  of [covariance] matrices equals the number of different combinations of two consecutive

25  branches in the trellis." '839 patent, 10:40–42. The patent counts the ***number of different***

26  ***covariance matrices to be 16***, which is equal to the sum of the number of "branches entering and

27  leaving each node" representing a state of the trellis. '839 patent, 10:42–44.

28



166.    The figure above illustrates this result. Note that Figure 4 of the '839 patent only illustrates branches leaving each node at $a_i$, and branches entering each node at $a_{i+1}$. To count the number of branches entering and leaving each node at $a_i$, the figure below extends the trellis to the left to add branches entering the nodes.

167.    By focusing on the nodes at $a_i$ one can easily count the number of branches entering and leaving each node, as shown in the figure below.



168.     As the '839 patent teaches, there are 16 branches entering and leaving each node, 16 different covariance matrices, and therefore 16 different signal-dependent branch metric functions. *See* '839 patent, 2:18–20 ("These covariance matrices are different for each branch of the tree/trellis due to the signal dependent structure of the media noise."); 5:53–55 ("[T]he branch metrics for every branch in the tree/trellis is based on its corresponding signal/noise statistics.").

169.     The above example directly contradicts Dr. McLaughlin. He states that the number of signal-dependent branch metric functions is equal to $2^L$, which is equal to 2 when L=1 as in the above example.[27] His analysis is wrong by a factor of 8, or in terms of percentage, he is wrong by 700%. Given that his analysis does not cite to the specification, it is unclear how he made the assumptions that led to such an erroneous result. In any case, the CMU Patents prove him wrong.

170.     The reexamination record further supports LSI's construction and contradicts Dr. McLaughlin's opinions.  Under the heading "Claim Construction" in the office action response

---

[27] It is not clear whether Dr. McLaughlin's L is the same L as used in the '839 patent. It is possible that Dr. McLaughlin's L will equal one plus the L in the '839 patent. In that case, Dr. McLaughlin is still wrong by a factor of 4, or 300%.

in connection with the '839 Patent's reexamination proceeding, the patentee stated: "'signal-dependent branch metric function' **must be construed** in a way that solves the problem the inventors addressed with their invention as discerned from the specification.  This includes using **different branch metric functions for each specific symbol sequence** (e.g., trellis branch) to account for both the neighborhood effect and the polarity of the transitions."[28]

171.    A POSITA would draw several conclusions from this explicit claim construction position.  First, the claim construction for the term "**must**" "solve[] the problem the inventors addressed with their invention as discerned from the specification."  At best, the specification discloses a trellis structure where there must be one branch metric function per branch having different parameters (e.g., covariance matrix and mean signal).  Dr. McLaughlin has not opined otherwise.

172.    Second, the construction goes further to affirm my opinion by saying that the construction must include at a minimum the use of "different branch metric functions for each specific symbol sequence." This requirement that the patentee acknowledged is consistent with the specification that for every branch in a trellis, the function must be different.

---

[28] Exhibit 14, Sep. 3, 2014 Response to Office Action, 90/013,125, at 52–53.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   I declare under penalty of perjury that the foregoing is true and correct to the best

2   of my knowledge, information, and belief.

3

4

5   Dated: _10/3/19_                                    _Emina_

6                                                        Emina Soljanin, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28