KENNETH L. STEINTHAL (State Bar No. 268655)
ksteinthal@kslaw.com
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone:   (415) 318-1211
Facsimile:    (415) 318-1300

STEVEN JAY RIZZI (admitted *pro hac vice*)
srizzi@kslaw.com
RAMY HANNA (admitted *pro hac vice*)
rhanna@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036
Telephone:   (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendants LSI CORPORATION and
AVAGO TECHNOLOGIES U.S. INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

CARNEGIE MELLON UNIVERSITY,

        Plaintiff,

    v.

LSI CORPORATION AND AVAGO
TECHNOLOGIES U.S. INC.,

        Defendants.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF NONINFRINGEMENT BASED ON IMPLIED LICENSE ("HAVE-MADE" RIGHTS)**

Case No.  3:18-cv-04571-JD

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 19, 2019, at 10:00 a.m., or as soon thereafter as may be heard, in Courtroom 11 of the above-captioned Court, located at the United States Court House, 450 Golden Gate Avenue, 19th floor, San Francisco, CA 94102, defendants LSI Corporation and Avago Technologies, U.S., Inc. (collectively, "Defendants"), by their attorneys, will move this Court for an order entering judgment against Plaintiff Carnegie Mellon University ("Plaintiff" or "CMU") pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities in support thereof, all pleadings and papers on file in this action, and such other and further matters as the Court may consider.

## STATEMENT OF RELIEF SOUGHT

Defendants request that summary judgment be granted in their favor on their implied license defense with respect to alleged infringement by Defendants in connection with products supplied to Seagate and HGST, pursuant to the "have made" rights of these licensees of the asserted patents.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

I.     Introduction ....................................................................................................... 1

II.    Factual Background ......................................................................................... 2

       A.    CMU Licensees Had "Have Made" Rights to the Asserted Patents ............... 2

             1.    Seagate's Rights Under the Associates Agreement ............................ 2

             2.    HGST's Rights Under the Associates Agreement ............................... 3

       B.    CMU's Infringement Allegations ................................................................. 4

       C.    Defendants' Product Development for CMU Licensees .................................. 7

             1.    Defendants' Development for and Sales to Seagate ........................... 7

             2.    Defendants' Product Development for and Sales to HGST .............. 11

       D.    Procedural History ...................................................................................... 13

III.   Legal Standards .............................................................................................. 14

       A.    Summary Judgment ..................................................................................... 14

       B.    Implied License and "Have Made" Rights ................................................... 14

IV.    Argument ......................................................................................................... 15

       A.    Have-Made Rights Need Not Be Expressly Invoked by a Licensee ............. 16

             1.    *Intel v. Broadcom* ....................................................................... 16

             2.    *CMU v. Marvell* ........................................................................... 16

             3.    *LaserDynamics v. Quanta Computer* ........................................ 17

             4.    *Asetek Holdings v. CoolIT Systems* ........................................... 18

       B.    Even Under *Intel* and *Marvell*, Defendants Had an Implied
             License to Perform Simulations and Sell Customized Read
             Channel Products to CMU Licensees ......................................................... 20

             1.    Defendants Developed Customized Products at the
                   Request of Seagate and HGST ...................................................... 20

             2.    The District Court's Decision in *Marvell* is Inapplicable ............... 21

       C.    Defendants' Simulations for CMU Licensees Are Protected by
             the Licensees' Have-Made Rights ............................................................... 22

V.     Conclusion ....................................................................................................... 24

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF AUTHORITIES

1

2

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................ 14

3

4

*Anton/Bauer, Inc. v. PAG, Ltd.*,
    329 F.3d 1343 (Fed. Cir. 2003)................................................ 14

5

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
    No. 3:12-cv-04498, 2013 WL 5640905 (N.D. Cal. Oct. 11, 2013) ("Asetek I") ....... 15, 18, 19

6

7

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
    No. 3:12-cv-04498, 2014 WL 2735046 (N.D. Cal. June 16, 2014) ("Asetek II")........... 19, 20

8

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*,
    72 F.3d 872 (Fed. Cir. 1995)................................................... 14

9

10

*Carey v. United States*,
    326 F.2d 975 (Ct. Cl. 1964) ................................................. 15, 24

11

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
    890 F. Supp. 2d 602 (W.D. Pa. 2012)....................................... 13, 16, 22

12

13

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
    906 F. Supp. 2d 399 (W.D. Penn. 2012).......................................... 2, 3

14

15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................. 14

16

*CoreBrace LLC v. Star Seismic LLC*,
    566 F.3d 1069 (Fed. Cir. 2009).............................................. 14, 24

17

18

*In re Bill of Lading Transmission*,
    681 F.3d 1323 (Fed. Cir. 2012)................................................. 6

19

20

*Intel Corp. v. Broadcom Corp.*,
    73 F. Supp.2d 201 (D. Del. 2001)......................................... passim

21

*Joy Techs., Inc. v. Flakt, Inc.*,
    6 F.3d 770 (Fed. Cir. 1993) ................................................... 6

22

23

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)............................................. passim

24

25

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)................................................. 6

26

27

28

---

## I.    INTRODUCTION

The vast majority of Carnegie Mellon University's ("CMU's") infringement allegations against Defendants LSI Corporation ("LSI") and Avago Technologies U.S. Inc. ("Avago") target sales to two customers who are licensees to the (now expired) asserted patents—Seagate Technology PLC ("Seagate") and Hitachi Global Storage Technologies ("HGST").  Both of their licenses include "have made" rights to the asserted patents, which permit the licensees to outsource to LSI (and other third parties) activities covered by their licenses, including the development, testing, and manufacture of products for the licensees.  There is no genuine dispute that Seagate and HGST entered into numerous product development and related agreements with Defendants (and their predecessors) for the products at issue.  Moreover, these licensees were actively involved with Defendants in the development and testing of their products, all of which are custom products developed for specific customer hard disk drive ("HDD") products.  Under any legal standard for have-made rights—even CMU's erroneous interpretation of nonbinding district court decisions—Defendants' allegedly infringing activities in connection with products supplied to Seagate and HGST are immune from liability under the doctrine of implied license.  These activities include not just the manufacture and sale of accused products, but the simulations that were performed as part of the development of such products.  Indeed, that Defendants' product sales to licensees are protected by CMU licensees' have-made rights is meaningless if the simulations and other activities necessary to develop those products are not.

CMU's only argument in response is that its licensees supposedly did not "exercise" their have-made rights by formally and explicitly conveying to Defendants the rights enjoyed by the licensees.  However, controlling Federal Circuit precedent makes clear that no such explicit invocation of have-made rights by the licensees is required under the law.  Nor is such a requirement set forth in the relevant license agreements.  And, as at least one court in this district has held, such a requirement would be at odds not only with Federal Circuit guidance, but also the nature of an *implied* license defense, which by definition arises in the absence of an explicit grant of license rights.  The Court should thus grant summary judgment in favor of Defendants on their implied license defense based on the Seagate and HGST have-made rights, thereby excluding from

liability all allegedly infringing activities performed in connection with products supplied to these CMU licensees.  Such a finding would remove from this case the vast majority of revenue on which CMU relies as the damages base for its improper damages claim, i.e., worldwide product sales to Seagate and HGST during the period from September 1, 2011, through expiration of the patents on April 3, 2018.  Licensees Seagate and HGST together represent about 90% of the total damages sought by CMU.  Thus, the granting of this motion would, at a minimum, significantly streamline the case and facilitate potential settlement.[1]

## II.  FACTUAL BACKGROUND

### A.  CMU Licensees Had "Have Made" Rights to the Asserted Patents

CMU licensed the asserted patents to numerous entities that were "associates" of CMU's Data Storage Systems Center ("DSSC"), a consortium CMU created to fund research in data storage technology.  *See Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 906 F. Supp. 2d 399, 402-03 (W.D. Penn. 2012).  It █████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████

#### 1.  Seagate's Rights Under the Associates Agreement

████████████████████████████████████████████████████████████████████
██████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

(Ex. 1 at § 2.b (emphasis added).)[2]  Although CMU argued during the *Marvell* trial that Seagate's

---

[1] During the conference on April 18, 2019, the Court granted Defendants' request to file an early summary judgment motion on their have-made rights defense in order to facilitate a potential settlement.  (April 18, 2019 Hrg. Tr. at 16:20-17:7.)

[2] Numbered exhibits are attached to the Declaration of Steven Rizzi and lettered exhibits are

1992 Associates Agreement was amended to eliminate the right to sublicense, there was no dispute that even the allegedly amended agreement included Seagate's right to have made the purported inventions claimed in the asserted patents.  *See Marvell*, 906 F. Supp. 2d at 402-03.[3]  Seagate's rights remained in force until the patents expired in 2018.  (Ex. 1.)

**2.    HGST's Rights Under the Associates Agreement**



(Ex. 2 at § 1.)

(*Id.* at § 3.1.)

(*Id.* at § 3.2.)

(*Id.* at § 3.3 (emphasis added).)

(*Id.* at § 2.1.)

(*Id.* (                                                              ").)

---

attached to the Declaration of Heather Christianson, both of which are provided in support of, and filed simultaneously with, Defendants' Motion.  Some exhibits are excerpted to reduce the volume of the exhibits; complete versions will be made available at the Court's request.

[3] Defendants contend that Seagate's sublicense right also endured through expiration of the patents, but for purposes of this motion rely only on its undisputed have-made right.

**B.      CMU's Infringement Allegations**

CMU alleges that certain of Defendants' "read channels" used in their customers' HDD products infringe two method claims of the asserted '839 and '180 patents.  (Ex. 3 at 3-4.)  The accused read channel functionality is incorporated into complex semiconductor devices that Defendants jointly develop with, and customize for, each of Defendants' HDD customers. Particularly in the relevant time period of 2011-2018, consolidation in the HDD market had reduced Defendants' customer base to five: Seagate, HGST, Western Digital ("WD"), Toshiba, and Samsung.  (Christianson Decl. ¶ 6.)  In 2012, WD acquired HGST, although Defendants continued their collaboration with HGST to design and develop its products.  (*Id.* at ¶ 41.)

The read channel functionality translates magnetically encoded information on a hard disk drive into electronic signals that can be understood by a computer.  (Wilson Decl. ¶ 6; Ex. 4 at 47:3-9; Ex. 5 at 37-:17-40:11.)  In this case, CMU accuses read channel functionality first developed in the early 2000s.  However, because of its delay in filing suit, CMU admits that it is entitled to damages (if at all) only for the period between September 1, 2011, and April 3, 2018, when the patents expired.

By 2011, HDD technology had matured such that the read channel functionality was no longer being implemented in a dedicated semiconductor chip, but instead incorporated into a larger "system on chip" or "SoC" that performs multiple functions both upstream and downstream of the read channel functionality, including functions that may be fully designed and provided by customers.  (Wilson Decl. ¶¶ 6, 8-9, 16.)  For example, in the case of Seagate, ███████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████. (Ex. 6 at 118:23-119:13; Wilson Decl. ¶ 9.)  HGST, on the other hand, ████████████████ ██████████████████████████████████████████████.  (*See* Wilson Decl. ¶¶ 14-16; Christianson Decl. ¶ 38.)

CMU's infringement contentions confusingly reference myriad code names from Defendants' documents, some of which refer to Defendants' read channel architectures, and others to customers' SoCs.  (Ex. 3 at 2-6.)  CMU alleges that the read channel functionality provided to

these and other customers is configured via firmware settings to operate in an "infringing mode." (*Id.* at 8-11.)  It should be noted that Defendants do not make or sell "off-the-shelf" products. Rather, all of the accused products developed and sold by Defendants result from years of close collaboration with their established customers to understand and address their particular needs and objectives, including extensive development and testing.  (*See* Ex. 6 at 18:4-18; 61:6-13 ("██████ ██████████████████████████████████████████████").)  In addition, such efforts may or may not lead to an order for a commercial product.  (*Id.* at 44:9-19, 129:3-130:7, 145:7-20; Ex. 5 at 173:22-174:9; *see also* Christianson Decl. ¶¶ 26, 40.)

In addition to alleging that Defendants' SoC sales infringe the patents, which CMU refers to as the "Accused Devices," CMU alleges separate acts of direct infringement by what it terms the "Accused Simulators." (Ex. 3 at 5-7.)  These "Accused Simulators" allegations are a contrived attempt to maintain an infringement claim against licensed products.  Defendants are not—and have never been—in the business of selling "simulators," which are not a separate product line offered to customers.  Rather, Defendants perform various *simulations* as part of the lengthy development and testing process for products jointly developed with their customers.  Defendants may also provide, at the request of a customer, custom "black box" software simulations, which the customer uses to assess performance during the development process.  (*See, e.g.*, Ex. 7 at 224:10-225:10.)  As CMU itself acknowledges, such simulations are part of the process of developing the custom read channel functionality for the accused customer SoCs (Dkt. 1, ¶¶ 132-144), and CMU's artificial distinction between "Accused Devices" and "Accused Simulators" is purely an improper, litigation-induced attempt to circumvent its licensees' have made rights.

Moreover, although it filed this case more than a year ago, and has now served two rounds of infringement contentions, CMU continues to provide only a vague, non-specific, and conclusory identification of "Accused Simulators" in its Amended Disclosure of Asserted Claims and Infringement Contentions:

> Simulators that Defendants made, sold, used, ran or executed that simulate the operation of any of the above Accused Devices or that simulate the operation of an optimal or benchmark detector that satisfy the criteria of an Accused Instrumentality are Accused Simulators. For each of the [source code file] folders listed above that correspond to one or more of the Accused Devices, the Exemplary Accused Simulators that satisfy these criteria include, but are not limited to,

simulators that executed the following source code files:  [listing specific files].

(Ex. 3 at 6.)

Because CMU asserts only method claims, the only potential act of direct infringement is the practice or use of the claimed method.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) ("A method claim is directly infringed only by one practicing the patented method.") (quoting *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993)).  CMU's only allegation of direct infringement by Defendants with respect to the "Accused Simulators" is that Defendants "operated the Accused Simulators using waveforms captured from drives and/or spinstands," followed by citations to a handful of LSI documents that supposedly report on the results of such simulations.  (Ex. 3 at 9.)  Moreover, although CMU's contentions regarding the "Accused Simulators" are premised on the execution during a simulation of specific source code files listed in its claim charts, CMU fails to identify which, if any, of such files was supposedly executed in connection with the simulations referenced in the documents CMU cites.  (*See id.*)

CMU's deficient infringement contentions aside, its allegations with respect to CMU licensees based on "Accused Simulators"—just like its allegations concerning "Accused Devices"—fail based on Defendants' implied license defense.  As described herein, there is no legal or factual basis to treat them differently, because any such simulations that were performed are within the scope of the "making" of the purported inventions that CMU's licensees delegated to Defendants.  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 71-73 (Fed. Cir. 2012).

CMU also alleges that Defendants induced HDD manufacturer customers, such as Seagate and HGST, to operate the accused products in an infringing manner, for example by providing the customers with the accused products and instructions on how to operate them and by providing the HDD manufacturers instructions on how to run the accused simulators.  (Ex. 3 at 9-11.)  But CMU's indirect infringement allegations fail for the same reason:  as a matter of law, indirect infringement, whether contributory or induced infringement, requires an act of direct infringement, and there can be no such acts of direct infringement by CMU's licensees or their customers.  *In re Bill of Lading Transmission*, 681 F.3d 1323, 1333 (Fed. Cir. 2012).

C.      **Defendants' Product Development for CMU Licensees**

Defendants' read channel business dates back to before August 2000, when Lucent Technologies incorporated Agere Systems Inc.  In 2002, Lucent spun off Agere as its own company.  Agere later merged with LSI Corporation, in 2007.  After the merger, LSI continued to develop and sell read channel functionality as part of SoCs.  In 2014, LSI was acquired by Avago Technologies, where it continues to develop and sell read channel functionality.

Seagate and HGST were Defendants' customers for the accused read channel functionality before the 2011-2018 time period for which CMU seeks damages.  (Christianson Decl. ¶¶ 6-7.) For example, CMU accuses the  Seagate "Banshee" and "Skua" SoCs, and the HGST  "Mellow" SoC.  (Ex. 3 at 4-5.)  These products were developed with, qualified by, and manufactured for the respective licensees before 2011.  The development process for read channel functionality in subsequent generations of customer SoCs sold in the 2011-2018 period began with the customers providing input concerning their needs and product roadmaps, which Defendants then used to update their own roadmaps for future read channel architectures designed to meet their customers' requirements.  (Ex. 4 at 30:25-33:8.)  SoCs developed with and for Seagate and HGST in the 2011-2018 period built upon prior generations of their respective SoCs as the starting point for future development, accounting for the customers' respective specific needs for their next generation SoCs.  (Christianson Decl. ¶ 33.)  The customer relationships and development process for each of Seagate and HGST are outlined below.

1.      **Defendants' Development for and Sales to Seagate**

Seagate has been a continuous customer for Defendants' read channel products since at least 2000, *i.e.*, about a decade before the period for which CMU seeks damages.  Defendants have continuously worked with Seagate—first through Agere, then LSI—to jointly design and develop custom SoCs for Seagate's HDDs since that time.

a)      **The Three-Way Seagate, Agere, and STMicro Alliance**

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████                (Ex. A at -753; *see also* Ex. 4 at 85:13-86:21

1 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
2 | ⬛⬛⬛ ").) ⬛⬛⬛⬛⬛⬛⬛⬛⬛ (*Id.*) ⬛⬛⬛⬛⬛⬛⬛⬛
3 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (Ex. A at -753-
4 | 56.) ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
5 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
6 | ⬛⬛⬛ (*Id.* at -753.)
7 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
8 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. (Ex. B.)
9 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
10 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
11 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (*Id.* at -343.)
12 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
13 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
14 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
15 | (*Id.* at -351, -354.)



16 |       The agreement explicitly contemplated that the parties would jointly develop new
17 | technology, and defined ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
18 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
19 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ "
20 | (*Id.* at -352-353.) ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
21 | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. (Ex. C at -252-53.)
22 |       **b)**     **Defendants' Two-Way Agreements with Seagate**
23 |       Seagate also entered into separate two-way Master Development Agreements with only
24 | Agere or LSI (*i.e.*, without STMicro).  The first (the "2004 MDA") was with Agere and effective
25 | February 23, 2004.  (Ex. D.)  After the LSI merger, Seagate entered into a similar Master
26 | Development Agreement with LSI (the "2007 MDA"), effective October 1, 2007.  (Ex. E.)  These
27 | agreements covered any deliverable "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛,"
28 | including "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" or other works Agere and LSI created or developed

for Seagate. (*Id.* at -041.) Under these agreements, LSI and Seagate (also known internally at LSI and "STX") worked together to create multiple generations of SoCs for Seagate with custom read channels, some of which are listed in the table below. (*E.g.*, Ex. H at -227 (copied below), -228-29; Ex. I at -266; Ex. 6 at 129:3-131:2.)



### c) Defendants' Joint Development with Seagate

Seagate and Defendants were in continuous communication as part of their joint development process, holding regular meetings with all parties present and consistently exchanging engineering and other information concerning Seagate's needs and requirements. (Christianson Decl. ¶¶ 17-21, 24, 27-29; *see also* Ex. 4 at 87:17-22 (explaining that Agere and LSI had quarterly meetings with Seagate); Ex. 6 at 46:3-16; Ex. 7 at 21:6-22:19.) As explained by Agere's former Director of Engineering, Harley Burger, Seagate and other customers were heavily involved in the design and development of their read channel functionality. (Ex. 4 at 30:25-33:8; 120:3-127:11; 173:15-21.) They reviewed Agere's read channel "roadmaps"—pre-design plans for future designs—and gave "feedback" to see if the plans "match[ed] customers' expectations." (*Id.* at 30:25-33:8.) As the process continued, the customers remained involved, for example: by defining the feature set and customer "care abouts" that balanced requirements such as performance, cost, and power; signing off on specification closures (the definition of the chip); and testing and evaluating the chip in drive or evaluation boards in their labs. (*Id.* at 120:22-123:5.)

Seagate and Defendants had dedicated meetings where the two companies discussed architecture, channel management, channel validation, and other development issues. (Wilson Decl. ¶¶ 10-12; Christianson Decl. ¶ 17; Ex. 7 at 21:6-22:19, 43:2-9.) During some meetings

---

DEFENDANTS' MSJ RE IMPLIED LICENSE                    CASE NO. 3:18-cv-04571-JD

Seagate identified features or functionalities it needed, and Defendants presented solutions as well as ideas for future products.  (Christianson Decl. ¶¶ 19-23.)  For example, Dr. Shohua Yang, a Distinguished Engineer at Broadcom Inc. and former Senior Manager of the read channel architecture group at LSI, testified that Seagate had many requests and requirements that directed the read channel functionality for Seagate, including requests that ████████████████████ ████████████████████████" (Ex. 7 at 49:1-50:6.)

Defendants then worked with Seagate to meet these requirements.  As an example, in response to Seagate's Request for Quote (or "RFQ") for Seagate's "Luxor" SoC (Ex. J), the read channel for which CMU identifies as an accused product, LSI responded in September 2008, summarizing the technology LSI proposed to meet the "very detailed" Seagate requirements set forth in the RFQ, leveraging the "██████████████████" that included a "complex ████████████████████████████████████████ ████████████████████████████████████████ ████." (Ex. K at -644.)  LSI proposed a "██████████████████," which was a "████ ████████████████████████████████████████ ████████." (*Id.*)

LSI and Seagate held strategic alignment and technical meetings to discuss the design and development of the Luxor SoC.  (Christianson Decl. ¶¶ 17, 21, 23.)  For example, LSI put together a technical review for the Seagate team, recommending a solution and proposing milestones from design to prototype in December 2009, with iterative design flow between the LSI Luxor team and the Seagate Luxor team—from design kick-off, through trial deliverables, to approval of the prototype.  (Ex. F at -046, -052, -110-111.)  Seagate and LSI communicated regularly throughout the development of the SoC, not only setting specific milestones, but also discussing specific engineering problems and solutions on a regular basis.  (Christianson Decl. ¶¶ 17-19, 21-23, 27-29; Wilson Decl. ¶¶ 9-12; *see, e.g.*, Ex. F at -110.)

After this lengthy collaboration, including presentation of proposed technical solutions and the award notice, Seagate would issue an SOW, which would often be revised multiple times throughout the course of the ongoing joint development.  (Christianson Decl. ¶¶ 23-24; Ex. 6 at

1   44 :21-45:9; *see also, e.g.*, Ex. L.)  For example, ████████████████████████

2   ████████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████.  (Ex. L at -812-13.)  Seagate dictated Defendants' responsibilities, including the

6   "███████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████."  (*Id.* at -

9   815.)  The development and qualification process took years.  (*See* Ex. 6 at 44:9-19, 129:3-130:13.)

10  For example, the "████████████████████████████████████████████████████████

11  ███████████████████████████████████████."  (Ex. L at -812.)

12          The foregoing is representative of the joint development and qualification process that LSI

13  and Seagate engaged in for other SoCs during the 2011-2018 timeframe.  (Christianson Decl.

14  ¶¶ 27-29.)  Seagate is Defendants' largest customer for accused products and has been since the

15  early 2000s.  (Christianson Decl. ¶ 10.)  According to CMU, Seagate accounts for about 65% of

16  CMU's damages claim.

17          **2.      Defendants' Product Development for and Sales to HGST**

18          HGST is another important customer for Defendants' read channel functionality and has

19  been since the early 2000s.  (Christianson Decl. ¶¶ 30-31.)  ████████████████████████

20  ████████████████████████████████████████████████████.  (Ex. M.)  Similar

21  to Seagate, ███████████████████████████████████████.  (*Id.*)  As with Seagate,

22  Defendants and HGST worked together when developing the read channel functionality for

23  HGST SoCs.  (Christianson Decl. ¶¶ 31-32.)  When HGST needed to develop a new SoC for its

24  HDD products in the 2011-2018 timeframe, it typically began by issuing a "Request for

25  Information" (or "RFI").  (*E.g.* Ex. O; *see also* Christianson Decl. ¶ 37.)  As former Senior

26  Business Development Manager, Keith Haag, testified, RFIs are engineering documents that state

27  "the functional performance requirements" specified by HGST for the proposed project.  (Ex. 8

28  at 13:25-14:12.)  Defendants and HGST collaborated on the requirements dictated in the RFIs,

---

DEFENDANTS' MSJ RE IMPLIED LICENSE                          CASE NO.  3:18-cv-04571-JD

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    working together to "build the correct product" for HGST.  (*Id.* at 14:20-25; *see id.* at 53:17-

2    54:13.)  The initial collaboration between the parties was often reflected in revised versions of the

3    RFIs, updated as appropriate to reflect their efforts.  (Christianson Decl. ¶ 37.)  For example, in

4    December 2011, HGST exchanged with LSI a █████████████████████████████████

5    ██████████████████████████████████████████████████████████████████████████.

6    (Ex. O at -768-771.)  The RFI included an entire appendix on the requisite "████████████

7    █████."  (*Id.* at -783-792.)

8    　　　As part of the collaborative development effort in response to an RFI, HGST and

9    Defendants would hold joint meetings (referred to as "Interlocks") to discuss various technical

10   issues, including proposed read channel functionality for an SoC.  (Christianson Decl. ¶ 35; *e.g.*

11   Ex. N; *see also* Ex. 7 at 20:5-21:5; Ex. 6 at 146:4-147:8.)  The joint development process for these

12   products usually lasted a year or more and required close collaboration with HGST to ensure the

13   SoC met HGST's requirements and specifications.  (Christianson Decl. ¶¶ 32-33, 35-38, 40.)

14   Following an award by HGST, the parties entered into a statement of work ("SOW").  (*Id.* ¶ 40.)

15   For example, in July 2012, HGST and LSI executed an SOW for the SoC7 that incorporated the

16   terms and conditions of the Base Agreement.  (Ex. Q at 678.)  The SOW stated explicitly that LSI

17   "████████████████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████."  (*Id.*)

21   　　　Exhibit 3 to this SOW was the "████████████," which set forth the "███████

22   ██████████████████████████████████████████████████████████████████████████

23   █████."  (*Id.* at -690.)  It further specified that ██████████████████████████

24   ██████████████████████████████████████████████████████████████████████████

25   ██████████████████████████████████████████████ (*Id.*; *see also* Ex. 8 at

26   165:4-13 (stating SoCs were "██████████████████████████").)

27   　　　The foregoing is representative of the joint development and qualification process that LSI

28   and HGST engaged in for other SoCs during the 2011-2018 timeframe.  (Christianson Decl. ¶¶

30, 41; Ex. 8 at 14:3-25, 53:4-54:9 ("there was a high degree of collaboration and there needed to be agreement, . . . there would be joint agreement needed that the design that was being taped out would satisfy the customer needs.").)  HGST is Defendants' second largest customer for accused products, and accounts for approximately 25% of CMU's damages claim.

### D.     Procedural History

CMU filed this action on July 27, 2018, seeking damages based on a per-unit royalty on *all worldwide sales* of accused products, including sales to CMU's own licensees.  Defendants answered on May 2, 2019, asserting, *inter alia*, an affirmative defense of express or implied license.  (Dkt. 97.)

On March 25, 2019, Defendants served its First Set of Interrogatories on CMU. Interrogatory No. 6 sought the legal and factual basis for CMU's contention that any alleged act of infringement "relating to the design, development, testing, manufacture, or sale of any Accused Product to Seagate Technology PLC ("Seagate"), is not covered by an existing or past License to Seagate from CMU."  (Ex. 9 at 21.)  CMU responded on April 24, arguing only that Seagate did not expressly state that it was exercising its have-made rights:

> Defendants' production to date contains no communication from Seagate to Defendants in which Seagate refers to, let alone purports to exercise, any have-made rights to the Patents-in-Suit in connection with Defendants' design, development, testing, manufacture or operation of Accused Devices. *See Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 234 (D. Del. 2001) (indicating have made rights apply only where "the licensee[] ***exercised*** [its] right to ***ask*** [a third party] to make a licensed product for them" (emphasis added)); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 890 F. Supp. 2d 602, 609 (W. D. Pa. 2012) ("Where a licensee commissions the work, a third party's acts do not infringe. … When there is no agreement between the licensee and the third party, the third party's acts do infringe."). Likewise, Defendants' production to date contains no other evidence of Seagate referring to or affirmatively exercising any such have-made rights with respect to the Patents-in-Suit. *See San Disk Corp. v. Round Rock Research*, No. C 11-5243 RS, 2014 WL 2700853, at *2 (N.D. Cal. June 13, 2014) ("SanDisk also cannot rely on supposed 'have made' rights of other third parties, because it has come forward with no evidence that it was specifically commissioned to design and make the products at issue.").

(*Id.* at 21-22 (emphases in original).)[4]

---

[4] Defendants did not serve a separate interrogatory with respect to HGST, but understand that CMU's contentions on this issue apply equally to HGST.

As explained below, CMU's sole basis for challenging Defendants' implied license defense based on its customers' have-made rights is based on a misapplication of the law.  CMU does not dispute the material facts actually relevant to the defense, and CMU's reliance on the district court decisions in *Intel* and *Marvell* is misplaced.

## III.   LEGAL STANDARDS

### A.     Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The principal purpose of summary judgment is to identify and dispose of factually unsupported claims.  While the party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. at 317, 323 (1986), an issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the nonmoving party and only material if it would affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  Once the moving party meets its initial burden, the non-moving party must present evidence that "set[s] forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

### B.     Implied License and "Have Made" Rights

A patentee's right to exclude others from making, using, or selling a patented invention is waived by granting a license, which may be express or implied.  *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003) (citing *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995)).  An implied license is a complete defense to patent infringement.  *Id.*  Similarly, Defendants cannot be liable for indirect infringement based on activities for licensed customers, because "there is no direct infringement to support a claim of either inducement of infringement or contributory infringement."  *Id.* at 1351.

A license to make, use, and sell a patented product includes "have made" rights, even if not explicitly included in the license grant.  *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1071 (Fed. Cir. 2009).  In fact, "a patent licensee's right to 'make' an article includes the right to

engage others to do all the work connected with its production." *Id.* (quoting *Carey v. United States*, 326 F.2d 975, 979 (Ct. Cl. 1964)). Here, there is no dispute that licensees Seagate and HGST were expressly granted have-made rights covering "all the work connected" to the supply of accused products to these licensees.

Licensees with have made rights can thus "confer an implied license to another by designating that person or entity to produce the item for which the licensee has a license." *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, No. 3:12-cv-04498-EMC, 2013 WL 5640905, at *3 (N.D. Cal. Oct. 11, 2013) ("*Asetek I*") (citing cases). The Federal Circuit has held that licensees' have-made rights protect an unlicensed supplier from infringement liability as long as the supplier made the allegedly infringing products "to fulfill bona fide orders from licensees." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 73 (Fed. Cir. 2012).

## IV. ARGUMENT

There are no genuine issues of material fact that prevent the Court from granting summary judgment on Defendants' implied license defense as to Seagate and HGST. Defendants' allegedly infringing activities for Seagate and HGST were indisputably done "to fulfill bona fide orders from licensees." *See LaserDynamics*, 694 F.3d at 73. CMU points to a supposed lack of evidence that CMU's licensees "refer[red] to" or "affirmatively exercise[ed]" their have-made rights, but as discussed below, no such explicit invocation of have-made rights by Defendants' customers is required by the law. Nor do Seagate or HGST's licenses require any such explicit or affirmative "exercise" of their have-made rights. (*See* Exs. 1–2.) CMU's argument therefore fails as a matter of law, and the Court should grant summary judgment in Defendants' favor on this basis alone.

Even if CMU were correct that the law requires something more than a bona fide sale to a licensee—which it does not—the facts demonstrate that CMU licensees Seagate and HGST specifically requested that Defendants engage with them to jointly develop and supply the accused products. There is no genuine dispute that the accused products are customized for each of Seagate and HGST, as evidenced by the fact these two licensees were heavily involved throughout the design and development process to ensure the products met their specific needs and requirements. Nor is there any genuine dispute as to the existence of the various agreements in place between

the Defendants and these licensees, or that the allegedly infringing sales and simulations occurred in the context of these well-established, existing customer relationships that predate the period for which CMU alleges damages.  Summary judgment is thus appropriate even if the Court were to adopt a more restrictive standard for have-made rights than the Federal Circuit articulated in *LaserDynamics*, as further discussed below.

### A.    Have-Made Rights Need Not Be Expressly Invoked by a Licensee

CMU relies on two district court cases to support its argument that an implied license based on have-made rights requires that the licensee explicitly reference those rights when requesting the development or manufacture of a product.  (*See* Ex. 9 at 21-22 (citing *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 234 (D. Del. 2001) and *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 890 F. Supp. 2d 602, 609 (W.D. Pa. 2012).)  As explained below, neither of these cases requires express invocation of a licensee's have-made rights.  And to the extent CMU contends otherwise, such argument contradicts controlling Federal Circuit precedent.

### 1.    Intel v. Broadcom

In *Intel v. Broadcom*, the district court distinguished between making an allegedly infringing product "pursuant to a request from a licensee" and merely selling "off-the-shelf" products to "parties that happen to be . . . licensees." *Intel Corp.*, 173 F. Supp. 2d at 233.  According to the *Intel* court, the latter infringes, and the former does not. *Id.*  Because there was "no discussion of evidence or lack of evidence of agreements between the licensees and Broadcom that demonstrates that the licensees[] exercised their right to ask Broadcom to make a licensed product from them," the court denied the parties' cross-motions for summary judgment on the issue. *Id.* at 234.

### 2.    CMU v. Marvell

In the *Marvell* case, the district court relied exclusively on the *Intel* decision in deciding Marvell's motion for summary judgment on its have-made rights defense. *Carnegie Mellon Univ.*, 890 F. Supp. 2d at 609.  In particular, the court cited what it characterized as the *Intel* court's distinction between "commissioning a third party to make licensed products" and "purchasing allegedly infringing products from a third party." *Id.* (citing *Intel*, 173 F. Supp. 2d at 234).  "Where

---

a licensee commissions the work, a third party's acts do not infringe. . . . When there is no agreement between the licensee and the third party, the third party's acts do infringe." *Id.* The court denied summary judgment with respect to activities other than sales of products because the evidence before it was "devoid of any specific agreement between Marvell and Seagate prior to Marvell's design win." *Id.*

### 3.    *LaserDynamics v. Quanta Computer*

Just six days after the *Marvell* court issued its decision, the Federal Circuit implicitly rejected the *Intel* court's rationale distinguishing between making a product pursuant to a licensee's request and selling an off-the-shelf item. *LaserDynamics*, 694 F.3d at 73. In *LaserDynamics*, the Court held that licensees' have-made rights protect an unlicensed manufacturer from infringement liability so long as the manufacturer made the allegedly infringing products "to fulfill bona fide orders from licensees." *Id*. The Court addressed only the nature of the transactions, rather than the extent of any customization or the licensee's involvement in the design process. *See id.* at 71-73. The Court found that the manufacture and eventual sale of patented products "were legitimate and separate business transactions that did not expand or circumvent the patent licenses." *Id.* at 73.

The defendant in *LaserDynamics*, Quanta Computer, Inc. ("QCI"), assembled laptop computers for various customers. *Id.* at 58. QCI purchased some of the allegedly infringing optical disc drives ("ODDs") it installed in laptops from licensed ODD manufacturers including Philips and Sony/NEC/Optiarc. The ODDs were off-the-shelf items made to be compatible with laptop computers. *See id.* at 58-59. Quanta Storage, Inc. ("QSI"), a partially owned subsidiary of QCI, assembled ODDs for Philips and Sony/NEC/Optiarc, both of which had "have made" rights to the asserted patent that allowed them to "retain companies like QSI to assemble ODDs for them." *Id.* at 59. On summary judgment, the district court held that QCI did *not* have an implied licensed "with respect to drives that [were] manufactured by QSI and eventually sold to QCI . . . , notwithstanding the fact that those drives [were] sold through Philips or Sony/NEC/Optiarc, two of [LaserDynamics'] licensees." *Id.*

The Federal Circuit reversed, finding that "the manufacture of the ODDs by QSI and their

---

eventual sale to QCI for incorporation into laptop computers, all via Philips and Sony/NEC/Optiarc, were legitimate and separate business transactions that did not expand or circumvent the patent licenses." *Id.* at 73. The Court noted that

> the substance of the transactions make[s] clear that QSI's manufacture of the ODDs was limited to the needs and requests of Philips and Sony/NEC/Optiarc. QSI had no unfettered ability to make more ODDs than were ordered from it. Nothing in the record suggests that this overall arrangement is designed to circumvent the terms of the patent licenses between LaserDynamics and Philips or Sony/NEC/Optiarc.

*Id.* at 72. Since QSI "made the ODDs . . . to fulfill bona fide orders from licensees Philips and Sony/NEC/Optiarc," the manufacture and sale of the ODDs were "valid exercises of the 'have made' and 'sell' rights, respectively, under the license agreements in this case." *Id.* at 73. Thus, in the absence of a "sham" transaction, manufacture and sale of allegedly infringing products for licensees with "have made" rights are immune from liability under an implied license. *See id.*

#### 4.   *Asetek Holdings v. CoolIT Systems*

In *Asetek Holdings v. CoolIT Systems*, another court in this district addressed a similar have-made rights defense in two separate opinions. In the first, Judge Chen considered three arguments in opposition to the defendant's motion for summary judgment on its implied license defense:

1. For an unlicensed manufacturer to be immunized under a licensee's have-made rights, "there must have been a contractual conveyance of rights" from the licensee to the manufacturer;

2. A valid exercise of have-made rights "requires that the manufacturing be done specifically at the request of the licensee and to its specifications, rather than a simple off-the-shelf purchase;" and

3. The Court should defer ruling on the defendant's summary judgment motion pending further discovery regarding "the extent to which [the defendant] was making products pursuant to [the licensee's] specifications."

*Asetek Holdings, Inc. v. CoolIT Systems, Inc.*, No. 3:12-cv-04498-EMC, 2013 WL 5640905 at *4 (N.D. Cal. Oct. 11, 2013) ("*Asetek I*").

Judge Chen readily rejected the first argument, noting that "the controlling authority is the Federal Circuit," which "has not required any such formal conveyance." *Asetek I* at *4. The court further explained that *LaserDynamics* "made no reference to and did not require any formal

---

agreement or conveyance of 'have made' rights . . . .  The fact that the licensees made the request of the manufacturer 'to fulfill bona fide orders from licensees' was sufficient to confer the implied license to the manufacturer."  *Id.* (citing *LaserDynamics*, 694 F.3d at 73).  In dismissing the plaintiff's reliance on *Intel*, the court held that requiring an express conveyance of rights from a licensee to an unlicensed manufacturer would be inconsistent with the theory of *implied* license.  *Id.*  The court further noted that even in *Intel*, "the court did not describe the transaction between licensee and manufacturer as a formal conveyance of licensing rights."  *Id.*

Judge Chen was also "skeptical" of the plaintiff's second argument.  After citing *LaserDynamics* and two earlier Federal Circuit cases, he concluded that none of those cases "require that the licensee provide specifications to the third party in addition to its request."  *Asetek I* at 8.  "While the product must be produced or made 'for' the licensee, the Federal Circuit has not expressly stated the product must be *custom* made for the licensee."  *Id.*  Although noting that the *Intel* court imposed such a requirement, the court nonetheless found it "difficult to discern a policy basis to distinguish under the implied license theory a customized product from a standardized product purchased by the licensee."  *Id.* at *5.  The court explained its reasoning as follows:

> In either case, the licensee chooses to outsource the production in order to practice the patent rather than manufacture the product itself.  And even if the product is off-the-shelf, the immunity extends only to sales of the product to the licensee, not to sales by the manufacturer or any other unlicensed party.  It Is therefore difficult to discern how the licensor's expectations and rights are impaired as a result of the licensee buying off-the-shelf versus customized products; the licensor's rights as to sales of infringing off-the-shelf products to unlicensed users is still protected.  Furthermore, the line between customized and non-customized products can be unclear:  For instance, how should the court treat an off-the-shelf product that is slightly modified for the license[e]?

*Id.*  The court ultimately chose not to resolve the question in *Asetek I*, instead deferring a summary judgment ruling until after the plaintiff took discovery concerning statements made in a declaration submitted with the defendant's reply.  *Id.* at *6.

In a second opinion, the court answered the question it left open in *Asetek I* and granted the defendant's motion for summary judgment on its have-made rights defense.  *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, No. 3:12-cv-04498-EMC, 2014 WL 2735046 at *4 (N.D. Cal. June 16, 2014) ("*Asetek II*").  First, Judge Chen reiterated his skepticism about the plaintiff's "off-the-shelf

theory" because it "begs the question of how customized a product must be before it can be deemed custom made." *Id.* at *4. Second, even under that theory, summary judgment was appropriate because no reasonable jury could find that the accused products "were in ready-made form and not custom made." *Id.* [5] As a result, the court concluded that the accused products were "sufficiently customized so as to be covered by the 'have made' provision of the license agreement." *Id.* at *5.

In short, Judge Chen in the *Asetek* cases rejected the same argument CMU advances in this case—that have-made rights apply only when they are explicitly "exercised" by the licensee—because it was in conflict with the Federal Circuit's controlling decision in *LaserDynamics*, inconsistent with *Intel* itself, and contrary to the nature of an implied license. Under *LaserDynamics*, bona fide sales to a licensee with have-made rights do not infringe. *LaserDynamics*, 694 F.3d at 73. The same rationale applies to allegedly infringing simulations performed in furtherance of sales to the licensee.

### B.      Even Under *Intel* and *Marvell*, Defendants Had an Implied License to Perform Simulations and Sell Customized Read Channel Products to CMU Licensees

Even were the Court to apply a legal standard for have made-rights that limits application of the doctrine to custom products made at the request of a licensee, as discussed above, Defendants' long history and various agreements with Seagate and HGST reflect *repeated* requests to develop, test, and manufacture customized products to meet specific customer requirements.

#### 1.      Defendants Developed Customized Products at the Request of Seagate and HGST

There is no genuine dispute that Defendants' business involves the joint development of complex, custom products for their customers. CMU itself admitted as much in its Complaint: "Defendants have provided . . .customized . . .simulators, and chips to OEMs – HDD manufacturers . . . ." (Dkt. 1 ¶ 21.)

As set forth above in Section II, Defendants' partnership with Seagate to develop and supply customized products to Seagate dates back to before 2001. Under the 2001 MDA, for

---

[5] The court also rejected the plaintiff's argument that have made rights did not apply because the "critical part of the product" was "in ready-made form and not custom made." *Id.* at *4-5.

1  example, █████████████████████████████████████████

2  ██████████████████████████████████████████████████

3  ████████████████████████████████  (Ex. B.)  That agreement expressly

4  provided that ████████████████████████████████████

5  ██████████████████████████████████████████████████

6  ███████████████████████████████████.  (*Id.* at -351, -

7  354.)  Seagate's close partnership with first Agere and then LSI has continued for nearly two

8  decades, with frequent meetings and collaboration between the parties.  (*E.g.* Ex. A; Ex. B; Ex. D;

9  Ex. E; *see also* Christianson Decl. ¶¶ 5-8, 10-11; Wilson Decl. ¶ 7; *supra* Part II.C.1.)  Simulations

10 performed by Defendants in connection with its product development for Seagate were similarly

11 based on Seagate's input and conducted in the context of the parties' collaborative relationship.

12 (Wilson Decl. ¶ 13; *see also* Ex. 4 at 126:2-7; 173:15-21.)

13       Similarly, █████████████████████████████████████

14 ███████████████████████████████████.  (Ex. M.)

15 Defendants routinely met with HGST to discuss and address HGST's requirements for the read

16 channel functionality in its SoCs.  (*See, e.g.*, Christianson Decl. ¶¶ 30, 32-33, 37; Ex. O; Ex. 8 at

17 14:3-25, 53:4-54:9; *see supra* Section II.C.2.)  And just as with Seagate, Defendants developed

18 technology and performed simulations as part of the parties' collaborative efforts to jointly develop

19 HGST's SoCs.  (*E.g.* Wilson Decl. ¶ 18.)

20       In short, undisputed evidence shows that CMU licensees Seagate and HGST commissioned

21 the development, testing, simulation, and manufacture of allegedly infringing products well before

22 any of Defendants' allegedly infringing sales during the damages period.  Even if Defendants'

23 implied license defense required CMU's licensees to "exercise" their have-made rights, Seagate

24 and HGST indisputably did so under *Intel*.  Indeed, even CMU does not argue that Defendants'

25 read channel products are "off-the-shelf" items.  (*See* Ex. 9 at 21.)  Accordingly, even under the

26 test set forth in *Intel*, Defendants' sales and related development and testing for Seagate and HGST

27 are immune from liability under the doctrine of implied license.  *See Intel*, 173 F. Supp. at 233.

28                  **2.     The District Court's Decision in *Marvell* is Inapplicable**

---

DEFENDANTS' MSJ RE IMPLIED LICENSE                    CASE NO.  3:18-cv-04571-JD

CMU's reliance on the district court's opinion in *Marvell* is misplaced.  As an initial matter, the *Marvell* court *granted* summary judgment of no indirect infringement by Marvell based on its sales of products to Seagate.  *Carnegie Mellon Univ.*, 890 F. Supp. 2d at 608 (because "Seagate's own use is not infringing, . . . Marvell cannot be indirectly liable for infringement").  That holding applies equally here.  In denying Marvell's motion for summary judgment as it related to Marvell's activities before such sales, the district court concluded that the "evidence of record indicates that Marvell uses the methods at issue during its sales cycle, but this evidence is devoid of any specific agreement between Marvell and Seagate prior to Marvell's design win."  *Id.* at 609.

Even under the *Marvell* court's apparent requirement that there be an agreement in place to evidence a licensee's "exercise" of its have-made rights, there is no genuine dispute that, before and during the relevant 2011-2018 period, there were agreements in place between Defendants and CMU's licensees, pursuant to which the parties engaged in joint development of the products CMU accuses of infringement, which included the simulation activities CMU improperly attempts to disassociate from Defendants' product sales.  Those agreements confirm that Defendants' allegedly infringing activities for Seagate and HGST were performed at the request and for the benefit of Seagate and HGST.  Put differently, those agreements make clear that CMU's licensees intended to—and in fact did—commission the development and manufacture of the allegedly infringing products.

### C.  Defendants' Simulations for CMU Licensees Are Protected by the Licensees' Have-Made Rights

CMU may nevertheless argue, as it did in the *Marvell* case, that, even if the accused product sales to Seagate and HGST are immune from liability, simulations Defendants performed in connection with those products are not.  (*See* Ex. 10 at 698-700.)  The Court should reject CMU's argument for several reasons.

First, unlike in the *Marvell* case, Defendants have presented indisputable evidence that any allegedly infringing pre-sale activities for which CMU claims damages—including the so-called "Accused Simulators"—occurred only *after* Defendants entered into development agreements and other contracts with the licensees to work closely with them to jointly develop and supply their

custom products.   This evidence confirms that CMU's licensees commissioned the allegedly

infringing sales *and* related pre-sale activities, including the allegedly infringing simulations.

Indeed, the very documents that CMU points to as allegedly supporting the performance

of infringing simulations by Defendants in CMU's "Accused Simulator" infringement contentions

confirm that such simulations were part of the joint development process between Defendants and

their customers.  For example, CMU relies on what it acknowledges is a "2010 presentation for

Seagate," which is a 79-page document titled "Seagate Quarterly Interlock" (Ex. 3 at 9 (citing Ex.

G (LSI-04571-0086692) at -736)) that provides a detailed progress update on LSI's close

collaboration with Seagate to jointly develop the next generation of Seagate's custom SoC.  The

presentation highlights this collaborative effort throughout.  A page titled "███████████████

████████████████████████████████████," a reference to Seagate's Twin Cities

Operations center.   (Ex. G at -698.)   The presentation later details "Significant Progress on

Dearfield," a Seagate SoC developed by Defendants and Seagate, that ███████████████

███████."  (*Id.* at -711.)  Indeed, the very page of this Seagate Quarterly Interlock that CMU cites

as evidencing performance of an infringing simulation by LSI highlights in a heading that LSI is

"Engaged with Seagate TCO Team" in connection with the simulation.  (Ex. 3 at 9 (citing Ex. G

(LSI-04571-0086692) at -736).)

Another Seagate presentation CMU relies on is titled "Topics for Q1 2011 Customer

Presentation (STX)."  (Ex. 3 at B1-3 (citing Ex. 11 (LSI-04571-0444703) at -718).)  The specific

page of this presentation cited by CMU shows the simulation at issue was done *for* Seagate and

again states that LSI was "Engaged with Seagate TCO Team" to address an issue raised by Seagate

during the joint development of the product.  (Ex. 11 at -718.)

CMU specifically relies on presentations about Seagate SoCs, Seagate and LSI joint

development, and HGST and LSI joint development throughout its infringement contentions.  (*E.g.*

Ex. 3 at 9 (citing "2013 Seagate presentation" and "2014 presentation to Seagate"), B1-3 (citing

Ex. 11 (LSI-04571-0444703), Ex. G (LSI-04571-0086692).)

Thus, CMU's own infringement contentions confirm that the allegedly infringing

simulations are part of the product development and testing process, so those simulations are

1    properly within the scope of those customers' licenses.  A predecessor court to the Federal Circuit

2    similarly held that a license to "produce, use and sell" allows the licensee to "employ others to

3    assist him in the production, and in the use and in the sale of the invention," and "permits him to

4    engage others to do all the work connected with the production of the article for him."  *Carey*, 326

5    F.2d at 979.  *Carey* was cited approvingly by the Federal Circuit in *CoreBrace*, in support of its

6    holding that "the right to 'make, use, and sell' a product inherently includes the right to have it

7    made by a third party, absent a clear indication of intent to the contrary."  566 F.3d at 1072-73.

8         On a similar note, treating Defendants' performance of simulations in connection with

9    product development and testing for Seagate and HGST differently from the sales of the products

10   themselves would effectively nullify the licensees' have-made rights.  Even CMU alleges that

11   Defendants cannot provide the accused products to their customers without first expending years

12   of effort to jointly develop and test the products, including running simulations.  (*See* Dkt. No. 1

13   at ¶ 144.)  That Defendants' product *sales* are protected by CMU licensees' have-made rights is

14   meaningless if the performance of *simulations* and other development and testing necessary to

15   develop the products are not.

16   **V.    CONCLUSION**

17        The undisputed facts demonstrate that Defendants' allegedly infringing development and

18   testing activities (including simulations) performed in connection with products provided to CMU

19   licensees such as Seagate and HGST are protected by the licensees' have-made rights, and

20   therefore are immune from liability.  CMU's arguments to the contrary fail as a matter of law.  The

21   Court should therefore grant partial summary judgment of noninfringement based on Defendants'

22   implied license defense, thereby excluding from CMU's alleged damages base all revenues from

23   Defendants' sales to Seagate and HGST.

24

25

26

27

28

---

DEFENDANTS' MSJ RE IMPLIED LICENSE                          CASE NO.  3:18-cv-04571-JD

1 Dated:  October 21, 2019

Respectfully submitted,

2 KING & SPALDING LLP

3 By: /s/  *Steven J. Rizzi*
KENNETH L. STEINTHAL (State Bar No. 268655)
4 ksteinthal@kslaw.com
KING & SPALDING LLP
5 101 Second Street, Suite 2300
San Francisco, CA 94105
6 Telephone:  (415) 318-1211
Facsimile:   (415) 318-1300
7

8 STEVEN JAY RIZZI (admitted *pro hac vice*)
srizzi@kslaw.com
9 RAMY HANNA (admitted *pro hac vice*)
rhanna@kslaw.com
10 KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
11 New York, NY 10036
Telephone:  (212) 556-2100
12 Facsimile:   (212) 556-2222
13

14 *Attorneys for Defendants* LSI CORPORATION and
AVAGO TECHNOLOGIES U.S. INC.,
15

16

17

18

19

20

21

22

23

24

25

26

27

28