**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Carnegie Mellon University*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>LSI CORPORATION and AVAGO TECHNOLOGIES U.S. INC.,<br><br>LSI. | Case No.: 3:18-cv-04571-JD<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO LSI'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NONINFRINGEMENT BASED ON IMPLIED LICENSE ("HAVE-MADE" RIGHTS)**<br><br>Date: December 19, 2019<br>Time: 10:00 a.m.<br>Courtroom: 11 - 19th Floor<br>Hon. James Donato |

# TABLE OF CONTENTS

**Page**

I.    Introduction .................................................................................................................. 1

II.    Factual Background ...................................................................................................... 3

    A.    Seagate's and HGST's Have Made Rights ................................................. 3

    B.    LSI's Development of Accused Products for Seagate and HGST ............................ 4

    C.    The Infringing Circuits and Simulators ...................................................... 5

    D.    Development of the Infringing Sequence Detectors ................................... 6

III.    Legal Standard For Summary Judgment .................................................................... 10

IV.    Argument .................................................................................................................. 10

    A.    Because LSI's Agreements with Seagate and HGST Do Not Affirmatively State that Those Customers Are Extending Their Have Made Rights to LSI, Those Agreements Disavow LSI's Claimed Implied License. ................................. 11

        1.    The Seagate Agreements Do Not Extend An Implied License to LSI. ........ 13

            a.    The 2001 MADA ............................................................ 13

                i.    ████████████████ ......................................... 13

                ii.    Other Categories ............................................. 14

            b.    The 2007 MDA ............................................................... 16

        2.    The HGST Agreement Does Not Extend Have Made Rights to LSI. .......... 17

    B.    LSI Cannot Establish That Seagate or HGST Affirmatively Exercised Their Have Made Rights In A Manner That Allows For Implication Of A License Outside The Confines Of The Agreements .............................................................. 18

    C.    Other Disputes of Material Fact Doom LSI's Motion. ............................................ 20

        1.    The Classification of Infringing Sequence Detectors Under the Agreements ................................................................................... 20

        2.    Timeline of Development of the Infringing Sequence Detectors ............... 21

        3.    The Extent of Customization ................................................... 23

V.    Conclusion ................................................................................................................ 25

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT    CASE NO. 3:18-cv-04571-JD

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addisu v. Fred Meyer, Inc.*,
    198 F.3d 1130 (9th Cir. 2000) ...................................................................................10

*Allen v. El Paso Pipeline GP Co., L.L.C.*,
    113 A.3d 167 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) .............12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................................10

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
    C-12-4498 EMC, 2013 WL 5640905 (N.D. Cal. Oct. 11, 2013)............................10, 22

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
    No. 3:12-cv-04498-EMC, 2014 WL 2735046 (N.D. Cal. June 16, 2014)...............23, 24

*Atlas Corp. v. U.S.*,
    895 F.2d 745 (Fed. Cir. 1990)......................................................................................13

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Cal.*,
    618 F.3d 1066 (9th Cir. 2010) .....................................................................................11

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*
    890 F.Supp.2d 602 (W. D. Pa. 2012).........................................................................2, 18

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*
    906 F. Supp. 2d 399, 403 (W.D. Pa. 2012)...................................................................18

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*
    986 F. Supp. 2d 574, 588 (W.D. Pa. 2013)...........................................................3, 18, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).....................................................................................................10

*Convolve, Inc. v. Compaq Computer Corp.*,
    527 Fed. Appx. 910 (Fed. Cir. 2013).......................................................................12, 13

*Crossroads Sys., Inc. v. Dot Hill Sys. Corp.*,
    48 F. Supp. 3d 984 (W.D. Tex. 2014)...........................................................................11

*Dow Chem. Canada Inc. v. HRD Corp.*,
    656 F. Supp. 2d 427 (D. Del. 2009), *aff'd*, 587 Fed. Appx. 741 (3d Cir. 2014)...........12

*Faigin v. Signature Grp. Holdings, Inc.*,
    150 Cal. Rptr. 3d 123 (Cal. Ct. App. 2012) ..................................................................12

*Fortis Advisors LLC v. Dialog Semiconductor PLC*,
   CV 9522-CB, 2015 WL 401371 (Del. Ch. Jan. 30, 2015)............................................................12

*Freescale Semiconductor, Inc. v. ChipMOS Techs.*,
   5:09-CV-03689-EJD, 2013 WL 308919 (N.D. Cal. Jan. 25, 2013) ............................................10

*Fuller v. Idaho Dep't of Corr.*,
   865 F.3d 1154 (9th Cir. 2017) ..................................................................................................10

*Hill v. State Farm Mut. Auto. Ins. Co.*,
   83 Cal.Rptr.3d 651 (Cal. Ct. App. 2008) .................................................................................12

*Intel Corp. v. Broadcom Corp.*,
   173 F. Supp. 2d 201 (D. Del. 2001)..................................................................................... *passim*

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012).....................................................................................................19

*M/A-COM Tech. Sols. Holdings, Inc. v. Laird Techs., Inc.*,
   CV 14-181-LPS, 2014 WL 2727198 (D. Del. June 13, 2014).............................................. *passim*

*Navarro v. Mukasey*,
   518 F.3d 729 (9th Cir. 2008) .....................................................................................................11

*Norton v. K-Sea Transp. Partners L.P.*,
   67 A.3d 354 (Del. 2013) ............................................................................................................11

*Overfelt v. Hagerty Ins. Agency, LLC*,
   19-CV-04297-SI, 2019 WL 4645323 (N.D. Cal. Sept. 24, 2019) .................................................12

*Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*,
   68 A.3d 665 (Del. 2013) ............................................................................................................11

*Skilstaf, Inc. v. CVS Caremark Corp.*,
   669 F.3d 1005 (9th Cir. 2012) ...................................................................................................11

*Thorn EMI N. Am., Inc. v. Hyundai Elecs. Indus. Co., Ltd.*,
   No. 94--332-RRM, 1996 WL 33415780 (D. Del. July 12, 1996)................................................23

*World Energy Ventures, LLC v. Northwind Gulf Coast LLC*,
   CV N15C-03-241 WCC, 2015 WL 6772638 (Del. Super. Ct. Nov. 2, 2015) ..............................12

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................................10

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Carnegie Mellon University ("CMU") files this Opposition to LSI's Motion for Partial Summary Judgment of Noninfringement Based on Implied License ("Have-Made" Rights) ("Motion").  Dkt. 145-4.

## I.     INTRODUCTION

Conceding that no customer has ever expressly exercised "have made" rights authorizing LSI to use CMU's patented methods, LSI asks this Court to determine as a matter of law that it has an *implied* license that exonerates its infringing uses.  According to LSI, the Court would be justified in manufacturing this implied license simply because LSI "collaborates" with its customers Seagate Technology PLC ("Seagate") and Hitachi Global Storage Technologies ("HGST") to develop and sell them the Accused Products, and those customers have a license to the CMU Patents that include "have made" rights.  In fact, the very agreements governing that collaboration ███████ ████████████████████████████████████████████████████████████ ████████ and therefore *preclude* this Court from *implying* the existence of such rights.

LSI studiously avoids any mention of numerous key facts that doom its claim.  For example, LSI relies heavily on its contracts with Seagate and HGST, but ignores the specific and detailed provisions of those contracts that █████████████████████████████████ ████████████████████████████████ (and as a result preclude *implicit* licensing to LSI).  LSI also never explicitly refers to the specific component of the Accused Products that practices CMU's patented methods, let alone asserts that Seagate or HGST required or even requested that LSI include those methods in the products that they purchased.  LSI's failure to do so is not surprising because (i) ███████████████████████████████████ ████████████████████████████████████████████ (ii) contrary to any suggestion that its customers required them to implement CMU's patented methods in their products, LSI denies actually including the infringing methods in the Accused Products; and (iii) █████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████ And LSI does not describe the timing of

1

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   its development of the embodiments of those methods in its products, ███████████

2   ██████████████████████████████████████████████████████████ Those

3   facts are fatal to LSI's Motion for at least three reasons.

4        **First**, the very agreements that LSI relies upon ████████████████████

5   ████████████████████████████████ preclude LSI's assertion that Seagate and HGST

6   impliedly exercised have made rights. ████████████████████████████

7   █████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ██████████████████████████ Hornbook law, however, prohibits courts from implying

12  additional license terms in the face of an agreement expressly addressing licensing.  *See* 11 Williston

13  on Contracts § 31:5 (4th ed.) ("[T]he courts properly and steadfastly reiterate the well-established

14  principle that it is not the function of the judiciary to change the obligations of a contract which the

15  parties have seen fit to make.  A court will not rewrite the contract of the parties.").

16        **Second**, a number of courts have required a party claiming the protection of a licensee's have

17  made rights to demonstrate the licensee affirmatively extended those rights.  *See, e.g.*, *M/A-COM*

18  *Tech. Sols. Holdings, Inc. v. Laird Techs., Inc.*, CV 14-181-LPS, 2014 WL 2727198, at *3 (D. Del.

19  June 13, 2014); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 890 F.Supp.2d 602, 609 (W. D.

20  Pa. 2012); *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 234 (D. Del. 2001).  LSI, however,

21  points to no evidence of any such exercise by Seagate or HGST, and ████████████████

22  ████████████████ Any evidence of such an exercise, in any case, could not ███████████

23  █████████████████████████████████████████████████████████

24  ████████████████████████████████████████████

25        **Finally**, to the extent the express terms of the agreements and the corresponding lack of an

26  affirmative exercise do not preclude LSI's defense, numerous disputes of material fact are fatal to its

27  Motion.  These include (i) the proper classification of LSI's embodiments of CMU's patented

28  methods under its agreements with its customers, because ████████████████████████

2

1    ████████████████████, (ii) the timeline of LSI's development of those embodiments, because

2    case law indicates that ██████████████████████████████████████████████████████████

3    ████████████████████████ cannot be immunized, and (iii) the extent of customization,

4    because LSI claims only that the Accused Products generally are customized, but CMU contends the

5    proper unit of analysis is ████████████████████████████████

6    **II.    FACTUAL BACKGROUND**

7        **A.    Seagate's and HGST's Have Made Rights**

8        It is uncontested that, to the extent Seagate and HGST possessed have made rights to the

9    patents at issue here, they did so as a result of Associates Agreements with CMU's Data Storage

10   Systems Center ("DSSC").  The DSSC is an interdisciplinary center for research and development of

11   data storage solutions funded through, *inter alia*, corporate sponsorship.  *See Marvell*, 986 F. Supp.

12   2d 574, 588 (W.D. Pa. 2013).  Since the DSSC's inception, companies could become "Associate

13   Members" by paying an annual fee and making other investments in CMU.  *Id.*  In exchange,

14   through Associates Agreements, those Associate Members received certain rights, including rights to

15   obtain a license that includes the right to "have made" any "inventions" "conceived or first reduced

16   to practice in the course of or under the Agreement by any personnel while engaged in the activities

17   of the Center."  *See* Dkt. 145-5 at § 2.b.

18       Drs. Jose Moura and Aleksandar Kavcic, "while engaged in the activities of the Center,"

19   conceived the inventions claimed in the Patents at least as early as February 1996 and diligently

20   reduced them to practice by spring 1998, when CMU filed the provisional application that ultimately

21   issued as U.S. Patent Nos. 6,201,839 and 6,438,180 (the "Patents").  *See* Exs. 1, 2, and 3.[1]

22   Accordingly, Seagate received any have made rights it has to those inventions pursuant to its

23   Associates Agreement with CMU.[2]  *See* Dkt. 145-5 at § 2.b.  HGST, on the other hand, did not

24   obtain have made rights to the Patents as an Associate Member.  Rather, LSI contends HGST

---

[1] Numbered exhibits herein refer to exhibits attached to the Declaration of Christopher M. Verdini, filed concurrently herewith.

[2] LSI incorrectly contends that Seagate also had a sublicensing right that "endured through expiration of the patents."  Dkt. 145-4 at 3 n.3.  In fact, on September 20, 1995, the DSSC Associate Members eliminated, as of that date, any sublicense rights under the Associate Agreements.  *See* Ex. 4; Ex. 5 at 28:21-30:5.  Accordingly, no Associate Member had sublicense rights to any inventions conceived after September 20, 1995, including the inventions claimed in the Patents.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT        CASE NO. 3:18-cv-04571-JD

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   obtained have made rights ██████████████████████ Dkt. 145-6 at §§ 3.1-3.3. ████

2   ████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ██████   *Id.* at §§ 1, 3.1, 3.3.

5   **B.      LSI's Development of Accused Products for Seagate and HGST**

6   LSI and its predecessor Agere Systems Inc. ("Agere") engaged in the development of

7   products for both Seagate and HGST pursuant to several product development agreements

8   ("Agreements"):

- The 2000 "Master Alliance Development Agreement" between Seagate, Agere, and STMicroelectronics NV ("STM"), *see* Dkt. 145-26;

- The 2001 "Master Alliance Development Agreement" between Seagate, Agere, and STM ("2001 MADA"), *see* Dkts. 145-27, 145-28;

- The 2004 Master Development Agreement between Seagate and Agere, *see* Dkt. 145-29;

- The 2007 Master Development Agreement between Seagate and LSI ("2007 MDA"), *see* Dkt. 145-30; and

- The 2011 Base Agreement between HGST and LSI ("2011 BA"), *see* Dkt. 145-41.

*See also* Dkt. 145-4 at 7-9, 11. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*See id.* at 8-9, 11; Dkt. 145-30 at § 8; Dkt. 145-41 at § 14.0.

Ms. Heather Christianson, who submitted a declaration in support of LSI's Motion, *see* Dkt.

145-25, and who LSI designated as its Rule 30(b)(6) witness on have made rights, Ex. 6 at 11:24-

13:19, testified that ██████████████████████████████████████████████████

██████████████████████████   *See id.* at 82:20-83:11, 86:16-23.  Notably, however, ████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████   *See, e.g.*, Dkt. 145-4 at 5

(explaining customers used "black box" simulations "to assess performance during the development

process"); *id.* at 9 (indicating customers sought to balance "requirements such as performance, cost,

4

and power"); *id.* at 11 (indicating HGST Requests for Information state "functional performance requirements").  LSI's denial that it uses CMU's patented methods also is at odds with any suggestion that its customers specifically demanded that LSI implement those methods in its products.  Furthermore, by claiming an "implied" license, LSI effectively concedes that none of the documents it relies upon expressly authorize or require LSI to practice the Patents.

As expected in joint development agreements, the parties also ████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████  Despite repeatedly citing the Agreements as evidence *of collaboration*, *see* Dkt. 145-4 at 1, 7-9, 11, 12, 15-16, 20-21, 22, LSI conspicuously fails to refer to the explicit provisions in the Agreements ████████████████████████████ █████████████  Those provisions, which preclude LSI's implied license defense, are discussed in detail *infra* at Section IV.A.

## C.   The Infringing Circuits and Simulators

The Patents are directed to a method used in a read channel circuit to improve the accuracy of detecting data written to a storage medium, such as a magnetic disk in an HDD, by accounting for the signal-dependent and correlated aspects of noise that distort the readback signal from the written data being read.  Because it cannot point to any collaboration with Seagate or HGST directed to the Patents or the methods claimed therein, LSI refers in its Motion almost exclusively to "Accused Products," *i.e.*, LSI's read channels or systems-on-a-chip ("SOCs"), and only vaguely and in passing refers to the "accused read channel functionality," Dkt. 145-4 at 4, without ever identifying that functionality.  But, as LSI concedes (and undoubtedly will argue for damages purposes), those products are "complex semiconductor devices," and their accused SoCs "perform[] multiple functions both upstream and downstream of the read channel functionality."  Dkt. 145-4 at 4.

In fact, CMU has accused specifically the pattern-dependent sequence detector in LSI's Accused Products of infringing the Patents.  LSI's sequence detector is the circuit in its read channel that ██████████████████████████████████████████████████████████████ ██████████████████████████████  LSI typically refers to its sequence detector as ██████████ ███████████████████████████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



*See, e.g.*, Ex. 7; Ex. 8 at 31:19-25.  It also refers to ████████████████████████████

██████████████████████████████████████████████████████

████████████████  *See, e.g.*, Ex. 9 at 11 ██████████████████ Ex. 10 at 27 (███████").

Additionally, CMU has accused certain simulators—computer-implemented detectors that execute

simulation code files to mimic the operation of detectors in the Accused Products— that ████

████████████████████████████ and that LSI essentially concedes are a necessary part

of making a sale (together with accused read channel circuits, the "Infringing Sequence Detectors") .

*See* Ex. 8 at 25:18-26:10, 37:12-22, 113:7-23; Dkt. 145-4 at 5.

**D.     Development of the Infringing Sequence Detectors**

Based upon documents produced by LSI, Agere began the development of the first pattern-

dependent sequence detector that CMU contends infringed the Patents ████████████████████

████████████████████████████████████████████

████████████████  *See, e.g.*, Ex. 11 ████████████████████████

████████████████████████; Ex. 9 at 11 ████████████████████████

██████████████████████████████████████████  Ex.

12 at line 3.  ████████████████████████████████████████

████████████████████  *See* Ex. 11; Ex. 13 at 2 ████████████████

████████████████; Ex. 14 at 15, 30 ████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████  *see* Ex. 15 at 7-8, ████████████████████

████████████████████████████████████████

████████████████████  *See, e.g.*, Ex. 12 at line 3 ██████████████████

████████████  Ex. 16 at 17 ████████████████████████

████████████████████████████████  Ex. 17 at 3 ████████

████████████████████████████████████████

████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

From Agere's first development of the Infringing Sequence Detectors through the end of the damages period, LSI's documents consistently refer to the Infringing Sequence Detectors as ████ ████████████████████████████████ *See, e.g.*:

- Ex. 18 at 1 ████████████████████████████████████
  ████████████████████████████████████████████ ;

- Ex. 20 at 1 ████████████████████████████████████

- Ex. 21 at 3 ████████████████████████████████████
  ████████████████████████████████████████

- Ex. 22 at 1-2 ██████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████

- Ex. 7 at 2 ██████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████ and

- Ex. 23 at 6 ████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[3] *See* Ex. 19 at 6.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



(emphases added).

Both Seagate's and HGST's documents likewise reflect that ⬛⬛⬛

⬛⬛⬛. *See, e.g.*:

- Ex. 24 at 4-6 ⬛⬛⬛

- Ex. 25 at 2-3 ⬛⬛⬛

- Ex. 26 at 2 and Ex. 27 at 2 ⬛⬛⬛

- Ex. 27 at 3-4 ⬛⬛⬛

- Ex. 28 at 3 and Ex. 29 at 3 ⬛⬛⬛ and

- Ex. 30 at 2 ⬛⬛⬛

(emphases added); *see also* Dkt. 145-4 at 11 (describing ⬛⬛⬛

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT        CASE NO. 3:18-cv-04571-JD

1    ████████████████████████████████████ Dkt. 145-40 (cited ████████████

2    ████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5         LSI's and its customers' documents are entirely consistent with the testimony of LSI's

6    witnesses to date, who have stated that ██████████████████████████████████

7    ████████████████ *See, e.g.*, Ex. 6 at 20:10-12 ████████████████████████████ *id.* at

8    183:23-184:13 ███████████████████████████████████████████████████████

9    ████████████████████████████ Ex. 31 at 17:14-19 ████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████); Ex. 8 at 40:5-17 (explaining that ████████████████████████

13   Ex. 32 at 310:1-313:14 (testifying about ████████████); Ex. 33 at 26:10 ████████

14   Indeed, LSI █████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████ *See* Ex. 8 at 21:15-

17   22:8, 40:5-41:3; Ex. 33 at 224:10-225:10.

18        Tellingly, as of at least 2003, ████████████████████████████████████

19   ████████ Seagate did not view them as its own.  In April 2003, CMU asked Dr. Mark Kryder, then

20   a Seagate Vice President and Director of Research and former head of the DSSC, about Seagate's

21   knowledge of any use in the hard disk drive industry of the methods claimed in the Patents.  Ex. 34

22   at 2.  Dr. Kryder denied that ***Seagate*** had any knowledge of such use but explained that "***channel***

23   ***vendors*** [*e.g.*, Agere] may well be working in the area."  *Id.* at 1.  At that time, ████████████████

24   ████████████████████████████ *See* Ex. 35 at 10.  Dr. Kryder then suggested that

25   CMU "send the patent to relevant people in each of the channel vendors making them aware of the

26   patent and indicating that, if they are building channel chips that incorporate algorithms for signal

27   dependent noise, they may be violating that patent, and if they are not, they may want to consider

28   designing a chip based upon that patent."  Ex. 34 at 1.  He posited that "[i]n either case, they [the

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT          CASE NO. 3:18-cv-04571-JD

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  channel vendors] may be interested in obtaining a license to that patent." *Id.*   If Seagate had

2  purported to own Agere's Infringing Sequence Detectors or to have licensed Agere under Seagate's

3  have made rights to the Patents, it would have been reasonable for Dr. Kryder to inform CMU of that

4  position.  Dr. Kryder did no such thing.

5  **III.   LEGAL STANDARD FOR SUMMARY JUDGMENT**

6       A court shall grant summary judgment only "if the movant shows that there is no genuine

7  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

8  Civ. P. 56(a).  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a

9  verdict" for either party, and a fact is "material" if that fact could "affect the outcome of the suit

10  under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

11       The moving party bears the initial burden of demonstrating the absence of a genuine issue of

12  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Reasonable doubts as to the

13  existence of material factual issue are resolved against the moving parties and inferences are drawn

14  in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130,

15  1134 (9th Cir. 2000) (citation omitted).  "[W]here evidence is genuinely disputed on a particular

16  issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary

17  judgment." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (citation omitted).

18  **IV.   ARGUMENT**

19       LSI bears the burden of proving its implied license defense based on have made rights.  *See*

20  *Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 5:09-CV-03689-EJD, 2013 WL 308919, at *3

21  (N.D. Cal. Jan. 25, 2013) (Davila, J.) ("Like with all patent-based affirmative defenses, the burden of

22  proving … [a] license rests on the party that raises the defense."); *see also Asetek Holdings, Inc. v.*

23  *CoolIT Sys., Inc.*, C-12-4498 EMC, 2013 WL 5640905, at *1 (N.D. Cal. Oct. 11, 2013) (explaining

24  that defendant had "the burden of proof" as to its "argument" that it had "an implied license to

25  practice the patents based on a license … given by [plaintiff] to a third party"); *Intel*, 173 F. Supp. 2d

26  at 207 ("[A]s the party asserting certain affirmative license defenses, Broadcom would bear the

27  burden of proving each of these defenses.").  LSI cannot satisfy its burden.

28

10

**A.** **Because LSI's Agreements with Seagate and HGST Do Not Affirmatively State that Those Customers Are Extending Their Have Made Rights to LSI, Those Agreements Disavow LSI's Claimed Implied License.**

LSI asserts that it developed chips for Seagate and HGST pursuant to the Agreements and emphasizes the collaborative nature of the joint development effort, but does not actually analyze the Agreements. *See, e.g.*, Dkt. 145-4 at 1, 7-13. Those "overarching" Agreements, *see* Ex. 6 at 82:20-83:11, 86:16-23, ██████████████████████████████████████████████████████████ ██████████████████████████████ [4] Indeed, by arguing it has an "implied" license, LSI concedes that there are no express grants of have made rights in those Agreements. And LSI ignores ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ *See* Ex. 31 at 84:1-7; Ex. 6 at 82:12-24; Ex. 32 at 242:25-244:23; Ex. 35 at 12. ████████████████████████ ██████████████████████████████████████████████████████

---

[4] The plain meaning of the Agreements controls, under both Delaware law — ██████████ ████████████████████████████████████ — and California law — ████████████ █████████████████████████████████████████ *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) ("We interpret clear and unambiguous contract terms according to their plain meaning."); *Navarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir. 2008) ("Because the interpretation of this settlement agreement is governed by California contract law, … we first determine whether the contract language is clear or ambiguous … If the contract language is clear, we give effect to its plain meaning." (internal citations omitted)). Under Delaware law, extrinsic evidence as to a contract's meaning may not be considered unless there is an ambiguity in the contract language. *See Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013). No such ambiguity exists here, making any attempt by LSI to introduce extrinsic evidence as to the meaning of ██████████████ in reply inappropriate. *See, e.g., Crossroads Sys., Inc. v. Dot Hill Sys. Corp.*, 48 F. Supp. 3d 984, 991 (W.D. Tex. 2014) ("Dot Hill provides an affidavit from HP's Vice President and Associate General Counsel who was involved in negotiating the HP License. … [T]he HP License is unambiguous, making resort to extrinsic evidence inappropriate. The contract speaks for itself … There is no language specifically referencing [certain matters] regardless of whatever HP's corporate representative now claims HP's intentions were."). Under California law, a court may consider extrinsic evidence to determine whether there is a latent ambiguity in a contract. *See Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012). But even if LSI could introduce such evidence regarding ██████████████, at most it would simply preclude summary judgment for LSI. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Cal.*, 618 F.3d 1066, 1079 (9th Cir. 2010) ("[A]mbiguity in a contract raises a question of intent, which is a question of fact precluding summary judgment." (quoting *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983))).

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT    CASE NO. 3:18-cv-04571-JD

1   █████████████████████████████████████████████████   *See* Ex. 6 at 138:20-140:10

2   ████████████████████████████████████████████████████████████████

3   ████████████

4       Without language addressing the treatment of customer have made rights, ████████

5   ████████████████████████████████████ the Agreements precludes LSI's ***implied*** license defense.

6   ███████████████████████████████████████ that does not permit the implication of

7   additional licenses from Seagate and HGST and that furthermore, █████████████

8   ██████████████████████████████████████ It is fundamental that

9   an implied agreement cannot supersede express contract terms.  *See* 11 Williston on Contracts §

10  31:5; *Overfelt v. Hagerty Ins. Agency, LLC*, 19-CV-04297-SI, 2019 WL 4645323, at *4 (N.D. Cal.

11  Sept. 24, 2019) ("There cannot be a valid, express contract and an implied contract, each embracing

12  the same subject matter, existing at the same time. … The reason for the rule is simply that where

13  the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for

14  undertaking certain obligations, it would be inequitable to imply a different liability....")(quoting

15  *Wal-Noon Corp. v. Hill*, 119 Cal. Rptr. 646, 650-51 (Cal. Ct. App. 1975)) (internal citations

16  omitted)); *Intel*, 173 F. Supp. 2d at 213 ("[W]here an agreement contains a specific provision

17  expressly defining the scope of the patent license[,] implied licenses dealing with the same subject

18  matter are not generally recognized.") (applying California law); *Dow Chem. Canada Inc. v. HRD

19  Corp.*, 656 F. Supp. 2d 427, 446-47 (D. Del. 2009), *aff'd*, 587 Fed. Appx. 741 (3d Cir. 2014)

20  (explaining, in addressing implied duty of good faith and fair dealing, that where contracting parties

21  recognize and negotiate an issue but do not include a particular term, courts cannot appropriately

22  imply a such a term) (applying Delaware law);[5] *see also Convolve, Inc. v. Compaq Computer Corp.*,

---

[5] *See also, e.g.*, *Faigin v. Signature Grp. Holdings, Inc.*, 150 Cal. Rptr. 3d 123, 134 (Cal. Ct. App. 2012) ("There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results."); *Hill v. State Farm Mut. Auto. Ins. Co.*, 83 Cal.Rptr.3d 651, 663 (Cal. Ct. App. 2008) ("Express covenants abrogate the operation of implied covenants so courts will not permit implied agreements to overrule or modify the express contract of the parties."); *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, CV N15C-03-241 WCC, 2015 WL 6772638, at *11 (Del. Super. Ct. Nov. 2, 2015) ("Importantly, the implied covenant will not be invoked to supersede the express terms of a contract."); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue"); *Fortis Advisors LLC v. Dialog Semiconductor PLC*, CV 9522-CB, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015)

527 Fed. Appx. 910, 925 (Fed. Cir. 2013) (explaining "common sense leads to the … conclusion"

that "[i]f the parties have contracted the limits of their [] relationship regarding a particular subject

matter, one party should not be able to circumvent its contractual obligations or impose new ones

over the other via some implied duty…"); *Atlas Corp. v. U.S.*, 895 F.2d 745, 754 (Fed. Cir. 1990)

("The existence of an express contract precludes the existence of an implied contract dealing with

the same subject, unless the implied contract is entirely unrelated to the express contract").

       **1.**    **The Seagate Agreements Do Not Extend An Implied License to LSI.**

        **a.**    **The 2001 MADA**

The 2001 MADA ████████████████████████████████████████████

███████████████████████████████ .[6]  *See* Dkt. 145-27 at § 7. ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████  *Id.*

         **i.**    ███████████████

The 2001 MADA defines ███████████████████████████████████

███████████████████████████████████████████████████

*Id.* at § 7.3 (emphasis added). ██████████████████████████████

███████████████████████████████████████████████████

██████  *Id.* (emphasis added). ████████████████████████████

████████████████████████  *Id.* (emphasis added).

      LSI contends Seagate possessed have made rights to the Patents because Seagate was an

Associate Member of the DSSC in 1996-1998 when the inventions claimed in the Patents were

conceived and reduced to practice.  Dkt. 145-4 at 2.  Accordingly, ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

("Where the contract speaks directly regarding the issue in dispute, 'existing contract terms
control…'" (quoting *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005))).

[6] The 2000 MADA contained ████████████████████████████████████
████████████ .  *See* Dkt. 145-26 at § 11.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT      CASE NO. 3:18-cv-04571-JD



Dkt. 145-27 at § 7.3.

See supra at Section IV.A.

### ii.      Other Categories

In addition to the fact that ███████████████████ in the 2001 MADA provide a viable avenue for the Court to imply that Seagate granted Agere a license to "have made" the Infringing Sequence Detectors.

***First***, ███████████████████████

Dkt. 145-27 at § 7.8 (emphasis added).

*Id.* at § 7.6.

*Id.*

*See* Ex. 11 at 0483543-56; Ex. 8 at 40:5-41:3; *see also supra* at Section II.D.

---

[7] ███████████████████ Dkt. 145-27 at § 7.8.

[8] ███████████████████ *Id.* at §§ 2.7, 7.6.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



***Second***, ████████████████████████████████████ █████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at § 7.7. ████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* ████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████ *See supra* at Section II.D.

***Finally,*** ████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████ *Id.* at §§ 7.1, 7.4, 7.8. █████████████████████ █████████████████

████████████████████████████████████████████ *Id.* at § 7.1. ████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ *Id.* at §§ 7.4, 7.8. █████████████████████████████████████

███████

        ████████████████████████████████████████████████

        ████████████████████████████████████████████████

[9] ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

*Id.* at § 7.7.

[10] ██████████████████████████████████████████ *Id.* at § 7.1.  LSI proffers no
evidence showing that Seagate's specifications described CMU's patented methods, and
████████████████████████████ *See* Ex. 6 at 189:2-23 ████████████████████
████████████████████████████████.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT          CASE NO. 3:18-cv-04571-JD

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



*Id.* at § 10.1 (emphasis added).[11]

*See, e.g.*, Ex. 12 at line 3

Ex. 32 at 242:25-243:23

Indeed,

*See, e.g.*, Ex. 43

    **b.**    **The 2007 MDA**

    Like the 2001 MADA, the 2007 MDA

.[12] Dkt. 145-30 at § 4; Ex. 44 at § 6 (amending 2007 MDA § 4.3).[13]

---

[11] Additionally,

*See* Ex. 40 at § 2(d); Ex. 41 at § 2(d); Ex. 42 at §1.7.

[12] Under the 2007 MDA,

Dkt. 145-30 at § 2.1.

[13] The 2007 MDA

*See* Dkt. 145-30 at § 4.3; Ex. 44 at § 6.  It does not impact the analysis here.

16

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   The 2007 MDA, ████████████████████████████████

2   ██████████████████████████████████

3   ████████████████████████████████████████

4   ████████████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████████

7   Ex. 44 at § 2 (amending 2007 MDA § 4.4) (emphasis added).[14]   ██████████████████

8   ████████

9   Seagate did not make, conceive, develop, create, or own the inventions claimed in the

10   Patents.  Furthermore, LSI itself argues that Seagate has a license to the Patents **because of** its DSSC

11   Associates Agreement, **not** because of the 2007 MDA (executed over decade later).  *See* Dkt. 145-4

12   at 2 ("[A]s [a] DSSC associate[] during the time period when the purported inventions were made,

13   … Seagate … obtained have-made rights to the asserted patents.").  Accordingly, the 2007 MDA's

14   ███████████████████████████████████  *Cf. M/A-COM*, 2014 WL 2727198, at *3

15   (explaining that agreement term granting rights "only to intellectual property conceived of, acquired

16   or developed **during** the course of performing work under a purchase order" "would not apply to the

17   technology claimed by the [asserted] Patent, which was granted well before [the agreement]"

18   (emphasis in original)).  Again, by arguing its license from Seagate is "implied," LSI also concedes

19   that ████████████████████ not extend to Seagate's have made rights to the Patents.  And

20   finally, ██████████████████████████████████████████

21   ████████████████████████████████████████

22   ██████████████████████████████████

23   **2.   The HGST Agreement Does Not Extend Have Made Rights to LSI.**

24   Finally, the 2011 BA ████████████████████████████████████

25   ████████████████████████████████████████

26   _____

27   ██████████████████████████████████  *See*
Dkt. 145-29.

28   [14] ████████████████████████████████████

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

1 ████████████████████████████████████████████████████████████████

2 ██████████████████████████████ Dkt. 145-41 at § 9. ████████████████

3 ████████████████████████████ *Id.* (emphasis added). ██████████████

4 ████████████████████████████████████████████ *See supra* at Section

5 IV.A.

6         Ultimately, the fact that the plain language of the Agreements does not extend have made

7 rights to LSI is consistent with the intent of the parties to those Agreements.  First, LSI denies

8 infringement, giving it no reason to have sought an extension of have made rights.  Second, ████

9 ████████████████████████████████████████████████████████████████

10 ███████████████████████████ Those rights are designed at least in part to protect the

11 customers from liability for inducing a supplier's infringement, █████████████████████

12 ██████████████████████████████████████████ At best, as an

13 analysis of the relevant provisions demonstrates, LSI's argument now is that the customers

14 accidentally conveyed their have made rights, ████████████████████

15
16     **B.     LSI Cannot Establish That Seagate or HGST Affirmatively Exercised Their
            Have Made Rights In A Manner That Allows For Implication Of A License
            Outside The Confines Of The Agreements.**

17         LSI's Motion separately fails because LSI has not identified any affirmative exercise of have

18 made rights by Seagate or HGST that could possibly justify implying the existence of a license.

19         Several district courts have held that third parties claiming the protection of a licensee's have

20 made rights must demonstrate that the licensee affirmatively exercised those rights.  *See, e.g., M/A-*

21 *COM*, 2014 WL 2727198, at *3 ("[T]he Court further concludes that MACOM is likely to overcome

22 Laird's license defense because … even if Ford were permitted to extend its rights to Laird, there is

23 no evidence that Ford has done so.") ; *Marvell*, 890 F.Supp.2d at 609 (finding no evidence of "any

24 specific agreement between Marvell and Seagate prior to Marvell's design win" that would indicate

25 Seagate "conferred" have made rights on Marvell); *Marvell*, 906 F. Supp. 2d 399, 403 (W.D. Pa.

26 2012) (indicating exercise could be "an instruct[ion] … to practice the alleged infringing methods or

27 to design [products] in accordance with the patents [to which the licensee has have made rights]."); 

28 *Marvell*, 986 F. Supp. 2d at 651 n.111 ("Marvell … did not proffer any contract, communication,

testimony or document showing Seagate exercised any DSSC rights in conjunction with its dealings with Marvell."); *Intel*, 173 F. Supp. 2d at 234 (denying summary judgment on implied licensing).

Such a requirement effectuates the "very different" "legal effect" of "licensees exercising their 'have made' rights by commissioning a third party to make licensed products," as compared to "licensees purchasing allegedly infringing products from a third party." *Intel*, 173 F. Supp. 2d at 234. "An unlicensed third party … only is afforded the protections of a license if those protections are conveyed by the licensee to the third party as an exercise of the licensed party's 'have made' rights. [An unlicensed third party] cannot lay claim to those protections if they were never conveyed to [it]." *Id.* at 233; *id.* at 234 ("Broadcom cannot unilaterally rely on the rights of the licensees who purchase its products, when none of those licensees' rights have been conferred onto Broadcom."). The requirement of some affirmative exercise makes practical sense. Without it, have made rights could transfer without the knowledge of and contrary to the intent of either or both the licensed party and the third-party supplier. This, in turn, would make the licensed party's compliance with potential obligations to the licensor (*e.g.*, royalty payments, marking) a near impossibility.

LSI overreads Federal Circuit precedent in arguing that no affirmative exercise of have made rights is required. Dkt. 145-4 at 17-19. Although *LaserDynamics, Inc. v. Quanta Computer, Inc.* did not discuss the precise nature of the licensee's request for product from the manufacturer in finding an implied license, the court did not specifically consider or discuss, let alone reject, the requirement of an affirmative exercise of have made rights. *See* 694 F.3d 51 (Fed. Cir. 2012).

Tellingly, LSI does not identify any documents that reflect an affirmative exercise of have made rights by Seagate or HGST, whether in the form of an agreement, a communication as to have made rights, an instruction to practice the Patents, or a directive to implement the methods claimed in the Patents. Moreover,

*See* Ex. 6 at 186:25-189:23

---

19

1

2    *see also*

3    Ex. 31 at 175:4-9

4

5    ).  That LSI never affirmatively sought an extension of its

6    customers' have made rights is particularly striking when LSI knew that it was infringing.  CMU

7    informed LSI's predecessor, Agere, of the Patents in 2003, after Agere had developed its first

8    Infringing Sequence Detector.  *See* Ex. 36.  An LSI Vice President admitted in 2009 that LSI

9    "cannot run channels w/o Kavcic's DDNP algorithms."  Ex. 37.

10

11    Ex. 38.

12         Even if LSI were to submit evidence of an affirmative exercise in its reply

13    , such evidence would at a minimum create a genuine issue of material fact that

14    defeats LSI's Motion.  But before it could rely on such hypothetical evidence, LSI first would have

15    to overcome a legal hurdle.  The Agreements

16         *See, e.g.*, Dkt. 145-27 at § 20

17

18

19

20

21    *see also* Dkt. 145-26 at § 23; Dkt. 145-29 at § 11.8; Dkt. 145-30 at § 11.8; Dkt. 145-41 at § 15.1,

22    §15.11.

23

24

25         **C.**    **Other Disputes of Material Fact Doom LSI's Motion.**

26              **1.**    **The Classification of Infringing Sequence Detectors Under the Agreements**

27

28         If the Court determines that LSI's implied license defense depends upon whether the

Infringing Sequence Detectors are

20

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   ██████████████████████████████████████ LSI's Motion should be denied because

2   it fails to make even a threshold showing of the proper classification.  At best, LSI makes only a

3   passing reference to █████████████████████████████████████████████████

4   █████████████████████████████████████████████████

5   █████████████████████████████████████ Dkt. 145-4 at 8-9.

6   ███████████████████████████████████████

7   ██████████████████████████████████████████

8   ████████████████████████████████████ *See supra* at

9   Section II.D.  Under the 2001 MADA, █████████████████████████████

10  █████████████████████████████████████████████████

11  ███████████████████████████████████████

12  █████████████████████████████████████████ *See*

13  *supra* at Section VI.A.1.a.ii. ████████████████████ *Id*.  Likewise, under the

14  2007 MDA, █████████████████████████████████

15  ██████████████████████████████████ *Id*. ████████

16  ████████████████████████ *Id*.

17      █████████████████████████████████████████ precludes LSI

18  from asserting that the have made rights of LSI customers extend to the Infringing Sequence

19  Detectors.  *See M/A-COM Tech.*, 2014 WL 2727198, at *3 ("Laird [the party claiming a have made

20  defense] is seeking to supply Ford [plaintiff's licensee] with a product Laird contends is the result of

21  Laird's design efforts, not a product designed and owned by the 'licensee,' that is, Ford.  In sum, the

22  Terms do not appear to give Laird the rights it claims protect it from liability for infringement.").

23  Any attempt by LSI to dispute that ████████████████████████████████████

24  under the Agreements would give rise to a dispute of material fact requiring denial of the Motion.

25          **2.**      **Timeline of Development of the Infringing Sequence Detectors**

26          Even if the Agreements did not preclude LSI's implied license defense in its entirety — and

27  they do — LSI's implied license defense cannot immunize its infringement during ████████

28  █████████████████████████████████████████████████

21

████████   A company's infringement to develop a product prior to a request from a licensee for that product cannot be subsequently immunized by a licensee's have made rights.  *See Intel*, 173 F. Supp. 2d at 234 (reasoning that a "third party's acts are noninfringing" where "there is a flow of rights that authorizes the unlicensed party's otherwise infringing acts (i.e. making, selling, or using the patented invention)" that takes place "***before the third party engages in any of those otherwise infringing acts***" (emphasis added)); *Asetek*, 2013 WL 5640905 at *6 n. 3 ("That does not mean … that a third party's production and sales that occurred prior to the conferral of 'have made' rights are somehow immunized."); *Marvell*, 986 F. Supp. 2d at 651 n.112 ("[H]ad Seagate exercised its 'have made' rights before Marvell undertook the sales cycle, [Marvell] would not be liable for infringement. … If Marvell, however, did not secure such a grant of rights it would have infringed the patents in order to make a non-infringing sale.").  Moreover, in a reasonable royalty calculation, subsequent non-infringing sales to licensees can be used to value the prior, non-immunized acts of infringement that generated those sales.  *See Marvell*, 986 F. Supp. 2d at 651 n.112 ("[T]he [non-infringing] sales to Seagate could still demonstrate the value to Marvell of infringing CMU's patents.").

LSI makes no mention of how and when it developed the Infringing Sequence Detectors that it implemented in each generation of its chips.  Instead, it argues generally that infringing "pre-sale activities for which CMU claims damages … occurred only after [LSI] entered into development agreements and other contracts with the licensees to work closely with them to jointly develop and supply their custom products."  Dkt. 145-4 at 22-23.  CMU does not dispute that one or more of the Agreements was in effect for the duration of the damages period.  But that is beside the point.  As LSI itself acknowledges, ████████████████████████████████████████

████████████████████████████████████████████████████████████ [15]  Dkt.

---

[15] Indeed, the Agreements ████████████████████  ████The 2001 MADA, for instance, ████████████████████████████████████████████████████████████ ████████████████████████████ ████Dkt. 145-27 at § 1.  ████████████████████████████████ *See id.* at § 7.3 ████████████████████████████████████████████████████████████ *See, e.g.*, Ex. 11 at 0483543-56.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

145-4 at 10-12. 

, including the Infringing

Sequence Detectors, which it conceded it built on from generation to generation.  *See, e.g.*, Ex. 18

Ex. 22

Ex. 48                                     Dkt. 145-4 at 7.  Indeed,

admits SoCs developed during the damages period "built upon

prior generations."  *See supra* at Section II.D; Dkt. 145-4 at 7.

Accordingly, have made rights do not immunize the uses

and the resulting sales are properly included in CMU's damages base.  To the extent LSI contests

that it developed Infringing Sequence Detectors

, the parties have a genuine dispute of material fact that demands denial of LSI's request for

summary judgment.

### 3.    The Extent of Customization

Several courts have reasoned that have made rights extend only to customized — and not

"off-the-shelf" — infringing technology.  *See Intel*, 173 F. Supp. 2d at 233 (holding that when a

third party "makes an allegedly infringing product, that act itself constitutes an act of potential

infringement" and "[s]ubsequent sales of such off-the-shelf products to licensees do not convert that

act of infringement into noninfringement"); *M/A-COM*, 2014 WL 2727198, at *3 (applying "off-the-

shelf" and "custom" distinction); *Thorn EMI N. Am., Inc. v. Hyundai Elecs. Indus. Co., Ltd.*, No. 94-

-332-RRM, 1996 WL 33415780, at *6 (D. Del. July 12, 1996) (explaining that where infringing acts

take place domestically, a patentee "would have recourse directly against a manufacturer who

produced [infringing] 'off the shelf' products it sold to a licensee").  Indeed, the *Asetek* decision

upon which LSI relies ultimately applied the customized versus off-the-shelf distinction to rule on

summary judgment.  *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, No. 3:12-cv-04498-EMC, 2014 WL

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT          CASE NO. 3:18-cv-04571-JD

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   2735046 at *4 (N.D. Cal. June 16, 2014).

2          LSI argues that it satisfies any legal requirement of customization simply because it sold

3   "customized" Accused Products to Seagate and HGST.  *See, e.g.*, Dkt. 145-4 at 20-21.  LSI never,

4   however, squarely addresses the extent of that customization, nor does it identify which components

5   of the Accused Products are customer-specific.  As a result, LSI never actually claims that the

6   embodiments of CMU's patented methods in the Infringing Sequence Detectors are customized.

7   This is not surprising. ████████████████████████████████████████████████████

8   ████████████████████████████████████████ *See, e.g.*, Ex. 43 ████████████████████

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████ ; Ex. 23 at 6 ██████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████ Ex. 10 at 27-29 ████████████████

14  ██████████████████████████████████████████████████████████

15  ██████████████████████████████████

16          This Court's analysis in *Asetek* confirms that LSI's focus on the Accused Products as a whole

17  is improper.  In *Asetek*, the parties disputed whether the relevant unit for assessing customization

18  should be the pump head, a component of the accused full liquid system, or the full liquid cooling

19  system, which had customized components other than the pump head and was the "unit of sale."

20  *Compare* Def.'s Reply in Supp. of Mot. for Partial S.J., No. 3:12-cv-04498-EMC, Dkt. 183 (N.D.

21  Cal. Aug. 2, 2013) *with* Pls.'s Supp. Br. on Mot. for Partial S.J., Dkt. 180-3.  The Court determined

22  that the system was the relevant unit not because it was the unit of sale, but because "the [asserted]

23  patents claim as their invention a liquid cooling system and not a pump head," and "a pump head on

24  its own does not infringe."  2014 WL 2735046, at *4.  Here, the Asserted Claims cover the method

25  LSI uses in its Infringing Sequence Detectors, a method ████████████████████████████

26  As such, the law precludes ████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████ CMU's evidence set forth above creates at least a genuine dispute of material

24

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   fact that bars summary judgment.

2   **V.**      **CONCLUSION**

3        For the foregoing reasons, CMU respectfully asks that this Court deny LSI's Motion.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT            CASE NO. 3:18-cv-04571-JD

Respectfully submitted,

Dated: November 4, 2019

*/s/ Christopher M. Verdini*
Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Carnegie Mellon University*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 4th day of November, 2019, the foregoing document was served on all counsel of record who have consented to electronic service via the Court's ECF system.  Any other counsel of record who have not registered as an ECF user will be served by electronic transmission, facsimile transmission, or first class mail.

*/s/ Christopher M. Verdini*
Christopher M. Verdini

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD