**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   KENNETH L. STEINTHAL (SBN 268655)
ksteinthal@kslaw.com
2   KING & SPALDING LLP
101 Second Street, Suite 2300
3   San Francisco, CA 94105
Telephone:    (415) 318-1211
4   Facsimile:    (415) 318-1300

5
STEVEN JAY RIZZI (admitted *pro hac vice*)
6   srizzi@kslaw.com
RAMY HANNA (admitted *pro hac vice*)
7   rhanna@kslaw.com
KING & SPALDING LLP
8   1185 Avenue of the Americas, 35th Floor
New York, NY 10036
9   Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222
10

11
Attorneys for Defendants LSI CORPORATION
12   and AVAGO TECHNOLOGIES U.S. INC.

13                **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
14                  **SAN FRANCISCO DIVISION**

15
CARNEGIE MELLON UNIVERSITY,            Case No.: 3:18-cv-04571-JD
16
                    Plaintiff,
17                                        **DEFENDANTS' RESPONSIVE CLAIM**
   vs.                                     **CONSTRUCTION BRIEF**
18
   LSI CORPORATION and AVAGO             **REDACTED VERSION**
19   TECHNOLOGIES U.S. INC.,
                                          Date: January 23, 2020
20                    Defendants.         Time: 2:00 p.m.
                                          Courtroom 11, 19th Floor
21                                        Hon. James Donato

22

23

24

25

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

I.   Introduction ................................................................................................................. 1

II.   **Defendants' Constructions of the Disputed Terms Should be Adopted** ....................... 4

   A.   "branch metric function" ........................................................................................ 4

   B.   "a set of signal-dependent branch metric functions" ............................................. 9

   C.   "signal-dependent noise" ...................................................................................... 17

   D.   "correlated noise" .................................................................................................. 19

   E.   "Viterbi-like" ........................................................................................................ 19

   F.   "each signal sample corresponds to a different sampling time instant" ............... 20

**Cases**

*Allen Eng. Corp. v. Bartell Indus.*,
    299 F.3d 1336 (Fed. Cir. 2002) ...................................................................................... 3, 5

*Bell Atl. Network Servs. v. Covad Communs. Group*,
    262 F.3d 1258 (Fed. Cir. 2001) ................................................................................. 2, 7, 13

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ........................................................................................... 13

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1297 (Fed. Cir. 2015). ...................................................................................... 10

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    No. 09-290, 2011 WL 4527353 (W.D. Pa. Sept. 28, 2011) ............................................. 1

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    No. 09-290, 2012 WL 1203353 (W.D. Pa. Apr. 10, 2012) ........................................ 1, 13

*Fin Control Sys. Pty., Ltd. v. OAM, Inc.*,
    265 F.3d 1311 (Fed. Cir. 2001) ...................................................................................... 10

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ......................................................................................... 1

*Georgetown Rail Equip. Co. v. Holland L.P.*,
    867 F.3d 1229 (Fed. Cir. 2017) ...................................................................................... 19

*Gillespie v. Dywidag Systems Int'l, USA*,
    501 F.3d 1285 (Fed. Cir. 2007) ................................................................................ 14, 15

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ......................................................................................... 5

*Key Pharms. v. Hercon Labs. Corp.*,
    161 F.3d 709 (Fed. Cir. 1998) ................................................................................... 2, 15

*Krippelz v. Ford Motor Co.*,
    667 F.3d 1261 (Fed. Cir. 2012) ...................................................................................... 13

*Marrin v. Griffin*,
    599 F.3d 1290 (Fed. Cir. 2010) ...................................................................................... 19

*Multiform Dessicants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998) ................................................................................ 16, 17

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ...................................................................................... 14

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .................................................................................... 2, 3

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004) ...................................................................................... 16

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    569 F. Supp. 2d 946 (N.D. Cal. 2008)................................................................................1

*SkinMedica, Inc. v. Histogen Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013) ........................................................................................4

*Solutran, Inc. v. U.S. Bancorp*,
    No. 13-cv-2637, 2017 WL 2274959 (D. Minn. May 24, 2017)......................................20

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ...................................................................................3, 14

*Townshend Intellectual Property, L.L.C v. Broadcom Corp.*,
    No. 06-cv-05118, 2008 WL 171039 (N.D. Cal. Jan. 18, 2008) .........................................2

*Visto Corp. v. Sproqit Techs.*,
    445 F. Supp. 2d 1104 (N.D. Cal. 2006)............................................................................1

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................................................2

    iii    

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

| No. | Claim Language | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|---|
| 1 | **branch metric function**<br><br>Claim 2 of the '180 Patent<br>Claim 4 of the '839 Patent | A function for determining a branch metric value for a branch, where the first set of the function comprises one or more signal samples and one or more target values, and the second set comprises branch metric values. | A mathematical relation that uniquely associates signal samples with branch metric values. |
| 2 | **signal-dependent branch metric function**<br><br>Claim 2 of the '180 Patent<br>Claim 4 of the '839 Patent | A "branch metric function" that accounts for the signal-dependent structure of the media noise. | *See* "a set of signal dependent branch metric functions," as the term is part of a larger clause. |
| 3 | **a set of signal-dependent branch metric functions**<br><br>Claim 2 of the '180 Patent<br>Claim 4 of the '839 Patent | Two or more "signal-dependent branch metric functions" | "set":  No construction necessary; in the alternative plain and ordinary meaning. One articulation of such meaning is "finite or infinite number of objects of any kind, of entities, or of concepts that have a given property or properties in common."<br><br>"signal-dependent branch metric functions":  A branch metric function that accounts for the noise attributable to the specific symbol sequence associated with one branch, *i.e.*, when computing the branch metric value of a first branch the method selects the branch metric function that is specific to the signal dependent noise associated with that branch, which differs from the function for any other branch. |
| 4 | **Viterbi-like detector**<br><br>Claim 4 of the '839 Patent | A detector that uses a "Viterbi-like algorithm." A "Viterbi-like algorithm" is an algorithm that is or is similar to the Viterbi algorithm, which is an iterative algorithm that uses a trellis to determine the best sequence of hidden states (in this case, written symbols) based on observed events (in this case, observed readings that represent | The preamble is not limiting.<br><br>In the event the Court finds the preamble is limiting, then this term is indefinite. |

| No. | Claim Language | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|---|
| | | the written symbols), where the determined sequence is indicated by the best path through the trellis and is determined using branch metric values calculated for branches of the trellis.<br><br>The preamble is limiting. | |
| 5 | **each sample corresponds to a different sampling time instant**<br><br>Claim 4 of the '839 Patent | Each "signal sample" is from a different point in time. | Indefinite |
| 6 | **signal-dependent noise**<br><br>Claim 2 of the '180 Patent | Media noise in the readback signal whose noise structure is attributable to a specific sequence of symbols (e.g., written symbols). | Noise in a received signal attributed to the specific sequence of symbols |
| 7 | **correlated noise**<br><br>Claim 2 of the '180 Patent | Noise with "correlation" among "signal samples," such as that caused by coloring by front-end equalizers, media noise, media nonlinearities, and magnetoresistive (MR) head nonlinearities. The noise in signal samples is "correlated" when the noise in the signal samples has a tendency to vary together. | Noise among signal samples that tends to vary together. |

Defendants LSI Corp. and Avago Technologies U.S., Inc. (collectively, "LSI") submit their responsive claim construction brief pursuant to the Court's Scheduling Order.

## I.  Introduction

**The Marvell Court Claim Constructions Have Little Relevance to the Disputed Issues of Claim Construction Before This Court**.  CMU's contention that the Marvell court "construed the claim element 'selecting' a 'branch metric function' from a 'set of signal-dependent branch metric functions,' also at issue here" (Dkt. 148 at 1) both encompasses four distinct disputed claim terms before this Court and is factually incorrect.  "Selecting" and "set" were not disputed; the court simply applied the parties' agreed constructions in its summary judgment opinion.  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2011 WL 4527353, at *7 (W.D. Pa. Sept. 28, 2011).  And in its later summary judgment opinion, the court confirmed its construction of "function," which LSI tracks in its construction for "branch metric function."  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2012 WL 1203353, at *7-8 (W.D. Pa. Apr. 10, 2012).  Moreover, the core dispute here concerning "signal-dependent branch metric functions," *i.e.*, the one-to-one correspondence between the signal dependent functions and the branches, was never raised in the Marvell litigation.  And, as CMU concedes, "Marvell did not appeal any construction." (Dkt. 148 at 1.)  Thus, no issues of claim construction were before the Federal Circuit, much less confirmed on appeal.

Therefore, CMU does not and cannot contend that any of the Marvell district court's claim construction rulings are controlling.  Nor should it be suggested that the Federal Circuit's decision in that case was somehow an endorsement of any of the district court's claim construction rulings.  To the contrary, this Court must "render its own independent claim construction."  *Visto Corp. v. Sproqit Techs.*, 445 F. Supp. 2d 1104, 1108-9 (N.D. Cal. 2006) ("This Court is not bound to follow the decision of another district court.") (internal quotations omitted).  The Federal Circuit's decision in *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008), does not require deference to another district court's claim construction decision.  As Judge Whyte noted in *Rambus Inc. v. Hynix Semiconductor Inc.*, 569 F. Supp. 2d 946, 966 (N.D. Cal. 2008), "[t]he lesson from *Finisar* is that additional litigation can refine and sharpen the courts' understanding

of an invention and that a second court should *not* defer to a prior court's claim construction without questioning its accuracy." Indeed, even where Judge Fogel himself had considered the same claim terms in a prior case against a different defendant, he determined that "the Court will adopt or modify the previous construction as is appropriate in light of the parties' arguments in the instant case and the current state of the law." *Townshend Intellectual Property, L.L.C. v. Broadcom Corp.*, No. 06-cv-05118, 2008 WL 171039 at *2 (N.D. Cal. Jan. 18, 2008). Judge Fogel modified one of his prior constructions based solely on new arguments. *Id.*

**The Intrinsic Record Resolves the Disputes**. The Federal Circuit's seminal decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), supplies the fundamental principles of claim construction that guide the Court's analysis of the disputed claim terms. First, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Second, the "specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).) And finally, the prosecution history for the patent, which in this case includes the reexamination proceedings, is used to determine whether the inventor "limited the invention in the course of" those proceedings through a disclaimer. *Phillips*, 415 F.3d at 1317.

The fact that CMU largely ignores the intrinsic record, and instead urges the Court to rely on its expert's testimony, should raise a red flag, because it is a "rare circumstance that the court is unable to ascertain the meaning of the asserted claims after assessing the intrinsic evidence." *Bell Atl. Network Servs. v. Covad Communs. Group*, 262 F.3d 1258, 1269 (Fed. Cir. 2001); *see also Vitronics*, 90 F.3d at 1584 ("[W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."). Relatedly, "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Phillips*, 415 F.3d at 1318 (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) (explaining expert testimony is disfavored because "expert reports and testimony is generated at the time of and for the purpose of litigation and thus

can suffer from bias that is not present in intrinsic evidence")).  The court also noted that "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents.  *Id.* at 1318-19 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

In addition, a recurring theme of CMU's and its expert's proposed constructions is an attempt to rewrite the claims in order to avoid invalidity.  However, it is improper as a matter of law to do so.  *Allen Eng. Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("It is not our function to rewrite claims to preserve their validity").  The Court need look no further than the intrinsic record of the asserted patents—which includes substantial admissions and prior argument in the context of reexamination—to conclude that CMU's constructions are untenable.

**CMU'S Expert Testimony Should Be Given No Weight**.  The Federal Circuit's cautionary statements about relying on expert testimony are particularly apposite here.  Indeed, because Dr. McLaughlin could not support his opinions using the actual language of the patent, he resorts to *altering* that language in his declaration.  For the "signal-dependent noise" term, which CMU also incorporates into its construction for "signal-dependent branch metric function," CMU seeks to modify the claim term "noise" to read "noise **structure**."  (Dkt. 148 at 13-14.) CMU relies on Dr. McLaughlin's declaration, where he points to a sentence in the common specification of the patents that he quotes as "[d]ue to the signal dependent *structure* of the media noise . . ." to support this modification, emphasizing "*structure*."  (Dkt. 144-4 at ¶ 78.)  However, the sentence he relies on actually reads "[d]ue to the signal dependent *nature* of media noise . . . ."  ('839 pat., 4:24 (emphasis added).)  Indeed, the word "structure" is not used at all to describe the noise in the '180 patent, and only once in the '839 patent.

Although this is the most egregious example of the unreliability of CMU's expert's opinions, there are other instances where his prior opinions and testimony from the Marvell litigation contradict his opinions in this case, as discussed below.  The Court should thus properly accord Dr. McLaughlin's opinions "no weight."  *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1209 (Fed. Cir. 2013) (expert's opinions "unhelpful" where "they lack any substantive

explanation tied to the intrinsic record; and they appear to conflict with the plain language of the written description"). Because the Court has deferred consideration of LSI's indefiniteness defenses, the Court need not rely on any expert testimony at this time. LSI offers the rebuttal opinions of Dr. Emina Soljanin as additional evidence that CMU's proposed constructions, and Dr. McLaughlin's opinions, are at odds with the intrinsic record. It is also telling that although CMU highlights that the Marvell district court appointed a technical advisor to assist with claim construction, when LSI suggested that the parties jointly propose that the Court similarly retain a neutral technical advisor to provide such assistance in this case, CMU balked.

## II.    Defendants' Constructions of the Disputed Terms Should be Adopted

### A.    "branch metric function"

The dispute concerning "branch metric function" is over what is a "function" in the context of the asserted patents. In Marvell, Judge Fischer construed "branch metric function" to mean "a mathematical function for determining a 'branch metric value' for a 'branch.'" (Ex. 1[1] at 17-18). That construction is not in dispute. However, CMU attempts to import a narrowing limitation in an effort to avoid prior art. LSI's construction tracks Judge Fischer's construction of function, which was part of the jury instructions in the Marvell litigation: "a mathematical relation that uniquely associates members of a first set with members of a second set." *Id.* In this regard, the parties agree that the claim language itself specifies that the "first set" includes "signal samples" and the "second set" includes "branch metric values." No other inputs are required.

First, the plain language of the claims specifies that the "branch metric function" is "appli[ed]" to "a plurality of signal samples . . .," thus clearly identifying "signal samples" as the only required inputs. CMU seeks to narrow the claim by requiring that the functions be applied to both "signal samples" *and* "target values," even though "target values" are nowhere mentioned in the claims. This is reason enough to reject CMU's construction. *Interactive Gift Exp., Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("[T]he analytical focus must begin and remain on the language of the claims themselves."). Moreover, CMU's motivation for doing so

---

[1] All Exhibits are attached to the Declaration of Steven Rizzi filed herewith.

1  is to try and rewrite the claim to avoid invalidity, which is improper. *Allen Eng*, 299 F.3d at 1349.

2      The patent's specification provides additional unambiguous support for LSI's far simpler

3  construction.  The '839 patent states that "**the [branch] metric [function] is a function of the**

4  **observed [signal] samples** . . . ." ('839 pat. 5:48-55) (emphasis added).  This passage tracks the

5  claim language, because it is mathematically equivalent to: "applying" the "branch metric

6  function" to the "signal samples."  Thus, the specification is consistent with the claims: the

7  "branch metric functions" require only the signal samples as inputs.  This should end the analysis.

8      Far from aiding the jury in understanding the scope of the claim, CMU's proposed

9  addition of "target values" not only injects an ambiguous, undefined term into the construction,

10  but also contradicts the claim language and specification.  In particular, after stating that the

11  claimed branch metric functions are functions of only the "observed [signal] samples," the patent

12  further explains that the function is "also **dependent** on the postulated sequence of written

13  symbols . . . which ensures the signal-dependence of the detector.  As a consequence, the branch

14  metrics for every branch in the tree/trellis is based on its corresponding signal/noise statistics."

15  ('839 pat., 5:50-55 (emphasis added).)  There is no dispute that a function is "dependent" on its

16  parameters; for any given function, the parameters remain constant, because when the value of a

17  parameter changes, the function changes.  (Dkt. 144-4-D ¶ 35.)  As the patents state, such

18  dependence results from the branch metric function being "based on" "signal/noise statistics."

19  There can also be no dispute that the patent characterizes the "mean" signal sample or "$m_i$" as a

20  signal/noise statistic, and therefore a parameter.  (*See e.g.*, '839 pat., 8:24–27.) [2]

21      Consequently, the "target value" cannot be an input.  CMU asserts that the term "$m_i$" in

22  the specification is the "target value."  First, the patent actually defines "$m_i$" as the "mean value"

23  (*see e.g.*, '839 pat., 6:5, 8:6–8, 8:24–27, 8:42–43), and states that it is only **assumed** to be equal

24  to the target value "for simplicity" (*id.* at 9:18-23).  And CMU concedes that, at a minimum, the

---

[2] Although Judge Fischer misinterpreted this language in the specification with respect to the meaning of "dependent" and the classification of various quantities described in the patents, she did so in the context of analyzing Marvell's invalidity challenge. *Carnegie Mellon Univ*. 2012 WL 1203353 at *7-9.  Indeed, in the same opinion, Judge Fischer confirmed her same construction of "function" in spite of that analysis.  In any event, as discussed herein, CMU's own admissions demonstrate that Judge Fischer erred in her classification of the "target value."

"target value" discussed in the patent can at times be the "mean value." (Dkt. 148 at 7 n.3.)  There is thus no basis to classify "$m_i$" (the mean value) any differently than the other noise statistics, which are indisputably parameters.  It cannot be that when the "$m_i$" value is labelled a "mean" it is considered a parameter of the "branch metric function," but when it is labelled a "target" it is considered an input.  The classification of the quantity "$m_i$" should not depend on its label but rather on what it actually represents, *i.e.*, a signal/noise statistic, and therefore, a parameter.

Objective extrinsic evidence further supports LSI's position.  The claimed "branch metric functions" are derived from a conditional probability density function.  (*E.g.* '839 pat. 4:24-32, 6:39-40.)  The well-known "Probability and Stochastic Processes for Engineers" textbook, stated that "[n]umbers such as the mean and the variance that characterize a probability density function are called *parameters*." (Dkt. 144-21, 217 (emphasis in original).)  The "Pocket Dictionary of Statistics" similarly states that "some examples of a parameter are the population mean … and the population standard deviation." (Dkt. 144-22 at 6.)

Dr. Soljanin also provided a detailed explanation of additional supporting reasons.  (Dkt. 143-4 ¶¶ 101-140.)  One example is her unrebutted opinion that a change in the mean and covariance/variance (*i.e.*, the statistics) changes the underlying conditional pdf.  (*Id.* at ¶ 123.)  This echoes the specifications' above-described statement regarding the "dependence" of the "branch metric function" on the noise/signal statistics.  A change in the statistics (*e.g.*, the "mean") results in a different function.  Thus, the mean/target values are parameters.

Dr. McLaughlin and CMU's statements in the Marvell litigation support LSI's position.  Dr. McLaughlin there opined that Marvell ████████████████████████████████████████ (Ex. 2 at ¶ 239).  Similarly, *in this case*, CMU's infringement contentions served in December 2018 stated that the purported branch metric function in LSI's products "represents **32 different branch metric functions,** ████████████████ █ ████████████████ …." (Dkt. 143-6 at 26, 70 (emphasis added).)  Because functions are different when the parameters are different, this shows that CMU itself understands that "mean" is a parameter.[3]

_____

[3] CMU has since realized its harmful admission and served Amended Contentions in an attempt to obfuscate its flawed positions.

CMU's only purported support for its construction is that "basic mathematical principles" support that "distance functions" or "metric functions" are "two-argument" functions. (Dkt. 148 at 7.) As an initial matter, CMU misleadingly points to Equation (8) of the patents, which according to CMU is ***not*** covered by the asserted claim. (Dkt. 148 at 8 n.4.) And CMU's position is based almost entirely on extrinsic evidence, which cannot be used to contradict the intrinsic record. *Bell Atl.*, 262 F.3d at 1269. Moreover, CMU misconstrues Dr. Soljanin's testimony. Specifically, CMU ignores Dr. Soljanin's explanation that her statement that distance functions are typically two argument functions is based on the assumption that both values are allowed to vary. (Ex. 3 at 36:16-24.) Consistent with her declaration (Dkt. 143-4 at ¶ 106), Dr. Soljanin explained that the branch metric functions described in the patent are not two-input "Euclidean distance functions" because they have only one variable/input ("$r_i$" – the observed signal) and one parameter "$m_i$." (Ex. 3 at 83:8-22.) Dr. Soljanin further opined, consistent with the intrinsic record and the parties' agreement that a change in parameter changes the function (Dkt. 148-4, Dkt. 144-4-D ¶ 35, Dkt. 143-4), that "$m_i$ [] especially for a particular branch, is a constant or parameter actually, and the only variable is actually r" (Ex. 3 at 83:10-13.)[4]

Nor is CMU's reliance on the Declarations of Drs. Strang and McLaughlin availing. Drs. Strang and McLaughlin largely discuss examples of other types of distance functions, such as the Hamming distance function, the Manhattan distance function and the Minkowski distance function, that, according to Drs. Strang and McLaughlin, are two-input functions. However, none of those functions is discussed in the patents, and Drs. Strang and McLaughlin do not address Dr. Soljanin's analysis that the mean/target is a known value for each branch, or the patents' statements showing that the mean/target value "$m_i$" is a parameter.

CMU attempts to cast doubt on LSI's construction by wrongly accusing Dr. Soljanin of

---

[4] CMU makes the red-herring argument that Dr. Soljanin testified that a parameter may vary at times for a given function. (Dkt. 148 at 8.) However, as Dr. Soljanin further explained, while this may be true in some cases, in the case of the functions described and claimed in the patent, the parameters (*e.g.*, the "$m_i$" mean values) are constant for any given function and "have one value." (Ex. 3 at 97:23-25; *see id.* at 135:9-10). The discussion of the potential for parameters to vary for other types functions is irrelevant to this case.

"creative semantics conflicts" for opining that the conditional probability density function from which the claimed "signal-dependent branch metric functions" are derived is a one-input function in light of the assertion that another variable "$a$" in the patent is an "argument." (Dkt. 148 at 8-9.) However, Dr. Soljanin did not agree that "$a$" is an argument. In fact, she disagreed. (Ex. 3 at 54:9-10). And CMU's argument regarding "$a$" is an attempt to distract from the undisputed point that the mean "$m_i$" is a parameter. In addition, Dr. Soljanin was simply analyzing the words used in the patent, which make clear that the postulated symbol sequence is assumed, and therefore treated as a parameter (not to mention that "a" is not even included in the calculation of the branch metric value altogether). Thus, the patents, a highly regarded textbook, the Pocket Dictionary of Statistics, and Dr. Soljanin all agree that the mean value of a conditional probability density function (from which the branch metric functions of the patent are derived) is a parameter. In sum, rather than engaging in "creative semantics," Dr. Soljanin was opining consistent with a POSA's understanding of the intrinsic record and known mathematical concepts.

CMU's argument that Dr. Soljanin "admitted that textbook definitions for metric functions do not preclude mean values of other statistics from being an input to a metric function" is another effort in misdirection. (Dkt. 148-8.) First, Dr. Soljanin's testimony concerning hypothetical functions that may have statistics as their inputs are irrelevant to her analysis of the branch metric functions of the asserted patents based on the intrinsic record. Second, CMU failed to disclose that in the Marvell litigation it took the position that "noise statistics" are parameters. Specifically, CMU advocated that "noise covariance matrices" be construed as "noise statistics used to calculate the 'correlation-sensitive branch metrics.'" (Ex. 4). There is no dispute that equation (13) includes the "correlation sensitive branch metric" and that the "noise covariance matrices" are parameters to the "branch metric functions." Similarly, there is no dispute that "$m_i$" (the mean value) is a signal/noise statistic. And, finally, there is also no dispute that the statistic "$m_i$" is used to calculate the correlation-sensitive branch metrics because of its use in calculating the covariance matrices in addition to its explicit inclusion in Equation 13. (*See* '839 pat., 9:55 (Equation 22); *id.* at 6:63 (Equation 12).) Therefore, under CMU's positions in the Marvell litigation, the mean "$m_i$" is treated the same as the "noise covariance matrices." And because

CMU concedes "noise covariance matrices" are parameters, then so too are the means "$m_i$." Indeed, Dr. Moura testified that "[i]n the context of the patent, we used noise statistics and noise covariance as essentially indistinct."  (Ex. 5 at 276:4-6.)

### B.   "a set of signal-dependent branch metric functions"

There are three distinct disputes subsumed within this clause concerning "set," "signal-dependent," and "branch metric function."   The first two are addressed herein.   The third is addressed above in the discussion of the "branch metric function" term.

**1. "Set."**   The parties' dispute is based on CMU's attempt to specially define "set" in a manner that contradicts its ordinary meaning and the intrinsic record.  Nothing in the intrinsic record supports CMU's redefinition of "set" to include a lower bound on the number of its members, *i.e.*, "two or more," which is another attempt to rewrite the claim to avoid invalidity.

The term "set" appears only in the claims, and not anywhere else in the patents.  The only other mention of "set" in the intrinsic record is in the reexamination proceedings, and it makes clear that the member(s) of the "set" all share the property or attribute of having parameters (noise statistics) that are specific to each branch or specific neighborhood of symbols.  In its office action response in the reexamination proceeding relating to the '839 patent, CMU stated, "Equation 13 of the CMU patents discloses a *'set of signal-dependent branch metric functions'* as required in claim 4 because each member of the set is a function with parameters that are different for each specific neighborhood of symbols, e.g., different for each trellis branch."  (Dkt. 144-19 at 27.) (emphasis in original) Dr. McLaughlin echoed CMU's position in his November 15, 2011, declaration (included in the intrinsic record of the reexaminations), opining that "Equation 13 of the CMU patents represents a set of branch metric functions used at a given time index of the trellis because the parameters of each member of the set are branch dependent, *i.e.*, they depend on a particular sequence of bits."  (Ex. 6 at ¶ 9.)  Indeed, Dr. McLaughlin opined that the signal-dependence of at least certain parameters "**define[s]** the family of functions that are disclosed by equation 13."  (*Id.* at ¶ 42 (emphasis added).)  "Set" in this context is akin to the "set of even numbers"—a grouping whose members share a common trait.  And in the event only one member has the trait, there is only one member of the set.

CMU's proposed construction is a blatant narrowing of the plain language from "a set of signal dependent branch metric functions" to "a set of **two or more** signal dependent branch metric functions."[5] In so doing, CMU ignores the intrinsic record, points to an agreed construction from the Marvell litigation and dictionary definitions for a different term that are contradicted by the intrinsic record, and makes an erroneous argument regarding LSI's claim construction position.

First, CMU cites the Federal Circuit decision from the Marvell litigation that "there is no dispute that 'set' requires more than one function, as the claims require selecting among a plurality of such functions at a given time index." (Dkt. 148 at 12.) However, CMU fails to acknowledge that this construction of "selecting …from a set" was agreed to by the parties in Marvell, and not appealed. The Federal Circuit simply applied the agreed construction, which is not binding on LSI. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1293-94 (Fed. Cir. 2015).

Second, CMU indicates that the two-member requirement arises from the construction of "selecting." (Dkt. 148 at 12-13.) However, the parties agreed that "selecting" should be accorded its plain and ordinary meaning, and in any event, CMU's dictionary definitions of "selecting" are unavailing. Specifically, both independent claim 1 of the '180 patent, which provides the antecedent basis for "selecting" in asserted claim 2, as well as claim 1 of the '839 patent, include a limitation of "selecting a branch metric function," with no requirement that the "selection" be from a "set." It is well-established that there is a "presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." *Fin Control Sys. Pty., Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001). In fact, Dr. McLaughlin agreed that selecting the **same** function for all branches satisfies the "selecting" step of claim 1 of the '839 patent. (Ex. 7 at 338:23-339:9.) Thus, there is no requirement that **different** selections be made to satisfy the "selecting" step, or that multiple choices are somehow inherent to "selecting." And CMU has not—and cannot—argue that

---

[5] Extrinsic evidence also refutes CMU's attempted rewrite of the claim language. Dr. Soljanin agreed that "set" as used in the patents should be defined based on a unifying characteristic rather than a lower bound on the number of its members. (Dkt. 143-4 at ¶ 45.)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  "selecting" should be construed differently in the asserted claims.  Therefore, CMU's argument

2  that selecting requires different selections contradicts the claim language.

3  Similarly, CMU argues that the plural form of "signal dependent branch metric functions"

4  requires that there are different signal dependent branch metric functions so that the same branch

5  metric function is not selected for all the branches (symbol sequences).  (Dkt. 148 at 12.)  This

6  argument is based on CMU's misplaced argument that the claimed "set" is limited to

7  predetermined branch metric functions corresponding to the branches.

8  The plain language of the claims does not support this contention.  For example, the

9  relevant limitation of claim 4 of the '839 patent states, "selecting a branch metric function for

10  each of the branches at a certain time index from a set of signal-dependent branch metric

11  functions."  That language requires only that the selection must occur for each of the branches,

12  and that the "set of signal dependent branch metric functions" needs to be available for each

13  selection.  The claim therefore encompasses the act of "selecting" the branch metric function from

14  a universe of available signal-dependent branch metric functions, *i.e.*, the "set" from which the

15  selection is made. Indeed, because the noise statistics that dictate the signal-dependent branch

16  metric functions are calculated at every branch, they can take on any value.[6]  There is no

17  requirement in "selecting" and "set" that more than one different selection be made.

18  Claim 2 of the '180 patent makes this point even clearer.  Independent claim 1 recites

19  "selecting *a* branch metric function at a certain time index," and dependent claim 2 adds that the

20  selection is "from a set of signal dependent branch metric functions."  This claim thus does not

21  even require two selections (e.g., for more than one branch), let alone two ***different*** selections.

22  CMU's argument focuses on the wrong "set," and would rewrite the claims as: "selecting

23  a branch metric function for each of the branches at a certain time index **[to form]** ~~from~~ a set of

24  signal dependent branch metric functions."  This sleight of hand is used by CMU to attempt to

25  manufacture an infringement argument by considering the different branches of a trellis at a time

26

27  [6] To the extent the Court considers the Federal Circuit's statement that the claims "require

28  selecting among a plurality of such functions at a given time index," even though not binding on LSI, the "selection" from a "set" available "at each branch" satisfies that requirement.

index for purposes of its infringement contentions.  But the claimed "set" is the set of available functions from which a selection is made for one branch, not, as CMU contends, the "set" that is formed *after* such selections have been made for each of the branches.  And the rewrite is even further afield of the claim language for the '180 patent, which as discussed above doesn't require more than one selection for one branch.

Finally, CMU wrongly argues that LSI's positions regarding "set" and "selecting" conflict with its position that "signal dependent" requires that each branch of the trellis have a unique function.  There is no inconsistency.  That "signal-dependent" requires a different function for *each branch* does not mean that "selecting" and "set" should be construed to mean "more than one function" for the reasons described above.  Irrespective of the Court's construction of "signal dependent," which CMU is resisting because LSI would prevail on noninfringement if the Court agrees with LSI, there is no basis to require that two different selections be made to form a different "set" (across the branches) that is *not* the "set" specified by the claim (for a single branch).  Again, the sole reason CMU seeks to import a "two or more" limitation to the claimed set is an improper attempt to narrow the claims to avoid invalidity.

Nor is there merit to CMU's argument that having one function across all the branches defeats "signal-dependence."  First, CMU does not explain how having only two functions (as CMU proposes) across all branches in trellises with, for example, 32 branches, would be "signal-dependent" whereas having just one would not be.  Second, assuming, *arguendo*, the Court adopts CMU's construction for signal-dependent, then a single function across all branches that adapts or changes over time (*i.e.*, parameters/noise statistics update from one time index to the next) would be signal-dependent under CMU's construction.

**2. "Signal-dependent."** LSI's proposed construction for "*signal-dependent* branch metric function" derives directly from the unambiguous intrinsic record, including both the specification and reexamination, and tracks nearly verbatim the construction CMU relied on in its appeal to the Federal Circuit to defeat Marvell's invalidity arguments.

Throughout the entirety of the patents' specification, the inventors made clear that the purported invention is the use of branch metric functions that are tailored to each branch based

on the noise statistics for the branch.  Starting with the "Summary of the Invention," the '839

patent states, "the noise sensitive branch metrics are adaptively computed by estimating the noise

covariance matrices from the read-back data.  **These covariance matrices are different for each**

**branch of the tree/trellis . . . ."**  ('839 pat., 2:15-19.) (emphasis added).  These statements support

LSI's construction.  *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004)

("Statements that describe the invention as a whole . . . are more likely to support a limiting

definition of a claim term" and "are more likely to be found in certain sections of the specification,

such as the Summary of the Invention").  In the "Detailed Description of the Invention" portion

that is common to both patents, the specification similarly emphasizes the 1:1 correspondence of

the claimed branch metric functions to the branches:

- "[T]he functional form . . . is different for different symbol sequences," *i.e.*, different for each branch of the trellis. ('839 pat., 4:25-27.)
- "[T]he branch metrics for every branch in the tree/trellis is based on its corresponding signal/noise statistics."  (*Id.* at 5:53-55.)
- "Each branch of the trellis requires a circuit 48 to compute the metric $M_i$ [for each branch]."  (*Id.* at 7:12-13.)
- "[T]here will be a different covariance matrix to track for each branch in the tree-trellis. . . ."  (*Id.* at 10:19-21.)
- "The matrix [] becomes our estimate for the covariance matrix corresponding to this particular symbol sequence (trellis path) and is used to compute the metrics . . . ."  (*Id.* at 11:7-10.)

These statements strongly support LSI's construction.  *Bell Atl.*, 262 F.3d at 1269 (a patent

may "define" claim language "by implication").  Indeed, after considering some of these same

parts of the specifications, Judge Fischer stated in the *Marvell* case: "The Court reads these

disclosures as describing different functions for different branches."  2012 WL 1203353, at *9.

Furthermore, during the *ex parte* reexamination proceedings that took place **after** the trial

and judgment in *Marvell*, CMU confirmed this construction, and disclaimed a broader

construction.[7]  In particular, after the PTO rejected the asserted claims as both anticipated and

obvious over certain prior art (the Zeng thesis), CMU pointed to some of the same portions of the

---

[7] Prosecution disclaimer applies equally to statements made during reexamination, which is part of the intrinsic record.  *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012).

specification highlighted above, and represented to the PTO and the public as follows:

> A.    Claim Construction
> ****
> "[S]ignal-dependent branch metric function" **must be construed** in a way that solves the problem the inventors addressed with their invention as discerned from the specification.  That includes **using different branch metric functions for each specific symbol sequence (e.g., trellis branch)** to account for both the neighborhood effect and the polarity of transitions.

(Dkt. 144-19 at p. 53 (emphasis added).)

CMU then repeatedly argued that the Zeng thesis "does not disclose any . . . signal-dependent branch metric function" in order to overcome the rejections.  (*Id.* at 55-61; 88-89.)  In the PTO's "Notice of Intent to Issue Ex Parte Reexamination Certificate" for the '839 patent issued less than three weeks later, the examiner made clear that these very arguments were the reason the prior art rejections were withdrawn: "The examiner agrees with Patent Owner that Zeng does not disclose a set of signal-dependent branch metric functions as articulated in the September 3, 2014 Response. . ."  (Ex. 8.)

CMU's "clear and unmistakable" arguments during the reexamination warrant a finding of prosecution disclaimer, which "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003).  The doctrine ensures that claims are not "construed one way in order to obtain their allowance and in a different way against accused infringers."  *Southwall Techs.*, 54 F.3d at 1576.  CMU's reliance on its proffered construction of "signal-dependent branch metric function" as requiring "different branch metric functions for each specific symbol sequence (e.g., trellis branch)" to distinguish prior art that formed the basis for the PTO's rejection presents a clear-cut case of disclaimer.  *E.g., Gillespie v. Dywidag Systems Int'l, USA*, 501 F.3d 1285, 1290-91 (Fed. Cir. 2007) (construing claim based on "the meaning [patent owner] used when he argued the difference from [prior art]").  Indeed, although the *Gillespie* court made clear that prosecution disclaimer does not require evidence that the arguments were material to grant of the patent, *id.*, that is unmistakably the case here.

Moreover, less than two months after making these arguments to the PTO during the

reexaminations, CMU filed its appeal brief in the Marvell litigation, and again reiterated essentially the same construction in describing the purported invention to the Federal Circuit:

> [The inventors] realized the solution was to generate "a *set* of signal-dependent branch metric functions" that are applied to multiple signal samples. **Each function in the set accounts for the noise-correlation structure attributable to the specific symbol sequence associated with one branch. Thus, when computing the branch-metric value for the 0-1-1 branch, the method selects the branch-metric function that is specific to the signal-dependent noise structure associated with that 0-1-1 branch, which differs from the function for the 0-1-0 branch**.

(Ex. 9 at 15-16 (italics emphasis in original; bold emphasis added).)

LSI's proposed construction tracks CMU's bolded definitional language almost verbatim, substituting "noise" for "noise-correlation structure" (*see* Section II.C., *infra*); "*i.e.*," for "Thus"; and generalizing the references to the specific, exemplary "0-1-1" and "0-1-0" branches. This explication of the meaning of "signal-dependent branch metric functions" is helpful to a lay jury's understanding of a key aspect of the claimed subject matter that bears directly on CMU's infringement claim, *i.e.*, the requirement that each such function is specific to one branch. CMU should not be heard to contend otherwise given that CMU used the same language in characterizing its purported invention to the Federal Circuit.

Both CMU and its expert ignore the intrinsic evidence, including the disclaimer in the reexamination. Grasping at straws, CMU attempts to draw a distinction between "branch-dependent" and "dependence on the written symbol sequence," offering just six lines of unsupported attorney argument. (Dkt. 148 at 11.) However, the above intrinsic evidence refutes CMU's attempt to alter the public record to serve its present litigation needs.

Moreover, CMU's current-litigation-induced arguments should be contrasted with the positions taken by the inventor and CMU's experts in the Marvell case when their guard was down on this issue. In explaining why his purported invention differed from a prior art reference, Dr. Kavcic acknowledged that the branch metric functions described in his patents are functions "whose functional forms are different for different branches." (Ex. 10 at 361:11-14.) Dr. McLaughlin submitted a sworn declaration in that case where he described the claimed functions as "branch-dependent, *i.e.*, they depend on a particular sequence of bits." (Ex. 6 at ¶ 9.) In the

same declaration, Dr. McLaughlin also stated that "the parameters of each branch metric function are signal-dependent (or data-dependent) because **the parameters are specific to the branch because each branch of the trellis corresponds to a 'specific sequence of symbols (e.g., written symbols)' on the disk**." (*Id.* at ¶ 14. (emphasis added).)  Dr. McLaughlin repeated this same opinion in his expert report.  (Ex. 2 at ¶ 87.)

Finally, another CMU expert in the Marvell case, Dr. Gilbert Strang, also submitted a sworn declaration stating that the CMU patents teach "one [signal-dependent branch metric function] for each branch of the example trellis shown in Figure 4 of the CMU patents."  (Dkt. 148-4 at ¶ 34.)  These inventor and expert admissions should be accorded more weight than the two declarations of Dr. McLaughlin CMU offers in this case, because, unlike the present declarations, the earlier testimony was i) submitted by CMU to the PTO and thus part of the intrinsic record, and ii) not influenced by CMU's different positions in the current litigation.

CMU cannot rely on claim 6 of the '839 patent to rebut Defendants' construction.  The *Karlin Tech* case it cites (Dkt. 148 at 11) concerns the doctrine of claim differentiation, which is inapposite because it "can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence."  *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1479-80 (Fed. Cir. 1998); *see also Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1409-10 (Fed. Cir. 2004) ("where neither the plain meaning nor the patent itself commands a difference in scope between two terms, they may be construed identically").  The Federal Circuit has thus affirmed constructions that rendered a dependent claim superfluous.  *Power Mosfet Techs.*, 378 F.3d at 1410.  In any event, that would not be the case here, because claim 6 is an independent claim with many differences in language as compared to the asserted claims, not just the one term at issue.  As the *Multiform* court noted, "claims that are written in different words may ultimately cover substantially the same subject matter."  *Multiform*, 133 F.3d at 1479-80  (citation omitted).

CMU's reliance on Dr. Soljanin's testimony construction (Dkt. 148 at 10) conflates claim construction with invalidity.  Her testimony that the patent does not disclose a "set of signal-dependent branch metric functions" is a basis for invalidity for failure to satisfy the written

description requirement that will be addressed in connection with expert reports.  With respect to claim construction, CMU does not and cannot contend that LSI's proposed construction is not supported by the intrinsic record or that it "excludes a preferred embodiment"; as discussed above, LSI's construction tracks CMU's own description of its purported invention.

### C.    "signal-dependent noise"

CMU's proposed construction of "signal-dependent branch metric function" also incorporates aspects of its proposed construction for the separate term, "signal-dependent noise," which improperly imports three limitations into the claim:  "media noise," "readback signal," and "noise structure," as well as exemplary language, "(e.g., written symbols)," that improperly suggests the term is limited to a signal that originates from a recorded medium.

The claim language supports LSI's construction.  Claim 2 of the '180 patent, through its dependence on claim 1, recites "*receiving* a plurality of time variant signal samples," and states that the received signal samples can have "signal-dependent noise."  It therefore follows from the claim language itself that signal-dependent noise is "noise in a *received* signal."  The plain language of the claim also requires that the *noise* be signal-dependent, not some undefined noise "structure," a term that has no accepted meaning.  (Dkt. 143-4 ¶ 99.)  And "the attributed to the specific sequence of symbols" language in Defendants' construction is clearly a reference to the noise being attributed to the sequence of symbols, which the parties agree is the source of the signal-dependent noise.  CMU's feigned inability to determine which part of LSI's construction is "attributed to the specific sequence of symbols" falls flat because the same criticism applies to CMU's construction.  The phrase "whose noise structure…" in CMU's construction could be read to modify the "readback signal" instead of the "media noise."  CMU's manufactured ambiguity aside, there is little question that both parties' constructions intend the modifying clauses to apply to the "noise" terms rather than the respective "signal" terms.

CMU seeks to inject the term "media noise" into the construction of "signal-dependent noise" not because it is necessary to resolve ambiguity, but to avoid invalidity by narrowing the claim, which is improper as discussed above.  Nor can CMU contend that its lengthy construction is somehow helpful to the jury, or even technically accurate.  The patents make clear that the

terms are not synonymous, and that media noise is just one example of signal-dependent noise. In this regard, CMU and the *Marvell* court commit a fundamental logical error in limiting the term to "media noise." The language CMU points to in the specification does not equate the terms, but rather describes media noise as "signal-dependent." ('180 pat., 1:39-51, 4:39-42, 10:52-55.) CMU does not dispute that signal-dependent noise occurs in many other environments besides "media noise in a readback signal." (Dkt. 143-4 ¶ 92.)

In addition, both inventors conceded that "signal-dependent noise" is not limited to media noise. Dr. Kavcic admitted that as used in his patent, the term "encompass[es] . . . noise other than media noise." (Ex. 11 at 53:13-16.) And Dr. Moura acknowledged that, even in magnetic recording, "there are other sources of signal-dependent noise." (Ex. 5 at 43:15-19.) Indeed, the '180 patent states that the "present invention" is not limited to magnetic media or any media at all, but is "directed generally to sequence detectors, and, more particularly, to sequence detectors in ISI memory channels." ('180 pat., 2:26-27.) Consistent with this statement, the specification and claims describe use of the detector in a "communications channel" that is indisputably not limited to media noise in a readback channel. (*Id.* at 2:12-23, 14:22-36, Figs. 14 and 15.)

Given this clear disclosure, and contrary to its proposed constructions, CMU was forced to admit that the claimed methods are not limited to magnetic media—or for that matter any media at all—but are generally applicable to "detecting a sequence of symbols through a communications channel." (Ex. 12 at 19.)

CMU's attempt to limit the claim to "media noise **in the readback signal**" is improper for the same reasons. The term "readback signal" nowhere appears in the claims, and CMU's motivation for including it is again to attempt to narrow the claim to avoid invalidity, because it is a term specific to magnetic media. CMU cites to a single sentence in the patents in an effort to justify importing "readback signal." ('180 pat., 2:36-39.) But the patent refers to a "readback signal" only twice, neither time mentioning either media noise or signal-dependent noise. (*Id.* at 1:57-58, 2:36-39.) And merely referring to a readback signal in the specification is no justification for importing it into the claim. CMU could have limited the claims to "media noise in the readback signal," but again claimed more broadly.

1        CMU also improperly limits the signal-dependence to an undefined "structure" of the

2  noise.  As discussed above, CMU's rewrite of the claim is based on its expert's rewrite of the

3  specification.  In actuality, the phrase "signal-dependent structure" does not appear in the '180

4  patent, which refers only to "signal-dependent **nature**."  Moreover, consistent with the claim

5  language, the specification also describes the noise itself as signal-dependent. ('180 pat., 1:41-42

6  ("Combating media noise and its signal dependence. . .").)

7        Finally, CMU's use of "written data" in its argument for a readback signal again exposes

8  its attempt to improperly limit the claims to magnetic storage systems.

9        **D.    "correlated noise"**

10        The parties' dispute concerns CMU's inclusion of a list of examples of "correlated noise"

11  as part of the construction.  Such list is unhelpful to the jury because it is incomplete.  It is also

12  prejudicial because it conveys the misimpression that "correlated noise" is limited to magnetic

13  media, which, is false for the reasons discussed in connection with "signal-dependent noise."

14        **E.    "Viterbi-like"**

15        It is well-established that a claim preamble is generally not a limitation.  *Georgetown Rail*

16  *Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017).  More specifically, preambles

17  that provide a statement of intended purpose are not limitations.  *Marrin v. Griffin*, 599 F.3d 1290,

18  1295 (Fed. Cir. 2010).  The preamble of claim 4 simply recites the intended purpose of the

19  method: to "determin[e] branch metric values for branches of a trellis."  CMU's argument that

20  the preamble provides antecedent bases for "branches" (Dkt. 148 at 18-19) does not make it a

21  limitation.  *See Marrin*, 599 F.3d at 1295 ("[T]he mere fact that a structural term in the preamble

22  is part of the claim does not mean that the preamble's statement of purpose or other description is

23  also part of the claim.").  In any event, should the Court determine that "Viterbi-like" is a

24  limitation, LSI will address the term when the Court considers its indefiniteness challenge.[8]

25        CMU's proposed construction confirms that the parties' dispute is grounded in invalidity

26  due to indefiniteness, not claim construction, because it simply replaces one ambiguous term

27

28  [8] Dr. Soljanin's rebuttal declaration provides multiple reasons why the term is indefinite in
response to Dr. McLaughlin's claim construction positions.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

("similar") with another ("like").  *See, e.g.*, *Solutran, Inc. v. U.S. Bancorp*, Case No. 13-cv-2637, 2017 WL 2274959, at *4 (D. Minn. May 24, 2017) ("[S]imply replacing one word of the term at issue with a synonym does not provide any type of construction.") (citation omitted).  In addition, CMU's 77-word construction for "Viterbi algorithm" itself is unhelpful because it does not address the actual dispute—what makes an algorithm sufficiently "like" or "similar to" a Viterbi algorithm?  Moreover, the lengthy proposed construction adds confusion by introducing new concepts including "observed readings" and "written symbols," the latter of which is yet another attempt to impermissibly narrow the claim scope to magnetic recordings.

### F.   "each signal sample corresponds to a different sampling time instant"

Here again, CMU's proposed construction demonstrates that the parties' dispute is better resolved when the Court addresses indefiniteness, and is not helpful to the jury because it does not address the ambiguity of the claim ***as a whole***, which is the basis for LSI's indefiniteness challenge.  Claim 4 recites ***two*** different "times": a "time index" and a "sampling time instant." But the claim provides no guidance to a POSA as to how the two times relate to each other in the claimed method as explained in Dr. Soljanin's declaration.  (Dkt. 143-4 at ¶ 80-88.)  CMU's proposed "different point in time" construction does not address this issue.

For the first time in its brief, CMU argues that a "time index" refers to a cell, transition, or stage of a trellis, and a "sampling time instant" refers to the time at which a readback signal is sampled. The Court should reject this untimely new construction that differs from its proposed construction.  Furthermore, this new construction contradicts the intrinsic record.  Figure 4 illustrates "one cell of a PR4 trellis" ('839 pat., 2:49), which, according to CMU, corresponds to a "time index" rather than a sampling time instant.  But Figure 4 shows two indices for $a$ ($a_i$ and $a_{i+1}$) and refers to a sample $r_i$—only further conflating the supposed "time index" and "sampling time instant."  (*Id.*)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Dated:  November 19, 2019

Respectfully submitted,
KING & SPALDING LLP

By:  /s/  *Steven Rizzi*
KENNETH L. STEINTHAL (State Bar No. 268655)
ksteinthal@kslaw.com
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone:   (415) 318-1211
Facsimile:    (415) 318-1300

STEVEN J. RIZZI (admitted *pro hac vice*)
srizzi@kslaw.com
RAMY HANNA (admitted *pro hac vice*)
rhanna@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036
Telephone:   (212) 556-2100
Facsimile:    (212) 556-2222

*Attorneys for Defendants* LSI CORPORATION and
AVAGO TECHNOLOGIES U.S. INC.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>Certificate of Service</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on November 19, 2019.

/s/    *Steven Rizzi*
Steven J. Rizzi