Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

CARNEGIE MELLON UNIVERSITY,      )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )      **NO. C 18-4571 JD**
                                 )
LSI CORPORATION,                 )
                                 )
            Defendant.           )
_____ )

                        San Francisco, California
                        Thursday, December 19, 2019

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    K&L GATES LLP
                    210 Sixth Avenue
                    Pittsburgh, Pennsylvania  15222
              BY:   **PATRICK J. MCELHINNY, ATTORNEY AT LAW**
                    **ANNA SHABALOV, ATTORNEY AT LAW**


For Defendant:
                    KING & SPALDING LLP
                    1185 Avenue of the Americas - 34th Floor
                    New York, New York  10036
              BY:   **STEVEN J. RIZZI, ATTORNEY AT LAW**
                    **RAMY HANNA, ATTORNEY AT LAW**




Reported By:        Marla F. Knox, RPR, CRR
                    Official Reporter

| | |
|---|---|
| 1 | **Thursday - December 19, 2019**                    **10:49 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling Civil 18-4571, Carnegie Mellon |
| 5 | University versus LSI Corporation. |
| 6 | Counsel. |
| 7 | **MR. McELHINNY:**  Good morning, Your Honor, Patrick |
| 8 | McElhinny on behalf of Carnegie Mellon University here with |
| 9 | Anna Shabalov. |
| 10 | **MR. RIZZI:**  Good morning, Your Honor, Steven Rizzi and |
| 11 | Ramy Hanna on behalf of the Defendant. |
| 12 | **THE COURT:**  All right. |
| 13 | **MR. RIZZI:**  Your Honor, one -- |
| 14 | **THE COURT:**  Yes. |
| 15 | **MR. RIZZI:**  -- procedural issue.  As you are aware, |
| 16 | the motion papers implicate a lot of confidential information |
| 17 | for which we have pending motions to file under seal.  Some of |
| 18 | that information may be addressed by one or both of us in court |
| 19 | today, and I just wanted to raise that with the Court about how |
| 20 | best -- |
| 21 | **THE COURT:**  Well, we are a public courtroom.  And as |
| 22 | one of my colleagues likes to say:  You can come in here with |
| 23 | the recipe for Coke or for Kentucky Fried Chicken and the world |
| 24 | can hear it.  I think you can do your argument without straying |
| 25 | into anything that is supposed to be sealed. |

1              **MR. RIZZI:**  Would we be able to still request sealing

2       portions of the transcript?

3              **THE COURT:**  Most certainly.  Whether I grant it -- I'm

4       skeptical but go ahead and ask.  Okay.  Go ahead, Mr. -- is it

5       Mr. Rizzi?

6              **MR. RIZZI:**  Yes.  Thank you, Your Honor.

7          We actually view this as a very compelling,

8       straightforward application of the have-made rights doctrine.

9          I did prepare for the Court just a few slides, if I may.

10             **THE COURT:**  Hand them to Ms. Clark, please.  Okay.

11      Thank you.

12             **MR. RIZZI:**  And these really just hit on the high

13      points of why we believe this is such a compelling case.

14         So just by way of -- to be clear on what a have-made right

15      actually is.  So in this case there is no dispute that a long

16      time ago, before 2000, IBM and Seagate were both granted broad

17      rights to the patents ensued by CMU in connection with their

18      relationship with CMU pursuant to the associate's agreements.

19         The relevant portions of those license grants are shown on

20      the first page, and there is no dispute that those license

21      grants are unrestricted; that they include have-made rights;

22      that they cover any and all products that either Seagate -- at

23      the time it was IBM.  It is now HGST -- either of those

24      licensees chose to make or have made.

25         That's the first prong of the have-made right analysis;

1    that each of these licensees was granted the ability to

2    outsource any portion of the development, manufacture, supply,

3    testing of products for them.  No dispute on that point,

4    Your Honor.

5         Second prong of have-made rights is really the simple

6    question of:  Was there, in fact, a request by each of these

7    customers to our clients to make products for each of them.

8    And there is no dispute on that issue either, Your Honor.

9         This is -- and the second page shows the timeline here.

10   None of these facts are in dispute.  I don't show when the

11   license grants -- when the licenses were entered into because

12   that's way in the past, but in the blue there I show the

13   timeline for Seagate.  The green is the timeline for HGST, and

14   then on the bottom is the yellow CMU's infringement

15   allegations.

16        Now CMU actually alleges an infringement began back in,

17   like, 2001 timeframe, nearly twenty years ago.  Around that

18   same timeframe both of these customers, Seagate and HGST, had

19   approached our client -- it was Agere at the time -- to

20   basically work with them, partner with them, in a joint

21   development collaborative relationship to support the

22   customer's development of the technology at issue.

23        And that's really the epitome of a have-made right.  The

24   whole purpose of a have-made right is to allow the licensee the

25   freedom and benefit of getting third-party expertise for some

 1    or all of a portion of whatever is covered by the patent.

 2         And it is -- it promotes efficiency, right.  It allows

 3    those licensees not to have to expend the resources to bring

 4    all that in-house.  That's why you have-have made rights.  It

 5    is good for society.  You know, it supports innovation and

 6    efficiency.

 7         An important aspect of the have-made right is that it is

 8    product focused.  So the second prong of the inquiry is:  Did

 9    one or both of those customers, those licensees, come to our

10    clients and say:  We want you to help us develop and make this

11    product?  It is not patent focused, and that's a fundamental

12    error in their position.  All that is required is the making of

13    a product.

14         Neither the licensee nor the manufacturer -- in our

15    case -- in this case our clients -- need to even have knowledge

16    of what patents may or may not be implicated in that product.

17    All that is required is the request to make the product and

18    then the engagement to do so.

19         Here, it went well beyond the sort of simple request to

20    supply the product.  There were these collaborative

21    partnerships that really demonstrate with no serious question

22    that these are products developed with and for these particular

23    customers; not work that was done independently and then later

24    sold to the customer.

25         So what the timeline shows is that the products that were

1    first -- the first products that were accused of infringement

2    were supposedly -- according to CMU -- were developed back in

3    2001, 2003.  Our clients were making and developing this

4    technology for these customers pretty much continuously from

5    around that timeframe until today.

6         With Seagate in particular multiple development agreements

7    were put in place as early as 2000/2001 to memorialize that

8    relationship.  We put all that in the record.  No serious

9    dispute of the content of those agreements or the facts

10   demonstrating this highly collaborative relationship to make

11   products specifically for Seagate and similarly with HGST.  It

12   took longer to sort of paper the relationship; but, again, that

13   happened in 2011.

14        And the reason that is relevant here is -- put this in

15   context of the -- you know, what is at issue here.  The relief

16   we seek in the motion pertaining only to the period beginning

17   September 1, 2011, and the reason is because CMU delayed so

18   long in bringing suit, they don't dispute anything that

19   happened before that.  Not actionable.  They are not entitled

20   to any relief.  To the extent they allege there was

21   infringement prior to that time, it is effectively irrelevant

22   because they don't dispute that they can't obtain any relief.

23   The patents are expired.  Certainly no injunctive relief, and

24   they are not entitled to any damages.

25        So what matters really is that period beginning in

1   September 2011.  And there is no dispute that well prior to

2   that period -- in fact, a decade prior -- these customer

3   relationships were in place by which the customers had come to

4   us to basically engage us as their joint development partner

5   for the very products that are accused of infringement.

6        **THE COURT:**  Let me just jump in.  You see no fact

7   disputes.  This is just an exercise in contract interpretation.

8        **MR. RIZZI:**  In a way, yes.  So I think their main

9   argument, which was -- we saw it the first time in their

10  opposition brief.  They didn't even raise this in their

11  contention interrogatory response which I think is telling --

12  is that somehow the inquiry is now governed by the IP ownership

13  and licensing provisions in those joint development agreements.

14  And that is wrong --

15       **THE COURT:**  That is just an interpretation issue.  You

16  are seeing this as really just contract -- construing the

17  contract to determine whether these were granted in the way

18  that you are contending; no fact issues and I don't have to get

19  hung up on anything outside of the -- basically the four

20  squares of the agreements.  Is that fair?

21       **MR. RIZZI:**  That is fair but I think some

22  clarification is appropriate on that point.  The contracts that

23  need to be interpreted -- I mean, it is really -- there really

24  is no even dispute on that because the have-made right -- the

25  license --

1      **THE COURT:**  I'm trying -- I thought I was throwing you

2  a bone to say the summary judgment is fine because there is no

3  fact dispute, but you are fighting with me.  What are the fact

4  disputes?  If you are not going to say yes, what do you see are

5  the material fact disputes?

6      **MR. RIZZI:**  I don't believe there are any material

7  fact disputes, Your Honor.

8      **THE COURT:**  Okay.  Mr. McElhinny?

9      **MR. McELHINNY:**  Your Honor, I think you are right in

10  the sense that most of this case or most of the issues here

11  turn on interpretation of a contract.  The contracts that they

12  have put in the record address IP provisions.  They address the

13  rights that transferred from Seagate and HGST to the

14  Defendants.

15      Those rights -- those contracts foreclose their claim that

16  have-made rights transferred.

17      **THE COURT:**  I understand but let me -- the threshold

18  here is:  Are there any genuine disputes of material fact.

19  Mr. Rizzi has finally said to me, No.  And what is your

20  position on that?

21      **MR. McELHINNY:**  There are disputes of material fact.

22      **THE COURT:**  Tell me what you think those are, and what

23  are the facts in dispute and how are they material to the

24  interpretation issue?

25      **MR. McELHINNY:**  Well, they are not material to the

1   interpretation issue because when you get -- if you get to the

2   interpretation issue, you don't get to the next question which

3   is the question that he says you have to determine whether

4   there was a request.  I think what they said in their papers

5   was:  You have to determine whether the have-made rights were

6   properly exercised.

7          THE COURT:  Let me just jump in.  I think I'm asking a

8   simpler question, maybe in-artfully.  Just tell me what are the

9   facts that would be wrong for me to decide and should go to the

10  jury that are material to the have-made defense.

11         MR. McELHINNY:  Those are the facts that bear on the

12  question of whether there was a proper exercise of the

13  have-made right.

14         THE COURT:  And what would that be?  Put some detail

15  on that.

16         MR. McELHINNY:  For example, whether or not the part

17  of the chip that performs the CMU's patented method is a

18  custom-made chip -- custom-made component of the chip for these

19  Defendants or whether it is off the shelf.  Under *Intel versus*

20  *Broadcom* that is an issue.  They claim that they are not

21  custom -- or that they are custom.  We claim they are not

22  custom.  They are modular.  They were designed well before

23  some --

24         THE COURT:  Let's just pause on that.  Let me just

25  tell you where I'm coming from.  I'm on the record in *D-Link*

1  *versus FTC* and a number of other cases.  I disfavor summary

2  judgment.  I think it usurps Seventh Amendment jury trial

3  rights and generally a bad practice.  I'm religious -- and I

4  use that word intentionally -- on limiting it to where it truly

5  matters and is truly available, and that is when there is no

6  material disputes of fact.

7       Now, you need to tell me -- otherwise, it is contract

8  interpretation which is for me anyway.  A jury doesn't do that.

9  So I need to hear your best summation in crystal-clear language

10  which facts are essential for a jury to decide and that would

11  force all that exercise of summary judgment here.  So you

12  started with whether the chips produced by who?  By Hitachi

13  and --

14       **MR. McELHINNY:**  The chips produced by the Defendants

15  are custom or off-shelf for these particular customers.

16       **THE COURT:**  Why does that matter to the have-made

17  issue?

18       **MR. McELHINNY:**  Well, under *Intel versus Broadcom*,

19  which is the most comprehensive decision on whether or not

20  have-mades are -- rights are properly exercised, that is a

21  distinction that matters.  That Court said that if a chip is

22  off the -- is an off the -- if a product is off-the-shelf, it

23  is not being made pursuant to a request from the customer where

24  they were properly exercising have-made rights.

25       That question that they have posited as a second question,

1   whether or not there was a proper exercise of the have-made

2   rights, is a very fact laden question.

3       We contend that there was no such exercise; that nobody

4   ever made that request.  And to the contrary --

5           THE COURT:  What do you think is the single best case

6   for that proposition; that the have-made inquiry raises a

7   number of factual inquiries?

8           MR. McELHINNY:  I would say *Intel versus Broadcom*.

9           THE COURT:  Okay.

10          MR. McELHINNY:  Because it talks about what is -- you

11  know, it says you have to make a proper request.  And they have

12  studiously avoided sort of defining what the contours of that

13  are.  I think that is a fact-laden question.  Right at the

14  outset --

15          THE COURT:  You would present to a jury -- you would

16  argue to a jury that this is off-the-shelf and couldn't

17  possibly contain any -- how -- what would your jury pitch be?

18          MR. McELHINNY:  Well, I think -- I think, first of

19  all, we would say, in fact, there was a -- there was no request

20  made.  Then to the contrary, Seagate and Hitachi and LSI all

21  agreed that no such technology and no such IP would be

22  incorporated in these chips.

23      The contracts say that -- and for a good reason because it

24  is a joint development agreement -- each side gets to bring to

25  the table -- they are going to be very meticulous about the IP

1    they are bringing to the table and what they are taking away

2    from the joint development agreement.

3        The contract says -- Seagate says we are not giving you

4    rights to anything else other than certain specific things that

5    we have laid out, and not included in that group is have-made

6    rights to any patent.

7        They specifically say:  We are not giving you any of our

8    rights.  And certainly LSI doesn't --

9            **THE COURT:**  Where do they say that?  What document?

10           **MR. McELHINNY:**  In the -- I have a slide deck that I

11   can --

12           **THE COURT:**  Please, hand it to Ms. Clark.  Thank you.

13       (Pause in proceedings.)

14           **THE COURT:**  Okay.

15           **MR. McELHINNY:**  So if you turn to slide number 8.

16           **THE COURT:**  Eight, all right.

17           **MR. McELHINNY:**  You see that slide number 8 is the

18   2001 Master Development Agreement.  Slide number 9 is the 2007

19   Master Development Agreement.

20       And then slide number 11 is the 2011 HGST agreement, and

21   there are cites on each of those pages as to where those

22   agreements appear in the docket.

23           **THE COURT:**  Okay.  Let's just take page 8 and walk me

24   through what you just said with the actual contract.

25           **MR. McELHINNY:**  Well, what -- this agreement has a

1  whole array of provisions that talk about what IP is being

2  brought to the table in this joint development agreement.  Some

3  of it is existing intellectual property.  Whether or not the

4  technology that falls -- that the -- you know, whether or not

5  this patent falls under existing intellectual property can be a

6  disputed issue of fact.

7          THE COURT:  Is it?

8          MR. McELHINNY:  We have not taken a position on it one

9  way or another.  They say it is all irrelevant.

10          THE COURT:  I'm asking you.

11          MR. McELHINNY:  I think -- I think it is existing

12  intellectual property, and there is no -- this agreement says

13  that Seagate is not granting a license to any existing

14  intellectual property.  And, therefore, they are not making a

15  proper exercise of --

16          THE COURT:  So you think that is a fact inquiry and

17  that certainly seems material to the construction of the --

18          MR. McELHINNY:  Yes.

19          THE COURT:  All right.  Mr. Rizzi, what is your

20  response?  Why isn't that a fact dispute the jury should hear?

21          MR. RIZZI:  It is not at all a fact dispute.  It

22  reflects a fundamental error of law in how have-made rights

23  work, Your Honor.  The have-made right is inherent to the

24  license that CMU granted to Seagate and HGST.  It is part of

25  that license right.  It is not a license right that is then

1   conveyed from the customer to us.

2       That's a sub-license.  Fundamentally different.  The

3   have-made -- and really it's not our have-made right.  It is

4   the customers' have-made right.  We benefit from the customer

5   exercising the have-made right because what the law recognizes

6   is by that exercise, immunity or protection from suit passes to

7   us as the supplier to the customer.

8       And the courts use the broad rubric of implied license to

9   describe that, which is a very general term that applies to all

10  sorts of circumstances where it is appropriate to find immunity

11  or protection from suit notwithstanding the lack of an

12  expressed license.

13      The law is very clear.  And the case that supports this is

14  *Laser Dynamics versus Quanta*.  There is no requirement

15  whatsoever for any formal conveyance or any written conveyance

16  of -- or transfer of the have-made right from the licensee

17  customer to us.  The law doesn't require that at all.  All the

18  law requires is the request to make the product.  That is not

19  in dispute.

20      What their argument is is that somehow -- as you heard

21  from my adversary -- that this is how somehow a legal right

22  that had to be transferred.  Simply wrong.  That is why it is

23  not addressed in the joint development agreement.

24      The joint development agreement, what that addressed was

25  existing rights of the parties and then new rights that came

out of the parties joint development agreement.  The provisions

that they rely on do not speak to third-party rights,

rightfully so; and nor in any way can they reasonably be

construed, as they contend, to somehow act to cut off that flow

by operation of law of have-made rights that really goes

directly from CMU to our client.  That is the origin of the

have-made right; not the IP provisions in the agreements with

our customers.

And, in fact, what they completely ignore -- and I don't

have a slide for this -- but in that very same agreement, they

completely ignore the only provision that actually addresses

third-party rights in the context of this development

agreement.

THE COURT:  What paragraph is it?

MR. RIZZI:  This is 8.

THE COURT:  No, I know.  But paragraph 8.0?

MR. RIZZI:  Paragraph 8.1 entitled Infringement

Disclaimer.  It says:  Pursuant to the development nature of

this agreement, ST and Agere shall have no liability whatsoever

to any claim of infringement of any third-parties intellectual

property rights caused by the design and development services

and the delivery of samples of any component.

That is the only provision that actually addresses

third-party rights.  So how they can argue that -- reading the

agreement as a whole as you must -- it -- somehow it acts as a

disclaimer or disavowal of the right that is there is

completely contradictory to that provision.  There is no logic

to why Seagate would even want to do that.

             **THE COURT:**  All right, Mr. McElhinny?

             **MR. McELHINNY:**  So, Your Honor, I think -- I heard

Mr. Rizzi say at one point that there are language in the

Seagate development agreement, for example, that addresses the

existing rights of the parties to that agreement.

     The have-made rights are rights that Seagate had that were

existing at the time of that agreement.  They are addressed in

that agreement.  That agreement says Seagate -- we are --

Seagate says:  We are not extending those rights to you.  It

did that for a very good reason because the Defendants make

chips for Seagate, and they also make chips for Seagate's

competitors.  And these guys didn't want Seagate to extend any

rights to it because it wanted to be able to sell chips that it

made with its own IP.  It calls it its own IP.  It didn't want

to take IP from Seagate, and the IP be restricted from putting

that IP into someone else's chip, a Seagate competitor chip.

     These folks were very meticulous about how they put

together their IP and what rights were transferred and what

rights were not transferred.

     They want to skip over that step even though they concede

the have-made rights run from CMU to Seagate.  They are an

existing right of Seagate at the time of this agreement.

1        **THE COURT:**  Let me just go back.  Are there any other

2   what you consider to be material fact disputes?

3        **MR. McELHINNY:**  So we think -- we actually think it is

4   undisputed that those rights were not transferred.

5        **THE COURT:**  That's all in the reading of the contract.

6   I mean, outside of the contract.

7        You have told me you are concerned about customers'

8   off-the-shelf chips; about existing IP as defined in the MDAs.

9   Any other fact agreements you think would hang up summary

10  judgment?

11       **MR. McELHINNY:**  The timeline of development; whether

12  or not these sequence detectors are classified; how they are

13  classified under the development agreements.

14       **THE COURT:**  Why is that -- that is just reading the

15  agreement.  What are the --

16       **MR. McELHINNY:**  It may or may not be.

17       **THE COURT:**  How so?  What would I have to resolve as a

18  fact issue that would be improper on summary judgment for that

19  topic?

20       **MR. McELHINNY:**  When these agreements -- when the

21  chips were made under the agreements and whether there are --

22  whether there is development that takes place independent of

23  and prior to the exercise -- the proper exercise of the

24  have-made rights.

25       I mean, under the Defendant's theory you have to make a

1  determination that the have-made rights were properly

2  exercised.  You have to decide what is the proper exercise of

3  those have-made rights.  Is it simply the request for the

4  production of a product?  Is it a contract that says we want

5  you to make these chips in a certain way?

6      What happens here is that these -- the Defendant's develop

7  these chips.  They develop them in a modular off-the-shelf kind

8  of way so that they can put them in -- the chips for all of

9  their customers.  So when does that -- when is the request

10  properly exercised?  Is it the development agreement?  Is it --

11  under each development agreement this is a big umbrella

12  agreement.  There are statements of work for each generation of

13  chip, and there are probably more than half a dozen of

14  generations of chip that are at play here.  So is the proper

15  exercise --

16          THE COURT:  Did you raise any of this in the

17  opposition?

18          MR. McELHINNY:  We did raise the timeline of the

19  development.

20          THE COURT:  You did?  Where was that?

21          MR. McELHINNY:  It is towards the end of the brief in

22  the section of -- in the section relating to --

23          THE COURT:  I mean, I see the extent of customization.

24  I see.  All right, 21.  All right.  Okay.

25      Any other -- last call.  Any other fact issues that you

1   raise in your opposition that you think would forestall --

2   remember what summary judgment is.  This is very important and

3   it gets lost.  That means trial by judge.  All right.  It is

4   just wrong in our system.  There is a strong presumption of

5   constitutionally and under the common law against that.  This

6   is a big step.  This is why I -- and a number of my

7   colleagues -- take a very hard look at whether summary judgment

8   is procedurally appropriate.  Again, I put this all in my

9   order.

10          The way this came to me looked to me like an exception to

11  my concerns because it looked relatively straightforward, with

12  an asterisk, interpretation of the agreements.  And I really

13  did scour your opposition.  And I saw, as you said towards the

14  end of the brief, some statements here and there; but I just

15  didn't get the sense -- I will be candid with you -- I didn't

16  get the sense that Carnegie -- is it Carnegie?

17          **MR. McELHINNY:**  We say Carnegie.

18          **THE COURT:**  That Carnegie was putting up a strong

19  fight that there were fact issues that would preclude summary

20  judgment.

21          **MR. McELHINNY:**  Your Honor, because --

22          **THE COURT:**  Go ahead.  That's what I'm asking.  That's

23  why we are having the argument.

24          **MR. McELHINNY:**  In fact, I don't think -- I mean, I

25  think our strongest argument is that the papers that they

1   submitted establish that they are not entitled to summary

2   judgment.  There is really no dispute over what -- that the

3   contract says what it says.  And so we didn't raise that as a

4   factual dispute.  I mean, I think if there is a question -- if

5   you frame the issue of:  Is there a proper exercise of the

6   have-made rights, and that's a fact laden question; and you

7   say -- as the first point on that framing, you say:  All right,

8   what does the contract say?  No one is going to dispute what

9   the contract says.  It says what it says.

10      To the extent that they say it is ambiguous, that is a

11   fact dispute.  We say that it is plain as day that these

12   have-made rights were not transferred because nobody wanted

13   them to be transferred.  Nobody wanted Seagate's technology

14   in --

15          **THE COURT:**  I understand all that.  Look, all I want

16   you both to say -- and Mr. Rizzi has given me halfway.  Now you

17   are on the 50-yard line.  You can kick it over -- you both

18   agree this is ripe for summary judgment, and there were no fact

19   disputes that were precluded.

20          **MR. McELHINNY:**  I'm not going to agree to that.  If

21   you say the contract isn't enough -- it doesn't get you there

22   for some reason -- I'm going to look at whether or not

23   exercise -- I can separate -- what they want you to do is

24   something unprecedented in my view, which is to say ignore the

25   express agreement between the parties and just say this

have-made right flows in a way that is unique to every other IP
right and benefits them.

They still concede that there has to be a proper exercise.
And so the question for the Court is where do you -- where do
you find that exercise?  Is it simply the request for a
product?  I don't think so.  And even if it is, when is that
request made?  Is it made -- and what is it for?  Is it for the
custom chip?  Is it for the component?  Is it during the
statement?  Is it when the statement of work issues?  These are
all sort of umbrella agreements that we focused on, but the
request for the product isn't made in 2001.  It is not made in
2004 or 2007.  It is made in a statement of work that is, you
know, 2011, 2012, 2013.

There are -- for each generation there is a new request,
and you have to get -- dig into that and find whether or not
that is an effective exercise of have-made rights at that point
in time.

**THE COURT:**  All right.  Mr. Rizzi, I'm going to give
you the last word.  So Mr. McElhinny says the have-made rights
can only be construed if they are properly exercised and that
is essentially a question of fact.  So your final thoughts on
that.

**MR. RIZZI:**  Yes, Your Honor.  That's just not at all
the case.

There is -- this is -- I can't think of a better fact

scenario where it is so clear that there was an exercise of have-made rights.  Again --

**THE COURT:**  Proper exercise.

**MR. RIZZI:**  I'm sorry.

**THE COURT:**  Proper exercise.

**MR. RIZZI:**  Right.  He keeps misstating the law that conflating a transfer of the have-made right with an exercise of a have-made right.  There is no transfer required.  That's why these agreements between our customer -- the development agreements don't speak to the issue.

The exercise occurs by the act of requesting the product be made.  We put in those development agreements because they demonstrate beyond any question that they don't dispute; not only did they request the product be made, but they have been partnering with us to support development of their products to develop this very technology for the last fifteen years.  And that goes well beyond simply saying "make this widget for us." They rely on us to develop the technology for them.  There is no dispute on that.

And it's -- this issue of, you know, the customization is a complete red herring.  The Federal Circuit has never said that have-made rights apply only when there are customized products.  And, frankly, *Intel* really doesn't stand for that proposition.

I would direct the Court to Judge Chen's very helpful

analysis in the *Asetek* case which is 2013 -- it is cited --

2013 Westlaw 564 --

    **THE COURT:**  I actually have it, yeah.

    **MR. RIZZI:**  So --

    **THE COURT:**  By the way, you don't need to file -- we

follow -- you don't need to file notices of new decisions.  We

are on it.

    **MR. RIZZI:**  That was for the other motion.

    **THE COURT:**  While you are here --

    **MR. RIZZI:**  First of all, *Intel* is a District of

Delaware case.  It is not a Federal Circuit.  It is not

controlling authority.  Federal Circuit has never said as a

matter of law only customized products are subject to have-made

rights.  We think -- as Judge Chen agreed -- that that is not

consistent with the law.

  Second, there is undisputed evidence in the record,

including in some of the documents they cite, that to the

extent that customization was required, these are all

customized products.  These are not widgets that are off the

shelf in the sense they are fungible.  You know, we are making

them for anybody who chooses to buy them off the shelf in a

warehouse.  This is the opposite of that.  These are only

customized products.  There is nothing that's in the customized

products in the context of what is accused.

  So even if there is a requirement of customization -- and

1   I would submit that, you know -- the point Intel was making was

2   really a timing issue.  If you are making fungible widgets,

3   which is not true here, and you are making them for anybody who

4   will buy them, if somebody -- so happens later someone pulls it

5   off the shelf that has a license that doesn't immunize the

6   prior unlicensed manufacturer, that is really the off-the-shelf

7   notion.

8        Federal Circuit has never said:  Well, sort of what is

9   required is customization.  I would submit, as Judge Chen

10  hypothesized too, is that as long as the customer is coming to

11  you and saying "make this product for us," anything that

12  happens after that, you are operating under the protection of

13  that customer's have-made rights, end of story.  Whether that

14  may be the same as you do for another customer doesn't matter.

15  If you do it for another customer, that is not licensed.  That

16  is not an issue in this motion.

17       We are only looking for summary judgment for that time

18  period that matters in the case starting in 2011 when these

19  relationships were already in place; the customers had already

20  been buying the products; asking us to make them for them with

21  the very same -- and they -- basically it includes every

22  product going back to 2003 with the functionality they say

23  infringes for that entire timeframe.

24            **THE COURT:**  Okay.  I think we are deep into briefs and

25  I have those.  Very helpful.  Thank you.  I actually will

1   probably have this out, by district court standards, relatively

2   soon.

3        All right.  Thank you.

4            **MR. McELHINNY:**  Thank you, Your Honor.

5            **MR. RIZZI:**  Thank you.

6                 (Proceedings adjourned at 11:21 a.m.)

7                      ---oOo---

8

9                    **CERTIFICATE OF REPORTER**

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:   Friday, January, 3,2019

14

15

16

17   _____

18            Marla F. Knox, RPR, CRR
              U.S. Court Reporter

19

20

21

22

23

24

25