UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>LSI CORPORATION, et al.,<br><br>　　　　　　　Defendants. | Case No. 18-cv-04571-JD<br><br>**ORDER RE PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 146 |

Plaintiff Carnegie Mellon University ("CMU") holds United States Patent No. 6,201,839 ('839 patent) and United States Patent No. 6,438,180 ('180 patent). As alleged in the complaint for patent infringement against defendants LSI Corporation and Avago Technologies U.S. Inc. (collectively, LSI), the patents "generally claim a method used in a 'read channel' for improving the accuracy of detecting data written to a storage medium, such as a magnetic disk in a hard disk drive ('HDD')." Dkt. No. 1 ¶ 2. CMU says that LSI designed and supplied HDD read channel products that practiced the methods claimed in the patents. The accused products included devices such as HDD controller systems-on-a-chip (SOCs), stand-alone read channel chips, and simulators used to mimic and model the operation of the accused devices. *See id*. ¶¶ 15, 22; Dkt. No. 145-8 (amended infringement contentions).

With the Court's consent, *see* Dkt. No. 89, LSI filed an early motion for partial summary judgment on the grounds of a "have made rights" defense. Dkt. No. 146. LSI says that it supplied the accused products to two licensees of CMU -- non-parties Seagate Technology PLC ("Seagate") and Hitachi Global Storage Technologies ("HGST") -- which were contractually

authorized to outsource the development and manufacturing of licensed products.  Dkt. No. 145-4 at 1.[1]  In LSI's view, this defense bars "about 90% of the total damages sought by CMU."  *Id*. at 2.

The Court grants summary judgment to LSI on the existence of have made rights.  The plain language of the Seagate and HGST licenses expressly conferred have made rights, and the record before the Court indicates, without meaningful dispute, that LSI made and supplied a substantial portion of the accused products in conformance with those rights.  The question of which specific LSI products are covered by the have made rights requires further development, as discussed in the Conclusion.

## BACKGROUND

The salient facts are straightforward and undisputed.  For many years, CMU has operated an "interdisciplinary center for research and development of data storage solutions" known as the Data Storage Systems Center ("DSSC").  Dkt. No. 149-4 at 3.  Among other activities, the DSSC solicits funding through corporate sponsorships.  *Id*.  Companies may join the DSSC as "associate members" by paying an annual fee and signing an "associates agreement."  *Id*.  The agreements confer a license to DSSC technology, including in this case the read channel methods in the '839 and '180 patents.  *See, e.g.*, Dkt. No. 145-5 ¶ 2(b); Dkt. No. 151-3.

Seagate was an early associate member, and signed an associates agreement with the DSSC in 1992.  Dkt. No. 145-5.  The Seagate agreement detailed a collaborative arrangement in which the company and the DSSC would share research and information about data storage technologies.  Among other obligations, Seagate agreed to pay an annual fee of $250,000 for an initial five-year period.  *Id*. ¶ 3; *see also id.* ¶ 8 (renewal clause).  In exchange, Seagate obtained access to the DSSC's technology, including a license.  As the agreement provides:

> The University shall grant to the Corporation [Seagate] and all other Associates a worldwide, irrevocable, royalty-free license, with right to sub-license, to make, **have made**, use, sell or otherwise dispose of the Inventions.

---

[1] This docket entry was provisionally filed under a motion to seal.  The parties' sealing requests will be denied, for the most part, in a separate order.  The Court cites here to provisionally sealed docket entries pending the filing of the unredacted versions.

*Id.* ¶ 2(b) (emphasis added).  "Inventions" was not a defined term in this agreement, but the parties do not dispute that it included the read channel method described in the '839 and '180 patents. *See, e.g.*, Dkt. No. 145-4 at 2-3; Dkt. No. 149-4 at 3-4.

IBM was an even earlier associate member and signed an associates agreement in 1983. *See* Dkt. No. 145-6 ¶ 1.  After a series of events, including litigation between IBM and CMU, IBM assigned its rights under the associates agreement to HGST in 2002.  Dkt. No. 145-6 ¶ 3.1.  This was done in a settlement agreement between IBM and CMU, which provides that:

> Hitachi Global Storage Technologies has rights, including a worldwide, irrevocable, royalty-free license under the Inventions, and all patents, patent applications and all other intellectual property rights derived therefrom to make, **have made**, use, sell, import, offer for sale, or otherwise transfer any apparatus or practice any method.

*Id.* ¶ 3.3 (emphasis added).  "Inventions" was defined in this agreement to mean inventions conceived or reduced to practice between July 18, 1983, and July 17, 2002.  *Id.* ¶ 2.1.  The parties again do not dispute the '839 and '180 patents are covered by the license granted to HGST.  *See, e.g.*, Dkt. No. 145-4 at 3; Dkt. No. 149-4 at 3-4.

CMU seeks damages for sales of allegedly infringing products by LSI between 2011 and 2018.  *See* Dkt. No. 149-4 at 4.  The parties agree that, for the entirety of this time period, LSI had contracts with Seagate and HGST to develop and supply data storage products to them.  The Seagate agreement originated in 2000 between Seagate, Agere Systems Inc. ("Agere"), and another company not relevant to this litigation.  Dkt. No. 145-26; *see also* Dkt. Nos. 145-27, 145-28 (2001 agreement and amendment).  The agreement was applied to LSI when it merged with Agere in 2007.  *See* Dkt. No. 1 ¶ 14; Dkt. No. 145-28 at 2.  Seagate also entered into other development agreements with Agere and LSI in 2004 and 2007.  Dkt. Nos. 145-29, 145-30.  LSI and HGST inked a development and supply agreement in January 2011.  Dkt. No. 145-41.

Under these agreements, Seagate and HGST hired LSI to supply data storage deliverables for use in their own products.  For example, Seagate commissioned LSI to develop and supply SOCs "for use in Seagate disc drive products."  Dkt. No. 145-26 ¶ 1.  Seagate provided the specifications for the SOCs, and LSI made them according to statements of work the parties

3

negotiated. *See id*. ¶¶ 2.1, 2.2. In similar fashion, HGST engaged LSI to provide data storage solutions as part of a multinational procurement relationship, again under statements of work HGST and LSI negotiated. Dkt. No. 145-41. CMU claims that the products LSI supplied under the agreements with Seagate and HGST used the read channel method in the patents-in-suit. *See, e.g.,* Dkt. No. 149-4 at 5-9.

## DISCUSSION

### I. LEGAL STANDARDS

Parties "may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may dispose of less than the entire case and even just portions of a claim or defense. *Smith v. Cal. Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id.* The Court views the evidence in the light most favorable to the nonmoving party, and "all justifiable inferences are to be drawn" in that party's favor. *Id.* at 255.

The moving party may initially establish the absence of a genuine issue of material fact by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). It is then the nonmoving party's burden to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.* at 323-24. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

It is not the Court's responsibility to root through the record to establish the absence of factual disputes, *Arvin Kam Constr. Co. v. Envtl. Chem. Corp.*, Case No. 16-cv-02643-JD, 2019 WL 1598220, at *1 (N.D. Cal. Apr. 15, 2019), or to look for evidence on the nonmoving parties'

4

behalf, *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 989 (N.D. Cal. 2017), *aff'd*, 932 F.3d 861 (9th Cir. 2019). While a large volume of briefs, declarations, and exhibits is not necessarily fatal to summary judgment, it is indicative of disputes of fact that will require a trial to resolve. *See FTC v. D-Link Sys., Inc.*, Case No. 17-cv-00039-JD, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018).

Summary judgment here turns on questions of contract interpretation. "The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract." *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1072 (Fed. Cir. 2009). Neither LSI nor CMU gave much attention to state law contract principles, and relied instead almost entirely on federal patent cases. Since the contracts are quite plain, and their terms are not disputed, this was not unreasonable. Even so, the Court notes that the Seagate and HGST associates agreements have Pennsylvania choice of law provisions. Dkt. No. 145-5 at 7; Dkt. No. 145-6 ¶ 9.1. LSI's supply agreements with Seagate are governed by Delaware law, *see* Dkt. No. 145-27 ¶ 16; Dkt. No. 149-29 ¶ 11.5, and its agreement with HGST is governed by California law, *see* Dkt. No. Dkt. No. 145-41 ¶ 15.3. In all three jurisdictions, the interpretation of a contract is a question of law for the Court to decide. *See, e.g.*, *Am. Alternative Ins. Corp. v. Superior Court*, 135 Cal. App.4th 1239, 1245 (2006); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997); *Maloney v. Valley Med. Facilities, Inc.*, 946 A.2d 702, 706 (Pa. Super. Ct. 2008), *aff'd*, 984 A.2d 478 (Pa. 2009). "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003); *see also Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014); *Driscoll v. Arena*, 213 A.3d 253, 259 (Pa. Super. Ct. 2019). "That intent is found in the first instance in the words of the agreement as understood in their ordinary meaning and in a manner that avoids absurd results." *Forto v. Capital One Bank, N. A.*, No. 14-CV-05611-JD, 2017 WL 1064972, at *2 (N.D. Cal. Mar. 20, 2017); *see also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 96 (3d Cir. 2001) (discussing Pennsylvania law); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).

The Federal Circuit has determined that have made rights function as an implied license to a supplier of products to a licensee customer. *See LaserDynamics, Inc., v. Quanta Computer, Inc.*, 694 F.3d 51, 73 (Fed. Cir. 2012). "The existence *vel non* of an implied license is a question of law." *Id.* (quoting *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003)). "An implied license is a defense to patent infringement." *Anton/Bauer*, 329 F.3d at 1350 (citing *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995)). The party claiming this defense has the burden of showing that an implied license exists. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 828 (Fed. Cir. 1991).

## II.  LSI HAS ESTABLISHED AN IMPLIED LICENSE

Although the parties submitted a considerable volume of deposition excerpts, declarations, and other evidence extrinsic to the contracts, the proper starting point for the implied license analysis is the language of the Seagate and HGST agreements. The Federal Circuit has concluded that a licensee enjoys have made rights even without an express delegation from the patent holder. The "right to 'make, use, and sell' a product inherently includes the right to have it made by a third party, absent a clear indication of intent to the contrary." *CoreBrace*, 566 F.3d at 1072-73. A licensee "is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention." *Id.* (quoting *Carey v. United States*, 326 F.2d 975, 979 (Ct. Cl. 1964)); *see also LaserDynamics*, 694 F.3d at 72-73. Put more directly, the licensee is perfectly free to engage a third-party supplier "to do all the work connected with the production of the article for him." *CoreBrace*, 566 F.3d at 1073 (same internal citation).

Whether a license is exclusive or non-exclusive is irrelevant to have made rights, and a general reservation of rights clause in a contract is not enough to trump the inherent grant of the right. *Id.* at 1074-75. To bar have made rights, and to "negate what would otherwise be inherent," a contract must manifest a "clear intent" to exclude them. *Id.* at 1075.

Neither *CoreBrace* nor *LaserDynamics* impose any special requirements on licensees to exercise their have made rights. This makes sense because the rights are inherent unless plainly disclaimed by the parties, and outsourcing the manufacture of licensed products is a "modern

6

industrial reality." *LaserDynamics*, 694 F.3d at 72.  There would be scant efficiency or utility in imposing a layer of technical requirements on licensees before they could make use of their inherent power to engage other companies for product development and supply.  The main constraint on the exercise of have made rights is that a supplier may not exceed or circumvent the scope of the original license.  *See id*. at 72-73.  So long as the supplier is fulfilling "bona fide orders" from the licensees, and not making products for its own needs, the arrangement is "legitimate." *Id*. at 73.

These principles make short work of LSI's motion.  CMU acknowledges, as it must in light of the plain words in the associates agreements, that Seagate and HGST were expressly granted have made rights.  *See, e.g.*, Dkt. No. 149-4 at 3-4.  The undisputed evidence shows that LSI was engaged by those companies to supply products for their own product needs.  Consequently, the grounds for an implied license to LSI are well established.

The arguments CMU makes against an implied license are not well taken.  Its main contention is that Seagate and HGST were obligated to "affirmatively state" in their contracts with LSI that they were using their have made rights.  *See* Dkt. No. 149-4 at 11.  That proposition makes little sense in light of the Federal Circuit's determination that have made rights are inherent in a license, and are not encumbered by a need to dot I's and cross T's before they can be exercised.  In effect, CMU presses for contractual formalities akin to the grant of a sublicense, but "a right to have made is not a sublicense," and "the contractor who makes for the licensee does not receive a sublicense from the licensee." *CoreBrace*, 566 F.3d at 1073 (citing *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 187-88 (Fed. Cir. 1996)).

CMU's heavy reliance on *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 233-34 (D. Del. 2001), is misplaced.  The decision predates *CoreBrace* and *LaserDynamics* by several years, and the Court joins other district courts that have read it not to require a formal conveyance of have made rights, or have declined to follow it in light of current circuit authority.  *See, e.g.*, *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, No. C-12-4498 EMC, 2013 WL 5640905, at *4 (N.D. Cal. Oct. 11, 2013).

CMU also says that Seagate and HGST expressly disclaimed the exercise of have made rights in their agreements with LSI. *See* Dkt. No. 149-4 at 2, 11. This too is an odd proposition. It typically would not be commercially reasonable to renounce have made rights in an outsourcing agreement to supply licensed products. The plain language of LSI's supply agreements with Seagate and HGST does not support such an unusual interpretation. CMU strains to read a boilerplate reservation of intellectual property rights by Seagate and LSI to mean that Seagate barred LSI from an implied license to CMU's patents. *See* Dkt. No. 145-27 ¶ 7.3. But this conventional IP reservation hardly indicates that Seagate was withholding or not using its have made rights, at LSI's peril of a patent infringement lawsuit by CMU. A rational supplier would rarely, if ever, undertake to supply licensed products on those terms, and certainly would not manifest such an intent purely through a standard IP ownership clause. CMU also overlooks the fact that the reservation clause pertained to rights owned by each "party" to the agreement, namely Seagate and LSI. *See, e.g.* Dkt. No. 145-27 ¶¶ 1, 6.1 (using "party" or "the parties" to mean Seagate, LSI, or the other party to the agreement). In a similar fashion, another agreement with Seagate cited by CMU merely declines to grant a license "to use Seagate Intellectual Property" for sale to other customers, and has no language suggesting that Seagate intended to forego use of its have made rights. Dkt. No. 145-30 ¶ 4.4; *see also* Dkt. No. 150-31 (2010 amendment).

So too for the HGST agreement with LSI. CMU says that HGST terminated any possible claim by LSI to an implied license because HGST expressly licensed only its own technology, and that no "other license is granted expressly or impliedly." Dkt. No. 145-41 ¶ 9.0. This again misreads the plain language of the agreement, which makes clear that HGST was not granting a license to its own technology beyond the terms of the agreement. It in no way manifests an intent to renounce HGST's have made rights with respect to outsourcing the supply of licensed products to LSI.

CMU's suggestion that an implied license extends only to products that are "customized" and not "off-the-shelf," Dkt. No. 149-4 at 23, is equally unavailing. What CMU means by customized is not entirely clear, and in any event this point replicates the same analytical error CMU made with respect to demanding a formal conveyance: nothing in governing circuit

8

1  precedent requires customization. To the contrary, *CoreBrace* and *LaserDynamics* found that the
2  suppliers enjoyed an implied license simply by making products at the licensees' requests to fulfill
3  the licensees' needs. *See LaserDynamics*, 694 F.3d. at 73; *CoreBrace*, 566 F.3d at 1074-75.
4  Neither case required, or even suggested, that the implied license was contingent upon a supplier
5  customizing a product with the equivalent of tricked out specs or racing stripes.

6  CMU's "timing" point fares no better. CMU says that LSI may have engaged in infringing
7  practices before Seagate and HGST exercised their have made rights. Dkt. No. 149-4 at 22-23.
8  But it has not proffered evidence of such conduct during the relevant 2011-18 time frame. CMU
9  speculates about possibilities, but does not raise a genuine dispute of material fact based on
10 evidence.

## CONCLUSION

The salient facts with respect to an implied license for LSI under Seagate's and HGST's have made rights are undisputed, and LSI is entitled to judgment on this issue as a matter of law. On the record as it currently stands, the Court cannot tell which of the accused products (devices and simulators) are covered by the implied license. Consequently, the parties are directed to meet and confer on a joint list that identifies the accused products supplied under the implied license. If for some good reason they cannot agree, LSI may bring a summary judgment motion directed solely to this question. The joint stipulation or summary judgment motion should be filed by December 7, 2020.

**IT IS SO ORDERED.**

Dated: September 18, 2020

JAMES DONATO
United States District Judge