Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel: (415) 882-8200
Fax: (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Carnegie Mellon University*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY, | Case No.: 3:18-cv-04571-JD |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO LSI'S SUMMARY JUDGMENT MOTION REGARDING ACCUSED PRODUCTS SUBJECT TO THE COURT'S ORDER ON IMPLIED LICENSE (D.I. 196)** |
| v. | |
| LSI CORPORATION and AVAGO TECHNOLOGIES U.S. INC., | |
| Defendants. | Date: February 18, 2021<br>Time: 10:00 a.m.<br>Courtroom: 11 - 19th Floor<br>Hon. James Donato |

## TABLE OF CONTENTS

I.    Introduction ...................................................................................................................1

II.   Background ...................................................................................................................5

    A.    CMU's Infringement Claims ...............................................................................5

    B.    LSI's Uses of the Claimed Methods During Its Sales Cycle ....................................6

        1.    LSI's Internal Development ...........................................................................6

        2.    LSI's Work With HDD Manufacturers ...........................................................8

    C.    CMU's Damages Claims ...................................................................................10

        1.    The Hypothetical Negotiation -- Date of First Infringement ........................11

        2.    The Hypothetical Negotiation -- Facts At The Time Of First
            Infringement ...............................................................................................11

        3.    The Hypothetical Negotiation -- Determining a Metric for the Value
            of LSI's Infringing Uses of CMU's Patented Method ..................................14

    D.    LSI's MPSJ ...................................................................................................15

    E.    Parties' Meet and Confer ..................................................................................16

III.  Argument ...................................................................................................................17

    A.    The Effect of an Implied License from Seagate and HGST on CMU's
        Damages  Is A Disputed Issue of Fact Not Addressed by the Court in the
        OPSJ ...........................................................................................................17

    B.    LSI's Identification Of Accused Simulators Immune From Liability Is
        Factually and Legally Incorrect ........................................................................22

IV.   Conclusion .................................................................................................................25

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT         CASE NO. 3:18-cv-04571-JD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*19 Tao Vega LLC v. Holo Ltd.*,
No. 19-5640, 2019 WL 8263434 (N.D. Cal. Dec. 18, 2019).....................................................18

*Automatic Radio Mfg. Co. v. Hazeltine Research*,
339 U.S. 827 (1950)..................................................................................................................19

*Chem v. N.Y. Life Ins. Co.*,
No. 97-1780, 1997 WL 792942 (N.D. Cal. Oct. 21, 1997) ......................................................18

*CMU v. Marvell*,
807 F.3d 1283 (Fed. Cir. 2015).......................................................................................*passim*

*CMU v. Marvell*,
986 F.Supp.2d 574 (W.D. Pa. 2013).................................................................................*passim*

*CMU v. Marvell*,
890 F.Supp.2d 602 (W.D. Pa. 2012)...................................................................................17, 21

*DCG Sys. v. Checkpoint Tech., LLC*,
No. C 11-03792, 2012 WL 1309161 (N.D. Cal. April 16, 2012) .........................................4, 5

*Digital Reg. of Tex. LLC v. Adobe Sys, Inc.*,
No. CV 12-01971, 2014 WL 1653131 (N.D. Cal. Apr. 24, 2014) .........................................25

*DSS Tech. Mgmt., Inc. v. Apple, Inc.*,
No. 14-cv-05330, 2020 WL 210318 (N.D. Cal. Jan. 14, 2020)..............................................25

*Fujifilm Corp. v. Benun*,
605 F.3d 1366 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 829 (2010) ...............................18, 19

*i4i Ltd. Partnership v. Microsoft Corp.*,
598 F. 3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ............................................*passim*

*Joy Techs., Inc. v. Flakt, Inc.*,
6 F.3d 770 (Fed. Cir. 1993) ......................................................................................................5

*Looksmart Group, Inc. v. Microsoft Corp.*,
386 F. Supp. 3d 1222 (N.D. Cal. 2019) ..................................................................................21

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)..........................................................................................19, 24

*Mahurkar v. C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996)..................................................................................................18

iii

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008) ........................................................................................2, 18

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003) ............................................................................................18

*MLC Intellectual Property, LLC v. Micron Tech., Inc.*,
    No. 14-cv-03657, 2019 WL 1865921 (N.D. Cal. April 25, 2019) .........................................25

*Perdana Capital, Inc. v. Chowdry*,
    No. 09-1479, 2010 WL 1145933 (N.D. Cal. Sept. 2, 2010) ..................................................17

*Powell v. Home Depot U.S.A., Inc.*,
    663 F.3d 1221 (Fed. Cir. 2011) ............................................................................................18

*Ricoh Co. v. Quanta Computer Inc.*,
    550 F.3d 1325 (Fed. Cir. 2008) ..............................................................................................6

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
    846 F.3d 1190 (Fed. Cir. 2017) .......................................................................................4, 24

*TQP Dev., LLC v. Merrill Lynch & Co., Inc.*,
    No. 2:08-CV-471-WCB, 2012 WL 3283356 (E.D. Tex. Aug. 10, 2012) ..............................18

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
    750 F.2d 1552 (Fed. Cir. 1984) ............................................................................................19

*Tri-Valley Cares v. U.S. Dept. of Energy*,
    No. 08-1372, 2010 WL 11530284 (N.D. Cal. Sept. 30, 2010) .............................................18

*Twilio, Inc. v. Telesign Corp.*,
    No. 16CV06925LHKSVK, 2017 WL 5525929 (N.D. Cal. Nov. 17, 2017) ..........................21

*Wang Labs., Inc. v. Toshiba Corp.*,
    993 F.2d 858 (Fed. Cir. 1993) ..............................................................................................11

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ..........................................................................................10, 14

**Statutes**

35 U.S.C. § 271(a) ..........................................................................................................................5

35 U.S.C. § 271(b) ..........................................................................................................................5

35 U.S.C. § 271(c) ..........................................................................................................................6

35 U.S.C. § 284 .............................................................................................................................10

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

1    Carnegie Mellon University ("CMU") files this Opposition to LSI's Motion for Summary

2  Judgment Regarding Accused Products Subject To The Court's Order On Implied License (Dkt.

3  196) ("Motion").  Dkt. 208-4.

4  **I.    <u>INTRODUCTION</u>**

5    Contrary to LSI's assertion that "CMU is attempting to relitigate issues decided by the OPSJ

6  and conceded by CMU," Dkt. 208-4 at 1, CMU opposes this Motion because LSI is attempting to

7  use it to secure expansive relief on issues that: (1) LSI did not raise in its Motion for Partial

8  Summary Judgement ("MPSJ"), Dkt. 145-4; (2) the Court did not decide in its Order on that motion

9  ("OPSJ"), Dkt. 196; and (3) CMU never conceded in its preliminary damages or infringement

10  contentions.  In LSI's MPSJ, the parties briefed *only* whether the "have made" rights that CMU

11  granted to LSI's customers Seagate Technology PLC ("Seagate") and Hitachi Global Storage

12  Technologies ("HGST") effectively created an implied license that benefitted LSI, notwithstanding

13  language in LSI's contracts with those customers providing otherwise.  LSI did not substantively

14  address any other relief.  Indeed, the Court stated as much; the OPSJ explains that "[o]n the record as

15  it currently stands, the Court cannot tell which of the accused products (devices and simulators) are

16  covered by the implied license."  Dkt. 196 at 9.

17    In light of LSI's failure to connect in its MPSJ its implied license defense to the so-called

18  "covered products" or any effect on damages, the Court ordered the parties to "meet and confer on a

19  joint *list* that identifies the accused products supplied under the implied license."  Dkt. 196 at 9

20  (emphasis added).  Consistent with the Court's direction, CMU offered to LSI a straightforward

21  stipulation that listed the read channel chips and systems on a chip ("SoCs") that LSI sold to Seagate

22  and HGST during the damages period and the associated simulators.  For reasons set out below,

23  CMU refused to accede to LSI's demands to go further.  LSI then filed this Motion in an attempt to

24  expand the OPSJ well beyond its scope and to improperly limit CMU's damages analysis and

25  infringement evidence.  The Court should deny LSI's Motion for the following reasons.

26    ***First***, LSI's unsupported assertion that the Court's finding of an implied license completely

27  eliminates its sales to Seagate and HGST from any consideration in CMU's damages analysis

28  ignores the briefing on the MPSJ and flies in the face of well-established law about the factual nature

1

of patent damages determinations.  In its MPSJ, LSI did not even attempt to carry its burden of proving that there are no disputed issues of material fact regarding the effect of an implied license on CMU's damages claim.  This self-imposed limitation on LSI's MPSJ is not surprising.  LSI certainly would have provoked material factual disputes had it addressed in detail in its MPSJ the effect the purported implied license may have on CMU's damages claim.  *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1366 (Fed. Cir. 2008) ("The correct measure of damages [in patent cases] is a highly case-specific and fact-specific analysis.").

The fact-dependent nature of patent damages claims is especially apparent here because the number of accused chips sold by LSI are merely a metric by which CMU's damages may be determined.  The patent claims CMU asserts are method claims.  LSI infringes those claims by ***uses*** of the patented method—uses by LSI, its customers (*i.e.*, hard disk drive ("HDD") manufacturers) and its customers' customers (*e.g.*, computer manufacturers and consumer purchasers of external hard drives).  Method claims are not infringed by the act of selling a product that practices the method when used.  The Federal Circuit previously held, in connection with the same patent claims in *Carnegie Mellon Univ. v. Marvell Tech. Grp.* ("*CMU v. Marvell*"), that an appropriate way to measure the value of infringing uses is to use a non-infringing act, *i.e.*, the chips sold by LSI that practice CMU's patented method, as a factor in calculating a reasonable royalty—CMU's damages measure.  807 F.3d 1283, 1303-05 (Fed. Cir. 2015).

Just as in *CMU v. Marvell*, CMU's damages analysis in this case will be based upon the hypothetical negotiation, a construct that recreates how the parties at the time of first infringement would have agreed to value the defendant's infringing uses.  Determining the appropriate reasonable royalty (*e.g.*, a royalty rate applied to a royalty base) in the context of a hypothetical negotiation is a fact-intensive exercise that will include accounting for the Court's finding of an implied license in its OPSJ.  It is possible, for example, that the parties to the hypothetical negotiation would have agreed at the time of first infringement to exclude from the royalty base the number of chips LSI sold to Seagate and HGST in determining the reasonable royalty that would be owed to CMU for LSI's own uses of the patented methods.  But, just as CMU had done in a prior license, there are sound business and legal reasons that the parties to the hypothetical negotiation would have recognized that those

2

chips can be a reasonable metric of the value that LSI would have reaped from the ability to use CMU's method to develop products that it could supply to other customers, including customers with a bigger market presence at the time.

In fact, the damages determination in this case turns on a number of factors never addressed in the briefing on LSI's MPSJ or this Motion. Those factors include LSI's position in the market at the time, LSI's need to develop chip platforms it could offer to the entire market, LSI's strategic plans for market expansion, Seagate's and HGST's own positions in the market, their relative importance among LSI's customer base, the industry approach to "have made" rights at the time, and, now, the Court's OPSJ regarding "have made" rights. *See, e.g.*, Lawton Decl." at ¶¶ 73-76. For this reason, the determination of a reasonable royalty is a subject for expert testimony and ultimately to be decided by the jury. LSI seeks to shortcut that required fact-finding. Without ever addressing the merits of doing so or explaining how the hypothetical negotiation would have yielded that result, LSI asks the Court to expand its OPSJ to exclude every chip sold to Seagate and HGST from September 1, 2011 through April 3, 2018 from CMU's damages analysis. CMU respectfully asks this Court to reject LSI's unsupported attempt to prematurely preclude CMU from presenting fulsome damages claims that, with the benefit of expert testimony, appropriately account for the OPSJ.

***Second***, LSI likewise overreaches by effectively transforming the OPSJ into something it decidedly was not—an order broadly precluding CMU from offering evidence of LSI's infringement by its and its customers' use of simulators. During the "sales cycle" process for every LSI chip, LSI and its customers (including customers other than Seagate and HGST) use simulators, which are computers that run source code files that mimic the operation of the actual chips. *See, e.g.*, Declaration of Christopher H. Bajorek ("Bajorek Decl.") at ¶¶ 28-29, 34-36, 40-41, 54, 61. In its MPSJ, LSI repeatedly argued that simulations it performed in connection with the products it sold to Seagate and HGST were the simulators covered by the alleged implied license. *See*, *e.g.*, Dkt. 145-4 at 1 (arguing activities covered by claimed implied license were "the simulations that were performed as part of the development" of products sold to Seagate and HGST); *see also id*. at 6, 22-24. Accordingly, in response to the Court's meet and confer order, CMU proposed that the parties

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

stipulate to LSI's own MPSJ position—that the covered simulators were those that "mimic the operation of the detector of the specific Accused Devices that were supplied to Seagate and HGST during the damages period."  Dkt. 208-10 at 10.  Even though LSI acknowledged that "in the general sense [] such simulators are covered by the Court's summary judgment order," *id.* at 9, it would not agree to CMU's proposal.  Now, LSI asks the Court to find that, except for two specific instances of simulations reflected in two LSI documents, ***all uses of the accused simulators*** must be excluded from CMU's infringement and damages analysis, whether or not they have anything to do with Seagate or HGST.  LSI's position is squarely at odds with its representations to the Court in its reply brief on the MPSJ that "whether Defendants infringed the patents during this time period in connection with any product development unrelated to Seagate or HGST, also a disputed issue of fact, is not before the Court…."  Dkt. 155-4 at 11.

LSI's demand does not relate in any way to the Court's finding regarding the existence of an implied license.  Instead, it is a thinly disguised bid to preclude CMU from relying on ***any*** direct or circumstantial evidence of LSI's and HDD manufacturers' use of LSI's simulators apart from two specific documents that CMU identified as ***examples*** in its Amended Infringement Contentions. LSI's position is contrary to the repeated explanation by courts in this District that infringement contentions do not require the disclosure of specific evidence of infringement, *see, e.g.*, *DCG Sys. v. Checkpoint Tech., LLC*, No. C 11-03792, 2012 WL 1309161 at *2 (N.D. Cal. April 16, 2012), and the Federal Circuit precedent that "a patentee is entitled to rely on circumstantial evidence to establish infringement."  *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017) ("If [Defendant] is arguing that proof of inducing infringement or direct infringement requires direct, as opposed to circumstantial evidence, we must disagree.  It is hornbook law that direct evidence of a fact is not necessary.").  LSI also fails to cite any factual basis to suggest that every simulation it or its customers ran using the accused simulators, other than the two simulations identified in its Motion, was used in connection with the chips sold to Seagate and HGST.  To the contrary, that notion flies in the face of the substantial evidence of (i) LSI's use of simulators during internal platform development before customer-specific customization, (ii) the fact that the simulators are used in connection with customization work for every LSI customer, not just Seagate

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

and HGST, and (iii) the importance and value of those uses to LSI in achieving all of its sales.  *See, e.g.*, Bajorek Decl. at ¶¶ 25, 28-29, 34-36, 40-41, 50, 54, 61, 64.

Accordingly, CMU respectfully requests the Court deny LSI's Motion and instead enter an order reflecting only that (i) the Accused Devices supplied to Seagate and HGST during the period of September 1, 2011 through April 3, 2018 are the devices listed in Appendix A to LSI's Motion; (ii) the related simulators are the source code files listed on page 6 of CMU's Amended Infringement Contentions, *see* Ex. 1,[1] that were used, run, or executed by LSI, Seagate or HGST during the period of September 1, 2011 through April 3, 2018 in connection with mimicking the operation of the detector of the Accused Devices identified in Appendix A to LSI's Motion; and (iii) the effect on the damages analysis of the Court's OPSJ is a question of fact to be addressed in the parties' expert reports (which will be required in any event to address the damages for approximately 262 million chips that would remain in the case even if the chips sold to Seagate and HGST were excluded as LSI requests).

## II.    BACKGROUND

### A.    CMU's Infringement Claims

CMU accuses LSI of infringing the methods of claim 4 of U.S. Patent No. 6,201,839 and claim 2 of U.S. Patent No. 6,438,180 (the "Claimed Methods").  When method claims are at issue, the act of direct infringement is the use of the claimed method, not the sale of an apparatus capable of performing the claimed process.  *See*, *e.g.*, *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).  CMU asserts that LSI infringes the Claimed Methods in three distinct ways:

- LSI directly infringes when it uses the Claimed Methods in the U.S. (35 U.S.C. § 271(a));

- LSI induces infringement when LSI's customers (and computer end-users with an HDD from LSI's customers that includes an LSI read channel chip or SoC) use the Claimed Methods in the U.S. pursuant to LSI's directions (35 U.S.C. § 271(b)); and

- LSI engages in contributory infringement by selling chips that LSI's customers and their customers use to practice the Claimed Methods (35

---

[1] All references to "Ex. __" herein refer to exhibits to the Declaration of Anna Shabalov, filed concurrently herewith.

1  U.S.C. § 271(c).[2]

2  **B.    LSI's Uses of the Claimed Methods During Its Sales Cycle**

3  LSI's infringement principally occurs in connection with its lengthy "sales cycle," that

4  begins with LSI engaging in internal research and development to create a proprietary, non-

5  customer-specific read channel platform (or "generation") that improves upon the prior read channel

6  platform.  *See* Bajorek Decl. at ¶ 24.  Once satisfied with the feasibility of the new platform, LSI

7  then offers that platform to HDD manufacturers (*i.e.*, at the time of the hypothetical negotiation, as

8  discussed below, Maxtor, Seagate, IBM, Western Digital, Fujitsu, HGST and Toshiba) as part of a

9  highly competitive bid selection process that typically results in a sole source, "winner take all,"

10  award.  *Id*.  If selected, LSI engages with the HDD manufacturer to customize LSI's proprietary base

11  platform for ultimate sale to that manufacturer.  *Id*.

12  **1.    LSI's Internal Development**

13  LSI's sales cycle for a new generation of chip begins with LSI formulating the new chip's

14  concept and basic design.  Ex. 2 at 44:24-45:23; Bajorek Decl. at ¶¶ 25-27, 30.  As illustrated by the

15  internal schematics below, LSI's concept and design goes through an extensive internal "product

16  planning review process" that includes design work and internal analyses to align potential product

17  developments with its technology capabilities:

18
19
20   
21
22
23
24
25

26  _____
27  [2] Liability for contributory infringement under § 271(c) exists when, among other things, there are
    *sales* of an "*apparatus*" for use in practicing a patented process" and the "*apparatus*" is used to
    practice the patented process in the U.S., as it is here.  *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d
28  1325, 1336-39 (Fed. Cir. 2008).  Here, apparatuses used to practice CMU's patented method are
    LSI's accused read channel chips and SoCs.

Ex. 3 at 9, 73; *see also id.* at 74; Ex. 4 at 32:22-34:9; 44:25-55:17; Ex. 2 at 44:24-45:23; Bajorek Decl. at ¶¶ 25-27, 53, 57.

During that process, LSI considers "product development or strategies that would apply to all customers or most customers and [would be] primarily concentrated on technology topics." *See* Ex. 4 at 32:22-34:9; *see also* Bajorek Decl. at ¶ 30 (explaining why, "[d]uring this initial phase, a supplier's design work on its proprietary chip architecture is not specific to a particular HDD manufacturer"). LSI also determines whether there is a financial justification to move forward with development of the new chip platform, including analyzing whether there would be HDD manufacturers willing or likely to buy a customized version of the chip. Ex. 4 at 53:10-54:4; Bajorek Decl. at ¶¶ 27, 30, 57. In performing these internal analyses, LSI identifies technology that it considers Storage Products Group ("SPG") intellectual property. Ex. 4 at 47:7-19. SPG intellectual property reflects "technology blocks that [LSI] would be developing independent of customer or mostly independent of [the] customer," and includes the read channel functionality that CMU has accused of infringing the Claimed Methods. *Id.*; *see also* Ex. 5 at 3; Bajorek Decl. at ¶¶ 30, 55.

Before LSI approves the concept and basic design of a new product and presents that design to any prospective customer, LSI's architecture group writes or revises computer software that allows LSI to evaluate internally the performance of the new design. *See* Ex. 2 at 47:4-16; Ex. 4 at 50:5-51:8; Bajorek Decl. at ¶¶ 28, 54. LSI calls the computer software "simulators" and CMU specifically identified in its Amended Infringement Contentions such LSI source code files that CMU contends infringe the Claimed Methods when used by LSI or its customers. Ex. 1 at 6 (identifying LSI "simulator" folders containing the source code that perform the Claimed Methods when used). LSI evaluates performance of its new design using various metrics including improvements in signal-to-noise ratio ("SNR"), which is referred to as "SNR gains." Ex. 6 at 62:2-7; Ex. 7 at 52:18-53:4, 96:22-97:4; Ex. 8 at 42:15-43:1; *see also* Bajorek Decl. at ¶ 29. LSI is particularly focused on SNR gain simulations during development of new technology, because such development "was a huge dollar investment and [LSI] wanted to make sure there would be SNR gain in return for the investment." Ex. 4 at 52:17-53:4; *see also* Ex. 9 at 52:14-54:6, 103:15-18, 116:11-

16; Ex. 7 at 52:23-53:1; Bajorek Decl. at ¶ 29 ("HDD manufacturers demand SNR gain generation-over-generation, making simulations to determine SNR gain over the prior generation chip in this initial phase a crucial design step."). LSI's simulations during its internal development use both synthetic waveforms and real drive waveforms and practice the Claimed Methods. Ex 10 at 25; Ex. 11; Ex. 12 at 7; Ex. 13; Bajorek Decl. at ¶¶ 28, 54. LSI would need a license to the CMU Patents to use those simulators for its internal, non-customer specific purposes; otherwise, LSI would infringe the Claimed Methods millions, if not billions, of times during each simulation with real waveforms. *See* Bajorek Decl. at ¶ 28.

LSI's internal, non-customer specific design work is critical to its business model. Chip development is an extremely expensive process for which LSI incurs significant costs even if no customer ultimately buys chips. *See* Bajorek Decl. at ¶ 30. Consequently, to maximize the return on its substantial research and development investment (and minimize the risk of ending up with no buyers), LSI creates common "building block" designs that it believes will be attractive to and can be customized for as many HDD manufacturers as possible. *Id.* at ¶¶ 30, 55. Because the semiconductor industry is extremely competitive and LSI cannot afford to fall behind in technological innovation, this internal development work is an ongoing process; LSI markets its new platform to multiple HDD manufacturers (as described below) and, in parallel, begins another round of internal research and development work for its next generation of chips. *Id.* at ¶¶ 25, 31.

## 2.    LSI's Work With HDD Manufacturers

Once LSI has internally designed and validated its next generation platform, it begins marketing that design to HDD manufacturers and must demonstrate the desirability of the new design to the HDD manufacturers in connection with a competitive bid process. Bajorek Decl. at ¶¶ 31, 34-37. During this proof of concept stage, LSI typically provides "black boxes" to the HDD manufacturers. The "black boxes" contain the simulation software created by LSI during its prior internal design phase, and allow HDD manufacturers to evaluate LSI's new platform, including the chip performance LSI is advertising, without LSI having to reveal how its proprietary technology operates. Ex. 8 at 224:10-225:10; Ex. 2 at 61:19-63:10, 111:19-112:18, 142:1-143:7; Ex. 14 at 21:19-22:8; Ex. 15 at 2; Bajorek Decl. at ¶¶ 35, 61. The "black box" must be a reliable indicator of

read channel performance and behave as the silicon (*i.e.*, the actual chip) will behave.  Ex. 2 at 142:1-143:7.  HDD manufacturers use these "black boxes," including in head-to-head "bake-offs" between potential suppliers, to decide which supplier to select to customize a chip to include in the HDD manufacturer's next generation of HDDs.  Bajorek Decl. at ¶ 35; Ex. 16 at 161:5-162:22; Ex. 6 at 208:10-20.  HDD manufacturers use black box simulators with both synthetic waveforms and real drive waveforms.  Ex. 17 at 68:4-69:14; Ex. 18 at 57:20-60:2; Bajorek Decl. at ¶ 35.  During the competitive sales process, LSI also supplies HDD manufacturers with early prototype samples, and both LSI and the HDD manufacturer test these samples to further evaluate the new platform's performance.  Ex. 7 at 32:3-33:8, 48:3-10; Bajorek Decl. at ¶ 36.  CMU contends that these black box simulators and the sample chips all perform the Claimed Methods when used and therefore infringe.

LSI engages in this proof of concept work to demonstrate to potential customers that its proposed chip performs as advertised and should be selected, among other competitive bids in the "winner take all" process, to be customized for an HDD manufacturer to use in its next generation of HDDs.  Ex. 9 at 54:21-56:4; Ex. 7 at 297:20-298:3; Bajorek Decl. at ¶¶ 31, 37, 60.  LSI seeks to win as many HDD manufacturers' competitive bid processes as possible for each chip generation, to maximize its return on investment for the very expensive chip development process.  Bajorek Decl. at ¶ 30.

If LSI is selected by an HDD manufacturer through this competitive selection process, LSI and the manufacturer then engage in several phases of testing, verifying, and optimizing the proposed chip design to customize it and confirm that it meets the performance characteristics demanded by that customer.  Bajorek Decl. at ¶¶ 32, 38-42, 61.  This is done using a variety of means, including use of Field Programmable Gate Arrays ("FPGAs"), drive taps, and bench testing.  *See* Ex. 19 at 83:14-84:6; Ex. 2 at 117:20-119:10; Ex. 20 at 72:24-76:10, 101:11-106:12; Ex. 14 at 156:2-157:11; Ex. 21 at 3, 25, 28; Bajorek Decl. at ¶¶ 39-40, 61.  LSI and its customers also use the Claimed Methods during this phase of the sales cycle.  *See* Bajorek Decl. at ¶¶ 27, 39-40.

After the customized design is finalized and its performance has been verified both internally and by the customer, LSI begins "tapeout," the process by which LSI generates a design file for the

chip that is transmitted to a foundry, which uses that file to generate masks and manufacture chip samples. Ex. 9 at 52:8-13; Ex. 4 at 55:18-23; Bajorek Decl. at ¶¶ 43, 61. LSI and its customers use these "engineering samples" to validate that the chip is functional and to test and optimize the performance of the samples, which includes use of the Claimed Methods. Ex. 9 at 30:8-32:23; Ex. 22 at 26:7-30:17; Bajorek Decl. at ¶¶ 45, 61. The final step of LSI's sales cycle is qualification of production-grade samples of the chips at the level of both the HDD manufacturer and the manufacturer's customers, which involves testing to confirm the chips have the expected reliability and life based on use. Ex. 9 at 30:8-32:23; Ex. 23 at 31:6-32:7; Bajorek Decl. at ¶¶ 46, 61. Once a chip has successfully completed qualification, it can enter into volume production. Ex. 9 at 45:15-46:2; Bajorek Decl. at ¶¶ 47, 64. At that point, the HDD manufacturer incorporates LSI's chips into its HDDs, which it then ships to its customers for their further use. Bajorek Decl. at ¶ 48.

## C.    CMU's Damages Claims

CMU seeks damages for LSI's own infringing uses of the Claimed Methods throughout the sales cycle described above (*i.e.*, direct infringement) as well as for indirect infringement resulting from the infringing uses of the Claimed Methods by (i) HDD manufacturers during the competitive bid selection process and customization work, and (ii) those manufacturers' customers when they use products that include LSI's chips. Pursuant to 35 U.S.C. § 284, CMU is entitled to damages adequate to compensate it for LSI's infringement and is "guarantee[d]" no less "than a reasonable royalty for the *use* made of the invention by the infringer." *CMU v. Marvell*, 807 F.3d at 1303-04 (emphasis added). One way to calculate a reasonable royalty is to determine an appropriate royalty rate and multiply that rate by an appropriate royalty base. *See, e.g.*, *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012). To determine the value of LSI's and its customers' use of the Claimed Methods, and by extension the appropriate royalty rate and base, CMU relies on the well-established damages methodology of a hypothetical negotiation. *See i4i Ltd. Partnership v. Microsoft Corp.*, 598 F. 3d 831, 854 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ("We have consistently upheld experts' use of a hypothetical negotiation … for estimating a reasonable royalty."). This approach "posits a 'hypothetical negotiation' between a 'willing licensor' and a 'willing licensee' 'to ascertain the royalty upon which the parties would have agreed had they

successfully negotiated an agreement just before infringement began." *CMU v. Marvell,* 807 F.3d at 1303-04.

### 1.   The Hypothetical Negotiation -- Date of First Infringement

The first step in positing a hypothetical negotiation is to determine the date of first infringement. *See Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993). Here, based upon documents and testimony developed in discovery, CMU contends the date of first infringement falls between 2001 and 2003, when LSI's predecessor Agere Systems, Inc. ("Agere") was internally developing the "Redtail" and "Copperhead" chips, both of which CMU accuses of infringement. Taking Redtail as an example, Agere began developing that chip in or around August 2001. *See* Dkt. 151-1 at Ex. 11 (Aug. 27, 2001 "Redtail Architecture and Features Discussion" agenda and slide deck). The Redtail chip was not designed for a specific customer. Ex. 7 at 111:17-20; Dkt. 151-1 at Ex. 12. In connection with the development of Redtail, Agere created and used computer software (*i.e.*, simulators) that infringed the Claimed Methods when operated. Agere authored both internal and HDD manufacturer-facing documents that showed the results from using the infringing simulators on real waveforms and demonstrated that the new platform provided a substantial improvement in SNR over the previous generation of chip. *See, e.g.*, Ex. 24 at 19-20; Ex. 25 at 496988-89; Ex. 26 at 1-9; Ex. 19 at 84:10-85:3; Ex. 27 at 24. Agere taped out the Redtail design and received samples in mid-2003, and ultimately shipped Redtail production chips to multiple customers, including Maxtor and Toshiba. *See* Ex. 28 at 2; Ex. 29 at Tab "Long Term View"; Ex. 30 at Tab "FY04".

### 2.   The Hypothetical Negotiation -- Facts At The Time Of First Infringement

After establishing the date of first infringement, "[a] key inquiry in the analysis is what it would have been worth to the defendant, as it saw things at the time, to obtain the authority to use the patented technology, considering the benefits it would expect to receive from using the technology and the alternatives it might have pursued." *CMU v. Marvell*, 807 F.3d at 1304. This inquiry can be properly addressed through the numerous *Georgia-Pacific* factors. *See i4i*, 598 F. 3d at 854 ("We have consistently upheld experts' use of … *Georgia-Pacific* factors for estimating a

reasonable royalty.").[3]  Here, CMU's damages analysis will include, among other things, consideration of the parties' circumstances at the time of the hypothetical negotiation, the state of the market for semiconductor chips, including the relative positioning of LSI's potential customers, evidence regarding the extent of LSI's expected uses of the Claimed Methods, the value of such uses, industry practices, prevailing understandings at the time of the scope and effect of have made rights, and subsequent legal rulings on have made rights, including the Court's OPSJ.

CMU has provided a detailed declaration from its damages expert, Catharine Lawton,[4] briefly summarizing some of the facts that are pertinent to valuing LSI's infringement.  Those facts parallel the factors endorsed by the Federal Circuit in *CMU v. Marvell* and include:

- **Value of the Invention**:  In 2002, Agere recognized that "[c]urrent drive programs and future drive programs are media noise dominant" and that "[e]xtending SNR gain beyond npml with parity requires a signal dependent architecture or even more complex structure such as iterative decoding. … Sub optimal implementation of signal dependent architectures is feasible while still achieving incremental SNR gain for next generation channels."[5] Lawton Decl. at ¶¶ 23-25, 28.  "Missing key IP" in the read channel, like signal dependent architecture, would mean a "Big Design Win Drought" that caused "Revenue Declines" and a "Revenue Hole."  *Id.* at ¶ 51; Ex. 31 at 7.

- **Value of Invention**:  Use of the CMU Patents for Agere at the time of the hypothetical negotiation was particularly urgent.  Agere's platforms with a signal dependent NPML were

---

[3] The *Georgia-Pacific* factors include: "(1) royalties the patentee has received for licensing the patent to others; (2) rates paid by the licensee for the use of comparable patents; (3) the nature and scope of the license (exclusive or nonexclusive, restricted or nonrestricted by territory or product type); (4) any established policies or marketing programs by the licensor to maintain its patent monopoly by not licensing others to use the invention or granting licenses under special conditions to maintain the monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee; (7) the duration of the patent and patent term; (8) the established profitability of the product made under the patent, including its commercial success and current popularity; (9) the utility and advantages of the patent property over old modes or devices; (10) the nature of the patented invention and the benefits to those who have used the invention; (11) the extent to which the infringer has used the invention and the value of that use; (12) the portion of profit or of the selling price that may be customary in that particular business to allow for use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements; (14) the opinion testimony of qualified experts; and (15) the results of a hypothetical negotiation between the licensor and licensee."  *i4i*, 598 F.3d at 853 n.3.

[4] Ms. Lawton also served as CMU's damages expert in the *CMU v. Marvell* case.  There, the district court remarked that "Ms. Lawton, in this Court's estimation, was remarkable as a witness. In the Court's thirty years of private trial practice and over six years on the bench, there have not been many witnesses (fact or expert) who have had such a grasp on all the facts and figures of a case…." 986 F.Supp.2d 574, 652 n.113 (W.D. Pa. 2013).  The Federal Circuit on appeal confirmed that Ms. Lawton was qualified and her substantive methodology was appropriate.  807 F.3d at 1303.

[5] The Claimed Methods are a "signal dependent" architecture.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

behind its main competitor, Marvell.  Agere, which was developing these new platforms for all customers, was relying on the signal dependent NPML to achieve better SNR gain than that provided by Marvell's chips.  The SNR gain is important, because if Agere could not offer that SNR gain like its competitors, it would be "out" of the competitive bid selection process.  Lawton Decl. at ¶ 30-32.

- **Market**:  In March 2002, the HDD manufacturers included not just Seagate and HGST, but also Maxtor, Western Digital, IBM, Toshiba, Fujitsu, and Samsung.  Lawton Decl. at ¶ 36.

- **Market Position**:  Agere was the market leader.  Marvell was its principal competitor and was gaining ground.  In 2004, Agere acknowledged that "Read Channel Competition with Marvell is occurring at every customer."  Lawton Decl. at ¶¶ 30, 33, 46-50.

- **Market Position**:  In 2004, Agere's largest customer by read channel and SoC revenue was Maxtor ($277.24 million).  Seagate was Agere's second largest customer, but provided revenues substantially less than Maxtor ($151.43 million).  Agere's read channel and SoC revenue from other HDD customers was relatively nominal:  HGST ($45.98 million), Toshiba ($240,000) and Samsung ($10,000).  Lawton Decl. at ¶ 42.

- **Type of Market**:  Time to market is of utmost importance for read channel/SoC suppliers.  Bajorek Decl. at ¶ 25; Lawton Decl. at ¶ 32.  Agere was behind Marvell in introducing "signal dependent architecture" to address the dominant media noise in HDD products.  Lawton Decl. at ¶¶ 30-32.

- **Type of Market**:  As part of winning the time to market race, suppliers must substantially invest in and succeed in research and development ("R&D") of chip platforms.  Bajorek Decl. at ¶¶ 25, 56; Lawton Decl. at ¶ 51.

- **Type of Market**:  Read channel suppliers seek to leverage their read channel platform R&D investment by developing versions of the read channel platform for multiple HDD market segments that can be sold to every HDD manufacturer.  That is because the suppliers need to maximize their return on the substantial amounts invested in their internal R&D.  Bajorek Decl. at ¶ 30; Lawton Decl. at ¶¶ 13-19, 45, 54-56.

- **Type of Market**:  Suppliers of read channel chips and SoCs cannot achieve "design wins," the lifeblood of the semiconductor industry, without internal R&D investment.  Lawton Decl. at ¶¶ 14-16, 51.

*See also id.* at ¶¶ 73-76 (summary).  In light of the foregoing, "in 2001 to 2003, the potential protection attendant to Seagate's have-made rights (beginning in March 2001, when the '839 Patent issued) and HGST's have made rights (beginning no earlier than December 31, 2002 and no later than December 3, 2003 when the IBM-CMU Settlement Agreement [conferring those rights] was executed) would not enable Agere to execute its strategy, which depended on its ability to develop and market its read channel platforms to all HDD customers.  Furthermore, the potential protection attendant to Seagate's and HGST's have-made rights would not protect Agere's business with HDD industry leader, Maxtor, who was Agere's largest customer in 2004, and the first to develop an SoC based on Agere's alleged infringing 'Redtail' platform -- or any other HDD customers including Western Digital, Fujitsu, Toshiba, Cornice and GS Magicstor."  *Id.* at ¶ 76.  Furthermore, the *Georgia-Pacific* factors include the licensing practices of the parties, the licensing practices in the

13

industry, and agreements for the CMU Patents, including the *CMU v. Marvell* settlement agreement.
*See supra* at n.3.  As Ms. Lawton notes, in her experience, "semiconductor and HDD industry
license agreements do not have royalty payment terms that provide exclusions based on an end
customer's have-made rights.   For example, the 1998 CMU-Showa Denko license does not exempt
Showa Denko's sales to Seagate from royalties based on Seagate's have-made rights under CMU's
'426 Patent [which Seagate had pursuant to the same DSSC Agreement at issue here]."  Lawton
Decl. at ¶ 76; *see also id.* at ¶ 71.

### 3.    The Hypothetical Negotiation -- Determining a Metric for the Value of LSI's Infringing Uses of CMU's Patented Method

Ultimately, the hypothetical negotiation is a construct intended to arrive at a "reasonable"
royalty—*i.e.*, one that reflects the value of the defendant's infringement.  *See CMU v. Marvell*, 807
F.3d at 1303-04.  Where a patent owner accuses a defendant of infringing an apparatus claim, the
sale of the apparatus itself is the infringing act, making the number of infringing sales or the revenue
derived from those sales a natural "royalty base" to which a royalty rate is applied to determine the
reasonable royalty.  *See, e.g.*, *Whitserve*, 694 F.3d at 27.  With method claims like those CMU
asserts, however, there are no infringing ***sales***—method claims are infringed solely by their ***use***.
Thus, with method claims, a hypothetical negotiation must establish an appropriate metric to value
those uses.

For certain methods, an appropriate metric might be a rate applied to a royalty base of the
number of times the method is performed.  Here, however, such an approach creates substantial
challenges.  Every time an HDD incorporating an accused LSI chip is operated to read data, the
Claimed Methods are performed billions of times ***per second***, and neither LSI nor its customers track
such uses.  Bajorek Decl. at ¶ 49.  As the district court explained in *CMU v. Marvell* about the
Claimed Methods:

> [Q]uantifying a per use fee in this case is nearly impossible, as the
> patented method is literally run hundreds of millions of times per
> second. … By the Court's rough calculation, assuming an eight hour
> work day, and 100 million runs per second, there are a minimum of 2.88
> trillion infringing uses, per single chip or simulator, per day.  Given
> same, if Marvell would rather negotiate a fee based on such use, the

14

Court is certain CMU would be more than willing, but such astronomical numbers make this method extremely impractical.

986 F.Supp.2d at 636.

Because of the impracticability of quantifying uses of the method directly, as well as HDD industry practice, CMU and Agere likely would have agreed, in the hypothetical negotiation, to a running royalty that applies a royalty rate to the number of read channel chips and SoCs sold by LSI. Indeed, both the district court and the Federal Circuit in *CMU v. Marvell* found that the number of chips sold is an appropriate metric to value infringing uses under CMU's infringement theories. *See CMU v. Marvell*, 807 F.3d at 1304 (approving use of the number of chips sold as metric for value of use during sales cycle); 986 F.Supp.2d at 636-37 ("[T]he Court ruled on several occasions that Marvell's sales" "that arose from the sales cycle" "could be an appropriate metric for assessing the value of the use of the patented methods in the U.S. by Marvell and its customers" "during this sales cycle[.]"); *id.* at 651 n.112 ("[T]he [non-infringing] sales to Seagate could still demonstrate the value to Marvell of infringing CMU's patents."). The Federal Circuit specifically explained, "a per-unit royalty [on chips sold] here allow[s] [defendant's] payments to vary with the sales its infringing activity produced, which are a good way of valuing what it was worth to [defendant] to engage in that activity." 807 F.3d at 1304.

### D.    LSI's MPSJ

With full knowledge of CMU's damages claims, LSI obtained permission to file a summary judgment motion on its implied license defense. In its MPSJ, LSI asked the Court to rule on only one question: whether LSI had an implied license to the CMU Patents through so-called "have made" rights owned by LSI's customers, Seagate and HGST. *See* Dkt. 145-4 at Statement of Relief ("Defendants request that summary judgment be granted in their favor on their implied license defense with respect to alleged infringement by Defendants in connection with products supplied to Seagate and HGST, pursuant to the 'have made' rights of these licensees of the asserted patents."). That is, LSI sought a determination limited to the ***existence*** of an implied license—not on the ***effect*** the existence of an implied license would have on CMU's damages claims.

Consistent with that approach, LSI made only unsupported attorney argument about the supposed effect of an implied license to CMU's damages. *Id.* at 1-2, 24. Indeed, despite filing two

15

1    briefs and having oral argument, LSI never cited to even a *single* legal authority to support its

2    passing, conclusory assertion that a finding of an implied license "would remove from this case the

3    vast majority of revenue on which CMU relies as the damages base…." *Id.* at 2.  The Court itself

4    recognized that LSI had failed to address substantively even what products the implied license might

5    cover, let alone the effect the existence of an implied license would have on damages.  Dkt. 196 at 9

6    (determining that "on the record as it currently stands" the Court cannot determine what products are

7    "covered by the implied license").  As a result, the Court ordered the parties to meet and confer on

8    the list of products and simulators subject to the Court's OPSJ.  *Id.*

9        **E.    Parties' Meet and Confer**

10       During the meet and confer process, which LSI initiated almost two months after the Court's

11   September 18, 2020 OPSJ and less than a month before the Court-ordered deadline for a follow-up

12   summary judgment motion, LSI consistently ignored the scope of its MPSJ.  Instead, it demanded

13   CMU agree to an unwarranted extension of the OPSJ to contested damages and infringement proof

14   issues that were never before the Court.  Specifically, LSI demanded that CMU agree that: (i) all

15   chips sold to Seagate and HGST were "out of the case" and could not be considered in connection

16   with CMU's damages analysis and (ii) the only simulators that remained in the case for purposes of

17   infringement and damages were two specific instances where LSI reported results of simulations

18   using simulators accused of infringement.  As reflected in the correspondence attached to LSI's

19   Motion, CMU would not agree to LSI's demands.  *See generally* Dkt. 208-10.  CMU and LSI,

20   however, did agree on: (i) a specific list of the Accused Devices LSI supplied to Seagate and HGST

21   during the period of September 1, 2011 through April 3, 2018 (reflected in Appendix A to LSI's

22   Motion), and (ii) an identification of the related simulators.  *Id.*

23       In a bid to distract from its own overreach, LSI now blames CMU for a purported

24   unwillingness to "acknowledge that [the devices in Appendix A to LSI's Motion] are 'supplied

25   under the implied license.'"  Dkt. 208-4 at 3, 4.  But LSI's accusation ignores that CMU, among

26   other things, was intent on preserving its position for appeal.  CMU was unwilling to stipulate to the

27   "supplied under the implied license" language because doing so might suggest CMU agreed that an

28   implied license existed, which could prejudice its position on appeal that no such license in fact

16

exists.[6]  As a practical matter, CMU agreed to an identification of products potentially protected by the implied license found in the OPSJ, *see* Appendix A of LSI's Motion, and LSI's assertion that CMU improperly derailed a potential stipulation is not supported by the record.

## III.   ARGUMENT

### A.   The Effect of an Implied License from Seagate and HGST on CMU's Damages Is A Disputed Issue of Fact Not Addressed by the Court in the OPSJ.

Using the Court's meet and confer order as a foil, LSI now seeks to convert its MPSJ into an order limiting CMU's damages claim while avoiding all of the necessary fact-finding on what constitutes a reasonable royalty under the circumstances of this case.  Although the parties reached agreement on the list of read channel chips and SoCs that LSI sold to Seagate and HGST during the damages period (*i.e.*, September 1, 2011 through April 3, 2018), LSI refused to enter into that stipulation.  Instead, LSI filed this Motion seeking an order from the Court—before the parties have even exchanged any expert reports—excluding every such chip from consideration in CMU's damages claims as a matter of law.  The Court should deny LSI's Motion for the following reasons.

*First*, LSI never made any substantive legal arguments in its MPSJ to support its conclusory assertions about the effect an implied license may have on CMU's damages claims.  To the contrary, LSI focused its MPSJ narrowly and exclusively on law and evidence regarding the *existence* of have made rights, an issue that speaks directly only to liability for certain potentially infringing acts.  LSI did include in its briefing a handful of comments in passing about its belief regarding the effect of have made rights on damages, but those tangential comments were unsupported by law or facts in a motion where LSI bore the burden of proof.  *See Perdana Capital, Inc. v. Chowdry*, No. 09-1479, 2010 WL 1145933 at *5 (N.D. Cal. Sept. 2, 2010) (declining to consider "lawyers' arguments, without any supporting evidence").  By not supporting those assertions with any facts or law, LSI cannot properly argue that they foreclose CMU's damages claims and require a grant of summary

---

[6] CMU respectfully submits that preservation of this position is not an idle exercise.  The district court in *CMU v. Marvell* held that the very same have made rights at issue here did not extend to Seagate's supplier (there Marvell).  *See* 890 F.Supp.2d 602, 609 (W.D. Pa. 2012); 986 F. Supp. 2d at 651.  Furthermore, this Court's analysis of the language in LSI's agreements with Seagate and HGST appears to be premised upon the *disputed* fact that CMU's proffered interpretation of those agreements was "unusual" and that the provisions in question were merely "boilerplate" and "conventional IP reservation[s]."  Dkt. 196 at 8.

judgment.  *See Tri-Valley Cares v. U.S. Dept. of Energy*, No. 08-1372, 2010 WL 11530284, at *8 (N.D. Cal. Sept. 30, 2010) (finding moving party could not seek summary judgment on issue where it made a "one-sentence long argument" and "fail[ed] to present any argument or decisional authority to support their contention"); *see also 19 Tao Vega LLC v. Holo Ltd.*, No. 19-5640, 2019 WL 8263434 at *6 (N.D. Cal. Dec. 18, 2019) ("The Court has no obligation to consider inadequately briefed arguments" where "[n]o supporting argument or citations to the record are offered"); *Chem v. N.Y. Life Ins. Co.*, No. 97-1780, 1997 WL 792942 at *3 (N.D. Cal. Oct. 21, 1997) (declining to consider argument that was not supported with any applicable authority or analysis).  And, indeed, this Court found LSI failed to even identify what products were potentially covered by the OPSJ, demonstrating that LSI could not carry its burden on the separate legal issue of damages.

  ***Second***, LSI's request is at odds with the fundamental principles of patent infringement damages.  The Federal Circuit has repeatedly emphasized that patent damages calculations are heavily fact-dependent.  *See, e.g.*, *Mars*, 527 F.3d at 1366 ("The correct measure of damages is a highly case-specific and fact-specific analysis."); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003) ("The amount of damages based on a reasonable royalty is an issue of fact."); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) ("Calculation of a reasonable royalty depends on the particular facts of each case.").  Courts have specifically identified the question of an appropriate royalty base as one such aspect of the reasonable royalty that is an issue of fact for trial.  *See, e.g.*, *TQP Dev., LLC v. Merrill Lynch & Co., Inc.*, No. 2:08-CV-471-WCB, 2012 WL 3283356, at *4 (E.D. Tex. Aug. 10, 2012) (Bryson, C.J., by designation) ("Whether [the expert's] choice of a royalty base is an appropriate one is a question for trial.").

  The law likewise is clear that a reasonable royalty for infringing use (like LSI's internal uses that practice the Claimed Methods) can be calculated using a royalty base that includes non-infringing acts, such as LSI's sales to Seagate or HGST.  *See, e.g.*, *CMU v. Marvell*, 807 F.3d at 1304 (approving use of non-infringing sales as metric for value of use during sales cycle); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) (affirming reasonable royalty based in part on cost savings to infringer and consideration of infringer's profits from sales of goods often sold in conjunction with infringing saw); *Fujifilm Corp. v. Benun,* 605 F.3d 1366, 1372-73 (Fed. Cir.

2010), *cert. denied*, 131 S. Ct. 829 (2010) ("The fact that bundling and convoyed sales affected [plaintiff's] estimate of both the royalty base and the royalty rate is thus not sufficient reason to nullify the jury's award.") (quoting *Interactive Pictures v. Infinite Pictures*, 274 F.3d 1371, 1385 (Fed. Cir. 2001))*; Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (explaining that profits from the non-infringing sale of eyeglasses could be relevant to the determination of a reasonable royalty for infringing use of patented eyeglass display).

Courts also have recognized that parties to real-world licenses often do not distinguish between infringing and non-infringing conduct for a number of practical reasons, and have deemed that a ***factual*** consideration relevant to the hypothetical negotiation. *See, e.g.*, *Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 833-34 (1950) (holding license agreement to pay royalties based on all sales, including non-infringing sales, is not patent misuse where "it was a convenient mode of operation designed by the parties to avoid the necessity of determining whether each type of [licensee's] product embodies any of the [licensor's] patents" and "[s]ound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement"); *Fujifilm*, 605 F.3d at 1372-73 (approving jury's reasonable royalty award based on expert model that included infringing and non-infringing products in royalty base "as an accepted technique" "to avoid repeated disputes [between the parties] over what percentage of" defendant's products infringed); *cf. Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009) ("[W]e have never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence. Such a strict requirement could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations. As shown by the evidence in this case, companies in the high-tech computer industry often strike licensing deals in which the amount paid for a particular technology is not necessarily limited to the number of times a patented feature is used by a consumer. A company licensing a patented method often has strong reasons not to tie the royalty amount strictly to usage."). In fact, the semiconductor industry commonly does exactly that. *See* Lawton Decl. at ¶ 76 ("[B]ased on my experience, semiconductor and HDD industry license agreements do not have royalty payment terms that provide exclusions based on an end customer's

19

1  have-made rights."); *id.* at ¶ 64 (explaining that, for example, "[i]n the semiconductor and HDD

2  industries," for the sake of "administrative convenience and because of the complexity of the

3  semiconductor supply chain," "patent licenses typically grant worldwide rights and royalties are paid

4  based on worldwide sales, even if the Licensor does not have patents in all countries").

5         Pursuant to that case law, because the chips LSI sold are solely a metric for the value of

6  infringing use under CMU's damages claims, the Court's finding of an "implied license for LSI

7  under Seagate's and HGST's have made rights" (Dkt. 196 at 9) does not, absent further factual

8  development, mandate a particular reasonable royalty calculation.  And, even though LSI bears the

9  burden to do so, LSI has never demonstrated that there are no disputes of material fact regarding the

10  appropriate considerations for CMU's reasonable royalty calculation.  Indeed, LSI has never

11  addressed how the parties to the hypothetical negotiation in 2001-2003 would have accounted for

12  LSI's need to engage in non-customer-specific internal development work in advance of beginning

13  its customer-specific engagements.  *See supra* at Section II.B.1.  Doing so depends upon a myriad of

14  factual considerations, *see i4i*, 598 F.3d at 853 n.3, that are outlined in part in the Lawton

15  Declaration but that LSI prefers to ignore.  Based upon the hypothetical negotiation, there may have

16  been multiple royalty base options CMU and Agere might have agreed upon to value Agere's (and

17  LSI's) infringing uses, including its internal development work, by, for example, using (i) a royalty

18  base encompassing ***all*** products sold stemming from that development work, whether or not those

19  chips ultimately would be sold to customers with their own licenses to the CMU Patents,[7] (ii) a

20  royalty base excluding all chips sold to Seagate and HGST, as LSI contends, or (iii) some

21  combination of (i) and (ii).  How the parties would have valued the license Agere needed, and how

22  they would have used chips sold to Agere's/LSI's customers as a metric, are fact-intensive questions

23  not amenable to summary judgment, let alone to the early summary judgment LSI seeks.

24         Nonetheless, LSI attempts to bootstrap the OPSJ into a damages exclusion order without any

25  meaningful discussion of the parties' respective damages theories and positions, or of how LSI

26

27  ───────────────
[7] In *CMU v. Marvell*, chips sold to Seagate were included in the damages calculations
notwithstanding Seagate's license from CMU (the same license at issue in this case).  *See* 807 F.3d

28  at 1304; 986 F.Supp.2d at 636-37; *id.* at 651 n.112 ("[T]he [non-infringing] sales to Seagate could
still demonstrate the value to Marvell of infringing CMU's patents.").

1    contends the OPSJ fits into the hypothetical negotiation framework that both parties agree will

2    govern the determination of a reasonable royalty.  LSI has now had ample opportunity to provide

3    such discussion—CMU has disclosed its damages theories to LSI in excruciating detail, not only in

4    its damages contentions and in negotiations over the OPSJ stipulation, but also by virtue of the fact

5    that CMU tried to verdict and appeal *CMU v. Marvell*, which involved the same CMU Patents and in

6    which CMU advanced the same damages theories, and where the district court rejected precisely the

7    same implied license defense LSI raised here (*see* 890 F.Supp.2d at 609; 986 F. Supp. 2d at 651).

8           ***Finally***, because LSI has no factual or legal arguments to offer the Court in support of its

9    requested relief, LSI instead resorts to mischaracterizing CMU's damages contentions.  Specifically,

10   LSI points to a supposed "admission" CMU made in its damages contentions that Seagate chips

11   should be excluded from the royalty base.  Dkt. 208-4 at 2, 5-6.  That supposed "admission,"

12   however, demonstrates no more than the fact that CMU's Damages Contentions, served more than

13   half a year before LSI had filed its MPSJ, included, among a range of alternative damages

14   calculations, a royalty base scenario excluding chips sold to Seagate.  LSI makes much of this,

15   cutting and pasting onto the very first page of its brief two tables from CMU's Damages Contentions

16   showing estimates with and without chips sold to Seagate in the royalty base.  *See* Dkt. 208-4 at 1.

17   In its brief, however, LSI does not inform the Court of CMU's explanatory footnote addressing the

18   inclusion of a royalty base without chips sold to Seagate in its Damages Contentions.  In the footnote

19   LSI omitted, CMU specifically explained that because "Defendants contend that sales to Seagate are

20   not subject to CMU's damages claims," it was providing "a damages estimate both including and

21   excluding Defendants' sales to Seagate" "***out of an abundance of caution***."  *See* Dkt. 208-8 at 6

22   n.11 (emphasis added).  This kind of standard preservation effort by a party to address in its initial

23   contentions an opponent's positions with which it steadfastly disagreed (and continues to disagree)

24   cannot be construed, as LSI argues, as some sort of admission or concession mandating summary

25   judgment.[8]  *Cf. Twilio, Inc. v. Telesign Corp.*, No. 16CV06925LHKSVK, 2017 WL 5525929, at *2

26

27   _____
     [8] Notably, LSI also ignores that CMU did not have sufficient time to amend its damages contentions
     to specifically address the Court's OPSJ as the OPSJ was entered on September 19, 2020 and
28   the Court stayed the case on September 28.  *See Looksmart Group, Inc. v. Microsoft Corp.*, 386 F. Supp.
     3d 1222, 1233 (N.D. Cal. 2019) (explaining that damages contentions "must disclose the basis for its

(N.D. Cal. Nov. 17, 2017) ("Local Rule 3-8 does not require certainty, and it is not fairly interpreted as replacing the robust analysis of a patent damages expert report.").

Likewise, LSI makes much of CMU's unremarkable "admission" that a ruling on the MPSJ would be "an important issue in the case." Dkt. 208-4 at 6. CMU's statements at the April 18, 2019 Conference that LSI cites to support its assertion should be read as indicating that a ruling favorable to CMU on the MPSJ would facilitate settlement by eliminating a potential defense that LSI viewed as critical. *See* Dkt. 91 at 12-17. CMU made no concession as to the specific effect of any ruling on the narrowly focused MPSJ, which remains an issue that must be addressed after, at a minimum, the benefit of appropriate expert testimony and briefing. LSI's Motion simply is the wrong vehicle to address it. Because LSI has never even attempted, in this Motion or its MPSJ, to satisfy its burden of proving that there are no disputed issues of material fact regarding the effect of the Court's OPSJ on damages and does not provide any legal authority for the proposition that the OPSJ precludes CMU from addressing chips sold to Seagate and HGST in its damages analysis, the Court should deny LSI's Motion.

**B.    LSI's Identification Of Accused Simulators Immune From Liability Is Factually and Legally Incorrect**

Inexplicably, LSI also seeks use the OPSJ ruling regarding the existence of an implied license for a completely unrelated purpose, *i.e.*, to exclude CMU from presenting any evidence of infringing simulator use other than two documents reflecting results from simulations run on two specific days. LSI's request has no basis in law or fact.

As an initial matter, the record does not support LSI's feigned ignorance as to which simulators CMU accuses of infringing the Claimed Methods. CMU clearly identified in its Amended Infringement Contentions the specific source code files created by LSI that, when used, run or executed on a computer, mimic the infringing operation of detectors in LSI's read channel chips and SoCs, *i.e.*, compute branch metric values by applying a set of signal-dependent branch

---

expert's specific theory of recovery" and can be amended without leave of court to address relevance of evidence as it changes).

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

metric functions to actual readback signal samples.[9]  Ex. 1.  LSI's own witnesses testified about these source code files and the simulations run using the files, without any difficulty connecting the two.  *See, e.g.*, Ex. 14 at 19:13-20:23 (testimony that LSI "wrote out the simulator, the code, C code, … run from end to end, from the waveform generator to the output… to benchmark its performance."); Ex. 32 at 100:6-20 ("You could put [drive waveforms] into your simulator and simulate them.").[10]

Moreover, the OPSJ asked only that the parties stipulate to the identity of the simulators subject to the Court's finding of an implied license.  LSI itself repeatedly argued in its MPSJ that simulations it performed in connection with the products it sold to Seagate and HGST were the simulations covered by the implied license.  *See, e.g.*, Dkt. 145-4 at 1 (arguing activities covered by LSI's claimed implied license were "the simulations that were performed as part of the development" of products sold to Seagate and HGST); *see also id.* at 6, 22-24.  That, in turn, is what CMU proposed to LSI for the parties' stipulation, and LSI even agreed that CMU's proposal "in the general sense [identified the] simulators [that] are covered by the Court's summary judgment order." Dkt. 208-10 at 9-10.  LSI nonetheless refused to stipulate to CMU's proposal and now asks the Court to enter an order deeming "All Accused Simulators" to be subject to the implied license found by the OPSJ, except for the two simulations memorialized in the two documents LSI identified in its Motion.[11]

In effect, where the Court sought the parties' assistance solely to clarify the universe of Seagate- and HGST-related simulators, LSI asks the Court to ignore the parties' agreement on that

---

[9] For ease of reference, CMU defined the simulations run using the identified computer software as the "Accused Simulators."

[10] LSI also complains that CMU supposedly failed to "meaningfully respond" to an interrogatory requesting detailed information regarding the "date and circumstances" of each infringing simulation run by LSI.  Dkt. 208-4 at 10.  But CMU served LSI with an interrogatory seeking equivalent information regarding simulations LSI or its customers ran using the simulator source code files identified in CMU's Amended Infringement Contentions and, in response, LSI declined to identify the date and circumstances of even a single simulation, objecting, *inter alia*, on a host of grounds, including that it called for expert opinion and was burdensome due to potential loss of evidence.  Ex. 33 at 2-3.

[11] LSI has also asked that "All Accused Simulators," except for the two specific simulation results identified in its Motion, be excluded from the royalty base.  This is an unfounded request that the Court should reject for the reasons set forth *supra* in Section III.A.

1    universe and instead rule on the proof CMU may proffer to the fact-finder regarding even the

2    separate universe of uses of the simulators that are **not** subject to the OPSJ because they are **not**

3    exclusively for chips sold to Seagate or HGST.  This demand turns the Court's request on its head

4    and is at odds with applicable law.

5          Specifically, LSI seeks to preclude CMU from proving use of simulators, even if not used to

6    develop Seagate- and HGST-specific products, by anything other than direct evidence, *i.e.*,

7    documents recording that a specific simulation occurred on a specific date and yielded particular

8    results.  The Federal Circuit has roundly rejected LSI's position, making clear CMU is not limited to

9    such direct evidence:

> A patentee is entitled to rely on circumstantial evidence to establish infringement: 'If [Defendant] is arguing that proof of inducing infringement or direct infringement requires direct, as opposed to circumstantial evidence, we must disagree.  It is hornbook law that direct evidence of a fact is not necessary.' *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed. Cir. 1986), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665 (Fed. Cir. 2008) (en banc), *as recognized in VirtualAgility Inc. v. Salesforce.com, Inc.,* 759 F.3d 1307, 1318 (Fed. Cir. 2014).

15   *Tinnus*, 846 F.3d at 1204; *see also Lucent*, 580 F.3d at 1318-19 (finding circumstantial documentary

16   evidence and expert testimony sufficient for a finding of infringement, even absent direct evidence).

17         Incredibly, LSI requests such an overly broad, sweeping request to limit CMU to direct

18   infringement evidence without presenting any case law in support of its new position and without

19   acknowledging that it expressly disclaimed that it was seeking such relief in its MPSJ.  *See* Dkt. 155-

20   4 at 11 (arguing that "whether Defendants infringed the patents during this time period in connection

21   with any product development unrelated to Seagate or HGST, also a disputed issue of fact, is not

22   before the Court…").  LSI also entirely ignores the extensive direct and circumstantial documentary

23   evidence in its own files and the testimony of its own witnesses that demonstrates LSI's uses of the

24   simulators identified by CMU to infringe the Claimed Methods and the importance and value of

25   those uses to LSI in achieving sales for every customer.[12]  *See supra* at Section II.B.1-2.  LSI further

26   seeks to prevent CMU from offering expert testimony regarding HDD industry practices of

---

27/28   [12] LSI may try to contest the import of this evidence in its reply brief, but that will serve only to highlight the substantial issues of material fact that LSI chose to avoid in its MPSJ and that cannot be decided in this procedural context.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

ubiquitous simulator use during the sales cycle, *see, e.g.*, Bajorek Decl. at ¶¶ 28-29, 34-35, 37, 40-41, 54, 61, which is precisely the kind of circumstantial evidence permitted by the Federal Circuit.

LSI's only argument for such preclusion is that CMU should be limited to documentary evidence it specifically cited in its Amended Infringement Contentions.  *See* Dkt. 208-4 at 9-10. That position is completely unrelated to the issue addressed in the MPSJ and is a non-starter under the law.  *See DCG Sys.*, 2012 WL 1309161 at *2 (explaining that infringement contentions under the Local Patent Rules "do not, as is sometimes misunderstood, require the disclosure of specific evidence nor do they require a plaintiff to prove its infringement case." (internal citations omitted)); *MLC Intellectual Property, LLC v. Micron Tech., Inc.*, No. 14-cv-03657, 2019 WL 1865921 at *2 (N.D. Cal. April 25, 2019) (same); *Digital Reg. of Tex. LLC v. Adobe Sys, Inc.*, No. CV 12-01971, 2014 WL 1653131 at *2 (N.D. Cal. Apr. 24, 2014) (distinguishing infringement contentions, which "need not disclose specific evidence," from expert reports which "must include a complete statement of the expert's opinions, the basis and reasons for them, and any data or other information considered when forming them."); *DSS Tech. Mgmt., Inc. v. Apple, Inc.*, No. 14-cv-05330, 2020 WL 210318 at *2 (N.D. Cal. Jan. 14, 2020) (same). LSI's argument also ignores the record, which reflects that CMU identified additional exemplary testimony and documentary evidence regarding LSI's infringing simulator use in its responses to LSI's interrogatories.  *See, e.g.*, Ex. 34 at 2-4; Ex. 35 at 2-5.

LSI has fallen woefully short of its burden to establish that CMU should be precluded, as a matter of law, from offering any evidence of simulators outside of the two documents LSI identifies.

## IV.    CONCLUSION

For the foregoing reasons, CMU respectfully asks that this Court deny LSI's Motion.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD

Respectfully submitted,

Dated: January 11, 2020

*/s/ Patrick J. McElhinny*
Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Carnegie Mellon University*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 11th day of January, 2021, the foregoing document was served on all counsel of record who have consented to electronic service via the Court's ECF system.  Any other counsel of record who have not registered as an ECF user will be served by electronic transmission, facsimile transmission, or first class mail.

*/s/ Patrick J. McElhinny*
Patrick J. McElhinny

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:18-cv-04571-JD