Erik J. Halverson (SBN 333492)
erik.halverson@klgates.com
**K&L GATES LLP**
4 Embarcardero Center, Suite 1200
San Francisco, CA 94111
Tel: (415) 882-8200
Fax: (415) 882-8220

*Counsel for Plaintiff*
*Carnegie Mellon University*

*[Additional counsel on signature page]*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY,<br><br>                              Plaintiff,<br><br>     v.<br><br>LSI CORPORATION AND AVAGO TECHNOLOGIES U.S. INC.,<br><br>                              Defendants. | Case No. 3:18-cv-04571-JD<br><br>**CMU'S TRIAL BRIEF FOR MAY 5, 2025 TRIAL**<br><br>Pretrial Conference:  April 17, 2025<br>Time:  1:30 p.m.<br>Courtroom:  11<br><br>Hon. James Donato<br>Trial Date: May 5, 2025 |

Pursuant to Paragraph 4 of the Court's Standing Order for Civil Jury Trials ("Standing Order"), Carnegie Mellon University ("CMU") respectfully submits this trial brief in advance of the limited purpose jury trial scheduled to begin on May 5, 2025 ("Trial").

## I. INTRODUCTION

The Court's Standing Order directs the parties to file trial briefs "specifying each cause of action and defense remaining to be tried along with a statement of the applicable legal standard." ¶ 4. The factual issue that LSI has framed for the Trial, however, has no direct bearing on any cause of action or defense and will not advance resolution of this dispute, the Court's stated goal for this Trial. LSI seeks to have the jury "identify each Real Signal Simulation conducted between September 1, 2011 and March 1, 2018 that CMU has proven by a preponderance of the evidence was NOT conducted in connection with developing products for HGST or Seagate," by specifying the "Date" they were run and the "Real Signal Used." *See* LSI Proposed Verdict Form. Yet LSI itself knows this exercise is impossible, having previously expressly represented to the Court that "LSI does not maintain logs identifying when simulations are executed, the file used to run the simulation, or the type of signal (real v. synthetic) that is used in each simulation." ECF 216 at 11 n.4. And although LSI claims it has done so only rarely, LSI admits that it has run Accused Simulators with real waveforms during the period of September 1, 2011 through April 3, 2018 (the "Damages Period"). *See* LSI MIL No. 1 at 2.

The law is clear that one-to-one direct evidence of simulation runs of the kind LSI demands is not necessary to support either a proper finding of infringement or an appropriate determination of damages for such infringement. *See* case law cited *infra*. That is particularly the case here since the parties agree that a reasonable royalty for LSI's alleged infringement would *not* be calculated on a per-simulation basis. Indeed, as LSI's own damages expert admitted at his recent deposition (which took place after the Court issued its orders regarding the scope of the Trial), he did not attempt to quantify the precise number of simulations and the "number of simulations" was "not impactful to [his] damages assessment." Ex. 1 at 41:11-42:4, 213:20-214:24. Instead, both experts provide competing scenarios calculating a reasonable royalty based on sales of SoCs (LSI's commercial products). Under that model, there is no dispute as to the number of SoCs

1  ("Accused Devices") sold to each customer. Both damages experts use the same detailed LSI
2  sales data for their calculations and report the exact same number of Accused Devices sold during
3  the damages period to Western Digital and Toshiba (customers not covered by the Court's Partial
4  Summary Judgment ruling)—███████ SoCs. Thus, there is no dispute between the parties
5  over the universe of so-called "covered" and "non-covered" Accused Devices.[1]

6      The chief dispute on damages in connection with the Court's have made rights rulings—and
7  the sticking point on meaningful settlement negotiations, as both sides agreed at December's
8  hearing—hinges on one factual issue: not the precise quantification of LSI's direct and indirect
9  infringing uses of Accused Simulators, but how the parties would have valued that necessary
10 infringement in the context of the hypothetical negotiation, including which Accused Devices
11 should be included in the reasonable royalty base in light of the Court's Partial Summary
12 Judgment ruling on allegedly licensed, *i.e.*, non-infringing, activities.

13     Contrary to LSI's repeated assertion that CMU is attempting to re-litigate the Court's
14 rulings, the Court itself identified that issue as a key disputed question of fact for trial in its second
15 summary judgment ruling on LSI's implied license defense. ECF 217 ("The effect, if any, of
16 LSI's non-infringing activities under the implied license on the calculation of a reasonable royalty
17 is also a disputed question of fact that is poorly suited for summary judgment. … This too will be
18 resolved at trial.").[2] CMU has stayed true to the Court's rulings and the Court's stated purpose for
19 the Trial by seeking to have the jury provide meaningful input into that disputed factual issue via

---

21 [1] CMU respectfully disagrees with the Court's rulings on LSI's alleged have made rights implied
22 license defense, ECF 196, 217, and, notwithstanding any statements made herein, reserves all
23 rights for purposes of appeal or otherwise.

24 [2] Moreover, any citation by LSI to the law of the case doctrine is "wholly inapposite. The doctrine
25 simply does not impinge upon a district court's power to reconsider its own interlocutory order
26 provided that the district court has not been divested of jurisdiction over the order." *City of L.A. v.*
27 *Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001); *Valenti v. Dfinity USA Research*
28 *LLC*, 2023 WL 3331310, at *4 (N.D. Cal. May 8, 2023) (Donato, J.).

CMU'S TRIAL BRIEF FOR MAY 5, 2025 TRIAL            CASE NO. 3:18-cv-04571-JD

the questions on CMU's proposed verdict form:

1. Do you find that CMU has shown, by a preponderance of the evidence, that LSI used accused simulators[3] with real drive waveforms for non-customer-specific internal development work in the United States between September 1, 2011 and April 3, 2018?

2. Do you find that CMU has shown, by a preponderance of the evidence, that LSI used accused simulators with real drive waveforms for development work for Western Digital or Toshiba in the United States between September 1, 2011 and April 3, 2018?

3. Do you find that CMU has shown, by a preponderance of the evidence, that LSI induced use of accused simulators with real drive waveforms by Western Digital or Toshiba in the United States between September 1, 2011 and April 3, 2018?

4. If you answered "Yes" to at least one of the questions above, do you find that an exact quantification of the number of such uses cannot be determined?

5. Do you find that the magnitude and nature of such uses was such that CMU and LSI would have included SoCs sold to all customers in the royalty base if they negotiated a license agreement to cover LSI's use?

Unlike LSI's proposed approach (which asks the jury to perform an impossibly precise quantification that its own expert admits is irrelevant to damages), CMU's proposed approach accords with the law and the facts. And it ensures that the jury's determinations at the Trial are a meaningful step toward resolution and make a substantive difference to the ultimate posture of the case, so that the Court's, the jury's and the parties' time is not spent in vain.

**II.   ARGUMENT**

A full jury trial in this case is set for October 20, 2025. In advance of that full jury trial, and in connection with the Court's prior rulings on LSI's alleged implied license defense under certain of its customers' have made rights to the Patents, *see* ECF 196, 217, the Court set a jury trial to "identify any remaining devices or simulators, and the quantities thereof, that were covered by the implied licenses so that there is no future dispute about the universes of covered vs. non-

---

[3] CMU's proposed verdict form provides the following instruction to jurors on this term: "As used herein, 'simulators' means detectors that are (i) used to simulate, on drive waveforms, performance and/or operation of the Accused Read Channel Chips and (ii) not designed for sale in large volumes to LSI's HDD customers. The Accused Simulators include both (i) computer implemented detectors that run software simulation programs and (ii) other hardware-based detectors, such as FPGAs, used to simulate the Accused Read Channel Chips."

3

covered devices and simulators." ECF 249.

There is no dispute between the parties as to the universe of allegedly "covered vs. non-covered" Accused Devices sold to customers with and without have made rights. LSI keeps detailed sales records reflecting the identities and quantities of devices sold to each of LSI's customers. Based on those records, the parties agree that the Accused Devices supplied to Seagate and HGST (the LSI customers with have made rights to the Patents) during the Damages Period are the devices listed in ECF 214-1. This is what the Court refers to as "covered devices." Conversely, Accused Devices not listed in ECF 214-1 are those sold to LSI customers without have made rights. This is what the Court refers to as "non-covered devices." Nor is there any dispute between the parties on the number of devices in each category. Based upon the parties' respective expert reports, the parties agree on the number of devices in each category; the parties agree, for example, that the number of non-covered devices" is ▇▇▇▇▇▇ SoCs sold to Toshiba and Western Digital during the Damages Period. *See* Ex. 1 at 211:1-20; Ex. 2 at Schedule 2.3.

There likewise is no dispute between the parties as to the identity of LSI simulator files accused in this case. CMU identified by name in its Amended Infringement Contentions the specific software simulation programs (i.e., source code files) created by LSI to mimic the infringing operation of the Accused Devices. *See* ECF 209-7 (excerpts filed under seal). LSI does not contest CMU's identification of the accused simulator files. Based on the closed universe of accused simulator files and the Court's finding that LSI had an implied license to the Patents from Seagate and HGST, CMU offered to stipulate that the universe of so-called "covered . . . simulators" consists of the simulations that were performed using the identified simulator files and the hardware-based detectors specifically as part of the process to customize its base platform to develop and sell the Accused Devices sold to Seagate and HGST (*i.e.* the agreed-upon list of products identified in ECF 214-1). *See* ECF 209-4 at 23 (filed under seal). But LSI refused. *Id.*

CMU asserts that LSI and its customers infringe the Patents when they simulate the detectors of the Accused Devices with real drive waveforms both (i) when running the simulation files in computer-implemented detectors and (ii) when using other hardware-based detectors, such as FPGAs, that are not designed for sale in large volumes to LSI's HDD customers. Notably, LSI

4

does not maintain business records, for example excel files or logs, "identifying when simulations are executed, the file used to run the simulation, or the type of signal (real v. synthetic) that is used in each simulation." Dkt. 216 at 11 n.4. Given LSI's lack of such recordkeeping, CMU instead will prove the above-specified uses of simulators using LSI PowerPoint presentations, LSI emails, and testimony by LSI employees that establish, among other things, the purpose and operation of the simulator files, the need to use the Accused Simulators in LSI's business and provide the results of tests run via the computer-implemented simulations and the hardware-based detectors.

At the Trial, CMU also intends to prove that LSI regularly performed simulations as part of its extensive read channel and SOC design, development, and sale process (the "Sales Cycle"). During this Sales Cycle, which LSI must undertake for every new generation of accused devices (SoCs) that it sells to HDD manufacturers, LSI undertakes multiple steps that proceed chronologically: (i) developing a proprietary, generic (i.e. non-customer-specific) base version of LSI's new SoC, through an internal design and development process; (ii) pitching that base version SoC to all of LSI's HDD manufacturer customers (both those with and without have made rights to the Patents); (iii) working with the interested customers to customize the generic base version SoC to each manufacturer's particular specifications; and (iv) ultimately reaching volume production of SoCs sold to particular customers, to be incorporated into the customers' HDDs. LSI's ubiquitous use of the simulations during this multi-step Sales Cycle included: (i) LSI performing the accused computer-implemented and hardware-based simulations with real drive waveforms for internal design and development work not specific to Seagate or HGST (or any other customer) in the United States during the Damages Period; (ii) LSI performing the accused computer-implemented and hardware-based simulations with real drive waveforms for development work specific to customers without have made rights in the United States during the Damages Period; and (iii) LSI inducing performance of the accused computer-implemented and hardware-based simulations with real drive waveforms by customers without have made rights in the United States during the Damages Period.

Thus, LSI ran so-called "non-covered" simulations that used the patented methods during the initial internal generic platform development phase of the Sales Cycle, even if some of its later

5

1  simulation uses allegedly were "covered" because LSI ran them to customize the previously
2  developed generic base platform for the subset of LSI customers with have made rights (i.e.
3  Seagate and HGST). And even in the later phases of the Sales Cycle, only a subset of simulations
4  were "covered" by the alleged implied license, because LSI not only conducted "non-covered"
5  simulations for customers without have made rights (and induced those customers to run such
6  simulations) but also engaged in ongoing internal work with simulations to refine its designs
7  independent of any customer.

8    In addition to proving those facts as to the Sales Cycle and simulation use, CMU intends to
9  proffer testimony from its industry expert, Dr. Christopher Bajorek, about what LSI's Sales Cycle
10 entails, including LSI's routine use of "non-covered" simulators with real waveforms in the U.S.
11 during generic platform development, ongoing internal work, and customer customization—
12 consistent with established industry practice. CMU's damages expert, Ms. Catharine Lawton, will
13 testify regarding how the parties would have treated such use when negotiating a license.

14   By way of specific example, CMU's evidence on LSI's simulator use that it intends to
15 present includes the following:

16 • LSI's Director of Read Channel Architecture, Bruce Wilson, testified that ▇
17 ▇
18 ▇
19 ▇ *See* Ex. 3 at 61, 96–98, 111–12, 125–27, 142–43, 159.
20 • An employee of LSI's Read Channel Architecture team, Weijun Tan, testified that ▇
21 ▇ *See* Ex. 4 at 100–03.
22 • James Bland, General Manager and Senior VP of LSI's HDD business, testified that ▇
23 ▇ *See* Ex. 5 at 47.
24 • Heather Christianson, LSI's Director of Account Marketing, testified that ▇
25 ▇ *See* Ex. 6 at 138–47.
26 • ▇
27 ▇
28 ▇ *See* Ex. 7 at -077, -527–49.

- [REDACTED] *See* Ex. 8 at -083.

- LSI's PowerPoint presentations and emails evidence the results of Accused Simulations, including the following examples:

[REDACTED]

The law is clear that CMU is entitled to establish use of accused simulators through circumstantial evidence like this, *e.g.*, evidence from PowerPoint presentations showing the results from an infringing simulation as opposed to a computer log detailing the date and time that a simulation was performed. *See, e.g., Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017) ("If [Defendant] is arguing that proof of inducing infringement or direct infringement requires direct, as opposed to circumstantial evidence, we must disagree. It is hornbook law that direct evidence of a fact is not necessary."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F. 3d 1301, 1334 (Fed. Cir. 2009); *France Telecom S.A. v. Marvell Semiconductor Inc.*,

1   82 F. Supp. 3d 987, 996 (N.D. Cal. 2015) ("[D]irect infringement may be proved by
2   circumstantial evidence."); *DCG Sys. v. Checkpoint Tech., LLC*, No. C 11-03792, 2012 WL
3   1309161 at *2 (N.D. Cal. April 16, 2012) (infringement contentions do not require the disclosure
4   of specific evidence of infringement).

5       Yet, despite that wealth of evidence, which would be more than enough to establish CMU's case even at the full trial in October, LSI takes the position that CMU must identify the "covered vs. noncovered" "universe[s]" of simulators by pinpointing and providing direct, documentary evidence of each specific use of the accused simulator files. And, according to LSI, this requires CMU to identify each separate simulation run, the specific date each simulation was run, the exact simulation file that was used and whether that simulation was run using synthetic or real waveforms. Not only does LSI know such information is not available to CMU, but LSI also knows that there is no legal requirement for this quantum of direct evidence.

    This precise quantification of the number and timing of LSI's uses of accused simulator of the kind LSI demands is irrelevant under both CMU's damages theory and the law. CMU's damages theory (i) relies on the fact that LSI made very valuable uses of the Patents by virtue of such uses being necessary to LSI's Sales Cycle and ultimate sales of SoCs and (ii) measures the value of those uses not by the number of uses (an unquantifiable fact) but instead by the quantities of Accused Devices sold. CMU's damages theory does not seek a per-*use* royalty. Such a royalty base would be both impossible to determine because LSI did not keep or produce records that track the number of simulations run by LSI or its customers and impractical to use given the sheer number of uses involved (it is undisputed the methods of the Asserted Claims are used *hundreds of millions to billions of times per second* when the simulations are run to read recorded data). *See CMU v. Marvell*, 986 F. Supp. 2d 574, 636, 642 (W.D. Pa. 2013) ("Quantifying a per use fee in this case is nearly impossible, as the patented method is literally run hundreds of millions of times per second. . . . By the Court's rough calculation, assuming an eight hour work day, and 100 million runs per second, there are a minimum of 2.88 trillion infringing uses, per single chip or simulator, per day. . . . [S]uch astronomical numbers make this method extremely impractical."); *Lucent*, 580 F. 3d at 1334 (Fed. Cir. 2009) ("A company licensing a patented method often has

8

strong reasons not to tie the royalty amount strictly to usage. The administrative cost of monitoring usage can be prohibitively expensive."); *Regents of Univ. of Minn. v. LSI Corp.* ("*UMN*"), No. 5:18-cv-00821-EJD, ECF 414 at 13 (N.D. Cal. Feb. 27, 2025) (citing *Lucent* and finding that because "UMN's claimed method would have run millions of times during the alleged infringement . . . any sort of per-use royalty" would be "impractical").

Instead, CMU seeks a reasonable royalty in which the royalty base consists of LSI devices (SoCs) sold as a result of Sales Cycles during which accused simulations were performed. Thus, sales of LSI's SoCs—the quantities of which are not in dispute—are a proxy metric to value, among other things, pre-sale infringing acts, *i.e.* the uses of CMU's patented methods during LSI's Sales Cycle that "enable[] and [are] needed to enable otherwise-unavailable profits" LSI obtained through sales of SoCs. *See Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024); *CMU v. Marvell*, 807 F.3d 1283, 1304 (Fed. Cir. 2015) (rejecting a challenge to a per-SoC unit license, like the one CMU seeks here, because "[i]n common-sense terms, a per-unit royalty here allowed [defendant's] payments to vary with the sales its infringing activity produced, which are a good way of valuing what it was worth to [defendant] to engage in that activity"); *UMN*, ECF 414 at 10–13 ("[S]ales of even noninfringing products can contribute to the damages calculation if there is a strong enough causal connection between those sales and the alleged infringement.").

LSI's demand for precise quantification of simulations also is out of step with the law. The Federal Circuit has stated that "we have never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence. Such a strict requirement could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *Lucent*, 580 F.3d at 1334. The law does not require CMU to identify precisely each individual act of infringement by LSI.

Moreover, the amount of CMU's damages demand is independent of a precise quantification of simulations run. *See UMN*, ECF 414 at 11 ("[T]he ultimate question is not whether a damages calculation is tethered to the number of uses of a claimed method so much as it is a question of whether the calculation compensates for the infringement in a broad sense."). A trial to determine the exact quantity of Accused Simulations run by LSI – the jury question

9

proffered by LSI – therefore does not focus on finding a fact that is either legally or factually relevant to the parties' dispute over the quantification of damages.  LSI's own damages expert recognized this at his recent deposition, testifying that he did not attempt to quantify the number of simulation, as he did not "think it was required" or "was possible" and it was "not impactful to [his] damages assessment."  Ex. 1 at 41:11-42:4, 213:20-214:24.  As a result, a Trial focused solely on determining an undeterminable fact that does not impact damages calculations would not advance the parties' efforts to resolve this matter.

But there is a dispute between the parties as to the accused simulators that heavily impacts the quantification of damages and can be addressed at the Trial.  It is precisely the factual issue this Court previously identified in its second order on LSI's implied license defense:

> The effect, if any, of LSI's noninfringing activities under the implied license on the calculation of a reasonable royalty is also a disputed question of fact that is poorly suited for summary judgment. *See, e.g., Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303-05 (Fed. Cir. 2015). This too will be resolved at trial.

ECF 217.  It is resolution of this issue—not a precise quantification of covered vs. non-covered simulations, an impossible task—that is the key barrier to settlement.  *See* Dec. 12, 2024 Hearing Transcript at 68–70 (both sides' counsel acknowledging this as the critical issue in response to the Court's inquiry as to how settlement could be facilitated).  CMU believes that the Trial will be a meaningful step toward settlement only if that issue is addressed.

LSI incorrectly asserts that answering the questions posed to the jury by CMU would turn the Trial into a full "damages trial."  ECF 249.  Following the presentation of the evidence on the sales cycle and simulation use identified above together with targeted additional evidence regarding LSI's, CMU's and the industry's contracting and licensing practices, the jury can be asked to decide first whether CMU has established the fact of "non-covered" simulator use, then whether it finds a precise quantification of such use to be impossible, and finally to weigh in directly on the key disputed issue as to the impact such use has on a royalty base.  Unlike the narrow and irrelevant scope LSI demands for the Trial, CMU's proposed scope, and the answer to its proposed jury verdict form questions, would make a meaningful difference to the substance of this case and to the parties' posture on resolution.

| | | |
|---|---|---|
| 1 | Date: April 3, 2025 | Respectfully submitted, |
| 2 | | */s/ Christopher M. Verdini* |
| 3 | | |
| 4 | | Erik J. Halverson (SBN 333492)<br>erik.halverson@klgates.com |
| 5 | | **K&L GATES LLP**<br>Four Embarcadero Center, Suite 1200<br>San Francisco, California 94111 |
| 6 | | Tel: (415) 882-8200<br>Fax: (415) 882-8220 |
| 7 | | |
| 8 | | Patrick J. McElhinny, pro hac vice<br>patrick.mcelhinny@klgates.com |
| 9 | | Mark G. Knedeisen, pro hac vice<br>mark.knedeisen@klgates.com |
| 10 | | Christopher M. Verdini, pro hac vice<br>christopher.verdini@klgates.com |
| 11 | | Anna Shabalov, pro hac vice<br>anna.shabalov@klgates.com |
| 12 | | **K&L Gates LLP**<br>K&L Gates Center |
| 13 | | 210 Sixth Avenue<br>Pittsburgh, Pennsylvania 15222 |
| 14 | | (412) 355-6500 |
| 15 | | Theodore J. Angelis, pro hac vice<br>theo.angelis@klgates.com |
| 16 | | **K&L Gates LLP**<br>925 Fourth Avenue, Suite 2900 |
| 17 | | Seattle, WA 98104<br>(206) 623-7580 |
| 18 | | *Counsel for Plaintiff* |
| 19 | | *Carnegie Mellon University* |

CMU'S TRIAL BRIEF FOR MAY 5, 2025 TRIAL                                   CASE NO. 3:18-cv-04571-JD

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the Electronic Service List for this case.

*/s/ Christopher M. Verdini*
Christopher M. Verdini