Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

*Counsel for Defendants*
*LSI Corporation and*
*Avago Technologies U.S. Inc.*

*[Additional counsel on signature page]*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY, <br><br> Plaintiff, <br><br> v. <br><br> LSI CORPORATION AND AVAGO TECHNOLOGIES U.S. INC., <br><br> Defendants. | Case No. 3:18-cv-04571-JD <br><br> **DEFENDANTS' TRIAL BRIEF** <br><br> Pretrial Conference: April 17, 2025 <br> Time: 1:30 p.m. <br> Courtroom: 11 <br><br> Hon. James Donato <br> Trial Date: May 5, 2025 |

## I.  INTRODUCTION

For the reasons stated herein, the Court should adopt Defendants LSI Corp. and Avago Technologies U.S. Inc.'s (collectively, "LSI") proposed verdict form, and limit the parties' trial presentations to evidence that will assist the jury in performing the discrete task assigned to it by the Court: identifying the acts of alleged infringement that remain in the case considering the Court's summary judgment rulings.

## II.  THE COURT'S HAVE MADE RIGHTS ORDERS

This Court held as a matter of law in its summary judgment ("SJ") ruling that LSI has an implied license to the asserted patents under "have made" rights possessed by its two largest customers, Seagate and HGST, in their licenses with CMU. D.I. 196. The Court ordered the parties to agree on an identification of the accused devices and simulators covered by the implied license. *Id*. But LSI was compelled to make another summary judgment motion because CMU proposed a stipulation that ignored key portions of the Court's order. *See* D.I. 208-4 at 2-3.

The Court agreed that all devices developed for Seagate and HGST were covered under the implied license and further held that simulators were covered "to the extent they were run or used in connection with developing" such covered devices. D.I. 217. Nonetheless, CMU continued to cling to arguments rejected by the Court and refused to acknowledge that the scope of alleged infringement still at issue in the case, and the damages potentially recoverable, were dramatically reduced, thereby precluding meaningful progress on settlement.

## III.  THE SCOPE OF THE MINI TRIAL

The Court ordered this mini trial to resolve remaining disputes concerning an issue left open in its SJ ruling, "the question of which *specific*" acts of alleged infringement remain at issue (D.I. 196 at 2 (emphasis added)); D.I. 250 at 71:5-72:8. The Court's January 14, 2025 Order reiterated that the trial "will **identify** any remaining devices or **simulators**, **and the quantities thereof**, that were covered by the implied licenses so that there is no future dispute about the universes of covered vs. non-covered devices and simulators." D.I. 249 (emphasis added). The Court also rejected CMU's attempt to convert the trial into a premature damages trial. *Id*.

Because the parties agree on the devices covered by LSI's implied license defense, the scope

1

of this trial is narrowly focused on identifying the "non-covered simulators." But because the two asserted patent claims are method claims, which can be infringed only by *use* of the claimed method, at issue is not the physical simulators themselves, but certain *simulations* run with the simulators. The Court's SJ ruling recognized this, as it defined the implied license as covering the "run[ning] or use[]" of the simulators, *i.e.*, simulations. Indeed, CMU acknowledges that neither the "Accused Devices" or "Accused Simulators" (which are simply certain computer code), are *themselves* infringing. To identify acts of potential infringement associated with Accused Simulators, it is thus necessary to identify potentially infringing *uses* of such simulators, *i.e.*, "Accused Simulat*ions*," not simply the computer code that effectuates such simulations, which is not in dispute.[1]

There are three aspects to the factual inquiry underlying this process of identification. ***First***, as the Court noted, the jury must determine whether the "use" of an Accused Simulator was "in connection with developing covered devices." D.I. 249 (citing the Court's SJ ruling, D.I. 217). Only uses not related to development or testing of products for Seagate and HGST within the United States remain at issue. ***Second***, even if there were such uses, the jury must further determine whether such use[s] employed a "real" signal, meaning a signal captured from actual magnetic media. This is because CMU only accuses simulations with real signals. In other words, CMU concedes that the far more prevalent use of the *identical* "Accused Simulator" with synthetic or computer-generated signals is *not* at issue. ***Third***, because the only recoverable acts of infringement must have occurred within the potential damages period, the identification must further be restricted to such uses occurring between September 1, 2011 and April 3, 2018. Identifying uses that fall within these parameters comports with the Court's directives.

Such specific identification of the accused simulations still at issue is critical to bridging the gap to settlement because it will allow the parties to then assess: (1) whether those specific acts infringed the asserted claims; and (2) the value, if any, resulting from such acts. CMU repeatedly argues that "precise quantification" of such Accused Simulations is "impossible" and "irrelevant." As discussed below, CMU is wrong, but regardless it does not seriously contest the need to *identify* those simulations for at least the reasons discussed above.

---

[1] CMU lists the alleged "Accused Simulators" files in its Amended Infringement Contentions.

CMU's own damages theory further highlights the need for such identification because it contends that LSI made "very valuable uses of the Patents by virtue of *such uses being necessary to LSI's Sales Cycle and ultimate sales of SoCs*." D.I. 272 (Joint Pretrial Statement) at 6-7. (emphasis added). Thus, according to CMU, determining the "value" of an Accused Simulation requires knowing (at a minimum) *when* it occurred during the so-called "Sales Cycle," and what customer's signal was used. If the evidence shows – as LSI contends it will – that any Accused Simulations occurred late in that "Sales Cycle," *i.e.*, *after* the customer had already committed to LSI as its supplier, the "value" is de minimis. CMU is of course well aware of these facts from the extensive fact discovery it obtained from LSI and its customers, which is precisely why it seeks to *avoid* having the jury make *any* identification. *See* D.I. 273 (Proposed Jury Verdict Forms) at 3-4, 10.

CMU's contention that the Court's objective for the mini trial can be achieved only if the jury answers questions pertaining to induced infringement and damages thus does not withstand scrutiny. *See* D.I. 273 at 3, 10. The discrete, far simpler task of identification of the Accused Simulations still at issue is highly likely to break the settlement logjam. Nor can CMU justify its repeated attempts to now try damages by claiming it is "is simply seeking to try the very disputed issues of fact this Court already held were to be tried." D.I. 272 at 3 (citing D.I. 217). In the cited ruling, the Court identified two discrete issues for which there were disputed facts: "determination of the exact simulators" and the effect of LSI's implied license on any damages owed. *Id*. And the Court made abundantly clear that the *mini trial* would address only the former. D.I. 249 ("This will not be a damages trial.").

CMU's position concerning the scope of the trial not only directly violates the Court's orders, but is a pretext for its true motive: to undo the Court's SJ ruling. By CMU's own admission (in its Local Patent Rule damages contentions), the impact of the Court's ruling on CMU's potential damages is dramatic, eliminating more than $400 million from its own maximum potential recovery based on just work for Seagate alone. With LSI's work for HGST also licensed, that number drops by nearly another $90 million, leaving CMU's maximum number at about $130 million. CMU's own math speaks for itself, yet CMU continues to refuse to accept that, for this and many other reasons, this case is not a repeat of its case against Marvell. Indeed, CMU now admits in its verdict

form position statement that it seeks to use the mini trial as an improper backdoor attempt to convince the Court (via the jury) to "reconsider its own" SJ ruling. D.I. 273 at 4.

Further, rather than face reality, since the Court's summary judgment ruling CMU has attempted to rework its entire damages case by taking the position that the Court's SJ ruling has *zero impact* on the damages it can recover and *doubling its asserted royalty rate* based on new theories never disclosed during fact discovery. *See* D.I. 272 at 11-12.[2] The Court should soundly reject CMU's request to deviate from the Court's narrowly defined scope for the mini trial, which will only drive the parties further from settlement.

## IV. CMU MUST ESTABLISH SPECIFIC ACTS OF POTENTIAL INFRINGEMENT

### A. CMU Cannot Prove Direct Infringement Through Circumstantial Evidence of Unaccused Simulations, Third Party Activity, or Simulations Outside the Damages Period

CMU agrees it bears the burden at the mini trial of identifying the Accused Simulations that remain subject to its infringement claims. To prove infringement of a method claim, "a patentee must either point to *specific instances of direct infringement* or show that the accused device necessarily infringes the patent in suit." *Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 723 (Fed. Cir. 2008) (quoting *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007)); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) (emphasis added) ("[I]t is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement."). Here that means CMU must identify Accused Simulations run by LSI with real signals that were *not* performed in connection with development or testing for Seagate or HGST.

CMU instead seeks to obfuscate and confuse the jury by flooding the record with evidence that will not assist it in making this necessary identification. This includes alleged extensive use of simulations *in general*, *i.e.*, whether or not accused, and whether or not performed in connection with development of products covered by LSI's implied license. CMU fails to inform the Court that

---

[2] LSI will file a motion to strike CMU's undisclosed damages theories together with its *Daubert* motions in advance of the main trial.

4

1  Accused (real signal) Simulations occurred at different times in the product development process, at different frequencies, and for different purposes than unaccused synthetic signal simulations. LSI disputes that any development work can be fairly considered "generic" or truly "customer independent," but regardless, read channel architecture development work that could potentially inform the design of read channels in SoCs for multiple customers (including LSI's two largest customers Seagate and HGST) involved simulations with synthetic signals, *not* Accused Simulations. *See* D.I. 262 at 33, 40-44 (LSI MILs Exs. 3-4).

CMU's argument regarding use of circumstantial evidence is beside the point, and does not alter its burden to prove **specific** acts of infringement, *i.e.*, performance of the claimed method. In *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017), cited by CMU, the Federal Circuit affirmed a grant of a preliminary injunction in an action for infringement of an *apparatus* claims. The Court held that at the preliminary injunction stage, an instruction manual was sufficient circumstantial evidence of how the accused product worked.  This case in no way endorses using circumstantial evidence of unaccused conduct to establish infringement of a method claim. And in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009), the Federal Circuit held that evidence that Microsoft designed certain products to practice the claimed invention and instructed its customers to use its products in an infringing manner was "just adequate to permit a jury" to find the direct infringement element of indirect infringement claims satisfied. The Federal Circuit made this determination under the Ninth Circuit standard permitting a grant of JMOL only if "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* at 1309, quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002).

When a method claim is asserted, "[i]t is one thing to find circumstantial evidence of use by a class of direct infringers such as a defendant's customers; it is a different matter to find circumstantial evidence of use by the defendant itself, particularly in the absence of evidence regarding the defendant." *France Telecom S.A. v. Marvell Semiconductor Inc.*, 82 F. Supp. 3d 987, 997–98 (N.D. Cal. 2015) (circumstantial evidence of customers' direct infringement did not support verdict of direct infringement of method by defendant).

5

In sum, contrary to CMU's mischaracterization, the dispute between the parties concerning the scope of the mini trial is not over direct versus circumstantial evidence, but over CMU's attempt to distract from an unfavorable factual record by presenting evidence of unaccused simulations, third-party activities, and activities outside of the damages period.

### B. CMU Cannot Avoid Its Burden by Seeking a Disguised Adverse Inference

CMU tries to avoid its burden of proof by complaining that LSI did not keep logs of every simulation it ran. It even goes so far as to propose that the jury be asked: "do you find that an exact quantification of the number of such uses cannot be determined?" D.I. 273 at 10. Setting aside that CMU's question is improper for failing to indicate CMU's burden of proof, the only purpose of this question is so that CMU can then argue that it should be absolved of its burden to prove specific acts of infringement. In other words, CMU effectively asks the jury to find an adverse inference it is not entitled to under the law, which requires: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989-90 (N.D. Cal. 2012). None of these apply, and CMU never made such a motion to the Court.

There is no legitimate reason to penalize LSI by excusing CMU from its burden of proving specific acts of alleged infringement that remain in this case, or allowing it to use evidence of unaccused or unrecoverable acts as a substitute. CMU brought this case, and CMU had sole control over its infringement theories, as well as its decision to base them on specific types of simulations supposedly conducted at a specific point in the development process. Moreover, CMU chose to delay suing LSI for **15 years** after it suspected it might be infringing, and **nine years** after suing Marvell. That is not to say that LSI ever kept the kind of records CMU contends are necessary for an "exact quantification." Indeed, no such simulation logs ever existed.

Far from supporting an adverse inference, the absence of such logs speaks volumes about CMU's theory of the case and the supposed "very valuable uses" of the patents. If real signal simulations were as critical to the sales process as CMU contends, and required by customers to

1  make purchase decisions, it stands to reason that not only would LSI have kept more detailed
2  records, but CMU would be able to point to documentation mandating such simulations. CMU has
3  not done so. In fact, CMU's description of how the alleged "Sales Cycle" supposedly works is a
4  complete fiction. Contrary to CMU's lawyer argument that the process would begin with LSI
5  developing a "generic base version" of a new SoC and then "pitching" it to all customers (*see* D.I.
6  272 at 5), when Seagate's corporate deposition representative was asked (by CMU) what was the
7  "first step" in the process of "solicit[ing] a new SoC design," he responded, "We typically did not
8  operate that way with Avago/LSI/Broadcom because we had an ongoing relationship with them. So
9  we would kind of work continuously on the current SoC and then start engaging on the next SoC."
10 Ex. 1 (Deposition of Cecil MacGregor) at 92-93. Not surprisingly, Seagate's witness is not on
11 CMU's witness list.

12 The evidence shows that real signal simulations were run on an *ad hoc* basis. Simulation
13 results, to the extent they were reported, were typically provided as part of a slide presentation. LSI
14 produced such documents in discovery, and CMU deposed numerous current and former employees
15 knowledgeable concerning such simulations. Tellingly, CMU did not complain that any records
16 were spoliated or that LSI is somehow at fault for the purported lack of documentary evidence of
17 real signal simulations. The paucity of records is indicative of how few there were rather than any
18 documents that were lost. In sum, there is no legitimate basis to excuse CMU from its obligation to
19 prove specific acts of potential infringement.

20 CMU's contention that LSI's proposed scope of trial and jury questions are unworkable is
21 belied by its explanation of how it intends to put on its case if the Court adopts LSI's view, which
22 is also what the Court ordered. D.I. 249. And contrary to CMU's strawman argument that LSI
23 demands "precise quantification" of Accused Simulations, LSI does not contend, for purposes of
24 any later trial on damages, that a reasonable royalty need be based on an amount per simulation.
25 Rather, the identity and quantity of remaining Accused Simulations are required to ascertain the
26 value of such acts (and to assess infringement of each specific alleged act). To that end, CMU's
27 cherry-picked statements regarding the impact of the number of simulations on LSI's damages
28 expert's analysis do not reflect the wealth of information he incorporated into his lump sum opinions

7

1  concerning the lack of relevance and rarity of real signal simulations in the product development
2  and testing process. *E.g.* D.I. 260 at 21-24. Therefore, it is not surprising that his lump sum analysis
3  did not depend on whether there were one or ten occurrences. By contrast, CMU's damages expert
4  assigns tremendous value to defendants' alleged simulation activity with little regard to the facts or
5  what is actually accused (*i.e.*, real signal simulations) to support her $1.3 billion damages opinion.
6  *See* D.I. 251-1 Ex. 4. Consequently, identifying the specific acts of infringement is not only a
7  liability prerequisite but also necessary to evaluate the opinions Ms. Lawton intends to later offer.

## V. CMU Should Not Be Permitted To Relitigate Issues Resolved In The SJ Rulings

CMU's first proposed question in its verdict form asks the jury a question the Court already answered, "whether LSI used accused simulators with real drive waveforms for internal development work not specific to Seagate or HGST in the United States between September 1, 2011 and April 3, 2018." In opposing LSI's SJ motion, CMU argued that "LSI's implied license defense cannot immunize its infringement during its internal development of the Infringing Sequence Detectors before it offered or sold such detectors to Seagate or HGST." D.I. 149-4 at 21-22. The Court rejected this "timing" argument and held that CMU "has not proffered evidence of such conduct during the relevant 2011-18 time frame." D.I. 196 at 9. The Court also rejected CMU's argument that have made rights apply only to "customized" or customer-specific work, holding that "nothing in governing circuit precedent requires customization." *Id*. at 8-9.

These matters are thus law of the case and should not be re-raised. *See United States v. Lummi Indian Tribe*, 235 F.3d 443, 452-53 (9th Cir. 2000) (applying law of the case doctrine to issue decided on summary judgment, because "a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case"). In the pretrial statement CMU seeks another bite at the apple by reframing the "internal development work" it was unable to establish during SJ proceedings as "customer-independent, customer-agnostic work." D.I. 272 at 17. But this is simply the same argument dressed in different clothes.

CMU's second question, "do you find that CMU has shown, by a preponderance of the evidence, that LSI used accused simulators with real drive waveforms for development work for Western Digital or Toshiba in the United States between September 1, 2011 and April 3, 2018?" is

8

equally improper as an attempt to undo the Court's SJ ruling. As CMU notes, the Court granted SJ "on the simulators described in Dkt. No. 209-7 as covered by the implied license to the extent they were run or used in connection with developing devices supplied under the implied license." Dkt. No. 209-7 is CMU's Amended Infringement Contentions where it defined Accused Simulators as simulators "that simulate the operation of the above Accused Devices." Thus, as long as a simulation simulates the operation of a covered device, it is covered. Whether it also happens to simulate the operation of a device that is not covered is irrelevant. CMU's contention that a simulation somehow becomes unlicensed in this scenario is contrary to law, logic, and the Court's ruling. Indeed, in connection with briefing the second summary judgment motion in 2020, CMU indicated that simulations that "mimic the operation of the detector of the [covered] Accused Devices" are protected by the implied license. D.I. 208-4 at 8. CMU did not argue that simulations that mimic a non-covered device as well as a covered device are somehow no longer immune. Indeed, consistent with controlling Federal Circuit law that does not require customization, the Court's order does not limit covered simulations to those run or used *solely* in connection with developing covered devices as CMU now contends. D.I. 196 at 8-9. Thus, uncovered simulations are those performed solely in connection with development or testing work for unlicensed customers.

### C. CMU's Questions 3 and 5 On Its Verdict Form Are Improper

CMU concedes that infringement is not part of the mini trial and does not propose that the jury be instructed on the elements of infringement, whether direct or indirect, which includes induced infringement under 35 U.S.C. § 271(b). A patentee asserting induced infringement under § 271(b) must show the following three elements: "(1) a third party directly infringed the asserted claims of the [asserted] patents; (2) [the accused infringer] induced those infringing acts; and (3) [the accused infringer] knew the acts it induced constituted infringement." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016). None of the facts necessary for CMU to prove inducement will be part of the mini trial. Indeed, CMU does not include a single witness or document produced by any customers on its witness or exhibit lists, even though it obtained discovery from multiple customers.

Yet at the same time CMU inexplicably proposes (in its question 3) that the jury now decide

in isolation whether LSI "induced" allegedly infringing simulations by its customers. Whatever CMU intends by this question, it cannot be inducement under § 271(b), the only potentially relevant inducement. And it is far afield from the narrow scope of this trial.

CMU's proposed question 5, which it admits bears solely on potential damages (D.I. 272 at 9) is even more improper given the Court's clear rejection of CMU's attempt to use the mini trial as a damages trial. Nor is it remotely feasible for the jury to decide one specific damages-related issue in isolation for all the same reasons LSI articulated in the parties' December 23, 2024, submission opposing CMU's request to convert the mini trial into a damages trial. D.I. 248 at 9-11. CMU's proposed question, which also fails to specify a burden of proof, asks the jury to hypothesize whether "CMU and LSI would have included SoCs sold to all customers in the royalty base if they negotiated a license agreement to cover LSI's use [at some unspecified time]?"

CMU intends to have its damages expert attempt to convince the jury to answer in the affirmative, which makes it even more improper given the Court has not yet considered Defendants' *Daubert* motion regarding Ms. Lawton, which is due May 12, 2025 and will raise numerous fatal flaws in her opinions. In addition, the question is highly prejudicial as it necessarily implies that the jury should presume both infringement liability and that a hypothetical license would have been structured using SoC sales as the royalty base, both hotly contested issues. For all these reasons, this question has no place in the mini trial.

## VI.  CONCLUSION

For the foregoing reasons, LSI respectfully requests that the Court adopt LSI's proposed verdict form and preclude evidence that does not assist the jury in making the specific identification of remaining Accused Simulations ordered by the Court.

Date: April 3, 2025

Respectfully submitted,

 /s/ Steven Rizzi

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:     (213) 694-1200
Facsimile:      (213) 694-1234

Steven Rizzi (admitted *pro hac vice*)
srizzi@McKoolSmith.com
Mariel Talmage (admitted *pro hac vice*)
mtalmage@McKoolSmith.com
**MCKOOL SMITH, P.C.**
1301 6th Avenue, 32nd floor
New York, NY 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Ramy Hanna (admitted *pro hac vice*)
rhanna@McKoolSmith.com
**MCKOOL SMITH, P.C.**
600 Travis Street, Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

Sarah Hassan (admitted *pro hac vice*)
shassan@McKoolSmith.com
**MCKOOL SMITH, P.C**
1717 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 370-8300
Facsimile: (202) 370-8344

***Counsel for Defendants
LSI Corporation and Avago
Technologies U.S. Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on April 3, 2025.

/s/ Steven Rizzi
Steven Rizzi