PUBLIC VERSION

# EXHIBIT 1



**HIGHLY CONFIDENTIAL - UNDER TERMS OF PO**

# Transcript of Brian William Napper

**Date:** March 18, 2025
**Case:** Carnegie Mellon University -v- LSI Corporation, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## Page 1

```
      IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF CALIFORNIA
             SAN FRANCISCO DIVISION
- - - - - - - - - - - - x
CARNEGIE MELLON         :
UNIVERSITY,             :
       Plaintiff,       :   Case No.
  v.                    :   3:18-cv-04571-JD
LSI CORPORATION AND     :
AVAGO TECHNOLOGIES      :
U.S. INC.,              :
       Defendants.      :
- - - - - - - - - - - - x

        ** HIGHLY CONFIDENTIAL UNDER THE
         TERMS OF THE PROTECTIVE ORDER **

         DEPOSITION OF BRIAN WILLIAM NAPPER
            REMOTE VIDEOTAPED DEPOSITION
              Tuesday, March 18, 2025
                   11:32 a.m.
Job No.: 576170
Pages: 1 - 223
Reported By: Maria M. Siatkowski, RDR, CRR, CRC,
CA CSR #14748
```

## Page 2

Deposition of BRIAN WILLIAM NAPPER, held at the offices of:

        REMOTE VIDEOTAPED DEPOSITION

    Pursuant to notice, before Maria M. Siatkowski, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Realtime Captioner, California CSR #14748, and Notary Public in and for the Commonwealth of Pennsylvania.

## Page 3

```
              A P P E A R A N C E S
    ON BEHALF OF THE PLAINTIFF CARNEGIE MELLON
UNIVERSITY:
        PATRICK J. McELHINNY, ESQUIRE
        K&L GATES
        210 Sixth Avenue
        Pittsburgh, PA  15222
        412-355-6500

    ON BEHALF OF THE DEFENDANT LSI CORPORATION AND
AVAGO TECHNOLOGIES U.S. INC.:
        RAMY EMAD HANNA, ESQUIRE
        MCKOOL SMITH
        600 Travis Street
        Suite 7000
        Houston, TX  77002
        713-485-7300

    ALSO PRESENT:
        JESSE CASTRO, VIDEO TECHNICIAN
        DYLAN KEISLER, VIDEOGRAPHER
```

## Page 4

```
                   C O N T E N T S
EXAMINATION OF BRIAN WILLIAM NAPPER        PAGE
  BY MR. MCELHINNY                           6

                     EXHIBITS
              (ATTACHED TO TRANSCRIPT)
  EXHIBIT                                   PAGE
Napper   Expert Rebuttal Report of Brian     27
No.      Napper
1100
Napper   E-mail from Peggy Fang, dated       89
No.      August 8, 2008, regarding reorg
1101     announcement
Napper   SoC/RC Product Planning Target     117
No.      Setting document
1102
Napper   E-mail from YuanXing Lee on        131
No.      September 20, 2010, regarding
1103     nomination of IEEE Award
```

### 41

BY MR. McELHINNY:
Q You said that they're done infrequently several times. Do you have any sense as to how -- how frequently these simulations are done?
A I don't -- I don't have a sense of that. I -- I understand that the simulated -- or synthetic simulations is done more frequently than the real simulation. I think Dr. Fitzpatrick has some observations on that, and I spoke with her about that as well.
Q So was it important to you to determine a number of simulations in order to reach your opinions about the value or the -- the damages that you posit here?
A I don't think -- I don't think it was required because as I understood it, based upon my discussion with both Ms. Christianson and Dr. Fitzpatrick, that more simulations were performed that were synthetic that are not covered by the asserted patents than the real simulations when the defendants are interacting with potential customers for read channel products.
Q Did you make any attempt to -- to quantify the number of times that either the simulated -- simulation or the synthetic simulations or the

### 42

real wave simulations were done?
A No, I don't believe that that was -- that was possible, if you will. That's my understanding. For that specific.
    But it's why I say that the nonrecurring expenses that are paid by these potential customers as a result of these simulations, be they synthetic, that's not covered, versus real, that is less frequently performed, that's probably -- that's too high of an amount because there's other things associated with those NREs.
Q Sir, you're familiar with the concept of the hypothetical negotiation?
A I am.
Q Could you describe it, please.
A The hypothetical negotiation is a construct that we use in patent damages matters that is attempting to reconstruct the patent holder and the potential licensee or accused infringer, and what the factors that those two parties would consider generally in order to come to some sort of conclusion as to what a reasonable royalty would be.
Q Do you need to understand the expectations of the parties to this negotiation at the time of

### 43

the negotiation?
A I think that's certainly one input, is the expectations of the parties. Yes.
Q What are the other inputs?
A Well, the other inputs are described in detail in terms of -- I must have tens of pages in my report on the other inputs, if you will. But essentially, the contribution of, in this case, the real simulations and how much that contributes, ultimately, to the product that's being sold by the defendants. And what it contributes to, what are the other contributions. Something called apportionment.
    That certainly would -- it's logical that would come up in the discussion between the patent holder and the -- the accused infringer.
    Whether they are competitors or whether they are ultimately not in the same business or, in this case, where you have a university who needs a licensee to implement their technology. So there's a recognition of that construct.
    The term of the -- of the patents and how long it's going to be, I mean, I -- honestly, Mr. McElhinny, I could go on and on.
Q Okay. That's sufficient for now.

### 44

    And when you -- you said the licensee is the university needs the -- well, strike that.
    You said the university needs the licensee to implement the technology. Why do you say that?
A Because generally universities are -- generally do not actually make product and incur the expenses to -- and all the R&D related to making a product that is ultimately salable in the marketplace, from a general standpoint. That's my experience of working with universities as well.
Q Okay. So -- but we agree -- or you would agree, I take it, that the use of the hypothetical negotiation framework is a proper method to calculate reasonable royalty damages in patent cases?
A Yes. As long as it's done appropriately, yes.
Q And as part of that process, it's also appropriate to consider what are called the Georgia-Pacific factors?
A Yes.
Q That's named after a case that listed a bunch of factors to be considered in the hypothetical negotiation; correct?
A Yes. So it's based on case law, and it's

FILED UNDER SEAL
Case 3:18-cv-04571-JD   Document 281-3   Filed 04/09/25   Page 5 of 7
Highly Confidential - Under Terms of PO
Transcript of Brian William Napper
Conducted on March 18, 2025
53 (209 to 212)

**209**

1  Q  So how would the subject of Seagate's
2  "have made" rights be addressed in that dialogue?
3  A  Well, it's reasonable to assume that LSI
4  would inform CMU that LSI has "have made" rights
5  to the asserted patents for certain product sales
6  to certain customers, and so that should be
7  reflected in the amount that LSI would be willing
8  to pay and CMU would be willing to accept.
9  Q  And do you know whether Seagate ever
10 communicated to LSI that it had "have made" rights
11 to the Kavcic-Moura invention?
12 A  I didn't -- I didn't have access to
13 Seagate folks.
14 Q  Well, you had access to LSI folks; right?
15 A  I did.
16 Q  Did any of them ever say that Seagate told
17 them that they had "have made" rights?
18 A  I had access to Ms. Christianson. I don't
19 believe we discuss that.
20 Q  You said it's reasonable to assume that
21 LSI would inform CMU during this hypothetical
22 dialogue that Seagate had "have made" rights. Why
23 is it reasonable to assume that?
24 A  Well, as a license, if you believe that a
25 certain level of your sales are being sold to

**210**

1  customers who have "have made" rights to the
2  patents that are being licensed, it's -- it would
3  not surprise me if that particular potential
4  licensee would inform the patent holder of that in
5  the hypothetical negotiation.
6  Q  Okay. But how is it that LSI would even
7  know that Seagate had "have made" rights?
8  A  Well, that -- using hindsight information,
9  they have those rights. So...
10 Q  What about the case for HGST? Its rights
11 derived from an IBM license; right?
12 A  Something about IBM transferring those
13 agreements over to Hitachi, yes.
14 Q  How does -- how does that subject get
15 brought up in this dialogue between CMU and LSI?
16 A  Well, again, it would be ultimately that
17 use -- using that information, it would come to
18 the table that LSI believes that one of its
19 customers, or at least two of its customers, have
20 had "have made" rights to the asserted patents.
21 Q  And do you know when HGST secured those
22 "have made" rights?
23 A  I don't know exactly the date of securing
24 those rights.
25 Q  Is it before or after your hypothetical

**211**

1  negotiation date?
2  A  I don't recall.
3  Q  Was that something you looked into?
4  A  No, because it's -- it's appropriate to
5  use information after the hypothetical negotiation
6  date under book of wisdom that would be
7  informative to the parties at the hypothetical
8  negotiation.
9  Q  Do you know whether you and Ms. Lawton
10 agree on the number of chips sold to companies
11 that do not have "have made" rights?
12 A  I -- I don't know if we performed that
13 reconciliation comparison. I'd have to look.



21 Q  Worldwide. And do you know whether that
22 agreement matches up -- or that number matches the
23 number that Ms. Lawton has in her report for the
24 same bucket?
25 A  If you're asking whether Ms. Lawton

**212**

1  addressed "have made" rights, I don't believe she
2  even mentions "have made" rights in her report.
3  If you're asking did we match up these sales of
4  [redacted] chips to Ms. Lawton's sales to
5  those non-Seagate, non-Hitachi customers, I don't
6  know if we reconciled that.
7      But assuming we both pulled our numbers
8  from the same LSI database, it wouldn't surprise
9  me that they're similar. But we don't have
10 anything to compare to at a summary level because
11 she didn't do that analysis. She ignored the
12 "have made" rights.
13 Q  You don't believe that she set out the
14 number of chips sold to each customer in her
15 report?
16     MR. HANNA: Objection to form.
17 Mischaracterizes testimony.
18     THE WITNESS: Well, yeah, she may have.
19 She has a lot of schedules to her report.
20     But, again, I think the -- the source
21 would probably be the same. She must have sourced
22 it from LSI, and we sourced it from LSI.
23 BY MR. McELHINNY:
24 Q  Do you know whether the -- do you have any
25 opinion on the number of simulations run -- let me

Highly Confidential - Under Terms of PO
Transcript of Brian William Napper
Conducted on March 18, 2025
54 (213 to 216)

213

1 ask a better question.
2     Do you have any opinion on the number of
3 simulations that are accused in this case as that
4 LSI ran?
5     **A  Are you talking about real wave**
6 **simulations or synthetic simulations?**
7     Q  Sure.  Let's start with the real wave
8 simulation.
9     **A  Yeah, we talked about this before.  I**
10 **don't have any information or -- information to**
11 **gauge specifically how often.  It's my**
12 **understanding that the real wave simulations are**
13 **done less frequently than the synthetic**
14 **simulations.**
15     Q  Do you know how many times during a
16 particular simulation the Kavcic-Moura method is
17 used?
18     **A  During a real-world simulation, I do not.**
19     Q  Does the number of simulations matter to
20 your damages analysis?
21     MR. HANNA:  Objection to form.
22     THE WITNESS:  Not -- not really.  I mean,
23 from a general standpoint, recognizing that it's
24 done much less frequency [as said], it would be in
25 the real wave simulations, than the synthetic

214

1 simulations.  And based upon some of the data
2 points that I used to determine appropriate
3 royalties, like the NREs, et cetera, I don't know
4 if any more precision would bring any more
5 reliability.
6 BY MR. McELHINNY:
7     Q  Is it the same answer for the number of
8 times the method would be performed during the
9 simulations?
10     **A  Yeah, I'm not even familiar with the**
11 **method being performed in the real-world**
12 **simulation, that that's outside of probably my**
13 **area of expertise.**
14     Q  So since it's outside the area of your
15 expertise, it didn't matter to your damages
16 assessment; correct?
17     **A  It didn't seem to be impactful to my**
18 **damages assessment.**
19     Q  Was it important to your damages
20 assessment to identify the specific simulators
21 used to perform the Kavcic-Moura method using real
22 waveforms?
23     MR. HANNA:  Objection to form.
24     THE WITNESS:  I did not investigate that.
25 BY MR. McELHINNY:

215

1     Q  And I think you said in your report
2 somewhere -- I can find it, if necessary, but
3 let's just ask the question.  Do you know whether
4 LSI maintained any records of the number of
5 simulations they performed using the real
6 waveforms?
7     **A  I don't know.**
8     Q  So did you look for any records of that --
9 of those simulations?
10     **A  I did not.  I got the explanation from**
11 **that from my discussions with Ms. Christianson.**
12     Q  Yeah.  Why didn't you look for records of
13 the number of simulations?
14     **A  Well, there's a presumption that there are**
15 **records, as to the number of real wave simulations**
16 **that were performed.  But, again, after hearing**
17 **Ms. Christianson's explanation, that the real wave**
18 **simulations, in her experience, are done on a**
19 **relatively -- significantly less frequently than**
20 **synthetic simulations.**
21     Q  So you said there's a presumption that
22 there are records.  I'm not sure I follow.  I just
23 want to make sure, what did you mean by that?
24     **A  I'm not aware there are records that would**
25 **track that.**

216

1     Q  Oh.  Okay.  And whether there are or
2 aren't, you didn't look for any; right?
3     **A  I relied upon Ms. Christianson and her**
4 **experience in dealing with customers and the fact**
5 **that she said it's a less -- significantly less**
6 **frequently to perform the real wave simulations.**
7     Q  Let me ask you about your discussion in
8 paragraphs 354 and 355 about discount rate.
9     **A  Okay.**
10     Q  So you use the prime rate as an
11 appropriate discount rate; is that correct?
12     **A  That's correct.**
13     Q  And you -- you described, "The prime rate
14 as the interest rate determined by individual
15 banks and is often the reference rate for many
16 types of loans.  The prime rate is generally based
17 on the federal funds rate established by the
18 Federal Open Market Committee."
19     **A  Correct.  The --**
20     Q  Did you use the funds rate as the prime
21 rate?
22     **A  I'm sorry.  I'm sorry, Mr. McElhinny.  I**
23 **interrupted you.  I'm sorry.**
24     Q  Did you use the federal funds rate
25 established by the Federal Open Market Committee

221

1  your time today. I don't have anything more at
2  this time. I'll reserve the right to re-call to
3  the extent that it, you know, offers anything new
4  or we get additional information.
5     MR. HANNA: Thank you, Mr. Napper. I have
6  no questions. We hold this deposition closed.
7     THE VIDEOGRAPHER: Okay. If there are
8  not further --
9     MR. HANNA: And, obviously, we will want
10 to sign -- read and sign for his thoughts.
11    THE VIDEOGRAPHER: Okay. If there are no
12 further questions, then this will mark the end of
13 the videotaped deposition of Brian Napper.
14    We are going off the record. The time is
15 6:12 p.m.
16    (At 6:12 p.m., the deposition was
17 concluded.)
18
19
20
21
22
23
24
25

222

1  CERTIFICATE OF SHORTHAND REPORTER - E-NOTARY
2  PUBLIC
3     I, MARIA M. SIATKOWSKI, Registered Diplomate
4  Reporter, Certified Realtime Reporter, Certified
5  Realtime Captioner, California CSR #14748, and
6  Notary Public, the officer before whom the
7  foregoing deposition was taken, do hereby certify
8  that the foregoing transcript is a true and
9  correct record of the testimony given; that said
10 testimony was taken by me stenographically and
11 thereafter reduced to typewriting under my
12 supervision; that reading and signing was
13 requested; and that I am neither counsel for or
14 related to, nor employed by any of the parties
15 to this case and have no interest, financial
16 or otherwise, in its outcome.
17    IN WITNESS WHEREOF, I have hereunto set my hand
18 and affixed my notarial seal this 26th day of
19 March 2025.
20 My commission expires June 15, 2025.
21
22 *Maria M. Siatkowski*
   _____
23 E-NOTARY PUBLIC IN AND FOR
24 THE STATE OF PENNSYLVANIA
25

223

1        ACKNOWLEDGMENT OF DEPONENT
2     I, BRIAN WILLIAM NAPPER, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached Errata sheet signed by me.
8
9  _____   _____
10   (Date)           (Signature)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25