PUBLIC VERSION

# EXHIBIT 6



pd
Planet Depos
We Make It Happen™

Highly Confidential - Outside Attorneys' Eyes Only

# Transcript of Heather Christianson, Corporate Designee

**Date:** September 25, 2019
**Case:** Carnegie Mellon University -v- LSI Corporation, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

N HE UN ED S A ES D S R C COUR FOR
HE NOR HERN D S R C OF CAL FORN A
SAN FRANC SCO D V S ON

CARENG E MELLON UN VERS Y Case No
P a n 3 8-CV-0457 -JD
v
LS CORPORA ON and AVAGO
ECHNOLOG ES U S NC
De endan s

H GHLY CONF DEN AL - OU S DE A ORNEYS EYES ONLY

DEPOS ON OF HEA HER CHR S ANSON
as De endan s Corpora e Des gnee
pursuan o Ru e 30(b)(6)

aken Sep ember 25 20 9
Schedu ed or 9 00 a m

REPOR ED BY JONA HAN WONNELL RMR

Videotaped deposition of HEATHER CHRISTIANSON, taken on September 25, 2019, commencing at 9:01 a.m., at the offices of Paradigm Reporting & Captioning, Inc., Fifth Street Towers, 150 South Fifth Street, Suite 1775, Minneapolis, Minnesota 55402, before Jonathan Wonnell, Registered Merit Reporter NCRA #835577 and Notary Public of and for the State of Minnesota.

* * * * * * * * * *

A P P E A R A N C E S

On behalf of the Plaintiff:

PATRICK J. MCELHINNY, ESQ.
ANNA SHABALOV, ESQ.
K&L Gates LLP
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
412 355 6500
patrick.mcelhinny@klgates.com
anna.shabalov@klgates.com

APPEARANCES continued on next page

A P P E A R A N C E S Continued

On behalf of the Defendants:

BRIAN EUTERMOSER, ESQ.
King & Spalding LLP
515 Wynkoop Street, Suite 800
Denver, Colorado 80202
720 535 2312
beutermoser@kslaw.com

ALSO PRESENT:

CATHARINE M. LAWSON, Berkeley Research Group
DAN BURTON, Videographer

I N D E X

WITNESS PAGE
HEATHER CHRISTIANSON
By Mr. McElhinny: 9

Afternoon Session 127

CONFIDENTIAL DESIGNATION:
By Mr. Eutermose 21

INSTRUCTIONS NOT TO ANSWER:
By Mr. Eutermose 39

PRODUCTION REQUESTS: None

E X H I B I T S M A R K E D

| LABEL/DESCRIPTION | PAGE |
|---|---|
| Deposition 93 Amended first notice of Rule 30 b 6 deposition | 8 |
| Deposition 94 Amended second notice of Rule 30 b 6 deposition | 8 |
| Deposition 95 DCD marketing and applications org chart attached to an e mail LSI 04571 0745933 | 29 |
| Deposition 96 Disclosure from counsel for Defendants in compliance with Patent Local Rule 3 4 12 pgs., NO BATES | 59 |

the pricing for Redtail as a result of this more than usual SNR gain?
MR. EUTERMOSER: Object to form.
**A The SoCs that used Redtail and their pricing, I don't remember it being special.**
**BY MR. McELHINNY:**
Q What do you remember about the pricing for the SoCs for Redtail?
**A Not much. Nothing in particular, I guess.**
Q Do you remember how you determined the pricing for Redtail?
**A For the projects that used Redtail?**
Q Mm-hmm.
**A I don't. But I assume that I, you know, assess the manufacturing cost and align to a margin target that was aligned with my corporate objective.**
Q So when you say you assess the costs and align them to the -- your margin target, is that generally how you did pricing or how you do pricing?
**A It's one of the ways. It's one part of it in addition to looking at opportunity and return on investment and the P&Ls that we've glanced at before.**
Q Would the projects that included Redtail have been priced specific for each customer that bought it?

[redacted]
Q Yes.
[redacted]
Q And what would it depend on?
[redacted]
Q Based on what?
**A** [redacted] **So the SoC is comprised of many different blocks of IP. Sorry. That's when we call it. And it also includes in blocks of IP or controller logic from the customer that they own.**
Q Mm-hmm.
**A And so if they have** [redacted]**'s going to be a different size, so your cost is higher, so you would want to charge more to achieve the same metric.**
[redacted]
**A No.**
Q Why not?
[redacted]

[redacted]
Q I'm sorry, what?
**A I don't see it as a value.**
Q Okay.
[redacted]
Q Okay. So is it generally the rule that if
[redacted]
MR. EUTERMOSER: Object to form.
**A I don't know of an example when** [redacted]

[redacted]
**BY MR. McELHINNY:**
Q Or said you can use this with my competitor; is that fair?
MR. EUTERMOSER: Object to form.
**A It's just not -- it just doesn't happen.**
**BY MR. McELHINNY:**
Q Because your customers are actually competitors with each other, fair?
**A They are.**
Q When we were talking about the Redtail pricing it sounded like you were responsible for the Redtail pricing. Is that correct or was I taking too much into that?
**A I don't remember. Again, I don't remember the exact products that Redtail went into. And I supported Seagate, so I would have only had some responsibility for those products.**
Q Who were your counterparts with respect to other products or other customers that Redtail might have gone into?
**A I don't remember.**
Q Who were you reporting to at the time?
**A It might have been Joe Borak.**
Q How do you spell that?

**A B-o-r-a-k. I had six different bosses in six different years, so...**

Q Well, why don't you name them so we can just have a record of who they were and maybe what order you can --

**A I don't remember them all.**

Q Well, you've got to give it your best shot.

**A Joe Borak was in there, but twice. Another person was Bill Billowich. And then I don't remember.**

Q Can you remember anyone else who might have been involved in approving Redtail pricing?

**A Just the leadership team at the time, which would have been Joe Borak or Joe O'Hare or Joe Auer. Oddly enough they're all named Joe.**

Q Was that a prerequisite?

**A Yeah, I think so. That was back in Lucent.**

Q Slide 15. What does Slide 15 reflect?

**A It was -- I think I referenced this earlier, but it was basically to try to challenge our normal design targets to a certain extent. This was a meeting with primarily the sales team. So I was trying to understand if there**

**And, you know, it was a fun discussion, but ultimately we never went there. We never did that. Or it was something that they felt the customers wouldn't do.**

Q Why?

**A Generation over generation, they don't want to pay more. So usually they have a budget and they have to stay within it.**

Q All right. I'm not going to mark this because it's enormous and I only have a couple of questions about it. But I will show you --

**A I know what it is.**

Q Well, I'm going to need to make a record. So I'll show you a product requirements document which is LSI 0630699 through 0935.

MR. McELHINNY: And I could give you one if you want?

MR. EUTERMOSER: I'll take a look at it. I don't want to keep it. Thanks.

BY MR. McELHINNY:

Q Is this a products requirements document?

**A Yes.**

Q And would they have been created for every read channel from the early 2000s to now?

**A Most likely.**

Q Would they still exist in defendants' files somewhere if they were created? I mean, is there a central repository, a document retention policy with respect to them?

**A Engineering would have kept it.**

Q And is there a central file for them in engineering or some custodian?

**A I'm not sure.**

Q Do you know what efforts were made to collect the PRDs for the period -- the early periods?

**A I spoke with Bruce Wilson and we confirmed with each other and with Barbara Ball that we checked every place we could think of to get documents.**

Q Documents including specifically the PRDs?

**A I don't remember specifically saying PRD, but that would have been a relevant document that it would have been pulled, yes.**

Q So Bruce would have been the guy -- of all the documents being pulled, it sounds like you pulled a bunch of marketing documents, he would have been the guy that would be pulling the PRDs?

**A He would have been closest to it, yes. For the record, this is not a read**

**channel.**

Q Okay. But there are product requirements documents for the read channels themselves, or are they for also the SoCs or both?

Q And there should be one for every channel?

**A What company is that from?**

Q Agere.

**A So at least going back to Agere.**

Q All right.

(Deposition Exhibit 108 was marked for identification.)

BY MR. McELHINNY:

Q So I'm showing you what we've marked as Exhibit 108. Could you tell me what Exhibit 108 is?

**A "Copperhead-Lite 90 Nanometer Product Definition Delta Spec."**

Q What's a delta spec?

**A It's a specification that highlights the changes relative to another read channel, in this case Copperhead.**

Q So do delta specs exist for every change

Case 3:18-cv-04571-JD    Document 281-8    Filed 04/09/25    Page 6 of 7

Highly Confidential - Outside Attorneys' Eyes Only
Transcript of Heather Christianson, Corporate Designee
Conducted on September 25, 2019

37 (145 to 148)

**Page 45**

1  from generation to generation?
2  A   I'm not sure.
3  Q   Who puts together the delta spec?
4  A   Engineering.
5  Q   So I'll ask Mr. Wilson again.
6  A   Good place to start.
7  Q   Okay. On the first page, maybe the fourth
8  sentence or so, it says, [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 [REDACTED]
12 [REDACTED]
13 [REDACTED]
14      Can you describe why you have that policy?
15 [REDACTED]
16 [REDACTED]
17 [REDACTED]
18 [REDACTED]
19 [REDACTED]
20 [REDACTED]
21 Q   So is it fair to say that if retail has a
22 certain feature and it's in the channels that you
23 offer to every customer, it's not something that was
24 offered to you by -- or requested by one customer
25 specifically?

**Page 46**

1       MR. McELHINNY: Object to form.
2  A   Can you say that again?
3  BY MR. McELHINNY:
4  Q   Is it fair to say that if you have -- if
5  you're offering a feature in a read channel that is
6  offered to all of your customers, that feature is not
7  something that a customer requested specifically that
8  you include in their channel?
9       MR. EUTERMOSER: Same objection.
10 A   No. [REDACTED]
11 [REDACTED]
12 [REDACTED] I guess if there are
13 other features that are listed in all customers'
14 specifications or the specs that we provide to all
15 customers, those could have been defined by Broadcom
16 or raised by Broadcom or discussed with anybody.
17      Does that answer the question?
18 BY MR. McELHINNY:
19 Q   I think so. Let me think about it.
20 A   Customers aren't the only ones who bring
21 ideas.
22 Q   Oh, I appreciate that.
23      So is it the case that it's more likely
24 that if a feature is in a read channel that you're
25 offering to all customers, it's a feature that

**Page 47**

1  originated with Broadcom?
2       MR. EUTERMOSER: Object to form.
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6  [REDACTED]
7  [REDACTED]
8  [REDACTED]
9  BY MR. McELHINNY:
10 Q   Do you have any recollection of whether
11 Seagate ever asks you to put features in a channel
12 that they didn't restrict you on in terms of sharing
13 with other customers?
14 A   I don't remember, but you're talking
15 probably hundreds of features over almost 20 years.
16      (Deposition Exhibit 109 was marked
17      for identification.)
18 BY MR. McELHINNY:
19 Q   I'm showing you what's been marked as
20 Exhibit 109. Do you recognize Exhibit 109 as an
21 e-mail thread? It includes an e-mail from Rita and
22 someone whose last name I'm not going to try to you
23 on January 5, 2015.
24 A   Mm-hmm.
25 Q   Is that a "yes"?

**Page 48**

1  A   Yes. Sorry.
2  Q   This relates to pricing issues?
3  A   Yes.
4  Q   And she's telling you that there are
5  issues with the [REDACTED] So I know we talked
6  about [REDACTED] Does [REDACTED]
7  [REDACTED] or is this just [REDACTED]
8  [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 [REDACTED]
12 [REDACTED]
13 [REDACTED]
14 Q   And who is authorized to make that change?
15 A   I'm not sure.
16 Q   In terms of the attachment to this e-mail
17 or one of the attachments --
18 A   Mm-hmm.
19 Q   -- is this a spreadsheet that comes out of
20 Model N?
21 A   I don't know.
22 Q   Do you recognize that, where it might come
23 from?
24 A   I don't know where it came from. I
25 recognize the content, but...

MR. EUTERMOSER: Object to form.
**A I vaguely recall loss of Maxtor business around that time frame, but that's the only context I really have.**
**BY MR. McELHINNY:**
Q And have you heard the phrase "litigation hold" in connection with documents?
**A Yes.**
Q Do you know when the litigation hold was placed in effect for this case?
**A I don't remember, but I know I received it.**
Q Is there a way we could document that?
**A Document when I received it?**
Q Yes.
**A Yeah. I can dig up the e-mail.**
MR. McELHINNY: I think that's within the scope of one of the document collection efforts are and maybe you know when the litigation hold was sent. But I want to know when the litigation hold was set?
MR. EUTERMOSER: I don't know. The content I believe is privileged. I'd have to think about the date, but I'll take it under advisement.
BY MR. McELHINNY:
Q Do you know to whom the litigation hold

was sent?
**A An e-mail to a number of people.**
Q Do you have any recollection as to who it was sent?
**A I just know I was on it.**
Q Do you remember thinking there's a lot of people, we're missing some folks, any reaction to the list?
**A Not really, no.**
Q Is there any way you can pin down the time, aside from -- I mean, sitting here today, anything that would help in relationship to anything?
**A Hmm-mm, no. It's one of hundreds of e-mails that we all I think get regularly.**
Q I feel your pain.
MR. McELHINNY: Subject to in the areas where the witness was unable to answer that were within the scope of the Rule 30(b)(6) notice and to any further production of documents, I don't have anything further for the witness at this time. Thank you very much for your time today and patience.
MR. EUTERMOSER: Counsel, what are those areas for which you're holding the deposition open?
MR. McELHINNY: I would have to go back and look. There were a whole host of areas where she

said she didn't remember, didn't know. But I will look to see, you know, what areas we think we want further -- we want to pursue further information.
MR. EUTERMOSER: We disagree with any allegation that she wasn't adequately prepared. A simple "I don't know" answer doesn't mean she wasn't prepared sufficiently. But I understand your position and you have mine.
MR. McELHINNY: Okay. Thank you all.
THE WITNESS: Okay.
MR. EUTERMOSER: We'll reserve signature.
THE VIDEOGRAPHER: We're going off the record. This is the conclusion of the deposition. The time is 4:04 p.m.
(Reading and signing reserved).
(Whereupon, at 4:04 p.m. the videotaped deposition was adjourned.)
* * * * * * * * * *

R PORT R'S C RT F CAT

STAT OF M NN SOTA )
COUNTY OF H NN P N )
ss

hereby certi y that reported the deposition o H ATH R CHR ST ANSON on September 25th, 2019, in Minneapo is, Minnesota, and that the witness was by me irst du y sworn to te the who e truth

That the testimony was transcribed by me and that this transcript is a true record o the testimony o the witness

That the cost o the origina has been charged to the party who noticed the deposition, and that a parties who ordered copies have been charged at the same rate or such copies

That am not a re ative or emp oyee or attorney or counse o any o the parties, or a re ative or emp oyee o such attorney or counse

That am not inancia y interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that a ects or has a substantia tendency to a ect my impartia ity

That the right to read and sign the deposition by the witness was requested

W TN SS MY HAND AND S A TH S 4th day o October, 2019

Jonathan Wonne
Notary Pub ic, Hennepin County, Minnesota
My Commission expires January 31, 2022