UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>LSI CORPORATION, et al.,<br><br>Defendants. | Case No. 18-cv-04571-JD<br><br>**CLAIM CONSTRUCTION** |

The parties in this long-running patent infringement action, plaintiff Carnegie Mellon University (CMU) and defendants LSI Corp. and Avago Technologies (together LSI), have asked for construction of seven terms or phrases in U.S. Patent No. 6,201,839 (the '839 patent) and U.S. Patent No. 6,438,180 (the '180 patent). The parties' familiarity with the record is assumed. Construction of two disputed terms -- "Viterbi-like algorithm" and "each sample corresponds to a different sampling time instant" -- is deferred to summary judgment because LSI raises indefiniteness challenges. The other five disputed terms are construed.

**LEGAL STANDARD**

"Claim construction must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Hybrid Audio, LLC v. Asus Comp. Int'l Inc.*, No. 17-cv-05947-JD, 2022 WL 3348594, at *1 (N.D. Cal. Aug. 12, 2022) (cleaned up) (quoting *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014)). Claim terms are given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Broadcom*

*Corp. v. Netflix Inc.*, No. 20-cv-04677-JD, 2022 WL 1619151, at *1 (N.D. Cal. May 23, 2022) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc)).

The Federal Circuit has emphasized that the "only meaning that matters in claim construction is the meaning in the context of the patent." *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). "The presumption in favor of giving terms their plain and ordinary meaning may be overcome by a patentee's express definition of a term, or express disavowal of the scope of the claim." *Broadcom*, 2022 WL 1619151, at *2. "A term may be redefined 'by implication' when given a meaning that is ascertainable from a reading of the specification or the patent documents." *Hybrid Audio*, 2022 WL 3348594, at *2 (citation omitted). "The ordinary meaning of a claim term is not the meaning of the term in the abstract," but the term's "meaning to the ordinary artisan after reading the entire patent." *Astra Zeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1330 (Fed. Cir. 2021) (quotations and citations omitted).

"A claim and its constituent words and phrases are interpreted in light of the intrinsic evidence. The touchstones are the claims themselves, the specification, and, if in evidence, the prosecution history." *Hybrid Audio*, 2022 WL 3348594, at *2. "This intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.2d 1576, 1582 (Fed. Cir. 1996)). Although "reading a limitation from the written description into the claims is one of the cardinal sins of patent law," *Broadcom Corp. v. Netflix Inc.*, 762 F. Supp. 3d 878, 884 (N.D. Cal. 2025) (cleaned up) (quoting *Phillips*, 415 F.3d at 1320), "the specification is 'the single best guide to the meaning of a disputed term,'" *Broadcom*, 2022 WL 1619151, at *2 (citation omitted); *see also Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1370 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification . . . ."). "The Court may also use extrinsic evidence (*e.g.*, dictionaries, treatises) to resolve the scope and meaning of a claim as circumstances warrant." *Broadcom*, 2022 WL 1619151, at *2.

**CLAIM CONSTRUCTION**

The parties request construction of terms in Claim 4 of the '839 patent and Claim 2 of the '180 patent. The text of the claims is useful to state in full.

2

Claim 4, '839 patent:

> A method of determining branch metric values for branches of a trellis for a Viterbi-like detector, comprising:
> selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions; and
> applying each of said selected functions to a plurality of signal samples to determine the metric value corresponding to the branch for which the applied branch metric function was selected, wherein each sample corresponds to a different sampling time instant.

Claims 1 and 2, '180 patent[1]:

> A method of determining branch metric values in a detector, comprising:
> receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith;
> selecting a branch metric function at a certain time index; and
> applying the selected function to the signal samples to determine the metric values.
>
> The method of claim 1, wherein the branch metric function is selected from a set of signal-dependent branch metric functions.

The parties agree the relevant person of ordinary skill in the art (POSITA) here is an individual who, as of 1998, held a Master's degree in electrical engineering and had at least two years of experience in the industry, and who specialized or had experience in data-detection techniques or technologies. Dkt. Nos. 144-4 (McLaughlin Decl.)[2] ¶¶ 57-58; 144-5 (Soljanin Rebuttal Decl.) ¶¶ 23-24; *see In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) ("The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art."). The ensuing constructions draw on this framing of the POSITA.

---

[1] The Court is construing a term that appears only in Claim 2, but Claim 1 is included for context.

[2] Dkt. No. 144-4 contains both an affirmative declaration and rebuttal declaration from Dr. Steven McLaughlin, which are separate documents. All citations to "McLaughlin Decl." and "McLaughlin Rebuttal Decl." are references to the respective documents in Dkt. No. 144-4.

3

**A.     "branch metric function" (Claim 2 of the '180 patent & Claim 4 of the '839 patent)**

| CMU's Proposed construction | LSI's Proposed Construction | Court's Construction |
|---|---|---|
| A function for determining a branch metric value for a branch, where the first set of the function comprises one or more signal samples and one or more target values, and the second set comprises branch metric values. | A mathematical relation that uniquely associates signal samples with branch metric values. | A mathematical function for determining a branch metric value for a branch, where a "function" is a mathematical relation that uniquely associates members of a first set with members of a second set. |

Although not binding, the Court "would be remiss to overlook another district court's construction of the same claim terms in the same patent." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008). In a prior litigation, *Carnegie Mellon University v. Marvell Technology Group, Ltd.* (*Marvell*), the District Court for the Western District of Pennsylvania conducted extensive claim construction proceedings related to the patents at issue involving multiple rounds of briefing and a court-appointed technical advisor.

In *Marvell*, the parties agreed, and the district court so construed, "branch metric function" to mean "a mathematical function for determining a 'branch metric value' for a 'branch.'" *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-cv-00290-NBF, 2011 WL 4527353, at *7 (W.D. Pa. Sept. 28, 2011). The district court construed "function" to mean "a mathematical relation that uniquely associates members of a first set with members of a second set," because that was the term's ordinary meaning "in the pertinent field" and the patent's full context revealed that "function" was being "used in its ordinary sense." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-cv-00290-NBF, 2012 WL 1203353, at *6 (W.D. Pa. Apr. 10, 2012) (citations omitted). Here, CMU and LSI again agree with those constructions. *See* Dkt. Nos. 148 at 6; 158

4

at 4; *see also* Dkt. No. 250 at 13:8-15, 21:22-24.  The Court adopts them based on the parties' agreement and for the reasons set forth in *Marvell*.

The parties disagree whether "function" means a one- or two-input function, *see* Dkt. Nos. 148 at 6-9; 158 at 4-8, but the question need not be answered at this juncture.  The issue of inputs versus parameters was addressed in *Marvell* solely in connection with the contention that the patents were invalid for lack of written description, *see* 35 U.S.C. § 112, because their specifications did not disclose a *set* of functions.  *See Marvell*, 2012 WL 1203353, at *8-9.  It was in that context that the district court characterized certain elements as parameters versus inputs, and even so, it spoke solely with respect to what Equation 13 in the specification did or did not disclose.  *See id.* at *9 ("[I]t follows that Equation 13 must represent a set of functions.").  The parties did not explain how that narrow question is relevant to what the claim language means.  It bears mention that, even after the summary judgment ruling, the district court neither changed its prior constructions nor instructed the jury with the additional language about which the parties presently fight.  *See* Dkt. No. 158-2 at ECF 19 (jury instruction about claim construction from *Marvell*); *see also* Dkt. No. 250 at 15:2-10.

B.   **"signal-dependent branch metric function" (Claim 2 of the '180 patent & Claim 4 of the '839 patent)**

| CMU's Proposed Construction | LSI's Proposed Construction | Court's Construction |
|---|---|---|
| A "branch metric function" that accounts for the signal-dependent structure of the media noise | A branch metric function that accounts for the noise attributable to the specific symbol sequence associated with one branch | A branch metric function that accounts for the signal-dependent nature of noise attributable to a specific symbol sequence |

The patents' specifications describe an invention that "[c]ombat[s] media noise and its signal dependence" by "tak[ing] into consideration the correlation between noise samples in the readback signal."  Dkt. No. 1-3 at 1:41-42, 57-58; *see also id.* at 2:15-28; Dkt. No. 1-4 at 1:38-58,

5

2:35-38. The parties agree that a POSITA would understand "signal-dependent branch metric functions" in the context of the patents to refer to branch metric functions which in some way account for the noise that is associated with, or dependent on, a particular signal. *See* Dkt. Nos. 148 at 9; 158 at 12-13.

The points of disagreement are discrete and relate to: (1) whether the signal-dependent noise for which the function accounts is limited to "media noise"; (2) whether the function is accounting for "noise" or "noise structure"; and (3) whether there must be different functions for each branch. The first two disputes are identical to the proper construction of "signal-dependent noise." Consequently, the Court resolves the disagreements for both disputed terms.

### 1.  MEDIA NOISE

As a matter of plain language, neither claim references media noise or magnetic recording in connection with signal-dependent branch metric functions or signal-dependent noise.[3] It also bears mention that Claims 11, 19, 23, and 24 of the '839 patent, *see* Dkt. No. 1-3 at 15:2-17, 15:51-67, 16:22-17:4, "demonstrate that the patentee knew how to use verbiage denoting" magnetic recording technology and related issues. *Broadcom*, 762 F. Supp. 3d at 885.

Extrinsic evidence establishes that a POSITA would understand there to exist other types of noise that are signal-dependent but are not "media noise," as the term is used in the specifications. LSI's expert, Dr. Emina Soljanin, stated that a POSITA would recognize that "[s]ignal-dependent noise arises in various applications such as . . . wireless communication systems where the transmitted signal can be distorted by nonlinearities in the transmission equipment that depend on the signal strength and bandwidth." Soljanin Decl. ¶ 92; *see also id.* ¶ 92 n.18 (citing U.S. Patent No. 6,151,370). Dr. Soljanin also stated that "an optical signal transmitted through fiber can have 'signal-dependent noise' because of its interactions with the optical medium." *Id.* ¶ 93. One of the inventors, Aleksander Kavcic, testified that signal-dependent noise in the context of his patent would include both "media noise" and "electronics

---

[3]  For present purposes, "media noise" denotes a phenomenon tied to magnetic recording technologies. *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-cv-00290-NBF, 2010 WL 3937157, at *17 (W.D. Pa. Oct. 1, 2020).

1   noise," but that "[s]ome people" would understand "that the conglomerate of the two noises is
2   media noise." Dkt. No. 157-14 at 53:13-25; *see also* Dkt. No. 157-8 at 43:13-45:22.

3   Despite good evidence that the disputed claim language is drawn broadly, CMU says that
4   "[t]he '839 Patent's specification repeatedly and exclusively references the signal-dependent
5   nature of *media* noise, making no mention of any signal-dependent noise that is not media noise."
6   Dkt. No. 148 at 9 (emphasis in original). CMU contends that a POSITA reading the claims would
7   understand media noise to be the claimed signal-dependent noise of which the claimed branch
8   metric functions are taking account. *See id.* at 9, 13-14.

9   It is true the '839 patent specification repeatedly connects the concepts of signal
10  dependence and media noise, specifically and exclusively, *see, e.g.*, Dkt. No. 1-3 at 1:39-43, 2:18-
11  20, 4:24-27, 10:18-21, 12:51-54, as does the '180 patent, though to a somewhat lesser extent, *see,*
12  *e.g.*, Dkt. No. 1-4 at 1:39-43, 4:39-42, 10:52-53. It also is true the specification is often "the
13  single best guide to the meaning of a disputed term." *Broadcom*, 2022 WL 1619151, at *2
14  (citation omitted). But "reading a limitation from the written description into the claims is one of
15  the cardinal sins of patent law." *Broadcom*, 762 F. Supp. 3d at 884 (quotations omitted) (quoting
16  *Phillips*, 415 F.3d at 1320); *see SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875
17  (Fed. Cir. 2004) ("Specifications teach. Claims claim." (citation omitted)). Other language in the
18  specifications and unasserted claim language, which will be discussed shortly, undermine the
19  notion that "signal-dependent noise" and "signal-dependent branch metric function" were defined
20  "by implication" to relate solely to media noise. *Trustees of Columbia Univ.*, 811 F.3d at 1364.

21  The '180 patent specification is instructive. To start, the background to the claimed
22  invention(s) is not limited to addressing the issues of correlated and signal-dependent noise in
23  magnetic recording, *see* Dkt. No. 1-4 at 1:20-67, as the '839 patent was, *see* Dkt. No. 1-3 at 1:20-
24  67. The '180 patent also discusses the "need" for detectors "designed for channels which have
25  correlated and/or signal-dependent noise." *Id.* at 2:19-23. When the specification begins to
26  describe those detectors, it makes clear "the teachings of the present invention, in which the
27  branch metric computations are performed assuming the channel has memory, i.e. the noise is
28  correlated and the noise statistical correlation is possibly signal dependent, can be applied to *any*

7

*device or algorithm in which branch metrics must be computed.*" *Id.* at 14:16-21 (emphasis added). It teaches that the detector in figure 15 "can work on a trellis, tree, finite-state machine, graph, or any other structure with branches for which the detector [ ] has a component that must compute branch metrics." *Id.* at 14:39-42. The specification describes a particular embodiment featuring "the BCJR algorithm", *see id.* at 14:48-15:22, before expressly stating that "[t]he generalization of the case described above for the BCJR algorithm can be made for any other soft output or hard output algorithm defined on a trellis or a graph of *any communications (or other dynamic) system*. *Id.* at 15:23-26 (emphasis added).

No mention is made of media noise or magnetic recording technology. The focus is on detector use in communication channels or systems, *see* Dkt. No. 1-4 at 14:9-47, and the specification twice emphasizes that the teachings may apply to "any" such system, *see id.* at 14:20-21, 15:25-26. Nothing suggests a necessary connection between media noise and communication channels, or that the relevant communication channels are limited to those involving magnetic recordings or media noise. The concept of media noise appears to completely fall out of the picture. CMU did not identify extrinsic evidence suggesting a POSITA would understand otherwise.

This is salient because Claim 8 of the '180 patent, which is related to those portions of the written description just described, claims a "method of detecting a sequence that exploits a correlation between adjacent signal samples for adaptively detecting a sequence of symbols through a communications channel having intersymbol interference" "wherein the channel has nonstationary *signal dependent noise*." *Id.* at 15:60-63, 16:12-13 (emphasis added). If CMU were right in saying that "signal-dependent noise" (and by extension "signal-dependent branch metric functions") in both patents relates solely to media noise, then Claim 8 must, by implication, only cover instances in which there was "media noise" in the channel. But that conclusion runs contrary to the specification's express contemplation of embodiments for "any communications (or other dynamic) system," *id.* at 15:25-26; *see also id.* at 14:16-47, and the Court does not see anything in the claim language or the relevant passages of the specification from which a POSITA

8

would conclude the claims is to be understood as so limited. CMU certainly did not proffer extrinsic evidence to that effect.

Consequently, use of the term "signal-dependent noise" in Claim 8 undermines CMU's position because its proposed construction could only be correct if "signal-dependent noise" means different things in different claims.[4] *See, e.g.*, *Phillips*, 415 F.3d at 1314 ("Other claims . . . can also be valuable sources of enlightenment as to the meaning of a claim term."). The Court "presume[s], unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003); *see also Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009). There are certainly circumstances in which that presumption is properly overcome, *see Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1374 (Fed. Cir. 2013), but CMU did not demonstrate they are present here. Notably, CMU's arguments and materials at the claim construction hearing never responded to LSI's identification of this point of incongruence about communication channels. *See* Dkt. No. 158 at 18:13-15; *see also* Dkt. No. 250 at 22:7-23:21, 46:24-47:4.

CMU's arguments to the contrary are unpersuasive. It urges the Court to follow *Marvell*, but the Court respectfully disagrees for the reasons stated. That decision focused almost exclusively on the '839 patent specification and did not address the aspects of the '180 patent discussed here. *See Marvell*, 2010 WL 3937157, at *17-20. CMU says LSI's construction should be disregarded because it would mean the patents "do not disclose *any* set of signal-dependent branch metric functions." Dkt. No. 148 at 10 (emphasis in original). The comment is undeveloped, and CMU did not explain how its cited deposition testimony is germane or supports that characterization.

---

[4] The adjective "nonstationary" in Claim 8 does not support concluding the terms in the two claims should have different meanings. The patents teach that "[t]he non-stationarity of the media noise results from its signal dependent nature." Dkt. Nos. 1-3 at 36-41; 1-4 at 1:39-41. In other words, the "nonstationary" quality is a product of signal dependence, and no intrinsic or extrinsic evidence suggests that the "nonstationary" quality is one peculiar to media noise that might distinguish it from other types of signal-dependent noise.

9

Two additional points bear mention. Although "signal-dependent branch metric function" and "signal-dependent noise" are different terms, with Claim 8 of the '180 patent only using the latter, CMU's evidence and arguments for both are identical. *Compare* Dkt. No. 148 at 9-10, *with id.* at 13-14; *see also Marvell*, 2010 WL 3937157, at *17-20 (construing both terms identically based on the same evidence and arguments), and there is no suggestion the two could or should be construed differently in this regard. CMU also made no argument the terms should be construed differently across the two patents and instead has proceeded as though they are coterminous.

### 2. NOISE STRUCTURE

Reading the patents as a whole, it is clear the claimed branch metric functions are accounting for the *way* in which the noise is dependent on a specific sequence of symbols. The branch metric functions are accounting for the signal-dependent nature of the noise. For that reason, too, "signal-dependent noise" refers to noise the nature of which is attributable to a specific sequence of symbols.

This is confirmed by the intrinsic evidence. The '839 patent specification repeatedly refers to "[t]he non-stationarity of the media noise results from its *signal dependent nature*." Dkt. No. 1-3 at 1:39-42 (emphasis added); *see also, e.g.*, *id.* at 1:41-51, 4:24-27. Several of its teachings make plain the connection between the asserted innovation and accounting for the way in which noise is signal dependent. *See, e.g.*, *id.* at 10:18-20 ("It is important to point out that, due to the signal-dependent character of the media noise, there will be a different covariance matrix to track for each branch."). The '180 patent specification is in accord. *See, e.g.*, Dkt. No. 1-4 at 4:39-42 ("Due to the signal dependent nature of media noise in magnetic recording, the functional form of joint conditional pdf [equation omitted] in (1) is different for different symbol sequences [equation omitted]."). Both patents' specifications also teach that the symbol sequences relevantly comprise the signal. *See, e.g.*, Dkt. No. 1-4 at 3:21-39. Consequently, a POSITA reading the claims in light of the written descriptions would readily understand "signal-dependent branch metric functions" to refer to functions that account for the signal-dependent nature of noise and that "signal-dependent noise" is noise the nature of which is signal dependent.

10

1    CMU's proposed construction is nearly identical in this regard but proposes the term
2    "structure" in lieu of "nature." Dkt. No. 244 at 3, 6. "Structure" is only used once in the '839
3    patent, *see* Dkt. No. 1-3 at 2:17-20, and not at all in the '180 patent. Its usage in the '839 patent is
4    cursory and undefined, and CMU did not establish with extrinsic evidence that "noise structure"
5    has an accepted meaning in the field that a POSITA would recognize. Consequently, there is no
6    reason to substitute "structure" in construing the terms when the specifications themselves
7    repeatedly refer to the noise's signal-dependent nature. *See, e.g.*, Dkt. Nos. 1-3 at 4:24-27, 12:51-
8    54; 1-4 at 1:39-41. LSI's proposed construction would refer simply to "noise," but its arguments
9    demonstrate that it understands the term as the Court presently construes it. *See* Dkt. No. 158 at
10   19 ("[C]onsistent with the claim language, the specification also describes the noise itself as
11   signal-dependent.").

### 3. ASSOCIATED WITH EACH BRANCH

The parties disagree about the construction of "signal-dependent branch metric functions," specifically about whether there must be a different function for each branch tailored to that branch's noise statistics. Claim 4 of the '839 patent requires only that *a* signal-dependent branch metric function be selected for each branch. *See* Dkt. No. 1-3 at 14:10-14. As a matter of plain reading, the language of the claim does not necessarily require the limitation that the signal-dependent function be unique or tailored to the branch for which it is selected. Unasserted claims suggest the omission of language to that effect was intentional. Claim 6 relates to "[a] method of generating a signal-dependent branch weight for branches of a trellis for a Viterbi-like detector," which includes "calculating a second value representing a *branch dependent* joint probability density function of said signal samples." Dkt. No. 1-3 at 14:24-32 (emphasis added). The patentee thus knew how to say that a function was tailored to a particular branch if it wanted to. *See Broadcom*, 762 F. Supp. 3d at 885.

In support of a narrower construction, LSI reads the specification to denote a 1:1 relationship between branch and branch metric function. *See* Dkt. No. 158 at 12-13; *see also* Dkt. No. 1-3 at 2:15-19, 5:53-55, 7:12-13. LSI also points to submissions from CMU during reexamination proceedings before the PTO in which it explained that the term "must be construed

11

1    in a way that solves the problem the inventors addressed with their invention as discerned from the
2    specification. That includes using different branch metric functions for each specific symbol
3    sequence (e.g., trellis branch)." Dkt. No. 144-19 at ECF 54.

4        "[T]here is sometimes 'a fine line between reading a claim in light of the specification, and
5    reading a limitation into the claim from the specification.'" *Bell Atl. Network Servs., Inc. v. Covad*
6    *Comms. Grp., Inc.*, 262 F.3d 1258, 1270 (Fed. Cir. 2001) (quoting *Comark Comms., Inc. v. Harris*
7    *Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)). The intrinsic evidence to which LSI points does not
8    suffice to show disclaimer, *see Omega Eng'g*, 334 F.3d at 1323-24, and the Court cannot conclude
9    at this juncture that a POSITA would understand the claim to be limited to requiring a different
10   branch metric function for each branch, rather than covering such embodiments and others.

11       To start, the reexamination proceeding is ambiguous because the relevant language gave
12   "trellis branch" as an example of "each specific symbol sequence." Dkt. No. 144-19 at ECF 54.
13   That did not unmistakably create an equivalence between the two or suggest the given example
14   was exhaustive. *See Omega Eng'g, Inc.*, 334 F.3d at 1324 (limiting claim scope inappropriate
15   where "alleged disavowal of claim scope is ambiguous"). The same ambiguity persisted with
16   respect to the specification. Beside those instances to which LSI points in which the written
17   descriptions posits a 1:1 relationship between branch and branch metric function, there are
18   passages where the specification explains that the functions differ "for different symbol
19   sequences." Dkt. No. 1-3 at 4:24-27; *see also id.* at 11:1-9 ("The matrix [equation omitted]
20   becomes our estimate for the covariance matrix corresponding to this particular symbol sequence
21   (trellis path)."); McLaughlin Decl. ¶ 28 (explaining that a "path is made up of a series of branches
22   end-to-end"). The specification consequently contemplates functions that account for symbol
23   sequences longer than a trellis branch. LSI's expert, Dr. Soljanin, takes the written description's
24   discussion of figures 4 and 5 to demonstrate that the claim is limited by implication, *see* Soljanin
25   Decl. ¶¶ 165-67, but that passage is best read as providing an example of how the invention would
26   work under certain assumptions, *see* Dkt. No. 1-3 at 10:26-52. That a specification extensively
27   discusses one embodiment, or one set of embodiments, does not mean the claims are limited to
28   that embodiment. *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).

United States District Court
Northern District of California

12

1    It appears that CMU, in briefs filed with the Federal Circuit in the *Marvell* litigation, made statements about the inventions that arguably are different from the claim constructions it proposes here. Namely, CMU contended that "[e]ach function in the set accounts for the noise-correlation structure attributable to the specific symbol sequence associated with one branch." Dkt. No. 158-12 at ECF 31-32. Extrinsic evidence refers to "evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," *Phillips*, 415 F.3d at 1317 (citation omitted), and LSI did not cite any authority to suggest that attorney argument in a brief constitutes such evidence. Even so, the Court will not close the door to revisiting claim construction on this point as circumstances warrant.

C.   **"a set [of signal-dependent branch metric functions]" (Claim 2 of the '180 patent & Claim 4 of the '839 patent)**

| CMU's Proposed Construction | LSI's Proposed Construction | Court's Construction |
|---|---|---|
| Two of more "signal-dependent branch metric functions" | No construction necessary; in the alternative, plain and ordinary meaning. | Plain and ordinary meaning. |

Claim terms are generally given the "ordinary and customary meaning" a POSITA would ascribe to them. *Broadcom*, 2022 WL 1619151, at *1 (citation omitted). Nothing in the claims or specifications suggests that a POSITA would understand "a set" to mean anything other than the term's customary meaning in ordinary English. No further construction is required.

//
//
//
//
//
//

United States District Court
Northern District of California

1  D.   "signal-dependent noise" (Claim 2 of the '180 patent)

| CMU's Proposed Construction | LSI's Proposed Construction | Court's Construction |
|---|---|---|
| Media noise in the readback signal whose noise structure is attributable to a specific sequence of symbols (e.g., written symbols) | Noise in a received signal attributed to the specific sequence of symbols | Noise the nature of which is attributable to a specific sequence of symbols |

The Court's construction of "signal-dependent branch metric function" applies with equal force to this disputed term, and no further construction is required.

E.   "correlated noise" (Claim 2 of the '180 patent)

| CMU's Proposed Construction | LSI's Proposed Construction | Court's Construction |
|---|---|---|
| Noise with "correlation" among "signal samples," such as that caused by coloring by front-end equalizers, media noise, media nonlinearities, and magnetoresistive (MR) head nonlinearities. The noise in signal samples is "correlated" when the noise in the signal samples has a tendency to vary together. | Noise among signal samples that tends to vary together. | Noise among signal samples that tends to vary together. |

There is not much daylight between the proposed constructions. CMU accepts that "LSI's own proposed construction tracks the portion of CMU's construction that relies on the standard

14

definition of 'correlated.'" Dkt. No. 148 at 15.  CMU does not explain why "non-exclusive examples" of correlated noise sources are needed to understand the term.  *Id.*  The additional language reads more like what a POSITA might *associate* with the term, but not what a POSITA would think the term itself means.  Neither party suggested there is a material difference between their preferred prepositions "among" versus "in."

**IT IS SO ORDERED.**

Dated: August 12, 2025

JAMES DONATO
United States District Judge

United States District Court
Northern District of California