1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARNEGIE MELLON UNIVERSITY,

Plaintiff,

v.

LSI CORPORATION, et al.,

Defendants.

Case No.  18-cv-04571-JD

**ORDER RE JUDGMENT ON THE PLEADINGS**

Carnegie Mellon University (CMU) sued LSI Corporation and Avago Technologies U.S. Inc. (collectively, LSI) alleging infringement of two CMU patents related to hard-disk drives.  *See* Dkt. No. 1 ¶ 2.  Among other defenses, LSI contends that the asserted claims are invalid under 35 U.S.C. Section 101 for claiming patent-ineligible subject matter and asks for dismissal under Federal Rule of Civil Procedure 12(c).  *See* Dkt. No. 105.  Because the claims are not directed to a patent-ineligible concept at *Alice* step one, LSI's motion for judgment on the pleadings is denied. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

**BACKGROUND**

The parties' familiarity with the record is assumed.  In pertinent summary, CMU owns United States Patent No. 6,201,839 (the '839 patent, Dkt. No. 1-3) and related No. 6,438,180 (the '180 patent, Dkt. No. 1-4) (collectively, the Patents-in-Suit).  CMU asserts two claims against LSI, one from each of the Patents-in-Suit.

Asserted claim 4 of the '839 patent recites:

4.    A method of determining branch metric values for branches of a trellis for a Viterbi-like detector, comprising:

United States District Court
Northern District of California

selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions; and

applying each of said selected functions to a plurality of signal samples to determine the metric value corresponding to the branch for which the applied branch metric function was selected, wherein each sample corresponds to a different sampling time instant.

'839 patent at 14:10-19.

Asserted claim 2 of the '180 patent is a dependent claim. Coupled with its independent claim, it recites:

1. A method of determining branch metric values in a detector, comprising:

receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith;

selecting a branch metric function at a certain time index; and

applying the selected function to the signal samples to determine the metric values.

2. The method of claim 1, wherein the branch metric function is selected from a set of signal-dependent branch metric functions.

'180 patent at 15:39-51.

The asserted claims were the subject of other litigation between CMU and Marvell Technology Group, Ltd. *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1288 (Fed. Cir. 2015). The Federal Circuit described the claims as "an improvement over existing detectors by teaching use of branch metric functions that are specifically adapted to reduce the effects of the most likely errors caused by the ever smaller magnetic regions used for storing data on hard disks. Specifically, the patents teach that (1) different functions may be used for different branches, depending in particular on the measured signal samples, and (2) each branch metric function can take as its input a plurality of adjacent signal samples, rather than a single sample. The former addresses signal-dependent noise, the latter correlated noise." *Id.* at 1291. The Federal Circuit has also described the asserted claims as "unconventional method[s] . . . for

improving a physical process by overcoming limitations in physical devices -- discerning more accurately what is on a physical recording medium from what a read head has sensed." *Id.* at 1297 n.3.

## DISCUSSION

### I.    LEGAL STANDARDS

As Rule 12(c) states, "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Rule 12(c) and Rule 12(b)(6) motions are functionally identical, and so the standards for a Rule 12(b)(6) motion apply to a Rule 12(c) motion. *Gregg v. Hawaii*, 870 F.3d 883, 887 (9th Cir. 2017). The Court takes as true the plausible and nonconclusory factual allegations in the complaint, and draws all reasonable inferences from those allegations in plaintiffs' favor. *See Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1068 (9th Cir. 2020). A Rule 12(c) motion may be granted when there is no issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir. 2009). Rule 12(b)(6) and Rule 12(c) motions generally are confined to the four corners of the complaint, and any materials it incorporates. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

"Challenges to patentability under Section 101 may be brought solely on the pleadings, including on a Rule 12(c) motion for judgment on the pleadings." *Open Text S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1045 (N.D. Cal. 2015). The question of eligibility may be determined on a Rule 12(c) motion "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (citing *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016)). The inquiry in a motion to dismiss is confined to the contents of the complaint and the plain words of the patent that is incorporated by reference. *See Broadcom Corp. v. Netflix Inc.*, 677 F. Supp. 3d 1010, 1018 (N.D. Cal. 2023); *Linquet Techs., Inc. v. Tile, Inc.*, 559 F. Supp. 3d 1101, 1106 (N.D. Cal. 2021). A patentee cannot avoid dismissal for ineligible claims based solely on conclusory statements or unfounded allegations later proved to be unsupported. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019).

United States District Court
Northern District of California

3

1    This litigation has been pending for some time, including through a stay, and the parties

2    have briefed and supplemented their briefing on the patent eligibility issue.  *See* Dkt. Nos. 105,

3    113, 117, 190, 191, 237, 238, 315.  Among other orders, the Court has resolved the parties' claim

4    construction disputes and construed the claims.  Dkt. No. 353.  Neither party asked to convert this

5    motion to one for summary judgment, and the Court sees no need to consider facts outside the

6    pleadings to resolve the patent eligibility question it faces here.  Consequently, this Section 101

7    inquiry may properly be resolved on the pleadings at this stage of the case.

8         "The scope of patentable subject matter includes 'any new and useful process, machine,

9    manufacture, or composition of matter, or any new and useful improvement thereof.'"  *Broadcom*

10   *Corp. v. Netflix Inc.* (*Broadcom II*), 598 F. Supp. 3d 800, 805 (N.D. Cal. 2022) (quoting 35 U.S.C.

11   § 101).  The Supreme Court of the United States has concluded that there are certain implied

12   exceptions to Section 101 for "laws of nature, natural phenomena, and abstract ideas," the last of

13   which "embodies the longstanding rule that an idea of itself is not patentable."  *Alice*, 573 U.S. at

14   216, 218 (cleaned up).  "These exclusions are intended to guard against undue preemption of

15   innovation and invention."  *Broadcom II*, 598 F. Supp. 3d at 805.

16        To determine whether the challenged patents claim the "building blocks of human

17   ingenuity" or, instead, "integrate the building blocks into something more," courts apply *Alice*'s

18   well-trodden two-step test.  *Alice*, 573 U.S. at 216-17.  At step one, the Court determines "whether

19   the claims at issue are directed to a patent-ineligible concept," such as an abstract idea.  *Id.* at 218.

20   "It is often 'sufficient to compare claims at issue to those claims already found to be directed to an

21   abstract idea in previous cases.'"  *Broadcom II*, 598 F. Supp. 3d at 806 (quoting *Enfish, LLC v.*

22   *Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016)).  The analysis entails ascertaining the

23   "basic character" of the claimed subject matter, *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th

24   1355, 1361 (Fed. Cir. 2023) (citations omitted), and for that, the Court "must avoid describing the

25   claims at a high level of abstraction, divorced from the claim language itself," *Contour IP Holding*

26   *LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379 (Fed. Cir. 2024).  "For the technology at stake here, the

27   relevant inquiry is 'whether the claims are directed to an improvement to computer functionality

28

United States District Court
Northern District of California

United States District Court
Northern District of California

versus being directed to an abstract idea.'" *Broadcom II*, 598 F. Supp. 3d at 806 (quoting *Enfish*, 822 F.3d at 1335).

If the claim is directed to an abstract concept, the Court proceeds to step two and looks for an "inventive concept." *Alice*, 573 U.S. at 217 (quotation omitted). Step two basically asks, "What else is there in the claims[?]" *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78 (2012). The Court must "consider the elements of [the] claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Trinity Info Media*, 72 F.4th at 1365 (alteration in original) (quoting *Alice*, 573 U.S. at 217). Merely tacking on claim language relating to "well-understood, routine, conventional" activities and components "previously known to the industry" does not suffice to imbue an otherwise ineligible claim with a patent-eligible "innovative concept." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 773 (Fed. Cir. 2019) (quoting *Alice*, 573 U.S. at 221). "[W]hether a claim element or combination of elements is well-understood, routine and conventional to a [person having ordinary skill in the art (POSITA)] is a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

## II.   CLAIM 4 OF THE '839 PATENT IS DIRECTED TOWARDS A PATENT-ELIGIBLE CONCEPT AT *ALICE* STEP ONE

LSI says that asserted claim 4 of the '839 patent is directed towards an abstract idea, namely a "purely mathematical method" of determining branch metric values. Dkt. No. 238 at 1. The plain language of the '839 patent establishes otherwise. It does not claim a general mathematical formula for determining branch metric values, which would raise preemption concerns under *Alice*. Rather, it claims "a specific means or method that improves" sequence detection of stored bits in memory channels, which improves the performance of hard disk drives. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). As the Federal Circuit has noted, the '839 patent achieves this advance through two specific teachings, "(1) different functions may be used for different branches, depending in particular on the

1   measured signal samples, and (2) each branch metric function can take as its input a plurality of

2   adjacent signal samples, rather than a single sample." *Marvell,* 807 F.3d at 1291.

3       These teachings are reflected in the plain language of the claims. Relating to (1) above,

4   claim 4 of the '839 patent recites "selecting a branch metric function *for each of the branches* at a

5   certain time index," and for (2), "*applying each of said selected functions to a plurality of signal*

6   *samples*." '839 patent at claim 4 (emphasis added).

7       Standing alone, these teachings are sufficient to establish that the '839 patent embodies "a

8   specific technique that departs from earlier approaches to solve a specific [technological]

9   problem," which makes it non-abstract at *Alice* step one. *Ancora Techs., Inc. v. HTC Am., Inc.,*

10  908 F.3d 1343, 1348 (Fed. Cir. 2018).

### A.    The '839 Patent Claim 4 Is a Specific Technological Improvement

12      Since the publication of *Alice,* the Federal Circuit has held in a long line of precedential

13  decisions that a specific technological improvement is patent-eligible under Section 101. *See*

14  *Enfish,* 822 F.3d at 1335 (holding that the relevant question at *Alice* step one was "whether the

15  claims are directed to an improvement to computer functionality versus being directed to an

16  abstract idea"); *McRO,* 837 F.3d at 1316 (claims passed *Alice* step one because they were a

17  "patentable, technological improvement"); *Visual Memory LLC v. NVIDIA Corp.,* 867 F.3d 1253,

18  1255 (Fed. Cir. 2017) (claims directed to "an improvement to computer memory systems" were

19  patent-eligible); *Koninklijke KPN N.V. v. Gemalto M2M GmbH,* 942 F.3d 1143, 1150 (Fed. Cir.

20  2019) ("To be patent-eligible, the claims must recite a specific means or method that solves a

21  problem in an existing technological process."); *CardioNet, LLC v. InfoBionic, Inc,* 955 F.3d

22  1358, 1368 (Fed. Cir. 2020) (claims directed to "improved cardiac monitoring device" were

23  eligible); *Adasa Inc. v. Avery Dennison Corp.,* 55 F.4th 900, 908 (Fed. Cir. 2022) ("If the focus of

24  the claim is a specific and concrete technological advance, for example an improvement to a

25  technological process or in the underlying operation of a machine, our inquiry ends and the claim

26  is eligible."); *Contour IP,* 113 F.4th at 1379 (claim directed to "a specific means that improves the

27  relevant technology" patent-eligible).

28

United States District Court
Northern District of California

1        Claim 4 of the '839 patent fits squarely within this line of cases.  The inventions of the

2   '839 patent "are particularly suited for the magnetic data-storage media of hard-disk drives in

3   computers."  *Marvell*, 807 F.3d at 1289.  They relate to the problem of reading the bits stored on a

4   data-storage medium, especially as the magnetic regions encoding those bits shrink to smaller and

5   smaller sizes.  *Id.*  The written description describes two specific problems found in the art: signal-

6   dependent noise and correlated noise.  *See* '839 patent at 1:38-2:8.  As the Federal Circuit has

7   described, signal-dependent noise is noise that may vary depending on the actual signal encoded.

8   *Marvell*, 807 F.3d at 1289.  Intuitively, in the abstract, a signal with higher absolute amplitude

9   may carry higher absolute noise, so the noise is dependent on the signal itself.  Correlated noise

10  reflects that "nearby . . . regions and boundaries tend to have related amounts of measurement

11  error."  *Id.*

12       The claimed invention is "correlation-sensitive," and teaches specific techniques to address

13  signal-dependent and correlated noise.  '839 patent at 2:9-28.  Specifically, the '839 patent teaches

14  that "different functions may be used for different branches, depending in particular on the

15  measured signal samples," addressing signal-dependent noise, and "each branch metric function

16  can take as its input a plurality of adjacent signal samples, rather than a single sample," addressing

17  correlated noise.  *Marvell*, 807 F.3d at 1289.  The teachings are reflected both in the written

18  description, *see* '839 patent at 3:51-13:37, and in the claims themselves.  *See* '839 patent at claim

19  4 ("selecting a branch metric function *for each of the branches* at a certain time index," "*applying

20  each of said selected functions to a plurality of signal samples*.") (emphasis added).  These

21  improvements are the epitome of "a specific and concrete technological advance," patent-eligible

22  under Section 101.  *Adasa*, 55 F.4th at 908.

23       LSI says that the CMU patents do not claim a specific improvement in the technology, and

24  likens them to cases where patent claims had a "purely functional nature."  Dkt. No. 238 at 4.  But

25  here, in distinction to the cases LSI mentions, the '839 patent expressly describes two specific

26  techniques for improving the performance of sequence detectors.  *See* '839 patent at claim 4, 1:38-

27  2:28; *Marvell,* 807 F.3d at 1291.  LSI's cited cases actually confirm the patentability of such an

28  improvement.  *See Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x. 529, 533 (Fed. Cir.

United States District Court
Northern District of California

7

1    2020) (invalidated claims lacked "a specific technique for improving a computer"); *Realtime Data*

2    *LLC v. Array Networks Inc.*, No. 2021-2251, 2023 WL 4924814, at *8 (Fed. Cir. Aug. 2, 2023)

3    (invalidated claims failed to "specif[y] any particular technique").

4         The '839 patent reflects a specific improvement to the sequence detection of stored bits

5    through the implementation of specific techniques to account for signal-dependent and correlated

6    noise.  Consequently, claim 4 of the '839 patent is directed to a patent-eligible concept.

7         **B.    LSI Has Not Shown Otherwise**

8         LSI's other arguments do not change this conclusion.  Its suggestion that the '839 patent is

9    directed to a nonpatentable mathematical formula is not persuasive.  *See* Dkt. No. 238 at 1-3.  The

10   Supreme Court has long endorsed patenting inventions that use algorithms to improve a

11   technological process.  *See Alice*, 573 U.S. at 223 (discussing *Diamond v. Diehr*, 450 U.S. 175

12   (1981)).  For example, in *Diamond v. Diehr,* the Supreme Court held that "Arrhenius' equation is

13   not patentable in isolation, but when a process for curing rubber is devised which incorporates in it

14   a more efficient solution of the equation, that process is at the very least not barred at the threshold

15   by § 101."  *Diehr,* 450 U.S. at 188.  So too here.  Change the Arrhenius' equation to Viterbi's

16   method, and curing rubber to deciphering the value of bits, and the conclusion is the same.  Since

17   the '839 patent is directed to incorporating mathematical principles in "a more efficient solution"

18   of the Viterbi method for reading bits accurately, it represents a patent-eligible improvement that

19   is more than just a mathematical process.

20        The Federal Circuit recognized this principle in *Thales Visionix Inc. v. United States*, 850

21   F.3d 1343 (Fed. Cir. 2017).  Reversing a judgment on the pleadings that invalidated a patent for an

22   inertial tracking system, the court held that just because "a mathematical equation is required to

23   complete the claimed method and system does not doom the claims to abstraction."  *Thales*, 850

24   F.3d at 1349.  Instead, because the *Thales* patent contemplated "a particular configuration" of

25   sensors and "a particular method of using" the data from the sensors to "more accurately

26   calculate" position and orientation through a mathematical equation, it survived *Alice* at step one.

27   Similarly here, the '839 patent contemplates a particular implementation of the Viterbi method and

28

United States District Court
Northern District of California

a particular method of using gathered signal data to more accurately detect a sequence of microscopic bits, a similarly non-abstract idea. *See* '839 patent at 13:38-45, claim 4.

LSI's other arguments are of no moment. LSI says that the Federal Circuit has confined the inquiry to the specific claims at issue, without considering the patent's specification. Dkt. No. 238 at 3. LSI overreaches in its characterization of the law. As the Federal Circuit stated in *US Pat. No. 7,679,637 LLC v. Google LLC*, which was published after the briefing of this motion was complete, "while the § 101 inquiry must focus on the language of the asserted claims themselves, the claim itself need not explicitly recite the improvement." No. 2024-1520, --- F.4th ----, 2026 WL 174922, at *3 (Fed. Cir. Jan. 22, 2026) (quotations omitted) (citing *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019)). The caselaw permits "a variety of analytical approaches," including "looking to the written description to understand the problem facing the inventor and what the patent describes as the invention" and "analyzing whether the claims and written description describe how the improvement was accomplished." *Id.* (quotations omitted) (citing *Visual Memory LLC*, 867 F.3d at 1258; *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1213 (Fed. Cir. 2025), *cert. denied*, No. 25-505, 2025 WL 3507020 (U.S. Dec. 8, 2025)). Consequently, the Court may look to the claims and the written description under step one of the Section 101 inquiry. It bears mention that all of this is somewhat beside the point because claim 4 of the '839 patent recites two specific ways to improve the read detection process covered by the patent, and so LSI's musings cannot carry the day for it. *See supra* at Section II.

III.    **CLAIM 2 OF THE '180 PATENT IS DIRECTED TOWARDS A PATENT-ELIGIBLE CONCEPT AT *ALICE* STEP ONE**

LSI agrees that claim 4 of the '893 patent is representative of its arguments for each of the asserted claims for purposes of the Section 101 analysis. Dkt. No. 105 at 3; Dkt. No. 117 at 5; Dkt. No. 238 at 2. CMU makes additional arguments supporting the patent-eligibility of claim 2 of the '180 patent, but since claim 4 of the '839 patent is patent-eligible, the Court need not discuss the additional arguments. Dkt. No. 117 at 7. Claim 2 of the '180 patent is patent-eligible under Section 101 for the same reasons claim 4 of the '839 patent is.

**CONCLUSION**

Since "it is clear for the reasons stated that the claims are not directed to an abstract idea," the Court need not proceed to *Alice* step two. *Enfish*, 822 F.3d at 1339; *Ancora*, 908 F.3d at 1349. The motion for judgment on the pleadings is denied.

**IT IS SO ORDERED.**

Dated: February 3, 2026

_____
JAMES DONATO
United States District Judge